Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS FOR QUALITY EDUCATION SAN DIEGO, an unincorporated nonprofit association; SAN DIEGO ASIAN AMERICANS FOR EQUALITY FOUNDATION, a nonprofit public-benefit corporation; SCOTT HASSON, individually and as next friend on behalf of his minor child, C.H; CHAOYIN HE, individually and as next friend on behalf of her minor child, B.H; XUEXUN HU, individually and as next friend on behalf of his minor child, R.H; KEVIN STEEL and MELISSA STEEL, individually and as next friends on behalf of their minor child, K.S; and JOSE VELAZQUEZ, individually and as next friend on behalf of his minor child, J.V., <br><br> Plaintiffs, <br> vs. <br><br> SAN DIEGO UNIFIED SCHOOL DISTRICT; RICHARD BARRERA, in his official capacity as Board President; KEVIN BEISER, in his official capacity as Board Vice President; JOHN LEE EVANS, in his official capacity as Board member; MICHAEL MCQUARY, in his official capacity as Board member; SHARON WHITEHURST-PAYNE, in her official capacity as Board member; and CYNTHIA MARTEN, in her official capacity as Superintendent, <br><br> Defendants. | Case No. <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND NOMINAL DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through their undersigned counsel, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      "In no activity of the State is it more vital to keep out divisive forces than in its schools." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).  Since July 26, 2016, Defendants have engaged with the Council on American-Islamic Relations ("CAIR"), an Islamic advocacy organization, to enact, implement, and enforce an "integrated and holistic" anti-Islamophobia initiative across the San Diego Unified School District ("School District"), purportedly to combat the bullying of, and discrimination against, Muslim students and their families.

2.      Under the guise of this anti-bullying program, Defendants have entangled themselves with the aforementioned religious organization to set up a subtle, discriminatory scheme that establishes Muslim students as the privileged religious group within the school community.  Consequently, students of other faiths are left on the outside looking in, vulnerable to religiously motivated bullying, while Muslim students enjoy an exclusive right to the School District's benevolent protection.

3.      The United States Supreme Court has held that government must be neutral toward religion; and it may not aid, foster, nor promote one religion or religious belief over other religions or religious beliefs.  *See Lemon v. Kurtzman*, 403 U.S. 602 (1971); *see also Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000).

4.      Plaintiffs seek a declaration that Defendants violated their constitutional and statutory rights; preliminary and permanent injunctions enjoining the implementation and enforcement of Defendants' unconstitutional policies, practices, and procedures; and a judgment awarding nominal damages against all Defendants. Plaintiffs also seek an award of their reasonable costs of litigation, including attorneys' fees and expenses under 42 U.S.C. §§ 1988, Cal. Civ. Code § 52, Cal. C.C.P. § 1021.5, and other applicable law.

## JURISDICTION AND VENUE

5.      This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, the California Constitution, the Unruh Civil Rights Act, the California Government Code, and the California Education Code. Jurisdiction is conferred on this Court under 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

6.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.  Plaintiffs' claim for nominal damages is made under 42 U.S.C. § 1983 and other applicable law.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this district.

## PLAINTIFFS

8.      Plaintiff Citizens for Quality Education San Diego ("CQE-SD") is an unincorporated nonprofit association located in San Diego County, California. Members of CQE-SD include parents residing within the School District and other taxpaying members of the community.  CQE-SD's mission is to revitalize and strengthen public education so that San Diego students are afforded a quality education that prepares them to participate in the social, economic, and political activity of our society. One or more members of CQE-SD have been injured as a direct result of Defendants' policies, practices, and procedures, and therefore would have standing to sue in their own right.  CQE-SD can bring this action on behalf of its members because the interests at stake are germane to its educational purpose.  Further, CQE-SD's claims are limited to injunctive and declaratory relief, which do not require the participation of individual members in this action.  CQE-SD has the capacity to sue and be sued.

9.      San Diego Asian Americans for Equality Foundation ("SDAAFE") is a nonprofit public-benefit corporation located in San Diego County, California. SDAAFE's mission is to advocate for full equality for San Diego Asian Americans by

promoting Asian American values and mobilizing the Asian American community on issues of concern, including discrimination in educational institutions. One or more members of SDAAFE have been injured as a direct result of Defendants' policies, practices, and procedures, and therefore would have standing to sue in their own right. SDAAFE can bring this action on behalf of its members because the interests at stake are germane to its purpose of advancing and promoting equality. Further, SDAAFE's claims are limited to injunctive and declaratory relief, which do not require the participation of individual members in this action. SDAAFE has the capacity to sue and be sued.

10.     Plaintiff Scott Hasson is the parent and legal guardian of Plaintiff C.H., a minor, who at all relevant times was a first-grade student at an elementary school in the San Diego Unified School District, San Diego County, California. Plaintiff Scott Hasson is suing on his own behalf and on behalf of C.H. as his next friend. At all relevant times, Plaintiff Scott Hasson resided within the San Diego Unified School District.

11.     Plaintiff Chaoyin He is the parent and legal guardian of Plaintiff B.H., a minor, who at all relevant times was a fourth-grade student at an elementary school in the San Diego Unified School District, San Diego County, California. Plaintiff Chaoyin He is suing on her own behalf and on behalf of B.H. as his next friend. At all relevant times, Plaintiff Chaoyin He resided within the San Diego Unified School District.

12.     Plaintiff Xuexun Hu is the parent and legal guardian of Plaintiff R.H., a minor, who at all relevant times was a fourth-grade student at an elementary school in the San Diego Unified School District, San Diego County, California. Plaintiff Xuexun Hu is suing on his own behalf and on behalf of R.H. as his next friend. At all relevant times, Plaintiff Xuexun Hu resided within the San Diego Unified School District.

13.     Plaintiffs Kevin and Melissa Steel are the parents and legal guardians of Plaintiff K.S., a minor, who at all relevant times was a seventh-grade student at a middle school in the San Diego County Unified School District, San Diego County, California.

Plaintiff Kevin Steel is suing on his own behalf and on behalf of K.S. as his next friend. Plaintiff Melissa Steel is suing on her own behalf and on behalf of K.S. as his next friend. At all relevant times, Plaintiffs Kevin and Melissa Steel resided within the San Diego Unified School District.

14.     Plaintiff Jose Velazquez is the parent and legal guardian of Plaintiff  J.V., a minor, who at all relevant times was a ninth-grade student at a high school in the San Diego Unified School District, San Diego County, California.  Plaintiff Jose Velazquez is suing on his own behalf and on behalf of J.V. as his next friend.  At all relevant times, Plaintiff Jose Velazquez resided within the San Diego Unified School District.  Further, Plaintiff Jose Velazquez is a veteran of the United States Navy, during which time he served several tours of duty in the War on Terror against Islamic extremists, including fighting in Operation Enduring Freedom and Operation Iraqi Freedom.

## DEFENDANTS

15.     Defendant San Diego Unified School District ("School District") is a public entity established and organized under California law and subject to the restrictions of both the United States and California Constitutions.  The School District may sue and be sued in its own name.

16.     Defendant Richard Barrera, at all relevant times, was President of the Board of Education for the School District acting under color of state law.  The Board of Education ("Board") is the School District's governing body and is responsible for creating, adopting, and implementing its policies, practices, customs, acts, and omissions, including the challenged policies, practices, and procedures set forth in this Complaint.  Defendant Barrera is sued in his official capacity.

