1  Charles S. LiMandri, SBN 11084
2  Paul M. Jonna, SBN 265389
   Teresa L. Mendoza, SBN 185820
3  Jeffrey M. Trissell, SBN 292480
4  FREEDOM OF CONSCIENCE DEFENSE FUND
   P.O. Box 9520
5  Rancho Santa Fe, California 92067
   Tel: (858) 759-9948; Fax: (858) 759-9938
6  cslimandri@limandri.com
7
   Attorneys for PLAINTIFFS
8

9            UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

11  **Citizens For Quality**          Case No. 3:17-cv-1054-BAS ( JMA)
12  **Education San Diego,** *et al.*,

13                                    **MEMORANDUM OF POINTS**
                                      **& AUTHORITIES IN SUPPORT**
14              Plaintiffs,           **OF PLAINTIFFS' MOTION FOR**
                                      **PRELIMINARY INJUNCTION**
15  vs.

16                                    Date:        March 26, 2018
                                      Judge:       Hon. Cynthia Bashant
17  **San Diego Unified School District,** *et al.*,   Magistrate: Hon. Jan Adler

18                                    **No Oral Argument Unless**
19              Defendants.          **Requested by the Court**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Pages (s)**

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION........................................................................1

STATEMENT............................................................................2

    1.    Summary Timeline of Facts.................................................2

    2.    Background.............................................................2

    3.    Relevant Proceedings ..................................................9

LEGAL STANDARD....................................................................10

ARGUMENT ...........................................................................10

    1.    Plaintiffs Are Likely to Succeed on the Merits...............................10

        1.1    Under the constitutional avoidance doctrine, the Court only needs to address Plaintiffs' California Constitution claims......10

        1.2    The Initiative violates the California Constitution's "No Preference Clause" because it favors a religious group.... 11

        1.3    The Initiative violates the California Constitution's "No Aid Clause" because it aids and advances a sectarian agenda.........12

        1.4    The Initiative violates the First Amendment because it defies the "history and logic of the Establishment Clause"...............13

            1.4.1   The discriminatory Policy withers under strict scrutiny....................................................13

            1.4.2   The Initiative fails the "*Lemon* Test" because it advances and fosters excessive entanglement with religion...........17

    2.    Plaintiffs Will Continue to Suffer Irreparable Harm Without Relief ..18

        2.1    Plaintiffs have Article III standing ...........................................18

            2.1.1   Individual Plaintiffs have standing under the First Amendment and as taxpayers.......................................19

# TABLE OF CONTENTS—continued

2.1.2  Organizational Plaintiffs have standing in their own right and on behalf of their members ............................20

2.2.  Defendants have caused Plaintiffs irreparable harm.................20

3.  The Balance of Hardships and the Public Interest tips Sharply in Plaintiffs' Favor .................................................................. 21

CONCLUSION................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
871 F.3d 884 (9th Cir. 2017) ................................................................20

*Agostini v. Felton*
521 U.S. 203 (1997) ........................................................................ 18

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*
512 U.S. 687 (1994) ........................................................................ 13

*Elrod v. Burns*
427 U.S. 347 (1976) ........................................................................20

*Brown v. Entm't Merchants Ass'n*
564 U.S. 786 (2011) ........................................................................ 15

*CAIR-Foundation, Inc. d/b/a Council on American-Islamic Relations*
Case 05-RC-186732 (N.L.R.B Apr. 7, 2017) ........................................5

*Cal. Educ. Facilities Auth. v. Priest*
12 Cal.3d 593 (1974) ........................................................................ 12

*Cammack v. Waihee*
932 F.2d 765 (9th Cir. 1991) ............................................................ 19

*Canell v. Lightner*
143 F.3d 1210 (9th Cir. 1998) ..........................................................20

*Carpenter v. City & Cnty. of San Francisco*
93 F.3d 627 (9th Cir. 1996) ............................................................ 10

*Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*
624 F.3d 1043 (9th Cir. 2010) .......................................................... 17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*
508 U.S. 520 (1993) ...................................................................14, 15

*City of Boerne v. Flores*
521 U.S. 507 (1997) ........................................................................ 14

# TABLE OF AUTHORITIES—continued

*Cmty. House, Inc. v. City of Boise*
  490 F.3d 1041 (9th Cir. 2007)............................................................... 21

*Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*
  492 U.S. 573 (1989)............................................................................. 17

*Doe v. Harris*
  772 F.3d 563 (9th Cir. 2014)................................................................ 20

*Doremus v. Bd. of Educ.*
  342 U.S. 429 (1952)............................................................................. 19

*E. Bay Asian Local Dev. Corp. v. California*
  24 Cal. 4th 693 (2000)..................................................................12, 13

*Edwards v. Aguillard*
  482 U.S. 578 (1987)............................................................................. 19

*Engel v. Vitale*
  370 U.S. 421 (1962)............................................................................. 19

*Estate of Thornton v. Caldor, Inc.*
  472 U.S. 703 (1985)............................................................................. 13

*Everson v. Bd. of Educ.*
  330 U.S. 1 (1947)................................................................................. 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
  528 U.S. 167 (2000)............................................................................. 20

*Gillette v. United States*
  401 U.S. 437 (1971)............................................................................. 13

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*
  484 U.S. 49 (1987)............................................................................... 18

*Hernandez v. C.I.R*
  490 U.S. 680 (1989)............................................................................. 14

*Hewitt v. Joyner*
  940 F.2d 1561 (9th Cir. 1991).............................................................. 11

# TABLE OF AUTHORITIES—continued

*Johnson v. Huntington Bch. Union High Sch. Dist.*
  68 Cal.App.3d 1 (1977)............................................................. 13

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*
  624 F.3d 1083 (9th Cir. 2010)......................................................20

*Larkin v. Grendel's Den, Inc.*
  459 U.S. 116 (1982).................................................................. 18

*Larson v. Valente*
  456 U.S. 228 (1982) ............................................................*passim*

*Lee v. Weisman*
  505 U.S. 577 (1992) .................................................................. 19

*Lemon v. Kurtzman*
  403 U.S. 602 (1971) ............................................................*passim*