17.     Defendant Kevin Beiser, at all relevant times, was Board Vice President for the School District acting under color of state law.  Defendant Beiser is sued in his official capacity.

18.     Defendant John Lee Evans, at all relevant times, was a Board member for the School District acting under color of state law.  Defendant Evans is sued in his

official capacity.

19.    Defendant Michael McQuary, at all relevant times, was a Board member for the School District acting under color of state law.  Defendant McQuary is sued in his official capacity.

20.    Defendant Sharon Whitehurst-Payne, at all relevant times, was a Board member for the School District acting under color of state law.  Defendant Whitehurst-Payne is sued in her official capacity.

21.    Defendant Cindy Marten, at all relevant times, was the Superintendent of the School District.  Defendant Marten is responsible for creating, adopting, and implementing School District policies, practices, customs, and acts, including the challenged policies, practices, and procedures set forth in this Complaint.  Defendant Marten is sued in her official capacity.

## STATEMENT OF FACTS

### I.    **Bullying & Discrimination.**

22.    Pursuant to California law and School District policy, School District officials, including teachers and administrators, are required to report all incidents of bullying and harassment of students from kindergarten to twelfth grade (K-12), including incidents of religiously motivated bullying.

23.    As part of its anti-bullying and harassment policies, practices, and procedures, the School District has adopted and applied two definitions of "bullying": one from the United States Department of Health and Human Services ("HHS") and the other from Section 48900 of the California Education Code.

24.    HHS defines "bullying" as follows: "Aggressive behavior that is intentional and that involves an imbalance of power or strength.  Typically, it is repeated over time."

25.    Section 48900 of the California Education Code defines "bullying," in relevant part, as follows: "[A]ny severe or pervasive physical or verbal act or conduct, including communications made in writing or by means of an electronic act. . . ."

26.    According to a School District "Protected Class Report," from July 1, 2016,

to December 31, 2016, there were seven reported incidents of bullying and harassment of K-12 students on the basis of religion.

27.     According to the School District's active enrollment report as of May 19, 2017, there are 125,300 K-12 students actively enrolled in the School District.

28.     Therefore, approximately 0.006% of actively enrolled K-12 students reported incidents of religiously motivated bullying and harassment.

29.     The Protected Class Report does not disclose how many of the seven reported incidents of religious bullying, if any, were directed at Muslim students.

30.     At the School District Board meeting that was held on or about July 26, 2016, the Board voted unanimously to direct school officials to develop policies, practices, and procedures to combat Islamophobia and the bullying of, and discrimination against, Muslim students ("Anti-Islamophobia Initiative").

## II.   Pretext for the Anti-Islamophobia Initiative.

31.      "Islamophobia" is the "[f]ear, hatred, or mistrust of Muslims or of Islam." *Islamophobia*, American Heritage Dictionary (5th ed. 2017).

32.     A "Muslim" is "[a] believer in or adherent of Islam."   *Muslim*, American Heritage Dictionary (5th ed. 2017).

33.     As a moving force for the Anti-Islamophobia Initiative, Defendants relied, and continue to rely, upon oral testimony given at separate Board meetings by Muslim students who were purportedly bullied at school.

34.     According to Defendants Barrera and Beiser, writing in an op-ed for the *San Diego Union-Tribune* that was published on or about May 10, 2017: "These types of reports are why the San Diego Unified school board took action to bring attention and awareness to the bullying of Muslim students."

35.     At the Board meetings during which Muslim students gave oral testimony, Defendant Board members did not hear oral testimony from non-Muslim religious students who have been bullied or harassed at school.

36.     As a moving force for its Anti-Islamophobia Initiative, Defendants have

relied, and continue to rely, upon a report released by the Council of American-Islamic Relations' California chapter ("CAIR-CA") entitled *Growing in Faith: California Muslim Youth Experiences with Bullying, Harassment & Religious Accommodation in Schools* ("Report")[1].

37.    The Report published the findings of CAIR-CA's 2014 statewide survey of 621 Muslim students between the ages of 11 and 18 who were enrolled in public and private schools.

38.    According to the Report:

> California's Muslim students, for the most part, reported **a healthy school environment** in which they were **comfortable participating in discussions about their religious identity**, **believed that their teachers respected their religion**, and **felt safe at school**.

39.    According to the Report, only 6% of students reported not feeling safe at school.  Further, only 7% of students reported that they were "often" or "very often" subjected to "mean comments" or "rumors about [them] because of [their] religion."

40.    In the Report's "Endnotes" section, CAIR-CA defines "bullying" as follows: "the term 'bullying' refers exclusively to bias-related actions committed by students."

41.    The definition of "bias" is a "preference or an inclination, especially one that inhibits impartial judgment."  *Bias*, American Heritage Dictionary (5th ed. 2017).

42.    Therefore, CAIR-CA's definition of "bullying" is dissimilar to HHS's and the California Education Code's definitions of "bullying."

43.    Consequently, pursuant to CAIR-CA's definition of "bullying," non-Muslim students who have a *preference* or *inclination against Islam* are "bullies."

44.    CAIR-CA did not distribute a comparative survey to non-Muslim students to validate its findings.

---

[1] Available at https://goo.gl/t5iKuG

45.    On or about April 27, 2017, the Anti-Defamation League ("ADL"), which is a national, nonprofit organization that works to stop anti-Semitism, discrimination, and bigotry, released its annual, nationwide *Audit of Anti-Semitic Incidents*.[2]

46.    According to the audit, which was compiled from information provided by victims, law enforcement, and community leaders, anti-Semitic incidents at non-Jewish elementary, middle, and high schools increased 106% from 114 incidents in 2015 to 235 incidents in 2016.  In "Q1 2017," 95 anti-Semitic incidents were reported.

47.    At the Board meeting that was held on or about July 26, 2016, or at any Board meeting held thereafter until this action was filed, the Board neither heard testimony from Jewish students nor instructed School District officials to develop an anti-Semitism bullying prevention initiative.

48.    In August 2016, the Asian American and Pacific Islander Bullying Prevention Task Force, as part of the White House Initiative on Asian Americans and Pacific Islanders, released a report[3] documenting the bullying and harassment of Asian American students from 2014-2016.  According to the report, which was developed in conjunction with the United States Departments of Education, Health and Human Services, and Justice, Asian American students across the nation reported being bullied because of their religious beliefs.

49.    At the Board meeting that was held on or about July 26, 2016, or at any Board meeting held thereafter until this action was filed, the Board neither heard testimony from Asian American students nor instructed School District officials to develop a religion-based, Asian American bullying prevention initiative.

III.    **The Anti-Islamophobia Initiative's Policies, Practices & Procedures**.

50.    At the School District Board meeting that was held on or about April 4, 2017, School District officials delivered a PowerPoint presentation ("Presentation")[4] to

---

[2] Available at https://goo.gl/wGHD33
[3] Available at https://goo.gl/AAJs2s
[4] Available at https://goo.gl/Lrrjyg

the Board, which updated the Board on the School District's Local Control and Accountability Plan ("LCAP")[5].