*Los Angeles Cnty. v. Hollinger*
  221 Cal. App. 2d 154 (1963) ...................................................... 13

*Lynch v. Donnelly*
  465 U.S. 668 (1984) .................................................................. 17

*McDaniel v. Paty*
  435 U.S. 618 (1978) .................................................................. 15

*Morrison v. Olsen*
  487 U.S. 654 (1988) ....................................................................1

*Nat. Res. Def. Council v. Cnty. of Los Angeles*
  840 F.3d 1098 (9th Cir. 2016)..................................................... 18

*Newdow v. Rio Linda Union Sch. Dist.*
  597 F.3d 1007 (9th Cir. 2010) .................................................... 17

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*
  551 U.S. 701 (2007)................................................................... 16

*Paulson v. City of San Diego*
  294 F.3d 1124 (9th Cir. 2002)...............................................12, 13

MEMORANDUM OF POINTS & AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES—continued

*PLANS, Inc. v. Sacramento City Unified Sch. Dist.*
319 F.3d 504 (9th Cir. 2003) ................................................................20

*Sammartano v. First Judicial Dist. Court*
303 F.3d 959 (9th Cir. 2002) ................................................................21

*Sands v. Morongo Unified Sch. Dist.*
53 Cal. 3d 863 (1991) ..........................................................................11

*Santa Fe Indep. Sch. Dist. v. Doe*
530 U. S. 290 (2000).......................................................................*passim*

*Sch. Dist. of Abington Twp. v. Schempp*
374 U.S. 203 (1963) .............................................................................19

*Spokeo, Inc. v. Robins*
136 S. Ct. 1540, 1547 (2016) ...............................................................18

*Tex. Monthly, Inc. v. Bullock*
489 U.S. 1 (1989) .................................................................................13

*Turner Broadcasting Sys., Inc. v. FCC*
512 U.S. 622 (1994)..............................................................................16

*United States v. Playboy Entm't Grp., Inc.*
529 U.S. 803 (2000).........................................................................15, 16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*
454 U.S. 464 (1982) .............................................................................19

*Vernon v. City of Los Angeles*
27 F.3d 1385 (9th Cir. 1994) ...........................................................10, 11

*Video Software Dealers Ass'n v. Schwarzenegger*
556 F.3d 950 (9th Cir. 2009) ................................................................15

*Wallace v. Jaffree*
472 U.S. 38 (1985) ...............................................................................19

*Watchtower Bible Tract Soc'y of N.Y., Inc. v. Vill. of Strauss*
536 U.S. 150 (2002) .............................................................................16

- vii -

# TABLE OF AUTHORITIES—continued

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ................................................................................10

**Statutes**

  42 U.S.C. § 1983................................................................................ 9
  Cal. Code Regs. tit. 5, § 4261. ..........................................................3

**Constitutional Provisions**

  U.S. Const. amend. I. ....................................................................... 13
  Cal. Const. art. 1, § 4 ...................................................................... 11
  Cal. Const. art. XVI, § 5 .................................................................. 12
  Cal. Const. art. IX, § 8...................................................................... 12

# INTRODUCTION

This case is a tale of two iniquities that—absent an injunction—continue to fester in the San Diego Unified School District. First, in light of Defendants' "anti-Islamophobia initiative," it is a far graver sin for a bully to tug on a Muslim student's *hijab* than it is to knock off a Jewish student's *kippah*. Second, Defendants have chosen to politicize the schoolchildren entrusted to their care rather than cut ties with a notorious sectarian association. Defendants insist, however, that their "holistic" campaign against the purported "Islamophobic" children in District schools is simply part of their efforts "to protect all students from bullying." Not only is that illogical; it is Orwellian. Indeed, to paraphrase *Animal Farm*, a high school English class staple, Defendants are merely claiming that all students are equal, but some students are more equal than others.[1]

But the irrationality does not end there. Despite public statements to the contrary, Defendants have strengthened their partnership with the Council on American-Islamic Relations (CAIR). CAIR's religious agenda is irrefutable; its divisiveness is undeniable. And strikingly, it prowls the schools not as a wolf in sheep's clothing—in Justice Scalia's words, "this wolf comes as a wolf."[2] Yet the wool is not being pulled over Defendants' eyes. Instead, they remain *willfully blind* to the "*clearest command*" of the Establishment Clause: "One religious denomination cannot be officially preferred over another."[3]

As concerned parents and community advocates for equal education, Plaintiffs respectfully ask this Court to enjoin Defendants' "anti-Islamophobia initiative." *First*, Plaintiffs are likely to succeed on the merits of their claims. Defendants are singling out a religious sect for favorable treatment, delegating government power to a religious organization, and spending taxpayer money to advance a sectarian agenda. *Second*, Plaintiffs will continue to suffer irreparable harm without an injunction. Permitting

---

[1] *See* George Orwell, *Animal Farm* (1945).
[2] *Morrison v. Olsen*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).
[3] *Larson v. Valente*, 456 U.S. 228, 244 (1982) (emphasis added).

Defendants to continue discriminating on the basis of religion would irreparably harm Plaintiffs' fundamental rights under the California and United States Constitutions. *Third*, the balance of hardships tips sharply toward injunctive relief. This case is about intentional government partiality toward one religion, which raises serious First Amendment questions. *Fourth*, the public interest favors an injunction. In addition to serving the strong public interest in preventing the violation of constitutional rights, enjoining Defendants' actions and policies also serves the public interest by keeping divisive forces out of America's schools.