51.   The LCAP is a three-year district-level plan, updated annually, which describes the School District's "key goals for students as well as the specific actions (with expenditures) the district will take to achieve the goals and the means (metrics) used to measure progress."

52.   Pursuant to the LCAP and via the Presentation, the School District promulgated policies, practices, and procedures to enact, implement, and enforce the Anti-Islamophobia Initiative.

53.   In the Presentation, School District officials issued the following policies, practices, and procedures, entitled "Immediate Action Steps," for enactment, implementation, and enforcement:

    a.   "***Distribute a letter to staff and parents addressing Islamophobia and direct support;***"
    b.   "***Review district calendars to ensure Muslim Holidays are recognized;***"
    c.   "Include a link of supports on the district's 'Report Bullying' page;"
    d.   "***Provide resources and strategies to support students during the upcoming month of Ramadan***"; and
    e.   "Continue the collaboration with community partners and district departments."

54.   In the Presentation, School District officials issued the following policies, practices, and procedures, entitled "Action Steps: Before the start of the 2017-18 school year," for enactment, implementation, and enforcement:

    a.   "***Provide Resources and materials for teachers on the History/Social Sciences page;***"
    b.   "Add information related to this topic in the Annual Employee Notifications (AP 6381);" and
    c.   "***Explore and engage in formal partnerships with the Council on American-Islamic Relations (CAIR)***."

---

[5] "Executive Summary" available at https://goo.gl/RirMEF

55.     In the Presentation, School District officials issued the following policies, practices, and procedures, entitled "Steps over multiple years," for enactment, implementation, and enforcement:

a.  "Create a survey to measure knowledge and implementation of practice;"
b.  "Identify areas of prevention, intervention, and restoration" including 'Restorative Practices' and 'Trauma Informed Practices;'
c.  "***Provide a series of professional development opportunities for staff related to awareness and advocacy for Muslim culture;***" and
d.  "***Provide practical tools for educators regarding Islamic religious practices and accommodations in schools.***"

56.     In the Presentation, School District officials issued the following policies, practices, and procedures, entitled "Student empowerment," for enactment, implementation, and enforcement:

a.  "Create opportunities for students to come together and share out their successes and challenges in service of unity;"
b.  "***Identify safe places*** and individuals for students to reach out to on campus if they have a concern;" and
c.  "Explore clubs at the secondary level to ***promote the American Muslim Culture*** and the student experiences."

57.     In the Presentation, School District officials issued the following policies, practices, and procedures, entitled "Parent and Community Support," for enactment, implementation, and enforcement:

a.  "Provide Family and Community opportunities to:
b.  Connect, share experiences, attend professional development, and receive resources;" and
c.  "Celebrate the accomplishments of parents, students, and community in ***creating safe spaces.***"

11

58.     On separate Board meetings in April 2017, parents and members of the local community, including members of Plaintiff CQE-SD, presented their concerns before the Board regarding both Defendants' favoritism and preference for a particular religious group and Defendants' sustained and detailed relationship with a controversial religious advocacy organization.

59.     On or about April 27, 2017, Plaintiffs' counsel sent a letter by mail and electronically to the individual Board Defendants and Defendant Marten, informing them that the Anti-Islamophobia Initiative raises serious constitutional questions. Further, Plaintiffs' counsel informed Defendants that the policies, practices, and procedures associated with the Anti-Islamophobia Initiative were presently insufficient to prevent civil rights violations.

60.     In the letter, Plaintiffs' counsel recommended that Defendants rescind the prior vote that approved the Anti-Islamophobia Initiative and pursue an alternative initiative that would not result in civil rights violations.

61.     At the time this action was filed, Defendant Board members willfully declined at subsequent Board meetings to rescind their prior vote that approved the Anti-Islamophobia Initiative.

**IV.     The Council on American-Islamic Relations.**

62.     Defendants have maintained a sustained and detailed relationship with the Council on American-Islamic Relations ("CAIR").

63.     CAIR identifies itself as America's largest Muslim civil liberties organization.

64.     On its public website, CAIR lists its core principles, including that it "***believes the active practice of Islam strengthens the social and religious fabric of our nation***."

65.     CAIR's stated mission is, in part, to "***enhance understanding of Islam***" and "***empower American Muslims***."

66.     As part of its advocacy for Muslims and Islam, CAIR "***conducts and***

12

*organizes lobbying efforts on issues related to Islam and Muslims*."

67.     As part of its advocacy for Muslims and Islam, CAIR provides workshops to educators as a "*proactive approach that highlights relevant Islamic practices and offers suggestions for religious accommodation*."

68.     As part of its advocacy for Muslims and Islam, CAIR provides school officials, educators, and students with guides and pamphlets about Islamic religious practices to provide "a religious educational environment."[6]

69.     These pamphlets include quotes from the Quran, which is the central religious text of Islam that Muslims believe to be a revelation from God; a glossary of "Muslim Terms"; and explanations of Muslim religious practices.

70.     Nihad Awad, CAIR's Founder and Executive Director, has testified that, "informing the American public about the Islamic faith is a religious obligation, and distributing these publications is both a religious and educational exercise."[7]

71.     Ibrahim Hooper, CAIR's Director of Strategic Communications, has stated:

> I wouldn't want to create the impression that I wouldn't like the government of the United States to be Islamic sometime in the future. But I'm not going to do anything violent to promote that. I'm going to do it through education.

72.     Since CAIR's founding in 1994, it has been linked by a complex set of personal, financial, and operational relationships with Islamic extremist groups, including the Muslim Brotherhood and especially Hamas, which the United States State Department has designated as a terrorist organization.

73.     Six of CAIR's leaders have been arrested, convicted, or deported for terrorism-related crimes.

74.     In 2007, federal prosecutors named CAIR as an unindicted co-conspirator

---

[6] *CAIR-Foundation, Inc. d/b/a Council on American-Islamic Relations (CAIR)*, NLRB, Case 05-RC-186732 (2017).
[7] *Id.*

with the Holy Land Foundation for Relief and Development and five of its leaders for providing material support to Hamas. Among those convicted was Ghassan Elashi, the founder of CAIR's Dallas chapter.

75.   Federal prosecutors have acknowledged that Muslim Brotherhood leaders founded CAIR and that CAIR conspired with other affiliates of the Muslim Brotherhood to support terrorists.

76.   In 2008, the Federal Bureau of Investigation (FBI) ended formal contact with CAIR because of its ties to terrorism. In an April 2009 letter[8] to former United States Senator Jon Kyl, the FBI explained its decision, stating:

> [U]ntil we can resolve whether there continues to be a connection between CAIR or its executives and HAMAS, the FBI does not view CAIR as an appropriate liaison partner.

77.   In September 2013, the United States Department of Justice reviewed the FBI's interactions with CAIR and reaffirmed the FBI's policy.

78.   In 2014, the United Arab Emirates, as part of a federal law to combat extremism, designated CAIR as a terrorist organization.

79.   In 2015, ADL published a report entitled *Profile: The Council of American Islamic Relations*[9] ("Profile"), as part of its "Imagine a World without Hate" campaign. According to the Profile:

> a.   "CAIR's stated commitment to 'justice and mutual understanding' . . . is undermined by its anti-Israel agenda."
> b.   "CAIR chapters continue to partner with various anti-Israel groups that seek to isolate and demonize the Jewish State."
> c.   "Some CAIR leaders have overtly expressed the notion that Israel and U.S. law enforcement pose a bigger threat to American Muslims than terrorist groups such as ISIS."