# STATEMENT

## 1. Summary Timeline of Facts (2016-2017)



## 2. Background

**Muslim Bullying: A 0.006% Crisis**. In July 2016, Defendant Board members (collectively, the "Board") directed the District's Superintendent, Defendant Cynthia Marten, to develop a "Plan to Address Islamaphobia [sic] and Muslim Student Safety/Bullying" ("Initiative"). [4] Under California law, school districts must adopt

---

[4] LiMandri Decl. ¶ 4, Ex. 2.

policies that prohibit religiously based "discrimination, harassment, intimidation, and bullying."[5] Leading up to their decision, however, Defendants did not make a determination that the District's state-mandated anti-bullying policies had failed to protect Muslim students. Nor did they have any credible evidence that a Muslim bullying crisis even existed. In fact, in 2015 and 2016, the District reported to California's Department of Education just two instances related to Muslim students. On the other hand, the District reported eleven incidents of anti-Semitic bullying.[6] Further, according to a District "Protected Class" report, from July 2016 to December 2016, just seven out of approximately 130,000 children were reported to have been bullied because of their religion. That report did not disclose how many of those seven students, if any, were Muslim.[7]

**"Awareness and Advocacy" for Muslims.** In April 2017, the Board enacted the Initiative's official policies and procedures ("Policy").[8] The Policy is the polished product of months of close collaboration between Superintendent Marten; Hanif Mohebi, executive director of CAIR's San Diego chapter; District bureaucrats; and a host of CAIR agents, including members of the "CAIR Education Committee to Address Islamophobia in the SDUSD" ("CAIR Committee").[9] In brief, the Policy triggered a series of "Action Steps" to "address Islamophobia and discrimination against Muslim students and their families."[10] These "Action Steps" include the following:[11]

- "Distribute a letter to staff and parents addressing Islamophobia";
- Ensure "Muslim Holidays are recognized" on District calendars;
- "Provide resources and strategies to support students during … Ramadan";

---

[5] *See* Cal. Code Regs. tit. 5, § 4261.
[6] LiMandri Decl. ¶ 5, Ex. 3; ¶ 6, Ex. 4.
[7] LiMandri Decl. ¶ 7, Ex. 5 at 6.
[8] *Id*. at 7-12.
[9] LiMandri Decl. ¶ 8, Ex. 6; *see also* LiMandri Decl. ¶ 33, Ex. 31.
[10] LiMandri Decl. ¶ 7, Ex. 5 at 4.
[11] *Id*. at 7-12.

1    o   "[V]et materials related to Muslim culture and history";
     o   "Explore and engage in formal partnerships" with CAIR;[12]
2    o   Provide "opportunities for staff related to awareness and advocacy
3        for Muslim culture";
     o   Develop "practical tools for educators regarding Islamic religious
4        practices and accommodations in schools"; and
5    o   "Explore clubs … to promote the American Muslim Culture"

6        **"Islam the Only Accepted Religion on Earth."** CAIR identifies itself as

7    America's largest Muslim civil liberties organization. In keeping with its religious identity,

8    CAIR "believes the active practice of Islam strengthens the social and religious fabric of

9    our nation."[13] As CAIR's founder, Omar Ahmad, said:

10            Islam isn't in America to be equal to any other faith, but to become
             dominant. The Koran, the Muslim book of scripture, should be the
11            highest authority in America, and Islam the only accepted religion on
             Earth.[14]
12
13   Moreover, Ibrahim Hooper, CAIR's Director of Strategic Communications, said:

14            I wouldn't want to create the impression that I wouldn't like the
             government of the United States to be Islamic sometime in the future.
15            But I'm not going to do anything violent to promote that. I'm going to
             do it through education.[15]
16
17   ///

18   _____

19   [12] Before the Policy's enactment, CAIR submitted a "Proposed Outline of Services" to
     District officials "IN THE NAME OF GOD, THE MOST COMPASSIONATE AND MERCIFUL."
20   CAIR's services included, among other things, "yearly mandatory training" for staff with
     "pass or fail" tests and the implementation of "culturally proficient curriculum" into
21   "lesson plans." For students, services provided for, among other things, mandatory videos
     to teach students about "how they can be allies to Muslim students." Finally, parent ser-
22   vices included, among other things, "training modules" to "better support and institu-
     tionalize healthy practices and support systems for Muslim students and parents."
23   According to Mohebi, the proposal was just an overview of CAIR's larger plan; and as he
24   noted in an email to Marten, "the short term as well as the long term plans will have some
25   costs." (LiMandri Decl. ¶ 9, Ex. 7.)

26   [13] LiMandri Decl. ¶ 10, Ex. 8.
27   [14] LiMandri Decl. ¶ 11, Ex. 9.
28   [15] LiMandri Decl. ¶ 42, Ex. 40.

Accordingly, CAIR prioritizes public school districts as ground zero to advance its religious mission.[16] To that end, CAIR has engaged the District to secure access to schools to hold "anti-Islamophobia" teacher workshops, give lectures to students about accepting Muslim students and Islam, and disseminate propaganda to teachers and students, including brochures about Islamic religious practices and Muslim student accommodations.[17] Nihad Awad, CAIR's national executive director, testified that the purpose of the propaganda is to create "a religious educational environment," and passing them out is both "a religious and educational exercise."[18] The reason, Awad testified, is that "informing the American public about the Islamic faith is a religious obligation."[19] In February 2017, Mohebi boasted in a radio interview that CAIR officials had visited over a dozen schools since President Donald Trump's election.[20]

**A Sustained and Detailed Covenant.** CAIR's relationship with the District runs deep. For example, in 2012, the District formed an official partnership with CAIR's San Diego chapter (CAIR-SD) to provide "mutual assistance and benefit through shared time and resources."[21] In 2015, the Board issued a formal "proclamation" to express gratitude both to CAIR-SD for "teaching" students and to Mohebi for his "guidance."[22] In November 2016, Defendant Marten wrote a letter of support for CAIR for its annual banquet, and in April 2017, Defendant Beiser wrote a letter of recommendation for Mohebi

---

[16] LiMandri Decl. ¶ 12, Ex. 10.

[17] CAIR gives students—including non-Muslim students—a pamphlet entitled *Know Your Rights as a Muslim Youth at School*. The guide exhorts students to "[l]earn more about and be proud of your faith" and to ask CAIR to "[h]elp connect you to resources about your faith." (LiMandri Decl. ¶ 13, Ex. 11.) For school officials, CAIR disseminates a pamphlet entitled *An Educator's Guide to Islamic Practices*. (LiMandri Decl. ¶ 14, Ex. 12.)

[18] *CAIR-Foundation, Inc. d/b/a Council on American-Islamic Relations*, Case 05-RC-186732 (N.L.R.B. Apr. 7, 2017) (decision and direction of election).