---

[8]Available at https://goo.gl/hebPzg
[9]Available at https://goo.gl/BvrHLR

## V.     The School District's Multifarious Relationship with CAIR-SD.

80.     CAIR San Diego ("CAIR-SD") is a chapter of CAIR-CA.

81.     As part of its longtime partnership with CAIR-SD, the School District has permitted CAIR officials, inter alia, to teach students during school hours, issue training resources and materials to School District officials, and disseminate religiously themed, non-educational propaganda to students.

82.     On or about March 27, 2012, the School District entered into a "Partnership Agreement"[10] with CAIR-SD, which involved the following "partnership activities:"

> a.     Teaching Against Islamophobia Training Program for Faculty and Staff of SDUSD;
> b.     Cultural Competency Training for SDUSD Faculty and Staff on Islam and Muslim Community; and
> c.     American Muslim Community Resource for SDUSD.

83.     According to the School District: "The intent for this partnership is . . . **to provide mutual assistance and benefit through shared time and resources**."

84.     On or about March 27, 2012, the Board conducted a "Workshop," the objective of which, in relevant part, was to "introduce the Board Partnerships that provide training on Islamophobia."

85.     As part of the Workshop, CAIR-SD provided training materials to the Board, including a book entitled *Teaching against Islamophobia*.[11]

86.     According to the book's foreword:

> We hope that the content of this book will assist teachers and students to move toward the emancipatory educational path of critically considering reasons for Islamophobia and popular perceptions toward Islam, Muslims, and Arabic peoples.

87.     The book trains School District educators to teach students, inter alia, the following:

---

[10]Available at https://goo.gl/rbeisy

[11] *Teaching against Islamophobia*, in 347 COUNTERPOINTS: STUDIES IN THE POSTMODERN THEORY OF EDUCATION (Joe L. Kincheloe, et al. eds., 2010).

a.   "The activities of the American Empire have not been the only forces at work creating an Islamist extremism that violently defies the sacred teaching of the religion[;]. American misdeeds have also played an important role in the process;"

b.   "The 'hatred and mistrust of the United States in the Islamic world' is a consequence of 'right-wing politics,' 'geo-political needs of the American Empire,' and 'widespread ignorance among Americans about the U.S. role in the world and in Islamic history;'" and

c.   "'9/11 in part reflected the rage toward the U.S. pulsing through the veins of many Muslims,' and 'the indifference displayed by many U.S. policymakers toward the suffering of everyday people around the Islamic world fanned the flames of this anti-American fury.'"

88.   On or about November 10, 2015, Defendants Beiser and McQuary presented on behalf of the Board a "Proclamation . . . In Support and Recognition of Council on American-Islamic Relations (CAIR), San Diego Chapter." [12]   The Proclamation states, in relevant part, the following:

a.   "WHEREAS, *with the guidance of Executive Director Hanif Mohebi, CAIR-San Diego has joined the district's Office of Race/Human Relations and Advocacy* in promoting equitable educational opportunity for all students and preparing them to succeed in a culturally diverse society;"

b.   "WHEREAS, *CAIR-San Diego has partnered with the district in mediating situations in the schools* that involve discrimination and other behavioral issues;"

c.   "WHEREAS, to further encourage participation in civic life, every year *CAIR-San Diego selects local high school juniors and seniors to participate in a mock California Legislature*, which takes place in the Capitol in Sacramento;" and

d.   "NOW, THEREFORE, BE IT PROCLAIMED, by the San Diego Unified School District Board of Education that it *recognizes CAIR-San Diego* and *thanks the organization for its 10 years of teaching students* to accept and honor religious and cultural differences among their peers."

---

[12]Available at https://goo.gl/gyFMKr

89.    Defendants' partnership with CAIR-SD in the Anti-Islamophobia Initiative directly aids CAIR's organizational objectives of empowering American Muslims and enhancing the understanding of Islam, both of which are intrinsically religious.

90.    CAIR-SD actively solicits donations to support its collaboration with the School District.

91.    CAIR-SD solicits donations on its public website to "Combat Bullying in Schools," which is listed as a "specific program."[13]

92.    In 2016, CAIR-SD solicited donations on LaunchGood.com, which is a global crowdfunding platform to support Muslims, to "Sponsor Anti-Bullying workshop at K-12 schools."[14]   According to the campaign description:

> With bullying incidents on the rise against Muslim students, *we actively reach out to Elementary, Middle and High Schools across the county to educate the educators*. Teachers and principals *learn* how to spot Anti-Muslim bullying and *get training* on how to prevent and address the incidents.  *Your donation will help us create and distribute proper material and training in schools*.

93.    CAIR's expectation for the Anti-Islamophobia Initiative is not just to address purported instances of bullying and harassment within the School District. Indeed, the Anti-Islamophobia Initiative is a pilot program through which CAIR is attempting to advance its mission in schools nationwide.

94.    In an April 5, 2017, interview with *The San Diego Union-Tribune*, CAIR-SD Executive Director Hanif Mohebi stated that if the Anti-Islamophobia Initiative is successful, then "*San Diego Unified School District would be the leading school district in the nation to come up with a robust and beautiful anti-bully and anti-Islamophobic program*."

---

[13] Available at https://goo.gl/8MsZMK
[14] Available at https://goo.gl/AGt5ej

95.    CAIR-CA publishes and distributes to educators, including to School District officials, a pamphlet entitled *An Educator's Guide to Islamic Practices* ("Islamic Guide").[15]

96.    The Islamic Guide includes the following quote from the Quran: "Read! For your Lord is most Generous.  (It is He) who taught by means of the pen; taught man that which he knew not.  The Quran, Chapter 96, Verses 3-5."

97.    The Islamic Guide includes the following quote from the Quran:

"As the Qur'an says, 'O mankind!  We created you from a single (pair) of a male and a female, and made you into nations and tribes, that you may know each other (Not that you may despise each other).'"

98.    At the end of the Islamic Guide, CAIR-CA lists over two dozen items for purchase, including pamphlets entitled *Welcome to Our Ramadan* and *Welcome to Our Mosque,* and a license plate holder with the inscription 'Faith in Action.'"

99.    On or about February 2, 2017, CAIR-SD officials visited Logan Elementary School in the School District to lecture seventh- and eighth-grade students about Islamophobia.

100.    CAIR-SD has stated that as of February 2, 2017, CAIR officials have visited over a dozen School District schools since the election of President Donald Trump.

101.    During CAIR-SD's visit to Logan Elementary School on or about February 2, 2017, CAIR-SD officials disseminated non-educational propaganda to students.

102.    "Propaganda" is defined as follows:

(1) "The systematic propagation of a doctrine or cause or of information reflecting the views and interests of those advocating such a doctrine or cause"; and

---

[15] Available at https://goo.gl/2vYa5M

FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF & NOMINAL DAMAGES

(2) "Material disseminated by the advocates or opponents of a doctrine or cause."

*Propaganda*, American Heritage Dictionary (5th ed. 2017).