[19] *Id.*

[20] LiMandri Decl. ¶ 15, Ex. 13; LiMandri Decl. ¶ 16, Ex. 14.

[21] LiMandri Decl. ¶ 17, Ex. 15.

[22] LiMandri Decl. ¶ 18, Ex. 16.

to serve on a "Human Relations Commission."[23] Moreover, CAIR actively fundraises based on its involvement in the Initiative.[24]

Superintendent Marten summarized the District's relationship with CAIR in an email to Mohebi leading up to the Policy's enactment:

> While the details for the implementation of [the Anti-Islamophobia Initiative] are currently being developed, one thing is clear: you, and your organization—CAIR are key partners in any of our next steps. I look forward to continuing to partner with you in our next steps.

Minutes later, Mohebi replied, "You are AWSOME! [sic]"[25]

**A "$124,000,000 Budget Shortfall."** According to a page on the District's website entitled "Addressing Bullying of Muslim Students," the District states that "CAIR has not contributed to our curriculum."[26] Yet even before the Board adopted the Policy, District officials had been "meeting regularly with Hanif and the team"[27] to buy CAIR's "Muslim Instructional Materials."[28] The week after the April board meeting, CAIR Committee member Valerie Shields emailed Christopher Woehler, manager at the District's Instructional Materials Center (IMC), to ask if the Board had provided money to buy CAIR's "Ramadan books." Woehler replied, "I'm not sure if you are aware, but there is currently a $124,000,000 budget shortfall in our school district and the directive from leadership includes a spending freeze and a hiring freeze."[29]

On May 10, 2017, Shields—after directing IMC officials which books to buy, the number per school, and what to do with the leftover money[30]—emailed District higher-up Stanley Anjan, copying Mohebi and other CAIR operatives, the quote for the CAIR books:

---

[23] LiMandri Decl. ¶ 19, Ex. 17; LiMandri Decl. ¶ 20, Ex. 18.
[24] LiMandri Decl. ¶ 23, Ex. 21.
[25] LiMandri Decl. ¶ 24, Ex. 22.
[26] LiMandri Decl. ¶ 25, Ex. 23.
[27] LiMandri Decl. ¶ 26, Ex. 24; *see also* LiMandri Decl. ¶ 8 at Ex. 6.
[28] LiMandri Decl. ¶ 27, Ex. 25.
[29] LiMandri Decl. ¶ 28, Ex. 26.
[30] LiMandri Decl. ¶ 29, Ex. 27.

$1,236.54. Shields then directed Anjan to send a budget code to IMC officials "so these books may be ordered and processed, and advertised to teachers as being available for checkout."[31] The next day, Woehler confirmed to Anjan that he was working with the CAIR Committee "to purchase and distribute copies" of CAIR's "Muslim Student Anti-Bullying Library Books," explaining that they had used the IMC's "procurement card" to buy the books, which were already "being distributed to schools for their libraries." Woehler added that the IMC "will be placing an additional order this week for copies/titles … for schools and teachers to checkout."[32]

**The "Still in Effect" Action Steps.** At a public board meeting on July 25, 2017, Superintendent Marten introduced an item for the Board's adoption that, in part, provided that District staff would not be "assigned specifically to address the bullying of students of any single religion," and that they would be "redirected from forming a formal partnership with CAIR."[33] Nevertheless, Marten and other District officials met with CAIR operatives just hours before the board meeting to discuss strategy and logistics to keep the Initiative going. After that meeting, CAIR Committee member Linda Williams emailed Marten—copying CAIR officials—a "Toolkit of Resources for Addressing Islamophobia." Williams thanked Marten for meeting with them and noted that the toolkit was "just a beginning," and it could be "enhanced and enriched." Williams then added, "PLEASE NOTE: And / all [sic] wording can be changed for how the documents are described, the label of this list, etc."[34]

The next day, Marten's assistant emailed Mohebi to "set up a lunch for you all, Cindy, and Andrew Sharp [the District's Director of Public Information] to get together and share some time catching up." Mohebi accepted the invitation and suggested that they meet in the conference room at CAIR-SD's headquarters, which, according to Mohebi,

---

[31] LiMandri Decl. ¶ 30, Ex. 28.
[32] LiMandri Decl. ¶ 31, Ex. 29.
[33] LiMandri Decl. ¶ 32, Ex. 30.
[34] LiMandri Decl. ¶ 33, Ex. 31.

was "large/nice and private."[35]

Three days after the board meeting, CAIR agent Williams sent a lengthy email to Marten, Defendant Board members, other District officials, and copying Mohebi, Lallia Allali, and other CAIR agents. Williams "respectfully remind[ed]" Marten that the Policy's "Action Steps" are "still in effect," and that the CAIR Committee "worked diligently to assist the District in implementation." She then urged Marten to let CAIR know "the next steps," and that they must "follow through with what the Board voted unanimously to do on 4-4-17."

Williams also provided a link to Allali's "Addressing Islamophobia" website "to help support teachers."[36] Allali and her spouse, Imam Taha Hassane, are CAIR executive board members,[37] and Allali is a leading CAIR Committee member.[38]

**The District's New "Islamophobia Toolkit."** Less than three weeks before students returned to school, Sharp invited Williams to share with District officials a revised "Islamophobia Toolkit."[39] The toolkit included CAIR's bullying reports, presentations on Islamophobia, curriculum recommendations, instructional materials, links to Allali's website, and "CAIR FLYERS FOR STUDENTS, WHEN READY!!!"[40] Williams thanked Sharp by email, noting that the CAIR Committee is "delighted that the Curriculum departments will be reviewing these resources for potential use in our District!" Williams added that Allali's resources were "only the very beginnings of what could grow into a robust 'Toolkit' for Teachers, Counselors, and Administrators."[41]

The following day, Allali sent District officials more book recommendations.[42]

---

[35] LiMandri Decl. ¶ 34, Ex. 32.
[36] LiMandri Decl. ¶ 35, Ex. 33.
[37] LiMandri Decl. ¶ 21, Ex. 19; LiMandri Decl. ¶ 22, Ex. 20.
[38] LiMandri Decl. ¶ 35, Ex. 33; LiMandri Decl. ¶ 36, Ex. 34.
[39] LiMandri Decl. ¶ 36, Ex. 34.
[40] LiMandri Decl. ¶ 37, Ex. 35.
[41] LiMandri Decl. ¶ 36, Ex. 34.
[42] LiMandri Decl. ¶ 38, Ex. 36.