103. CAIR-SD distributed to students, including to non-Muslim students, a propaganda pamphlet published by CAIR-CA entitled *Know Your Rights as a Muslim Youth at School* ("Propaganda Pamphlet")[16].

104. The Propaganda Pamphlet counsels the student to "***Learn more about and be proud of your faith***."

105. The Propaganda Pamphlet offers CAIR-CA's services under the heading "What CAIR Can Do To Help."

106. CAIR-CA's services to the student include "***Help connect you to resources about your faith which you can share with administrators and teachers***" and "***Help you file a complaint if school administrators aren't taking effective action*** to stop the bullying."

107. CAIR-CA encourages Muslim students to report bullying incidents through its website.[17] If a Muslim student reports a bullying incident, CAIR-CA may then report the incident to the School District, either orally or through a formal written complaint, after which School District officials will subject the accused "bully" to a formal investigation and disciplinary action.

108. According to the School District's bullying and intimidation policy, AP 6381, a complainant may pursue available civil law remedies outside of the School District's complaint procedures. Furthermore, the policy states, "[c]omplainants may seek assistance from mediation centers or public/private interest attorneys."

109. CAIR-SD and its officials have maintained, from press statements to fundraising content, that it has collaborated, and will continue to collaborate, with the

---

[16] Available at https://goo.gl/uFy7yN
[17] Available at https://goo.gl/u4GQaC

School District to enact, implement, and enforce the Anti-Islamophobia Initiative.

110.    According to CAIR-SD, this collaboration includes providing training, resources, educational materials, and guidance on curricular changes.

111.    In a July 28, 2016, interview with KPBS-FM, CAIR-SD Executive Director Hanif Mohebi commented on the Anti-Islamophobia Initiative.

112.    The following is a true and accurate excerpt from the interview transcript:

>    Host: Now the San Diego Unified School District still needs to produce a plan and to address anti Muslim bullying. What would you like to see included in that plan?
>
>    Mohebi: Absolutely, so this is the first step and the plan has to include, ah, number one, <u>providing resources</u>, knowledge is power, ma- I do these - these, ah, trainings in other school districts and one of the top question the, ah, teachers ask me, "I wish I had these information before." Right, so ***we need to provide them one, ah, resources, two, developments or professional development and training, three, we need to work on curriculum and make sure that the curriculum is more, ah, inclusive and fourth***, when we talk about bullying ***we have to make sure that the Muslim community is involved in that discussion***.

113.    On or about April 5, 2017, CAIR-CA released a press release entitled "CAIR-San Diego Welcomes School District's Initiative to Combat Islamophobia, Bullying of Muslim Students," which stated, in relevant part, the following:

>    a.    "The San Diego chapter of the Council on American-Islamic-Relations (CAIR-San Diego) today welcomed the San Diego Unified School District's (SDUSD) new initiative to combat Islamophobia and the bullying of Muslims students."
>    b.    "This plan, ***developed in collaboration with CAIR-San Diego*** and in alignment with the Safe Place to Learn Act (AB 2845), was brought forward for formal board adoption and passed. It will focus on the district's plan to address Islamophobia and discrimination against Muslim students and their families, as directed by the SDUSD Board in July, 2016."

c.   "'We believe this is a great first step in the direction of protecting Muslim students from the bullying that is a direct result of the growing Islamophobia in our state and nation,' said CAIR-San Diego Executive Director Hanif Mohebi. 'Other school districts should follow this lead, and **we will be happy to work with them to provide resources and trainings**.'"

114.   In an April 5, 2017, interview with *The San Diego Union-Tribune*, Mohebi stated:

I'm really happy we're going toward the right direction. I am excited, but also careful and cautious because **the work ahead is something we will all be responsible for**.

115.   On or about May 24, 2017, CAIR-SD released a press release entitled "CAIR-San Diego, Community Partners to Support Safe Learning Environment for All Students," which stated, in relevant part, the following:

The anti-bullying plan, **developed in collaboration with CAIR-San Diego** and in alignment with the Safe Place to Learn Act (AB 2845), will focus on the district's plan to address Islamophobia and discrimination against Muslim students and their families.

116.   The School District maintains on its website a webpage entitled "Addressing Bullying of Muslim Students."

117.   One section of the webpage is entitled "Why partner with CAIR?", which includes the following:

Because CAIR has broad reach, it was helpful to have **input** on what the specific concerns of our Muslim community are and on what actions might serve to address those concerns. **That has been the extent of our partnership**. **CAIR has not contributed to our curriculum**.

118.   The School District and CAIR-SD are making, and continue to make, contradictory statements about the extent of the School District's entanglement with CAIR-SD, which includes both CAIR-SD's involvement with the enactment, implementation, and enforcement of the Anti-Islamophobia Initiative and its access to

21

indoctrinate and disseminate propaganda to students.

## VI.    **Plaintiffs' Allegations.**

119.    Plaintiff Scott Hasson plans for C.H. to continue to receive an elementary school education within the School District.  Plaintiff Chaoyin He plans for B.H. to continue to receive an elementary school education within the School District.  Plaintiff Xuexun Hu plans for R.H. to continue to receive an elementary school education within the School District.  Plaintiffs Kevin and Melissa Steel plan for K.S. to continue to receive a middle school education within the School District.  Plaintiff Jose Velazquez plans for J.V. to continue to receive a high school education within the School District.

120.    As parents of students within the School District (collectively, "Parent Plaintiffs"), Parent Plaintiffs do not wish for their children (collectively, "Student Plaintiffs"), as they mature and become more aware of religious differences, to believe that the School District favors Muslim students and the religion of Islam over students of other faiths and other religions.  Therefore, Plaintiffs perceive the Anti-Islamophobia Initiative as the School District's endorsement of Islam and a rejection of other religions, which has caused, and will continue to cause, irreparable harm to their children's education and constitutional rights.

121.    Defendants have specifically targeted religion for disparate treatment, and under the pretext of preventing bullying and discrimination, have established policies, practices, and procedures that grant Muslim students exclusive access to the School District's accommodations, advantages, privileges, while denying non-Muslim students equal access to the same.  Therefore, Defendants convey a message that Islam is the favored religion of the school community, and that the Anti-Islamophobia Initiative makes Muslim students' adherence to Islam relevant to the standing of both Muslim and non-Muslim students within the school community.

122.    Defendants' formal partnerships and collaboration with CAIR-SD to enact, implement, and enforce the Anti-Islamophobia Initiative constitute government entanglement with religion, and grant CAIR-SD – as well as CAIR-CA and CAIR

National – extraordinary discretion, power, and influence to convey religious messages, including proselytization, to students in an involuntary and coercive environment.

123.   Defendants' reliance upon both CAIR-CA's bullying report and prepared student testimony during Board meetings as the prime motivators for the Anti-Islamophobia Initiative undermines any valid secular purpose sought to be served, and is merely a pretext to further particular political views that are intertwined with a religious advocacy organization's sectarian agenda.

124.   Plaintiffs do not object to programs that teach about religion and its role in the social and historical development of civilization, nor do Plaintiffs object to School District initiatives that foster mutual understanding and respect for the rights of all individuals regarding their beliefs, values, and customs.