1   Sharp promised Allali that he would "circulate the list now."[43] At present, school library

2   shelves are stocked with CAIR books.[44]

3

## 3. Relevant Proceedings

5         The individual Plaintiffs are an ethnically and religiously diverse group of white,

6   Hispanic, and Chinese Americans, all of whom live and pay taxes in San Diego County and

7   send their children to District schools.[45] Their families do not worship Allah. The

8   organizational Plaintiffs are based in San Diego County and advocate on issues related to

9   education, student welfare, and equality.[46] In May 2017, Plaintiffs filed a lawsuit in this

10   Court under 42 U.S.C. § 1983 seeking declaratory and injunctive relief, alleging that the

11   Initiative violated the United States and California Constitutions as well as multiple state

12   statutes, including the Unruh Civil Rights Act and Education Code.[47] In June 2017,

13   Plaintiffs filed an amended complaint with additional state law claims.[48]

14         In September 2017, Plaintiffs' counsel received documents from the District in

15   response to two California Public Records Act requests submitted on July 31, 2017, and

16   August 1, 2017.[49] In brief, the documents showed, among other critical facts, Defendants'

17   personal involvement in the Initiative's planning and execution; the intensity of CAIR's

18   power and authority in the District; and the expenditure of taxpayer funds to purchase

19   CAIR educational resources. The documents also showed that Defendants are at present

20   intimately and continuously engaged in implementing the Initiative and that the Board's

21

---

22   [43] LiMandri Decl. ¶ 36, Ex. 34.

23   [44] He Decl. ¶ 26.

24   [45] *See* Hasson Decl. ¶¶ 1-4; He Decl. ¶¶ 1-4; Hu Decl. ¶¶ 1-4; Steel Decl. ¶¶ 1-4; Velazquez ¶¶ 1-4.

25   [46] *See, e.g.*, Declarations for Citizens for Quality Education San Diego ("CQE-SD") &

26   San Diego Asian American Foundation for Equality ("SDAAFE").

27   [47] Compl., ECF No. 1.

    [48] Amend. Compl., ECF No. 3.

28   [49] LiMandri Decl. ¶¶ 2-3.

"redirection" at the July board meeting was a sham. Consequently, Plaintiffs served Defendants with the amended complaint on November 3, 2017,  and now seek injunctive relief.[50]

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

**1. Plaintiffs Are Likely to Succeed on the Merits.**

**1.1    Under the constitutional avoidance doctrine, the Court only needs to address Plaintiffs' California Constitution claims.**

Under the constitutional avoidance doctrine, "[f]ederal constitutional issues should be avoided when the alternative ground is one of state constitutional law." *Carpenter v. City & Cty. of San Francisco*, 93 F.3d 627, 629 (9th Cir. 1996) (declining to address the plaintiff's federal constitutional claims because "the religion clauses of the California Constitution are read more broadly than their [federal] counterparts"); *but see Vernon v. City of Los Angeles*, 27 F.3d 1385, 1292 (9th Cir.1994) ("Where the state constitutional provisions are coextensive with related federal constitutional provisions, [courts] may decide the federal constitutional claims because that analysis will also decide the state constitutional claims."). Because Defendants have violated the California Constitution, the Court may decline to consider Plaintiffs' federal Establishment Clause claim and grant injunctive relief based only on their state law claims.

---

[50] The Court dismissed San Diego Unified School District as a defendant upon granting the parties' joint Motion to Dismiss. (ECF No. 19.)

### 1.2    The Initiative violates the California Constitution's "No Preference Clause" because it exalts religion.

The "No Preference Clause" guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference." Cal. Const. art. I, § 4. Although similar to the Religion Clauses of the First Amendment, the provision specifies that "the state may not discriminate between religions or prefer one religion over another." *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991). As such, the California Supreme Court has observed that "it would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion than that found in the no preference clause." *Sands v. Morongo Unified Sch. Dist.*, 53 Cal. 3d 863, 883 (1991) (internal citation and quotation marks omitted). Remarkably, Defendants contend that Muslim students are not getting special treatment.[51] Yet the Policy's "Action Steps" *expressly* single them out for preferential benefits.[52] Moreover, the *sole litmus test* for receiving those benefits is whether a student is Muslim or not, and the *sole reason* Defendants are working with CAIR to implement the Initiative is because the latter is an Islamic organization.

Nevertheless, Defendants insist their intent was not to endorse a religion but to "draw[] attention to the bullying of Muslim students" and "raise awareness of the issue."[53] That argument is unavailing. The No Preference Clause "prohibits *any appearance* that the government has allied itself with one specific religion." *Vernon*, 27 F.3d at 1395 (emphasis added). To Plaintiffs, the perception is crystal clear: the Initiative is the *only* school program designed exclusively by the District to benefit students of *one* religion, and this is magnified by the fact that the Initiative was built *from the ground up* as a *joint venture* with a sectarian organization.

In short, Defendants knowingly crossed the bright line that separates the permissible

---

[51] *See* LiMandri Decl. ¶ 25, Ex. 23.
[52] *See supra*, at 3-4.
[53] LiMandri Decl. ¶ 25, Ex. 23.

1 from the impermissible, deliberately lavishing time, energy, and benefits exclusively to
2 Muslim students—all in violation of the No Preference Clause.