125.   However, Defendants do not have any pedagogical basis or valid secular purpose to enact, implement, and enforce policies, practices, and procedures that were promulgated to both serve a religious purpose and favor a particular religious sect. Therefore, Plaintiffs object to the use of taxpayer funds to enact, implement, and enforce the Anti-Islamophobia Initiative.

126.   Defendants do not have any pedagogical basis to collaborate with CAIR, a religious advocacy organization with verifiable links Islamic extremism, to enact, implement, and enforce policies, practices, and procedures that favor a particular religious sect and advance a sectarian agenda.  Therefore, Plaintiffs object to the use of taxpayer funds to collaborate and engage in formal partnerships with CAIR-SD, which uses public schools as a means to promote its denominational and theological agenda.

127.   Defendants' adoption of multiple definitions of "bullying," including CAIR-CA's definition of "bullying" in its Report, fails to inform students of what conduct and speech is prohibited, allows for unbridled discretion in enforcement decisions, and encroaches upon Student Plaintiffs' free exercise of their sincerely held religious beliefs.

128.   Under CAIR-CA's chilling definition of "bullying," Student Plaintiffs will

be accused of Islamophobia when they express or exercise beliefs, including their sincerely held religious beliefs, that neither *prefer* nor *incline* toward Islamic beliefs and Muslim culture.

129.   Parent Plaintiffs do not wish for their children, as non-Muslims, to be ostracized by other students or staff if they do not accord Muslim students the requisite respect as Defendants' favored religious sect.

130.   Parent Plaintiffs do not wish for their children, as non-Muslims, to be subject to a civil action brought by CAIR if they do not accord Muslim students the requisite respect as Defendants' favored religious sect.

131.   Therefore, the Anti-Islamophobia Initiative places coercive pressure on Student Plaintiffs to either suppress their personal beliefs, including the free exercise of their sincerely held religious beliefs, and submit to the School District's favored religious sect or otherwise be accused of Islamophobia.

132.   Defendants' policies, practices, and procedures are applied selectively to members of a particular class, rather than uniformly to all students.  Therefore, because the Anti-Islamophobia Initiative does not apply equally to students of all faiths, including Student Plaintiffs, but only to adherents of the Islamic religion, it lacks a genuine and demonstrable secular purpose.

133.   Defendants' Anti-Islamophobia Initiative encourages divisiveness along religious lines in a public school setting.  Consequently, Defendants' policies, practices, and procedures send a clear message to Student Plaintiffs that they are outsiders, not full members of the school community, while sending an accompanying message that Muslim students are insiders, full members of the school community.

134.   The Anti-Islamophobia Initiative protects and supports Muslim students' constitutionally protected free exercise of their religion, while non-Muslim students, including Student Plaintiffs, are subjected to bullying on account of their religious beliefs without the same accommodations, advantages, privileges granted to Muslim students.

135.   Defendants were adequately informed of the legal ramifications of the Anti-Islamophobia Initiative, yet they intentionally and indifferently refused to explore any alternative policies, practices, and procedures that would combat the religiously motivated bullying and harassment of Muslim students – but on an equal basis with students of *all* religions and religious beliefs.

136.   By expending time and resources to provide special protections to only Muslim students through the Anti-Islamophobia Initiative, Defendants have failed, and will continue to fail, to prioritize or equally consider the religiously motivated bullying of non-Muslim students, including Student Plaintiffs.

137.   Parent Plaintiffs entrust School District officials with the education of their children, who are impressionable and whose attendance at school is mandatory. Therefore, Defendants' intentional efforts to promote a favorable view of a particular religion and religious practices, which include allowing CAIR-SD officials to indoctrinate School District students within a "captive" setting, violate their trust and their private beliefs.

138.   The School District's minimization and omission of perceived negative facts about Islam constitute subjective and inaccurate instruction.   Therefore, Defendants' selective exposure of ideas about Islam and Muslim culture through the manipulation of educational materials has caused, and will continue to cause, irreparable harm to Student Plaintiffs' education.

139.   Defendants' collaborative efforts to vet and revise curricula, library books, and other educational materials with CAIR-SD to promote a more "favorable" and "inclusive" depiction of Islam and Muslim culture do have any pedagogical basis.  Nor do they have any rational relation to combat the bullying of, and discrimination against, Muslim students.  Further, Defendants' policies, practices, and procedures undermine Student Plaintiffs' right to learn a diverse body of ideas, including those that may be viewed to be unfavorable by school officials or a particular outside group.

140.   Defendants' collaborative efforts to vet and revise curricula, library books,

and other educational materials with CAIR – an anti-Israel organization that rejects Israel as a legitimate State and adversely demonizes Jewish people – to promote a more "favorable" and "inclusive" depiction of Islam and Muslim culture, poisons the educational environment and advances a particular political and religious viewpoint to a captive student audience.

141.   Defendants' blessing to CAIR-SD to formulate, integrate, and disseminate religious propaganda under the guise of instructional and anti-bullying materials impermissibly suggests that CAIR-SD's "partnership" with the School District is a valid component of a compulsory education, which constitutes government preference for, and entanglement with, Islam.

142.   Defendants' adoption, distribution, and dissemination of instructional materials created, published, and provided by CAIR-CA, with or without equal contributions by other secular or sectarian groups, reflect adversely upon Student Plaintiffs as members of religions other than Islam.

143.   The School District intentionally and knowingly permitted CAIR-SD to teach and disseminate religious doctrines and propaganda to "captive" pupils in its tax-supported public school buildings, which directly and substantially aids CAIR-SD in its fundraising and religious advocacy objectives.

144.   The School District intentionally and knowingly adopted and distributed materials to educators and teachers that were published by CAIR-CA with full knowledge that such actions will directly aid and substantially benefit CAIR-SD's fundraising and religious advocacy objectives.

145.   As a direct and proximate result of Defendants' continuing violation of Plaintiffs' rights, Plaintiffs have suffered immediate and irreparable harm.  Without injunctive and declaratory relief as requested herein, Plaintiffs will continue to suffer immediate and irreparable harm, including, but not limited to, the loss of the ability to exercise their constitutional rights.

/ / /

## FIRST CLAIM FOR RELIEF

## VIOLATION OF THE ESTABLISHMENT CLAUSE

## OF THE FIRST AMENDMENT

### (By All Plaintiffs)

146.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

147.   The Establishment Clause of the First Amendment to the United States Constitution ("Establishment Clause") prohibits the government from officially favoring one religion or religious sect over another religion or religion sect, and it prohibits government entanglement with religion.

148.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated the Establishment Clause as applied to the states and their political subdivisions under the Fourteenth Amendment and 42 U.S.C. § 1983.

149.   Defendants' policies, practices, and procedures convey an impermissible, government-sponsored approval of, and preference for, Islam.

150.   The Anti-Islamophobia Initiative lacks a valid secular purpose, has the primary effect of advancing and endorsing a religion and religious practices, and creates excessive entanglement with religion.

151.   Defendants' collaboration and engagement of formal partnerships with CAIR-SD lack a valid secular purpose, have the primary effect of inhibiting religion in favor of another religion, and constitute impermissible government entanglement with religion.

152.   Defendants' policies, practices, and procedures send a clear message to Plaintiffs that they are outsiders, not full members of the school and political communities because they are not Muslim, and it sends an accompanying message that Muslims are insiders, favored members of the school and political communities.