3     **1.3**    **The Initiative violates the California Constitution's "No Aid Clause"**
4                 **because it aids and advances a sectarian agenda.**

5         Under the "No Aid Clause," no "school district … shall ever make an
6 appropriation, or pay from any public fund whatever, or grant anything to or in aid of any
7 religious sect, church, creed, or sectarian purpose." Cal. Const. art. XVI, § 5. According
8 to the California Supreme Court, the No Aid Clause holds that "the power, authority, and
9 financial resources of the government *shall never* be devoted to the advancement or support
10 of religious or sectarian purposes." *Cal. Educ. Facilities Auth. v. Priest*, 12 Cal.3d 593, 603
11 (1974) (emphasis added).[54] Further, the Ninth Circuit summarized a wide range of relevant
12 California cases in *Paulson v. City of San Diego* and concluded that the provision

13               prohibits the government from (1) granting a benefit in any form (2) to
14               any sectarian purpose (3) regardless of the government's secular
              purpose (4) unless the benefit is properly characterized as indirect,
15               remote, or incidental.

16 294 F.3d 1124, 1131 (9th Cir. 2002) (en banc).

17         In this case, a government policy by which public officials *mis*-appropriate taxpayer
18 money under the direction of a sectarian organization cannot be more fundamentally at
19 odds with the No Aid Clause. Tellingly, District officials did this even though they were
20 *well aware* of the $124 million budget deficit and corresponding spending freeze.[55] Moreo-
21 ver, the No Aid Clause "forbids more than the appropriation or payment of public funds
22 to support sectarian institutions." *E. Bay Asian Local Dev. Corp. v. California*, 24 Cal. 4th
23 693, 721 (2000). "[It] bans any official involvement, *whatever its form*, which has the direct,
24 immediate, and substantial effect of promoting religious purposes." *Paulson*, 294 F.3d at

25

26      [54] *See also* Cal. Const. art. IX, § 8 ("[A]ny sectarian or denominational doctrine [shall
27 never] be taught, or instruction thereon be permitted, directly or indirectly, in any of the
common schools of this State.").

28      [55] *See supra*, at 6.

1  1129 (emphasis added) (quoting *E. Bay*, 24 Cal. 4th at 721). [56]

2  The provision does not prohibit, however, "incidental benefits" to a sectarian

3  purpose. *Id.* at 1131. A "benefit" may be "incidental" if it is "available on an equal basis

4  to those with sectarian and those with secular objectives." *Id.* That is not the case here.

5  There are no programs promoting "Jewish culture." There are no lectures from priests on

6  how to accommodate Catholic students during Lent. And there are no partnerships with

7  Evangelical Christian activists. In short, Defendants have placed their power, prestige, and

8  purse behind a single religion: Islam.

9  **1.4    The Initiative violates the First Amendment because it defies the**

10  **"history and logic of the Establishment Clause."**

11  **1.4.1   The discriminatory Policy withers under strict scrutiny.**

12  The First Amendment forbids any "law respecting an establishment of religion."

13  U.S. Const. amend. I. Accordingly, the Supreme Court has long held that "the

14  Establishment Clause prohibits government from abandoning secular purposes in order to

15  put an imprimatur on one religion, or on religion as such, or to favor the adherents of any

16  sect or religious organization." *Gillette v. United States*, 401 U.S. 437, 450 (1971); *Bd. of*

17  *Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994) ("[A] principle at

18  the heart of the Establishment Clause [is] that government should not prefer one religion

19  to another, or religion to irreligion.").[57] Consequently, when a government policy prefers

20

21

---

22  [56] *See, e.g., Johnson v. Huntington Bch. Union High Sch. Dist.*, 68 Cal.App.3d 1, 16 (1977)

23  (upholding school district's rejection of student Bible study club meetings because the

24  meetings "implicated school authority and prestige behind the dissemination of religious

25  dogma"); *Los Angeles Cnty. v. Hollinger*, 221 Cal. App. 2d 154, 158 (1963) (holding that the

    No Aid Clause prohibited the public financing of a film about a religious parade even

    though "publicizing the attractions of the county is a proper secular purpose").

26  [57] *Cf. Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 17 (1989) (plurality) (invalidating a tax

27  exemption for religious publications because it "effectively endorses religious belief"); *Es-*

28  *tate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 711 (1985) (O'Connor, J., concurring) (finding

    a state statute that gave special treatment to Sabbath observers unconstitutional because

1   one religion to another, the Court applies strict scrutiny to determine its constitutionality.

2   *See Larson v. Valente*, 456 U.S. 228, 246 (1982).[58] Under this standard, Defendants must

3   show that discriminating among students on the basis of religion is narrowly tailored to

4   achieve a compelling government interest. *See id.* at 247. Strict scrutiny is "the most

5   demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534

6   (1997), and a policy that "targets religious conduct for distinctive treatment … will survive

7   [it] only in rare cases." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

8   520, 546 (1993). This is not one of those cases.

9       "The clearest command of the Establishment Clause is that one religious

10   denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. In

11   *Larson*,[59] the Supreme Court struck down a state statute that facially exempted from state

12   registration and reporting requirements only those religious organizations that received

13   more than half their funds from members. *Id.* at 231. Evident in the statute's history, the

14   state legislature intentionally drew this distinction to discriminate between religions. *Id.* at

15   253–54. Because the statute was "drafted with the explicit intention of including particular

16   religious denominations and excluding others," the Court explained that the law "sets up

17   precisely the sort of official denominational preference that the Framers of the First

18   Amendment forbade." *Id.* at 254-55. Like the law in *Larson*, the Policy was purposefully

19   drafted to prefer one religion to another. In fact, Defendants' denominational preference

20   is even *more* offensive than that in *Larson* because, *by its plain language*, the Policy facially

21   classifies among religions.[60]

22

23   "[t]he message conveyed is one of endorsement of a particular religious belief, to the det-

24   riment of those who do not share it").

25   [58] *See, e.g.*, *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (holding that when it is
claimed that a denominational preference exists (as here), the initial inquiry is whether the

26   law facially discriminates among religions; if not, then the Court applies the three-pronged

27   test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).

    [59] A copy of the Supreme Court's decision in *Larson* is attached as Exhibit 50.

28   [60] *See supra*, at 3-4.