153.   An objective observer will unquestionably perceive that the Anti-Islamophobia Initiative is stamped with the School District's seal of approval, which

places an undue influence on the minds and feelings on impressionable children.

154.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

155.   As a direct and proximate result of Defendants' violation of the Establishment Clause, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FREE EXERCISE CLAUSE

### OF THE FIRST AMENDMENT

### (By Plaintiffs Hasson, He, Hu, Steel, Steel & Velazquez)

156.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

157.   The Free Exercise Clause of the First Amendment to the United States Constitution ("Free Exercise Clause") prohibits government action that substantially burdens a person's sincerely held religious beliefs.

158.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated the Free Exercise Clause as applied to the states and their political subdivisions under the Fourteenth Amendment and 42 U.S.C. § 1983.

159.   Defendants' Anti-Islamophobia Initiative substantially burdens Plaintiffs' sincerely held religious beliefs by failing to grant Plaintiffs equal access to its accommodations, advantages, privileges on an equal basis with Muslim students.

160.   The Anti-Islamophobia Initiative is neither neutral nor generally applicable, and it intentionally and discriminatorily denies Student Plaintiffs equal access to the accommodations, advantages, and privileges that are granted only to Muslim students.

161.   There is no compelling interest sufficient to justify the Anti-Islamophobia Initiative, it is not the least restrictive means to accomplish its purported governmental purpose, nor is the restriction of Student Plaintiffs' free exercise of religion narrowly tailored to that purpose.

162.   As a direct and proximate result of Defendants' violation of the Free Exercise Clause, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF
### THE FOURTEENTH AMENDMENT

### (By All Plaintiffs)

163.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

164.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ("Equal Protection Clause") prohibits, absent a compelling governmental interest, consideration of the religious affiliation of a person or group in governmental decision-making as well as the denial of equal benefits based on membership in such groups.

165.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Fourteenth Amendment and 42 U.S.C. § 1983.

166.   The Anti-Islamophobia Initiative is not facially neutral, it discriminates between religion and non-religion, and it specifically targets religious students for discriminatory treatment.

167.   The Anti-Islamophobia Initiative is an unconstitutional abridgment of Plaintiffs' right to equal protection of the law because it permits the School District to treat Plaintiffs differently from Muslim students due to their religion and religious beliefs.

168.   The Anti-Islamophobia Initiative is unsupported by a compelling government interest sufficient to justify its enactment, implementation, and enforcement, nor is it the least restrictive means to accomplish its purported governmental purpose.

169.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

170.   As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

## FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE NO PREFERENCE CLAUSE OF
### THE CALIFORNIA CONSTITUTION
### (By All Plaintiffs)

171.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

172.   Article I, Section IV of the California Constitution ("No Preference Clause") guarantees the free exercise and enjoyment of religion without discrimination or preference.

173.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated the No Preference Clause.

174.   Defendants have intentionally, willfully, and without justification granted, and continue to grant, preferential treatment to Muslim students because of their religion in the enactment, implementation, and enforcement of the Anti-Islamophobia Initiative.

175.   Defendants' sustained and detailed relationship with CAIR-SD conveys a preference for a particular sectarian group and therefore an impermissible, government-sponsored approval of, and preference for, Islam.

176.   Consequently, Defendants' policies, practices, and procedures send a clear message to Plaintiffs that they are outsiders, not full members of the school and political communities, and they send an accompanying message that Muslims are insiders, favored members of the school and political communities.

177.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

178.   As a direct and proximate result of Defendants' violation of the No Preference Clause, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**VIOLATION OF THE ESTABLISHMENT CLAUSE**

**OF THE CALIFORNIA CONSTITUTION**

**(By All Plaintiffs)**

179.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

180.   Article I, Section IV of the California Constitution ("Establishment Clause") prohibits the government from making any law respecting an establishment of religion.

181.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated the Establishment Clause.

182.   The Anti-Islamophobia Initiative lacks a valid secular purpose, has the primary effect of advancing and endorsing a religion and religious practices, and creates excessive entanglement with religion.

183.   Defendants' collaboration with CAIR-SD lacks a valid secular purpose, has the primary effect of inhibiting religion in favor of another religion, and creates excessive entanglement with religion.

184.   Consequently, Defendants' actions send a clear message to Plaintiffs that they are outsiders, not full members of the school and political communities because they are not Muslim, and it sends an accompanying message that Muslims are insiders, favored members of the school and political communities.

185.   An objective observer will unquestionably perceive that the Anti-Islamophobia Initiative is stamped with the School District's seal of approval, which places an undue influence on the minds and feelings on impressionable children.

186.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

187.   As a direct and proximate result of Defendants' violation of the Establishment Clause of the California Constitution, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE NO AID CLAUSE OF
## THE CALIFORNIA CONSTITUTION
### (By All Plaintiffs)

188.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

189.   Article XVI, Section V of the California Constitution ("No Aid Clause") prohibits a government agency from paying from any public fund or granting anything to or in aid of any religious sect, church, creed, or sectarian purpose.

190.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated the No Aid Clause.

191.   The Anti-Islamophobia Initiative grants a substantial and direct benefit of protecting Muslim students, a particular religious group, and that benefit is unavailable

on an equal basis to other religious groups.

192.   Defendants' official involvement with CAIR-SD has the direct, immediate, and substantial effect of promoting and benefiting CAIR-SD's religious purposes.

193.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

194.   As a direct and proximate result of Defendants' violation of the No Aid Clause of the California Constitution, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

## SEVENTH CLAIM FOR RELIEF

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT

### (By Plaintiffs Hasson, He, Hu, Steel, Steel & Velazquez)

195.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

196.   The Unruh Civil Rights Act ("Unruh Act"), codified as Section 51 of the California Civil Code, entitles full and equal accommodations, advantages, and privileges to all persons regardless of their religion.

197.   The School District is a "business establishment" under the Unruh Act.

198.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated the Unruh Act.

199.   Plaintiffs are not entitled to the accommodations, advantages, and privileges associated with the Anti-Islamophobia Initiative.

200.   Defendants have arbitrarily and intentionally discriminated against Plaintiffs with full knowledge that their policies, practices, and procedures would benefit Muslim students and prejudice Plaintiffs, who are non-Muslim.

201.   As a direct and proximate result of Defendants' violation of the Unruh Act, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm,

entitling them to declaratory and injunctive relief and nominal damages.

## EIGHTH CLAIM FOR RELIEF

## VIOLATION OF § 11135 OF THE CALIFORNIA GOVERNMENT CODE

### (By All Plaintiffs)

202.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

203.   Under Section 11135 of the California Government Code, no person in California may on the basis of religion be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under, any program or activity that receives any financial assistance from the state.

204.   The School District receives financial assistance from the state.

205.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated Section 11135 of the California Government Code.

206.   The Anti-Islamophobia Initiative discriminates against Plaintiffs by denying them full and equal access to the Initiative's accommodations, advantages, and privileges based on their religion and religious beliefs.

207.   Through Defendants' outwardly neutral purpose of addressing bullying and discrimination, they have expended time and resources establishing policies, practices, and procedures that benefit a particular sect without considering an equally effective alternative program, thereby causing a significantly adverse and disproportionate impact on Student Plaintiffs' protections against religiously motivated bullying.