Because the Initiative is fatally flawed, only an interest "of the highest order" can justify it. *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (internal quotation marks omitted). Defendants assert that their intent is to "eliminat[e] the fear faced by children."[61] But how can pursuing such an amorphous end validate a policy that divides students along religious lines and singles out one sect for preferential treatment? "Even where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 804–05 (2011). And the limit on Defendants' Initiative is beyond question: "[N]o State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Larson*, 456 U.S. at 246 (quoting *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947)). "This prohibition is *absolute*." *Id.* (emphasis added).

Even if Defendants' interest in combating "Islamophobia" is compelling enough to contravene Plaintiffs' constitutional rights, there must be an "actual problem" in need of solving. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000). Defendants contend that Muslim students are feeling particularly vulnerable.[62] Yet there is not a scintilla of credible evidence that "Islamophobia"—that is, the *pure hatred* of Muslim students—runs rampant in District schools.[63] Instead, Defendants have relied solely on specious student surveys and testimonials that CAIR had provided as part of its lobbying for the Initiative.[64] Under the Supreme Court's "most rigorous" scrutiny, that is not enough. *Lukumi*, 508 U.S. at 546.[65]

Moreover, whatever interest Defendants may have in protecting Muslim students,

---

[61] LiMandri Decl. ¶ 25, Ex. 23.

[62] *Id.*

[63] *See, e.g.*, LiMandri Decl. ¶¶ 4-7.

[64] LiMandri Decl. ¶ 39, Ex. 37.

[65] *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009), *aff'd sub nom. Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011) (striking down on First Amendment grounds a California law that placed violent video game restrictions on minors in part because the studies the State offered in support of its asserted compelling interest (preventing psychological or neurological harm to minors) suffered from "significant, admitted flaws in methodology").

- 15 -

the Policy's "Action Steps" are not narrowly tailored to achieve it. "Narrow tailoring requires serious, good faith consideration of workable [religion]-neutral alternatives." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007) (internal citation and quotation marks omitted); *Playboy Entm't Group, Inc.*, 529 U.S. at 815 ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it."). Given that their intentionally discriminatory scheme was built from the ground up with CAIR, it is hardly surprising that Defendants never considered a constitutionally mandated neutral alternative.

Narrow tailoring also requires Defendants to show that the Initiative "will in fact alleviate" the alleged Islamophobia in "a direct and material way." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994) (plurality).[66] For Defendants, that presents a glaring problem: the District *already* has an anti-bullying department that has "assigned staff and serves students and other departments through trainings, curriculum review and other activities,"[67] and it *already* has state-mandated policies in place to address student bullying and discrimination.[68] To the extent Defendants' interest is keeping every student safe, ordaining activists from a religious organization to assume the duties of trained guidance counselors with superior experience and qualifications is, at the very least, an extreme measure. In any event, the Policy's "Action Steps" are not narrowly tailored to achieve any compelling interest. In both design and execution, the Initiative discriminates in favor of one religion, which is an objective that defies "the history and logic of the Establishment Clause." *Larson*, *supra*, at 246.

---

[66] *Cf. Watchtower Bible Tract Soc'y of N.Y., Inc. v. Vill. of Strauss*, 536 U.S. 150, 152 (2002) (rejecting the government's asserted interest of crime prevention in part because of the "absence of any evidence of a special crime problem" related to the challenged discriminatory law).

[67] LiMandri Decl. ¶ 25, Ex. 23.

[68] *See supra*, at 3.

### 1.4.2   The Initiative fails the "*Lemon* Test" because it advances and fosters excessive entanglement with religion.

Under the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), a government policy subject to an Establishment Clause challenge (1) must have a secular purpose; (2) its primary effect must not advance religion; and (3) it must not foster excessive government entanglement with religion. *See id.* at 612-613. "Failure to satisfy any one of the three prongs is sufficient to invalidate the challenged law or practice." *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1076-77 (9th Cir. 2010). The Initiative not only fails one *Lemon* prong—it fails all three.

*First*, the Initiative's purpose is *sectarian*, not secular. To determine "purpose" under the *Lemon* test, the "starting point" is the government policy's "language itself." *Newdow*, 597 F.3d at 1024; *Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1056 (9th Cir. 2010) ("[A] court must, in deciding whether a government action violates the Establishment Clause, read the words of the government enactment."). As discussed above (*see supra*, at 11, 15), the Policy's plain language makes it obvious that Defendants have implemented the Initiative for the unlawful purpose of favoring a particular religious sect. When tested under *Lemon*'s purpose prong, Defendants' actions cannot stand.

*Second*, the Initiative's primary effect advances religion. Indeed, the Initiative sends a message to Plaintiffs—as nonadherents of Islam—that they are outsiders, not full members of the school community. *See Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring). It also sends a message to Muslim students that they are insiders, favored members of the school community. *See id*; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U. S. 290, 390 (2000). "The Establishment Clause, at the very least, prohibits government … from making adherence to a religion relevant in any way to a person's standing in the political community." *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 593-94 (1989) (internal quotation marks omitted). Defendants have done so here.

*Third*, Defendants are excessively entangled with religion. When determining excessive entanglement, courts examine "the character and purposes of the benefited institutions, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Agostini v. Felton*, 521 U.S. 203, 206 (1997) (internal quotation marks omitted).[69] Little analysis is needed here. When Defendants delegate government power to a religious organization; when they lavish unique benefits on a religious subset within the school community; and when they give sectarian activists exclusive access into classrooms to proselytize to schoolchildren in a coercive educational environment—"excessive entanglement" is an understatement.

## 2. Plaintiffs Will Continue to Suffer Irreparable Harm Without Relief.

### 2.1    Plaintiffs have Article III standing.

To establish Article III standing, a plaintiff must show that his injury is (1) actual, concrete, and particularized; (2) fairly traceable to Defendants' actions and policies; and (3) redressable by a favorable ruling from this Court. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Defendants have violated Plaintiffs' constitutional rights, and a decision from this Court will redress these injuries.[70] Therefore, at this preliminary stage of the litigation, Plaintiffs have carried their burden to establish standing.

---

[69] *See, e.g.*, *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126-127 (1982) (holding that a state statute giving churches & schools power to veto liquor license applications within a 500-foot radius of a church or school violated the Establishment Clause because the law created a "fusion of governmental and religious functions" by delegating "important, discretionary governmental powers" to sectarian institutions).