208.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

209.   As a direct and proximate result of Defendants' violation of Section 11135 of the California Government Code, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, entitling them to declaratory and injunctive relief

and nominal damages.

## NINTH CLAIM FOR RELIEF

## VIOLATIONS OF §§ 200 & 220 OF

## THE CALIFORNIA EDUCATION CODE

### (By All Plaintiffs)

210. Plaintiffs hereby incorporate by reference all above-stated paragraphs.

211. Sections 200 and 220 of the California Education Code specifically prohibit discrimination based on religion. Under these Sections, an educational institution that receives, or benefits from, state financial assistance in any program or activity cannot discriminate against any person because of that person's religion or religious beliefs.

212. Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated Sections 200 and 220 of the California Education Code.

213. Because Plaintiffs are non-Muslim, Defendants have denied Plaintiffs equal accommodations, advantages, and privileges associated with the Anti-Islamophobia Initiative, while Muslim students exclusively enjoy those rights.

214. Defendants' discriminatory policies, practices, and procedures have created, and will continue to create, a hostile environment for Student Plaintiffs, and have jeopardized, and will continue to jeopardize, Student Plaintiffs' opportunity for equal education.

215. Defendants' policies, practices, and procedures also substantially harm the ability of Defendants CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

216. As a direct and proximate result of Defendants' violation of Sections 200 and 220 of the California Education Code, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, entitling them to declaratory and injunctive relief and nominal damages.

## TENTH CLAIM FOR RELIEF

## VIOLATION OF § 51500 OF THE CALIFORNIA EDUCATION CODE

**(By All Plaintiffs)**

217.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

218.   Section 51500 of the California Education Code prohibits school districts from sponsoring any activity that promotes a discriminatory bias on the basis of religion.

219.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated Section 51500 of the California Education Code.

220.    The Anti-Islamophobia Initiative promotes a discriminatory bias against non-Muslim students on the basis of their religion.

221.   Defendants have permitted CAIR-SD to advance its organizational objectives within the School District, including the proselytization and indoctrination of students, which promotes a discriminatory bias against Plaintiffs on the basis of their religion.

222.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

223.   As a direct and proximate result of Defendants' violation of § 51500 of the California Education Code, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, entitling them to declaratory and injunctive relief and nominal damages.

## ELEVENTH CLAIM FOR RELIEF

## VIOLATION OF § 51501 OF THE CALIFORNIA EDUCATION CODE

**(By All Plaintiffs)**

224.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

225.   Section 51501 of the California Education Code prohibits school districts

from adopting textbooks or other instructional materials for use in public schools if they contain any matter reflecting adversely upon persons on the basis of religion.

226. Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated Section 51501 of the California Education Code.

227. Defendants have adopted, distributed, and disseminated instructional materials created, published, and provided by a CAIR-CA, an Islamic advocacy organization, which reflects adversely upon Plaintiffs and their sincerely held religious beliefs.

228. Defendants have adopted, distributed, and disseminated instructional materials created, published, and provided by CAIR-CA, whose organizational activities include disparaging Judaism, de-legitimizing Israel's right to exist, and adversely demonizing Jewish people.

229. CAIR's contribution to school curricula to portray Islam and Muslim culture more favorably will result in biased and inaccurate information about important historical concepts, including concepts about the relationship between the Muslim world and Israel.

230. CAIR's longstanding ties to Islamic extremist groups such as Hamas, which is opposed to Jewish statehood and which calls for the elimination of all Jews, will adversely affect the objectivity and accuracy of instructional materials related to important historical issues such as the relationship between the Muslim world and Israel.

231. Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

232. As a direct and proximate result of Defendants' violation of Section 51501 of the California Education Code, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, entitling them to declaratory and injunctive relief

and nominal damages.

## TWELVE CLAIM FOR RELIEF

## VIOLATION OF § 60044 OF THE CALIFORNIA EDUCATION CODE

### (By All Plaintiffs)

233.   Plaintiffs hereby incorporate by reference all above-stated paragraphs.

234.   Section 60044 of the California Education Code prohibits a governing board from adopting any instructional materials for use in the schools that, in its determination, contain any matter adversely reflecting upon persons on the basis of religion or any sectarian or denominational doctrine or propaganda contrary to law.

235.   Because of the aforementioned policies, practices, and procedures, engaged in under color of state law, Defendants have violated Section 60044 of the California Education.

236.   The School District has accepted, adopted, and distributed instructional materials published and provided by CAIR-CA and CAIR-SD that contain denominational doctrine and propaganda.

237.   The School District has accepted, adopted, and distributed materials published and provided by CAIR-CA and CAIR-SD, both of which are sectarian advocacy groups that demonstrate hostility to, and disparagement of, other persons, religions, and religious beliefs, including Judaism and Jewish culture.

238.   Defendants' policies, practices, and procedures also substantially harm the ability of Plaintiffs CQE-SD and SDAAFE to accomplish their organizational goals, which include advocating quality education for all students and eliminating discrimination and inequality within the School District.

239.   As a direct and proximate result of Defendants' violation of Section 60044 of the California Education Code, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and nominal damages.

/ / /

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

1.     Declare that Defendants have violated the First and Fourteenth Amendments to the United States Constitution, as set forth in this Complaint;

2.     Declare that Defendants have violated the California Constitution, as set forth in this Complaint;

3.     Declare that Defendants have violated the Unruh Civil Rights Act, as set forth in this Complaint;

4.     Declare that Defendants have violated the California Government Code, as set forth in this Complaint;

5.     Declare that Defendants have violated the California Education Code, as set forth in this Complaint;

6.     Preliminarily enjoin Defendants from enacting, implementing, and enforcing the unconstitutional policies, practices, and procedures of the Anti-Islamophobia Initiative;

7.     Permanently enjoin Defendants, in their official capacity, and their successors in office, and all their respective agents, employees, and others in active concert with them, from enacting, implementing, and enforcing the unconstitutional policies, practices, and procedures of the Anti-Islamophobia Initiative;

8.     Preliminarily enjoin Defendants from engaging in any partnerships or associations whatsoever with the Council on American-Islamic Relations and its chapters, including CAIR-SD;

9.     Permanently enjoin Defendants from engaging in any partnerships or association whatsoever with the Council on American-Islamic Relations and its chapters, including CAIR-SD;

10.    Award Plaintiffs nominal damages against all Defendants;

11.    Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, Cal. Civ. Code § 52, Cal. C.C.P. § 1021.5, and other applicable law;

1    12.    Grant such other and further relief as this Court finds just and proper.

2

3                      **<u>DEMAND FOR JURY TRIAL</u>**

4        Plaintiffs hereby demand a trial by jury of all triable issues.

5

6                              Respectfully submitted,

7                              FREEDOM OF CONSCIENCE DEFENSE FUND

8

9    Dated:  June 28, 2017          By:   /s/ Charles S. LiMandri
                                          Charles S. LiMandri
10                                         Paul M. Jonna
                                          Teresa L. Mendoza
11                                         Jeffrey M. Trissell
                                          Attorneys for PLAINTIFFS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF & NOMINAL DAMAGES