[70] Defendants purportedly rescinded the Initiative's official Policy at the July 25, 2017, board meeting. Even if the resolution was genuine and not a sham, it does not moot this case. Voluntary cessation of a challenged practice does not moot a case unless "it is absolutely clear that allegedly wrongful behavior could not reasonably be expected to recur." *Nat. Res. Def. Council v. Cnty. of Los Angeles*, 840 F.3d 1098, 1102 (9th Cir. 2016) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987)). Defendants have neither stipulated nor shown that they would not reinstate the Policy or officially partner with CAIR in the future.

### 2.1.1  Individual Plaintiffs have standing under the First Amendment and as taxpayers.

The Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard,* 482 U.S. 578, 583-584 (1987). Thus, the Court has affirmed the standing of schoolchildren and parents who are "directly affected" by a policy that has "the purpose and perception of government establishment of religion." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 n. 22 (1982).[71] Here, the issue of standing is simple: Every single day Plaintiffs' children attend school, they are exposed to the threat of a constitutional injury. Defendants' favoritism toward Muslim students spiritually affronts them. Defendants' promotion of Islam ostracizes them. And Defendants' exclusion of Plaintiffs' children from a publicly financed program deprives them of an educational benefit.[72] Therefore, Plaintiffs have standing under the Establishment Clause.

Furthermore, the individual Plaintiffs have standing as taxpayers. Specifically, they pay taxes to the state, and they have identified the expenditure of public funds on the Initiative.[73] *See Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952); *see also Cammack v. Waihee*, 932 F.2d 765, 769 (9th Cir. 1991) (holding that state and municipal taxpayers had standing to challenge a statute declaring Good Friday a state holiday because they had suffered a "pocketbook injury").

---

[71] The Supreme Court has consistently found standing in Establishment Clause challenges in the school context. *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (prayer at a football game); *Wallace v. Jaffree*, 472 U.S. 38 (1985) (moment of silence at school); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) (Bible reading at a public school); *Lee v. Weisman*, 505 U.S. 577 (1992) (religious invocation at a graduation); *Engel v. Vitale*, 370 U.S. 421 (1962) (school prayer).

[72] *See, e.g.*, Decls. of Hasson, He, Hu, Steel & Velazquez.

[73] *See* Hasson Decl. ¶ 13; He Decl. ¶ 27; Hu Decl. ¶ 13; Steel Decl. ¶ 13; Velazquez Decl. ¶ 13; *see also* LiMandri Decl. ¶ 31 at Ex. 29.

### 2.1.2  Organizational Plaintiffs have standing in their
### own right and on behalf of their members.

The organizational Plaintiffs have standing because they have suffered harm as associations. In particular, Defendants' actions both have directly undermined their missions and forced them to divert time and resources to counteract the Initiative.[74] *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083 (9th Cir. 2010) (holding that an organization suffers an injury-in-fact when a defendant's actions both frustrate the organization's mission and causes a diversion of resources). The organizational Plaintiffs also have standing in a representative capacity because their members have individual standing to sue, the interests at stake are germane to their interests, and their claims do not need the individual members' participation in the lawsuit.[75] *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000).[76]

### 2.2    The Initiative has caused Plaintiffs irreparable harm.

"The Supreme Court has made clear that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 871 F.3d 884, 898 (9th Cir. 2017) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).[77] Plaintiffs' "colorable First Amendment claim" constitutes irreparable injury, which is sufficient to merit injunctive relief. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (internal quotation marks omitted).

---

[74] CQE-SD Decl. ¶ 9; SDAAFE Decl. ¶ 6.

[75] CQE-SD Decl. ¶ 2; SDAAFE Decl. ¶ 2.

[76] *See also PLANS, Inc. v. Sacramento City Unified Sch. Dist.*, 319 F.3d 504, 507 (9th Cir. 2003) (organization had standing in Establishment Clause challenge because it had members who lived within the districts' boundaries, it sought to protect interests germane to its purpose & it asserted claims that did not need individual member participation).

[77] *See Santa Fe*, *supra*, 18 & n. 68, at 316 ("[T]he simple enactment of this policy, with the purpose and perception of school endorsement of [religion], was a constitutional violation."); *see also Canell v. Lightner*, 143 F.3d 1210, 1214 (9th Cir. 1998) (noting that "a government policy" subject to an Establishment Clause challenge "need not be formal, written, or approved by an official body to qualify as state sponsorship of religion").

**3.  The Balance of Hardships and the Public Interest Tips
    Sharply in Plaintiffs' Favor.**

The balance of hardships and the public interest favors the protection of Plaintiffs' constitutional rights. Indeed, Plaintiffs have raised "serious First Amendment questions," which "compels a finding" that the balance of hardships tips sharply in Plaintiffs' favor. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (finding the balance of hardships tipped in the plaintiffs' favor because they alleged government aid to religion). Also, courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

# CONCLUSION

The question before this Court is simple: Is the Anti-Islamophobia Initiative neutral toward religion? In light of Supreme Court precedent and the Establishment Clause's absolute mandate against religious preference, it is not. Accordingly, Plaintiffs respectfully ask this Court to enjoin Defendants, serving in their official capacities, as well as Defendants' officers, agents, employees, and attorneys, serving in their official capacities, from

1.  Implementing and executing the Initiative as detailed in the Policy's "Action Steps" or any similar policy;

2.  Permitting the Council on American-Islamic Relations, its employees, agents, and representatives to advance their organizational objectives within the District; and

/ / /
/ / /
/ / /
/ / /

1        3.     Adopting and implementing the CAIR Committee's "Islamophobia

2                Toolkit" and all related online resources, recommended books, and in-

3                structional materials, together with all such materials currently in use in

4                the District.

6                          Respectfully submitted,

7                          FREEDOM OF CONSCIENCE DEFENSE FUND

9  Dated: February 20, 2018       By:     /s/ Charles S. LiMandri

10                         Charles S. LiMandri

                           Paul M. Jonna

11                       Teresa L. Mendoza

12                       Jeffrey M. Trissell

14                       Attorneys for PLAINTIFFS