Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Citizens For Quality Education San Diego**, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> **San Diego Unified School District**, *et al.*, <br><br> Defendants. | Case No. 3:17-cv-1054-BAS ( JMA) <br><br><br> **INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

/ / /

/ / /

/ / /

/ / /

/ / /

# INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Exhibit | Page # | Title / Description |
|---------|--------|---------------------|
| Exhibit 1 | 2 | Declaration of Charles LiMandri |
| Exhibit 2 | 10 | Agenda Item G.5., "Proposed Direction to Superintendent to Develop Plan to Address Islamophobia and Muslim Student Safety/Bullying," from the San Diego Unified School District ("District") Board of Education's ("Board") regular board meeting on July 26, 2016 |
| Exhibit 3 | 12 | The District's notices of state-reported reports of religious-based incidents in 2015 and 2016 |
| Exhibit 4 | 31 | The District's list of unique incidents of bullying and harassment reported in 2015 and 2016 |
| Exhibit 5 | 48 | "Vision 2020/Quality Schools in Every Neighborhood District Accountability Report" presented at the April 4, 2017, District Board meeting |
| Exhibit 6 | 61 | Defendant Cynthia Marten's notes taken during a meeting with CAIR representative Hanif Mohebi on September 26, 2016 |
| Exhibit 7 | 65 | CAIR's "Proposed Outline of Services" to the District |
| Exhibit 8 | 68 | CAIR's "Vision, Mission, Core Principles" posted on its website, *available at* http://cair.com/about-us/vision-mission-core-principles.html |
| Exhibit 9 | 73 | July 4, 1998, article from the *San Ramon Valley Herald* headlined "American Muslim leader urges faithful to spread Islam's message" |
| Exhibit 10 | 75 | Printout of the rush transcript of a July 28, 2016, KPBS News radio interview with Hanif Mohebi, Executive Director of CAIR's San Diego chapter ("CAIR-SD"), entitled "San Diego Unified School Board Approves Creation of Anti-Islamophobia Plan" |
| Exhibit 11 | 80 | CAIR pamphlet entitled *Know Your Rights as a Muslim Youth at School* |
| Exhibit 12 | 83 | CAIR pamphlet entitled *An Educator's Guide to Islamic Religious Practices* |

| Exhibit | Page # | Title / Description |
|---|---|---|
| Exhibit 13 | 103 | Two email exchanges beginning on December 15, 2016, and January 30, 2017, respectively that include KPBS reporter Megan Burks and various District officials regarding Mohebi's visit to Logan Elementary school on February 2, 2017 |
| Exhibit 14 | 109 | February 2, 2017, article by Megan Burks for KPBS News, headlined "Anti-Islamophobia Training Rolls Out In San Diego Schools, *available at* https://goo.gl/iUCF7p |
| Exhibit 15 | 113 | Partnership Agreement between  the District and  CAIR-SD entered into in November 2015 |
| Exhibit 16 | 116 | Agenda Item F.3., "Proclamation Recognizing the Council on American-Islamic Relations (CAIR) San Diego Chapter," from the District Board of Education's regular board meeting on November 10, 2015; copy of said Proclamation |
| Exhibit 17 | 119 | Email exchange beginning on October 13, 2016, involving Defendant Marten and Mohebi, through which Mohebi requested, and Marten provided, a letter honoring CAIR |
| Exhibit 18 | 126 | Email exchange beginning on April 4, 2017, involving Defendant Beiser and Mohebi, through which Mohebi requested, and Beiser provided a letter of recommendation, which Mohebi had drafted |
| Exhibit 19 | 129 | Printout of a page from the CAIR California – San Diego Area website entitled "Our Board" |
| Exhibit 20 | 131 | Printout of a page from the CAIR California – Greater Los Angeles Area website entitled "Our Board" |
| Exhibit 21 | 133 | Printout of a page the CAIR California – San Diego Area website entitled "Make a One-Time Gift" |
| Exhibit 22 | 139 | Email exchange beginning March 28, 2017, among Defendant Marten, Mohebi, and various District officials, with the subject line, "April 4th Meeting and MOU" |
| Exhibit 23 | 143 | Printout of a page on the District's website entitled "Addressing Bullying of Muslim Students" |
| Exhibit 24 | 147 | #mail exchange beginning March 15, 2017, between Linda Trousdale, a District official, and Defendant Marten, with the subject line, "CAIR / Hanif Mohebi – Invitation to edit" |

/ / /

INDEX OF EXHIBITS IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION                317CV1054

| Exhibit | Page # | Title / Description |
|---------|--------|---------------------|
| Exhibit 25 | 149 | Email exchange beginning March 6, 2017, between District officials Christopher Woehler and Linda Trousdale, with the subject line, "Muslim Instructional Materials" |
| Exhibit 26 | 151 | Email exchange beginning April 15, 2017, among District official Christopher Woehler and CAIR agent Valerie Shields, along with other District officials, with the subject line, "Books for Ramadan" |
| Exhibit 27 | 153 | Email dated April 21, 2017, from Cair agent Valerie Shields to District officials, with the subject line, "More specifics re ordering of Muslim culture books" |
| Exhibit 28 | 155 | Email dated May 10, 2017, from CAIR agent Valerie Shields to District official Stanley Anjan, cc'ing Mohebi and CAIR agents Lallia Allali and Linda William, provides a quote for the CAIR books from Barnes & Noble Booksellers for $1,236.54. |
| Exhibit 29 | 158 | Email exchange beginning on May 10, 2017, between District officials Woehler, Anjan, and Jim Solo, with the subject line, "Muslim Student Anti-Bullying Library Books." |
| Exhibit 30 | 161 | Agenda Item E.2, "REVISED 7/25/17: Addressing Tolerance Through the Comprehensive School Counseling and Guidance Plan" from the District Board of Education's regular board meeting on July 25, 2017 |
| Exhibit 31 | 164 | Email exchange on July 25, 2017, between District officials and CAIR agents, with the subject line, "Thanks for today's meeting! As promised—1st DRAFT—Creating a Toolkit of online resources for Addressing Islamophobia!" |
| Exhibit 32 | 169 | Email exchange beginning on July 26, 2017, from Defendant Marten's assistant to Mohebi and others, with the subject line "Lunch with Cindy and Andrew" |
| Exhibit 33 | 175 | Email dated July 28, 2017, from CAIR agent Linda Williams to Superintendent Marten, Defendant Board Members, and other District officials, copying Mohebi, Lallila Allali, and other CAIR agents, with the subject line "Addressing Islamophobia SDUSD." |

/ / /
/ / /

- 3 -

| Exhibit | Page # | Title / Description |
|---|---|---|
| Exhibit 34 | 179 | Email exchange beginning August 9, 2017, among CAIR agents Linda Williams and Lallia Allali and District official Andrew Sharp, copying Defendant Marten and Mohebi, among others, with the subject line "Recommended resources to be reviewed/vetted by SDUSD Curriculum Department" |
| Exhibit 35 | 185 | CAIR's "A Beginning Toolkit of Resources for Addressing Islamophobia, and Promoting Mutual Understanding, Respect, and Harmony" |
| Exhibit 36 | 188 | CAIR agent Lallia Allali's "List of 36 Books for promoting American/Islamic Harmony" |
| Exhibit 37 | 205 | Report of a survey conducted by CAIR's California chapter entitled "Mislabeled: The Impact of Bullying and Discrimination on California Muslim Students" |
| Exhibit 38 | 223 | AP 6381, the District's administrative procedure for addressing bullying and intimidation |
| Exhibit 39 | 234 | April 4, 1993, article by Lou Gelfran for the *Minneapolis Star Tribune* entitled, "Reader Says Use of 'Fundamentalist' Hurting Muslims" |
| Exhibit 40 | 237 | July 31, 2017, letter to the San Diego Unified School District seeking records under the California Public Records Act |
| Exhibit 41 | 242 | August 1, 2017, letter to the San Diego Unified School District seeking records under the California Public Records Act |
| Exhibit 42 | 246 | September and October 2017 emails from Jeffrey Day, Legal Specialist at the District, responding to California Public Records Act requests |
| Exhibit 43 | 259 | Declaration on behalf of Plaintiff Citizens for Quality Education San Diego |
| Exhibit 44 | 263 | Declaration on behalf of Plaintiff San Diego Asian Americans for Equality Foundation |
| Exhibit 45 | 266 | Declaration of Plaintiff Scott Hasson |
| Exhibit 46 | 270 | Declaration of Plaintiff Chaoyin He |
| Exhibit 47 | 276 | Declaration of Plaintiff Xuexun Hu |

| Exhibit | Page # | Title / Description |
|---------|--------|---------------------|
| Exhibit 48 | 280 | Declaration of Plaintiff Kevin Steel |
| Exhibit 49 | 284 | Declaration of Plaintiff Jose Velazquez |
| Exhibit 50 | 288 | Copy of the United States Supreme Court's opinion in *Larson v. Valente*, 456 U.S. 228 (1982). |

Respectfully submitted,

FREEDOM OF CONSCIENCE DEFENSE FUND

Dated:  February 20, 2018        By:    /s/ Charles S. LiMandri

Charles S. LiMandri
Paul M. Jonna
Teresa L. Mendoza
Jeffrey M. Trissell
Attorneys for PLAINTIFFS

- 5 -

**EXHIBIT 26**

[150]

Responsive Documents FY20162017.142 Request 4

| From: | Woehler Christopher |
|---|---|
| Sent: | Monday, April 17, 2017 7:15 AM |
| To: | 'Valerie Shields'; Denton Margo |
| Cc: | Karanopoulos Martha |
| Subject: | RE: Books for Ramadan |

| Tracking: | Recipient | Read |
|---|---|---|
| | 'Valerie Shields' | |
| | Denton Margo | |
| | Karanopoulos Martha | Read: 4/17/2017 8:06 AM |

Hi Valerie,

That's great news for your Board work. I'm not sure if you are aware, but there is currently a $124,000,000 budget shortfall in our school district and the directive from leadership includes a spending freeze and a hiring freeze. We can certainly incorporate your donation into the IMC collection. Are the books hard cover copies of the title? If so, please work with Martha Karanopoulos with your donated copies.

Thank you,

Chris Woehler
Manager, Instructional Materials & Williams Coordinator Instructional Resources and Materials Department
2441 Cardinal Lane, SD CA 92123
(858)496-8461

-----Original Message-----
From: Valerie Shields          Redacted
Sent: Saturday, April 15, 2017 9:56 AM
To: Denton Margo <mdenton@sandi.net>; Woehler Christopher <cwoehler@sandi.net>
Subject: Books for Ramadan

Good news re Board support for our work again Islamophobia. However, any $ showing up from them to purchase our Ramadan books? Or was their support all words? We do have 60 books of Grand Mosque of Paris being purchased by Jewish Community group. Remind me how they go about donating to the IMC? And how can we advertise to teachers in the District that the books are available for checkout, once bought? Thanks, from the committee.

**[151]**

**EXHIBIT 27**

Responsive Documents FY20162017.142 Request 4

| | |
|---|---|
| **From:** | Valerie Shields    Redacted |
| **Sent:** | Friday, April 21, 2017 2:50 PM |
| **To:** | Karanopoulos Martha |
| **Cc:** | Denton Margo; Woehler Christopher |
| **Subject:** | More specifics re ordering of Muslim culture books |

Please only order: 1. "Lailah's Lunchbox"; one per site for any site that has grades K-5. (We r hoping u have accurate #s & school names to do this.). 2.  "Grand Mosque of Paris"; one per site any site that has grades 6-8 and grades 9-12. (Again u have #s & names). With any funds left over, we would like to order the 20 each of the other titles that we have given u, to b kept at IMC & checked out by teachers. Not sure how funding works? Need to give Stan the budget required for books AFTER u go thru & see the cost? Or can he give u the $ he has for us cartel Blanche? Thanks, val & committee.

Sent from my iPhone

**EXHIBIT 28**

[154]

FY20162017.142 3,8,9,11

| From: | Valerie Shields <    Redacted |
|---|---|
| Sent: | Wednesday, May 10, 2017 10:05 AM |
| To: | Anjan Stanley |
| Cc: | Lallia Allali; Hanif Mohebi; Linda Williams; Simone Arias |
| Subject: | Fwd: Barnes & Noble Quote 538621 |

Stan, here is the quote from the vendors for the sets of books for the IMC.  As you can see, it is only $1236, due to being mostly paperbacks.  Can you please send a budget code to Martha or Chris W in the IMC so these books may be ordered and processed, and advertised to teachers as being available for checkout at the IMC?  They are still waiting on the budget code for the other books. At this point, we are only talking $3600, a far cry from the $8,000 funds Lallia had heard mentioned?  Again, we need you to send a communication to staff once these books become available.  Thanks so much for your support in this.  Val Shields, on the Distict Committee to Address Islamophobia  (PS, I think this would be a nice step for the Board Members to be made aware of, given their commitment to addressing this issue.)


Begin forwarded message:

**From:** Barnes & Noble Hazard Center <CRM1978@bn.com>
**Subject: Barnes & Noble Quote 538621**
**Date:** May 9, 2017 at 11:22:40 AM PDT
**Cc:** Barnes & Noble Hazard Center <CRM1978@bn.com>


## Barnes & Noble
## Booksellers
Store 1978

Mission Valley  7610 Hazard Center Drive #315  San Diego, CA  92108

### Quote # 538621

| Store Number: | 1978 |
|---|---|
| Prepared For: | SDUSD IMC Anne Anne  Mealiffe |
| School/Company: | SDUSD IMC Anne |
| Store Contact: | Mary Zaffron |
| Contact Phone: | (619) 220-0175 |
| Store Fax No.: | (619) 220-0373 |
| Preparation Date: | 05/09/2017 |
| Order Due Date: | 05/12/2017 |

**Shipping Address:**

**Customer Phone:** (858) 496-8465
**Customer Email:** amealiffe@sandi.net

| Product | Title | Author | Publisher | Format | Discount Allowed | Destination | Quantity | List Price | % Off | Quoted Price | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9780439922333 | Does My Head Look Big in This? | Randa Abdel-Fattah | Scholastic, Inc. | MM | | Ship-to-Store | 20 | 9.99 | 20.0% | 7.99 | 159.80 |
| 9780802852960 | Four Feet, Two Sandals | Karen Lynn Williams | Eerdmans, William B. Publishing Company | TC | | Ship-to-Store | 14 | 17.00 | 20.0% | 13.60 | 190.40 |
| 9781580896122 | I'm New Here | Anne Sibley O'Brien | Charlesbridge | TC | | Ship-to-Store | 20 | 16.95 | 20.0% | 13.56 | 271.20 |
| 9780884484318 | Lailah's Lunchbox: A Ramadan Story | Reem Faruqi | Tilbury House Publishers | TC | | Ship-to-Store | 20 | 16.95 | 20.0% | 13.56 | 271.20 |

[155]

FY20162017.142 3.8.9.11

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9780385741958 | Outcasts United: The Story of a Refugee Soccer Team That Changed a Town | Warren St. John | Random House Children's Books | TP | | Ship-to-Store | 20 | 8.99 | 20.0% | 7.19 | 143.80 |
| 9780761385837 | Rashad's Ramadan and Eid Al-Fitr | Lisa Bullard | Lerner Publishing Group | TP | | Ship-to-Store | 20 | 6.95 | 20.0% | 5.56 | 111.20 |

| | |
|---|---|
| **Subtotal:** | $1147.60 |
| **Shipping:** | $0.00 |
| **Sales Tax:** | $88.94 |
| **Total:** | $1236.54 |

Please direct any questions to Mary Zaffron at (619) 220-0175 or CRM1978@bn.com.

Price valid through 06/08/2017.  Delivery date depends upon date of order.  Additional fees may apply.

Please make checks payable to "Barnes & Noble" and present your Tax Exempt certificate at payment.

If charging to an Institutional Account. Please present your Institutional Account Card and Tax Exempt certificate at payment. OR provide a Purchase Order indicating your Account Number and Tax Exempt information.

[156]

**EXHIBIT 29**

Responsive Documents FY20162017.142 Request 4

| | |
|---|---|
| **From:** | Woehler Christopher |
| **Sent:** | Friday, May 12, 2017 11:00 AM |
| **To:** | Anjan Stanley; Solo Jim |
| **Subject:** | RE: Muslim Student Anti-Bullying Library Books |

| Tracking: | Recipient | Read |
|---|---|---|
| | Anjan Stanley | Read: 5/12/2017 11:01 AM |
| | Solo Jim | |

Stan,

I'll give you a call now. We will hold off on sending them out to schools, but our resource librarian, Margo Denton, had trainings this week for the library techs and with the urgency expressed by Valerie for the books to get out asap, we provided the library techs who attended the trainings their copies. We can work on getting them back, if need be.

Also,

Below is the message Valerie asked be included with deliveries to elementary schools. This has not been shared with anyone at this point.

May, 2017

To:     Site Principal
From:  SDUSD Board's Committee to Address Islamophobia in the Schools
Re:     Enclosed Book: "Lailah's Lunchbox, A Ramadan Story," about Muslim Culture

   As a result of the Board's commitment to address Islamophobia and the increase in bullying of Muslim students, our committee was formed. We have compiled a carefully reviewed list of books about the Muslim culture with which to educate all students. It is our belief that education leads to understanding, and an appreciation for diversity. Due to budget constraints, we can only provide one book for each site. The one selected for lower grades is "Lailah's Lunchbox," a read-aloud picture book that can stimulate discussion among children, grades K-5. We ask that this book be highlighted at a staff meeting, if possible, and in the library, available for daily checkout by the teachers. Library technicians may also want to conduct lessons with it for classes that come to the library. A Teachers's Guide can be found online, available to print and hand out with the book.

   In addition, the IMC will soon offer sets of twenty books each of seven different titles, also carefully vetted for an accurate picture of Muslim life. We encourage library staff and/or teachers to make use of these for older children to read and discuss. Also, speakers knowledgeable about Muslim culture are available through the CAIR (Council on American-Islamic Relations) office (858-278-4547.)

   Please support the Board's commitment to eradicate Islamophobia in our schools. Sharing a story about a Muslim girl's experience in a public school, and conducting a classroom discussion about it, is a small beginning. But a start, nonetheless. Thank you for your participation.

I'll give you a call.

Chris Woehler
Manager, Instructional Materials & Williams Coordinator
Instructional Resources and Materials Department
2441 Cardinal Lane, SD CA 92123
(858)496-8461

[158]

Responsive Documents FY20162017.142 Request 4

**From:** Anjan Stanley
**Sent:** Friday, May 12, 2017 10:48 AM
**To:** Woehler Christopher <cwoehler@sandi.net>; Solo Jim <jsolo@sandi.net>
**Subject:** RE: Muslim Student Anti-Bullying Library Books

Hey Chris,
Are you available to speak.  I need some clarity on a few of the items and can also answer any of your questions.  Please pause on sending the books out to to sites until we speak.

Looping in Jim as he also has some information to our plan.


*Stanley Anjan,*

*Executive Director,*
*Family and Community Engagement Department*
*619-381-0779*
*sanjan@sandi.net*
https://sdusdfamilies.org


---

**From:** Woehler Christopher
**Sent:** Thursday, May 11, 2017 11:19 AM
**To:** Anjan Stanley
**Subject:** Muslim Student Anti-Bullying Library Books

Hi Stan,
We have been working with Valerie Shields and her team to purchase and distribute copies of a few library titles to support your Islamaphobia education plan.  To date:

- We ordered and have received the titles being distributed to schools for their libraries.
- We will be placing an additional order this week for copies/titles to be incorporated into the IMC library for schools and teachers to check-out.

Questions:
1. We purchased the books using our department's procurement card.  Do you have a budget string available to support approximately $3600 for the books?  If not, I have a few options within our funding.
2. Do you have an informative letter or notice we can include with the books being sent to schools?  This will help avoid confusion when it arrives at the schools.

I look forward to your response.  BTW-We met at a Board meeting a few months back when Jim made introductions and I took your seat! ☺ (My apologies.)


Chris Woehler
Manager, Instructional Materials & Williams Coordinator
Instructional Resources and Materials Department
2441 Cardinal Lane, SD CA 92123
(858)496-8461

**EXHIBIT 30**

[160]



San Diego Unified
SCHOOL DISTRICT

San Diego Unified
SCHOOL DISTRICT

**Agenda Item Details**

| | |
|---|---|
| Meeting | Jul 25, 2017 - Regular Meeting, 5:00 P.M. |
| Category | E. STUDENT INSTRUCTIONAL MATTERS |
| Subject | 2. REVISED 7/25/17: Addressing Tolerance Through the Comprehensive School Counseling and Guidance Plan |
| Type | Action |
| Fiscal Impact | No |
| Budgeted | No |

**RECOMMENDATION:** The Superintendent will present information to the board and the public on how the district's comprehensive guidance plan will address academic and life readiness skills, including leadership, social and emotional, community involvement and civic engagement, and address issues of tolerance.  It is recommended that the district enter into a partnership with the Anti-Defamation League to assist in creating respectful, inclusive, and safe learning environments and communities.

**FISCAL IMPACT**: None.

**PRIOR YEAR FISCAL IMPACT**: None.

**IMPACT TO DISTRICT STAFFING**: None.

**CONSULTATION WITH BOARD ADVISORY COMMITTEE:** Not applicable.

**BACKGROUND**:  On April 25, 2017, the board adopted a resolution in the matter of affirming the values of peace, tolerance, and respect for multiple perspectives.

On April 4, 2017, the Board of Education approved a plan to address the bullying of Muslim students.  The purpose of that action was to raise awareness of the issue of anti-Muslim bullying, ensure that District staff are aware of and sensitive to the issue, and to assure our Muslim community that their children will given the same protection from bullying as all other students in the District.  In approving this item, the Board affirms its commitment to ensure our schools are safe for all students and that the District will not tolerate the bullying of any student; and clarifies that our Muslim students will be treated equally with respect to bullying.   A calendar of observances to be created shall include holidays of all faiths for the purpose of enhancing mutual understanding and respect among the various religious, ethnic and cultural groups, and to assist staff to be sensitive to such holidays in the scheduling of events.  Staff have not been assigned specifically to address the bullying of students of any single religion; rather, the District's anti-bullying program is developed to comprehensively address the

**[161]**

issue of bullying of all students through the No Place for Hate program.  The District's instructional materials are and will continue to be consistent with state standards which address all major world religions in the context of world history and culture.  While students are entitled under federal law to form student clubs focused on a religion; however, District policy (consistent with federal law) prohibits staff from promoting any such club and that remains unchanged.  Finally, staff is redirected from forming a formal partnership with CAIR to forming an intercultural committee which shall include representatives of from all faiths and cultures and which shall provide input to District staff on issues of cultural sensitivities and the individual needs of various subgroups within our diverse community.

[Originator/Contact:  Cindy Marten, Superintendent of Public Education, 619.725.5506]

    Anti-Defamation League Partnership.pdf (63 KB)

    Proposed ADL Cluster Support Schedule.pdf (31 KB)

    Addressing Tolerance Presentation 7-25-17.pptx (1,840 KB)

    Addressing Tolerance Presentation 7-25-17.pdf (1,747 KB)

    Tolerance 7.25.17 rev.pptx (1,841 KB)        Tolerance 7.25.17 rev.pdf (916 KB)

**Workflow**

Workflow            Jul 14, 2017 2:42 PM :: Submitted by Marty Stultz. Routed to Cheryl Hibbeln
                    for approval.
                    Jul 21, 2017 7:14 PM :: Final approval by Cheryl Hibbeln

Last Modified by Martha Corrales on July 26, 2017

**[162]**

Exhibit 31

[163]

| From: | Linda Williams <       Redacted |
|---|---|
| Sent: | Tuesday, July 25, 2017 3:51 PM |
| To: | Sharp Andrew |
| Subject: | Re: Thanks for today's meeting! As promised--1st DRAFT -- Creating a Toolkit of online resources for Addressing Islamophobia! |

I'm so glad you caught up with Hanif!  See you in about an hour!  I appreciate your listening, and I'll stay in touch.  LKW

**From:** Sharp Andrew <asharp@sandi.net>
**To:** Linda Williams <       Redacted
**Sent:** Tuesday, July 25, 2017 3:47 PM
**Subject:** Re: Thanks for today's meeting! As promised--1st DRAFT -- Creating a Toolkit of online resources for Addressing Islamophobia!

Thank you again for making everyone available on such short notice, Linda. I caught up with Hanif when his flight landed just now. I told him if asked about CAIR this evening, we will be ready to say the following:

We deeply appreciate the work done by CAIR to highlight the unfair bullying of Muslim students. We recognize their contribution and tonight, we are recommitting to the work to protect all students from bullying, including our Muslim youth.

Thank you again for everything,

Andrew Sharp
Chief Public Information Officer
San Diego Unified School District
Office: 619-725-7505

Note: If you're a member of the media on deadline, please contact Communications Director Maureen Magee at mmagee@sandi.net or 619-725-5578 (After hours, call 619-381-7930)

**From:** Linda Williams <       Redacted       mailto:       Redacted
Reply-To: Linda Williams <       Redacted       mailto:       Redacted
Date: Tuesday, July 25, 2017 at 3:13 PM
To: Cindy Marten <cmarten@sandi.net<mailto:cmarten@sandi.net>>, Monreal Staci <smonreal@sandi.net<mailto:smonreal@sandi.net>>, Local Admin <asharp@sandi.net<mailto:asharp@sandi.net>>, Anjan Stanley <sanjan@sandi.net<mailto:sanjan@sandi.net>>
Cc: Hanif Mohebi <hmohebi@cair.com<mailto:hmohebi@cair.com>>, Lallia Allali
< Redacted       mailto:       Redacted       John Michno
< Redacted       mailto:       Redacted       Marilyn Lyons
< Redacted       mailto:       Redacted       Valerie Shields
< Redacted       mailto:       Redacted       Simone Arias
< Redacted       mailto:       Redacted       Godwin Higa
< Redacted       mailto:       Redacted
Subject: Thanks for today's meeting! As promised--1st DRAFT -- Creating a Toolkit of online resources for Addressing Islamophobia!

[164]

FY20162017.142 3.8.9.11

Dear All,

Thank you again for your time and attention at our 1pm meeting today!  I'm including those who joined us, and Godwin, who expressed his regret at not being able to be with us; I'm also including Stan, and also Hanif and Lallia, who were out of town.

Our Committee is comprised of a large number of interfaith, intercultural community volunteers (largely made up of retired educators/ administrators) who have been meeting since July 2016 when the 1st Board Resolution was passed.

Please see below the dozen resources which have been a result of our Committee's year's worth of passionate work to support the District's efforts to address Islamophobia and the bullying of Muslim students.  Stan, I've shared these with you in the past.

This is just a beginning; it can serve as the beginnings of an online Toolkit to Address Islamophobia, and will be enhanced and enriched by a number of additional resources (e.g., assisting teachers in dealing with 9-11 related issues).

PLEASE NOTE:  And/ all wording can be changed for how the documents are described, the label of this list, etc.
"Let's talk!"

Blessings, Linda K. Williams          Redacted

TOOLKIT OF RESOURCES FOR
ADDRESSING ISLAMOPHOBIA, AND
PROMOTING MUTUAL UNDERSTANDING, RESPECT, AND HARMONY

THE PROBLEMS:
Addressing Islamophobia and its Impact on Children:  PowerPoint by Lallia
Allali<https://wordpress.com/post/addressingislamophobia.wordpress.com/40>
https://wordpress.com/post/addressingislamophobia.wordpress.com/40

CAIR Report on Bullying of Muslim Students -
2013<https://addressingislamophobia.files.wordpress.com/2017/07/cair-2013-growinginfaith.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/cair-2013-growinginfaith.pdf

CAIR Report on Bullying of Muslim Students -
2015<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-5-5-17-cair-ca-2015-bullying-report-mislabeled.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-5-5-17-cair-ca-2015-bullying-report-mislabeled.pdf

Bullying Cost Analysis<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-bullying-cost-analysis-by-john-michno-rev-5-26-17.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-bullying-cost-analysis-by-john-michno-rev-5-26-17.pdf

[165]

FY20162017.142 3,8,9,11

RECOMMENDED SOLUTIONS/ AVENUES FOR ACTION:
USING BOOKS TO PROMOTE AMERICAN/ ISLAMIC HARMONY
Text Kits and Resources to Address
Islamophobia<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf

Book List to Address Islamophobia:(36 texts) by Lallia
Allali<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf>
A List of 36 Books for Promoting American/ Islamic
Harmony<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf

Compassionate Comprehension with the Common Core
(CC/CC):  <https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf>
Key Questions, Songs, and Support Resources to use with any text, to promote Empathy, Compassion, and
understanding of Restorative Justice and Trauma-Informed
Lens<https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf
PLEASE NOTE:
Within the above CC/CC document, you will find hyperlinks to numerous resources for
* Using Community-Building Classroom Circles
* Helping students      ~ develop their vocabularies of feelings words,
                                   ~ understand Compassion, Restorative Justice, and Trauma- Informed Lens

USING RESTORATIVE PRACTICES/ RESTORATIVE JUSTICE/ CONFLICT RESOLUTION
Peace Path from Cherokee Point Elementary:  1 p. graphic plus directions in Eng. and
Span.<https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-1-p-graphic-plus-directions-in-eng-and-span.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-1-p-graphic-plus-directions-in-eng-and-span.pdf

Peace Path from Cherokee Point Elementary:  3 pages graphics plus directions in Eng. and
Span.<https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-all-4-pages.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-all-4-pages.pdf

NEA Mini-Poster:  Restorative Policies vs. Zero-Tolerance -- A Tale of Two
Schools<https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf

K-5 Mini-Poster: Restorative Policies vs. Zero Tolerance - A Tale of Two Schools - by
NCRC/SDUSD<https://addressingislamophobia.files.wordpress.com/2017/07/ncrc-flyer-taletwoschools-5-16-17.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/ncrc-flyer-taletwoschools-5-16-17.pdf

**[166]**

FY20162017.142 3,8,9,11

USING A TRAUMA-INFORMED LENS
10 Things About Childhood Trauma Every Teacher Needs to
Know<https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf>

https://addressingislamophobia.files.wordpress.com/2017/07/trauma-informed-10-things-about-childhood-trauma-every-teacher-needs-to-know.pdf

[167]

**Exhibit 32**

[168]

FY20162017.142 3,8,9,11

| | |
|---|---|
| **From:** | Hanif Mohebi <hmohebi@cair.com> |
| **Sent:** | Friday, August 04, 2017 12:50 PM |
| **To:** | Graham Julie; Andrea Guerrero; Norma Chavez-Peterson |
| **Cc:** | Redacted ; Hudson Melissa; Allee Robert |
| **Subject:** | RE: Lunch with Cindy and Andrew? |

Thank you all
As I mentioned before I will have at 2-3 team members that have worked on this project with me as well.  See you all in the meeting.

Hanif Mohebi

**From:** Graham Julie [mailto:jgraham2@sandi.net]
**Sent:** Thursday, July 27, 2017 3:36 PM
**To:** Hanif Mohebi <hmohebi@cair.com>; Andrea Guerrero <andrea@alliancesd.org>; Norma Chavez-Peterson <norma@aclusandiego.org>
**Cc:** Redacted Hudson Melissa <mmabe2@sandi.net>; Allee Robert <rallee@sandi.net>
**Subject:** RE: Lunch with Cindy and Andrew?

Hello all,

Let's aim for the 31st from 11:30am – 1:00pm , as Richard appears to be open and available to join for that date.

I will send out an invite with the location to be determined, as Hanif - while we greatly appreciate the offer of you hosting, Cindy's schedule is rather tight the first week of classes. Traffic around the lunch hour can sometimes be risky.

Thank you all for your help in getting this booked. I will update with more details as soon as possible.
Greatly appreciated,
Julie Graham, Confidential Administrative Assistant II
On Behalf of Cindy Marten
The Office of the Superintendent
4100 Normal Street, San Diego, CA 92103

jgraham2@sandi.net
Direct: (619) 725-7104
  Cell.: (619) 381-6553



**From:** Hanif Mohebi [mailto:hmohebi@cair.com]
**Sent:** Wednesday, July 26, 2017 5:54 PM
**To:** Graham Julie <jgraham2@sandi.net>; Andrea Guerrero <andrea@alliancesd.org>

FY20162017.142 3,8,9,11

Cc:     Redacted
**Subject:** RE: Lunch with Cindy and Andrew?

I suggest our conference room (see highlighted for address), which is large/nice and private.  We can order lunch, that is not a problem.

*7710 Balboa Avenue*, 3rd floor conf. room
San Diego, CA 92111

*Hanif Mohebi, Executive Director*
*Council on American-Islamic Relations, San Diego Chapter*
*7710 Balboa Avenue*, Suite 326
San Diego, CA 92111
Telephone/Fax 858-278-4547
Cellphone: 858-774-9991
http://ca.cair.com/sandiego/
hmohebi@cair.com

**Invest in your civil rights by making a contribution today.**
**Donations to CAIR are both tax-deductible and zakat-eligible.**

NOTE:  "This email may contain confidential and privileged material, including attachments, for the sole use of the intended recipient(s) named above. Please do not review, use, copy, forward, or in any way distribute or disclose the contents of this e-mail including any attachments unless you are the intended recipient(s) named above. If you are not the intended recipient, or authorized to receive this message for the recipient, please contact the sender by reply email and delete all copies of this message. This email does not by itself establish an attorney-client relationship, and may not constitute legal advice."

**From:** Graham Julie [mailto:jgraham2@sandi.net]
**Sent:** Wednesday, July 26, 2017 5:33 PM
**To:** Hanif Mohebi <hmohebi@cair.com>; Andrea Guerrero <andrea@alliancesd.org>
Cc:     Redacted
**Subject:** RE: Lunch with Cindy and Andrew?

Lovely!

If you have an area that you prefer as well, just let me know.
Chat soon,
Julie Graham, Confidential Administrative Assistant II
On Behalf of Cindy Marten
The Office of the Superintendent
4100 Normal Street, San Diego, CA 92103

jgraham2@sandi.net
Direct: (619) 725-7104
 Cell.: (619) 381-6553

**[170]**

FY20162017.142 3,8,9,11



**From:** Hanif Mohebi [mailto:hmohebi@cair.com]
**Sent:** Wednesday, July 26, 2017 5:23 PM
**To:** Graham Julie <jgraham2@sandi.net>; Andrea Guerrero <andrea@alliancesd.org>
**Cc:**          Redacted
**Subject:** RE: Lunch with Cindy and Andrew?

Both days are OK with me.  I would bring 2 to 3 individuals from our team that deal with the project as well.

August 21st, from 11:30am -1:00pm or

August 31st from 11:30am – 1:00pm

Hanif Mohebi

**From:** Graham Julie [mailto:jgraham2@sandi.net]
**Sent:** Wednesday, July 26, 2017 5:07 PM
**To:** Andrea Guerrero <andrea@alliancesd.org>
**Cc:**          Redacted          Hanif Mohebi <hmohebi@cair.com>
**Subject:** RE: Lunch with Cindy and Andrew?

Thank you Andrea – I will reach out to the Board office.

Unfortunately, Norma's email bounced back full so I will give her a jingle as well.

I will be in touch.
Enjoy your evening!
Julie Graham, Confidential Administrative Assistant II
On Behalf of Cindy Marten
The Office of the Superintendent
4100 Normal Street, San Diego, CA 92103

jgraham2@sandi.net
Direct: (619) 725-7104
 Cell.: (619) 381-6553



**From:** Andrea Guerrero [mailto:andrea@alliancesd.org]
**Sent:** Wednesday, July 26, 2017 5:03 PM
**To:** Graham Julie <jgraham2@sandi.net>
**Cc:**          Redacted          hmohebi@cair.com
**Subject:** Re: Lunch with Cindy and Andrew?

We had mentioned including Richard Barrera. Would these dates work for him as well?

**[171]**

FY20162017.142 3,8,9,11

Aug 31st would be my preferred date.

**Andrea Guerrero, Esq.**
**Executive Director**
**Alliance San Diego**
www.alliancesd.org
*619.269.1823 Office*
*619.405.0620 Direct*

On Wed, Jul 26, 2017 at 4:50 PM, Graham Julie <jgraham2@sandi.net> wrote:

Hello,

First, let me introduce myself. My name is Julie Graham and I am the assistant to the Superintendent, Cindy Marten.

I hope to set up a lunch for you all, Cindy, and Andrew Sharp to get together and share some time catching up.

Could I possible share a couple of dates and see if any could work?

Cindy and Andrew are available the following:

August 21st, from 11:30am -1:00pm or

August 31st from 11:30am – 1:00pm

| Andrea | August 21st, 11:30am - 1:00pm | August 31st, 11:30am - 1:00pm | |
|--------|-------------------------------|-------------------------------|--|
| Norma | August 21st, 11:30am - 1:00pm | August 31st, 11:30am - 1:00pm | |
| Hanif | August 21st, 11:30am - 1:00pm | August 31st, 11:30am - 1:00pm | |

Would you kindly mark which works best, send back, and I will (hopefully) send an invite your way shortly?

Thank you for your assistance!

Julie Graham, Confidential Administrative Assistant II

On Behalf of Cindy Marten

The Office of the Superintendent

[172]

FY20162017.142 3,8,9,11

4100 Normal Street, San Diego, CA 92103

jgraham2@sandi.net

Direct: (619) 725-7104

  Cell.: (619) 381-6553



**EXHIBIT 33**

[174]

FY20162017.142 3,8,9,11

| From: | Linda Williams < | Redacted |
|---|---|---|
| Sent: | Friday, July 28, 2017 4:09 PM | |
| To: | Marten Cynthia; Monreal Staci; Anjan Stanley; Sharp Andrew; Barrera Richard; Beiser Kevin; Whitehurst-Payne Sharon; McQuary Michael; Evans John | |
| Cc: | Hanif Mohebi; Lallia Allali; Valerie Shields; Simone Arias; John Michno; Marilyn Lyons; Godwin Higa | |
| Subject: | Addressing Islamophobia:  Clarity and Transparency, please...  Heads-up, plus a request, and Questions to be answered | |
| Attachments: | Addressing Islamophobia SDUSD   support letter 6-4-17.pdf | |

(My apologies that I did not include all intended recipients the first time!  Take care, all -- LKW)

Dear Superintendent Marten, Board Members, Ms. Monreal, Mr. Anjan, and Mr. Sharp,

Our Committee truly acknowledges the challenges and stress created by the backlash to the Board's 4-4-17 vote to address Islamophobia and the bullying of Muslim students --- and especially the ensuing threats and the lawsuit.

We offer you empathy, and we appreciated the Board's statements at the 7-25-17 meeting, adamantly asserting that our District will not be giving in to hate, and promising to move forward to protect all marginalized, vulnerable students.  It is hard to imagine the pressure under which you have all been operating for the past few months.  We will continue to actively encourage community members to speak up to express their appreciation and support.

Cindy, thank you again for your time earlier on 7-25-17; we were glad that Staci and Andrew were able to join us, as well.  In that meeting, we all emphasized the need for clarity, transparency, timely communication, and collaboration.  In that spirit, we wanted to send this to you right away, so that we can move forward together in a timely fashion for the benefit of all of our precious students.

We are still quite incredulous that no one connected with CAIR or our Committee regarding the E.2. item on the 7/25/27 board meeting agenda to give us a respectful, timely notice that Board action item E.2. included specific reference to the District's relationship with CAIR, changing that relationship in dramatic though unspecified ways.  The wording to which I am referring is this:  **"Finally, staff is redirected from forming a formal partnership with CAIR..."** It was devastating to only learn about this agenda item the day before, and just by happening to hear about it on the radio -- and then to learn Tues. evening that someone in the general public (a person who called to sign up to speak on the issue) was told about the agenda item earlier the previous week.

Below we've included some issues, concerns, and requests we have.  We know that many, if not most of you, are taking a well-deserved Summer Break right now; we look forward to hearing from you as soon as possible after Aug. 7, regarding the scheduling of a Restorative Circle, disposition of the books at IMC, and especially the plans for action on the next steps outlined on 4-4-17.  Thank you.

On behalf of our **CAIR Education Committee to Address Islamophobia in the SDUSD,**

for the protection and uplifting of all our students -- especially the most vulnerable and marginalized...

Respectfully yours,
          Linda K. Williams,     Redacted


**Heads-up:**

FY20162017.142 3,8,9,11

**Upcoming article in a national magazine** about our committee's work with the SDUSD; this will include the entire journey from July 2016 to early August 2017:

By Aug. 11, Craig Frantz will be submitting an article (which our church was invited several months ago to write) to **The Messenger**, the national monthly magazine of the Church of the Brethren. The editor has been very interested in how this has been unfolding. I would love the article to have a positive conclusion of evidence of respect and collaboration. I'm re-sending you the letter which our local Church of the Brethren sent you in June, in support of the District's declared goal of addressing Islamophobia.

**Our request (first made 7-25-17):**
**Restorative Circle requested**

We are respectfully requesting the opportunity to meet face to face to repair the harm that has been done. To be authentic and effective, we request that the Restorative Circle include at least Superintendent Marten and Stan Anjan from the District. We will not invite the entire group of dedicated community volunteers who have been a part of our Committee's efforts for the past year, but to be authentic and effective, we would need to invite those who have taken the most active and repeated roles in meetings, collection and creation of resources, making presentations, attending press conferences, and working to provide books for the IMC. Our smaller core group would be comprised of about 15-18 people (though many others have contributed in various ways over the past year). Mr. Anthony Ceja, Senior Manager at the San Diego County Office of Education, has graciously indicated he would be very willing to facilitate.

**Clarity:**
**Interfaith/ Intercultural Composition of our Committee**

Our **CAIR Education Committee to Address Islamophobia in the SDUSD** has always (since July, 2016) been both interfaith and intercultural. Over the past year, this was clearly expressed to the District in e-mails, in statements at the mic at Board Meetings, and in meetings with Linda Trousdale and Stan Anjan. We have been blessed to have leadership from CAIR in the persons of Hanif Mohebi and/or Lallia Allali at all our meetings. From time to time, other Muslims have been present. Please note that the vast majority of those those who have taken the most active roles in this committee have been Christians, Buddhists, and others with no religious affiliation; and, in addition to our valued Muslim friends, our group has been comprised of Latinos, African Americans, Asians, Native Americans ... and Anglos. Lallia also partnered with the Temple Beth Israel, which resulted in that Jewish group donating several hundred dollars' worth of the book: **The Grand Mosque of Paris: A Story of How Muslims Rescued Jews During the Holocaust**

**Clarity requested:**
**Books at IMC to address Islamophobia-- already vetted by IMC**

After the 4-4-17 Board vote, our Committee worked very hard to support the District's efforts and stated intentions to do the following:

* Provide resources and strategies to support students during the upcoming month of Ramadan
* Review and vet materials related to Muslim culture and history at the Instructional Media Center or in video libraries
**WHEN will those books be made available to start building harmony and understanding?**
We stand ready, as before, to facilitate that process in any way in which we can assist.
Our Committee members spent many hours reading and reviewing possible texts to recommend, and the books were then vetted by IMC staff for distribution by the IMC (as per District protocol).
Our Committee found and provided online resources to help support teachers. Please see the Text Kit resource at this link (previously sent): **Text Kits and Resources to Address Islamophobia**

https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf

Orders were placed, and, as noted above, were generously supplemented by Temple Beth Israel's donations. We even drafted a letter to accompany the books to the schools, to help facilitate their full use. To the best of my knowledge, the following books are currently at IMC, awaiting Staff action to release them to sites:

ELEMENTARY
20 copies / K-2: **Rashad's Ramadan and Eid Al-Fitr**
20 copies /
K-2: **I'm New Here**
141 copies / 3-5: **Lailah's Lunchbox** (a Ramadan-themed book)

**[176]**

FY20162017.142 3,8,9,11

20 copies /
Gr.'s 3-5:  **Four Feet, Two Sandals** (including 6 copies which were already at IMC)

MIDDLE SCHOOL
92* **Grand Mosque of Paris: A Story of How Muslims Rescued Jews During the Holocaust**
       (* 60 of which were donated by Temple Beth Israel -- and, the last I heard, they were planning on ordering more copies       with additional donations)

HIGH SCHOOLS
20 copies / Gr's. 9-12:
**Does my Head Look Big in This?**

20 copies / Gr's. 9-12:
Outcasts United

And, last but definitely not least ---
Clarity requested:
**April 4 Board Vote:  Immediate Action Steps / Action Steps: Before the start of the 2017-18 school year / Steps Over Multiple Years**

We respectfully remind you that the following list of Action Steps are still in effect.  Our Committee has worked diligently to assist the District in implementation; however, instead of being supported and and appreciated, our efforts have actually been undone/ reversed by District Staff --- even though we communicated extensively to District Staff with ample lead time.

**Please let us know what the next steps are --- and when they will be taken --- to follow through with what the Board voted unanimously to do on 4-4-17.**

Excerpted from  the 4-4-17 Board Document which passed unanimously, to address Islamophobia in the SDUSD
http://www.boarddocs.com/ca/sandi/Board.nsf/files/AKUS6F71237D/$file/LCAP%20Goal%204%20Presentation%2C%204-4-17.pdf

Page 8:
**Immediate Action Steps**
* Distribute a letter to staff and parents addressing Islamophobia and direct support
* Review district calendars to ensure Muslim Holidays are recognized  Include a link of supports on the district's "Report Bullying" page
* Provide resources and strategies to support students during the upcoming month of Ramadan
* Continue the collaboration with community partners and district departments

Page 9:
**Action Steps: Before the start of the 2017-18 school year**
* Review and vet materials related to Muslim culture and history at the Instructional Media Center or in video libraries
* Provide Resources and materials for teachers on the History/Social Sciences page
* Add information related to this topic in the Annual Employee Notifications (AP 6381)
* Explore and engage in formal partnerships with the Council on American-Islamic Relations (CAIR)

Page 10:
**Steps Over Multiple Years**
* Create a survey to measure knowledge and implementation of practice
* Identify areas of prevention, intervention, and restoration
            - Restorative Practices
            - Trauma Informed Practices
* Provide a series of professional development opportunities for staff related to awareness and advocacy for Muslim culture
* Provide practical tools for educators regarding Islamic religious practices and accommodations in schools

[177]

**EXHIBIT 34**

[178]

**From:** Sharp Andrew
**Sent:** Thursday, August 10, 2017 12:44 PM
**To:** allali lallia; Linda Williams
**Cc:** Marten Cynthia; Monreal Staci; Anjan Stanley; Simone Arias; Valerie Shields; Hanif Mohebi; Godwin Higa; John Michno; Marilyn Lyons
**Subject:** Re: Recommended resources to be reviewed/ vetted by SDUSD Curriculum Department

That's very kind of you, Lallia. Thank you. I believe we already have copies at the Ed Center, but we'll follow up with you if that's not the case.

Thanks again,

Andrew Sharp
Chief Public Information Officer
San Diego Unified School District
Office: 619-725-7505

*Note: If you're a member of the media on deadline, please contact Communications Director Maureen Magee at mmagee@sandi.net or 619-725-5578 (After hours, call 619-381-7930)*

---

**From:** allali lallia <          Redacted
**Reply-To:** allali lallia <          Redacted
**Date:** Thursday, August 10, 2017 at 12:27 PM
**To:** Local Admin <asharp@sandi.net>, Linda Williams <                    Redacted
**Cc:** Cindy Marten <cmarten@sandi.net>, Monreal Staci <smonreal@sandi.net>, Anjan Stanley <sanjan@sandi.net>, Simone Arias <          Redacted          Valerie Shields <          Redacted          Hanif Mohebi <hmohebi@cair.com>, Godwin Higa <          Redacted          John Michno <          Redacted          Marilyn Lyons <          Redacted
**Subject:** Re: Recommended resources to be reviewed/ vetted by SDUSD Curriculum Department

Thanks Andrew, as far as the books I have a copy of each of book listed in the previous emails  and we will be happy to hand delivered them to you.
Please let us know when and where?
Thanks

Lallia Allali
Master of Art in Leadership Studies
Leadership Coach Candidate
DELAC Chairperson

---

**De :** Sharp Andrew <asharp@sandi.net>
**À :** allali lallia <          Redacted          Linda Williams <          Redacted
**Cc :** Marten Cynthia <cmarten@sandi.net>; Monreal Staci <smonreal@sandi.net>; Anjan Stanley <sanjan@sandi.net>;
Simone Arias <          Redacted          Valerie Shields <          Redacted          Hanif Mohebi <hmohebi@cair.com>;
Godwin Higa <          Redacted          John Michno <          Redacted          Marilyn Lyons

[179]

FY20162017.142 3,8,9,11

<                   Redacted
**Envoyé le :** Jeudi 10 août 2017 11h36
**Objet :** Re: Recommended resources to be reviewed/ vetted by SDUSD Curriculum Department

Thank you so much. We will circulate the list now.

Take care,

Andrew Sharp
Chief Public Information Officer
San Diego Unified School District
Office: 619-725-7505

Note: If you're a member of the media on deadline, please contact Communications Director Maureen Magee at
mmagee@sandi.net or 619-725-5578 (After hours, call 619-381-7930)

From: allali lallia <          Redacted          mailto:          Redacted
Reply-To: allali lallia <          Redacted          mailto:          Redacted
Date: Thursday, August 10, 2017 at 10:32 AM
To: Linda Williams <          Redacted          mailto:          Redacted          Local Admin
<asharp@sandi.net<mailto:asharp@sandi.net>>
Cc: Cindy Marten <cmarten@sandi.net<mailto:cmarten@sandi.net>>, Monreal Staci
<smonreal@sandi.net<mailto:smonreal@sandi.net>>, Anjan Stanley
<sanjan@sandi.net<mailto:sanjan@sandi.net>>, Simone Arias
<          Redacted          mailto:          Redacted          Valerie Shields
<          Redacted          mailto:          Redacted          Hanif Mohebi
<hmohebi@cair.com<mailto:hmohebi@cair.com>>, Godwin Higa
<          Redacted          mailto:          Redacted          John Michno
<          Redacted          mailto:          Redacted          Marilyn Lyons
<          Redacted          mailto:          Redacted
Subject: Re: Recommended resources to be reviewed/ vetted by SDUSD Curriculum Department

Hi Andrew,
I am Lallia Allali, a member of this committee and the DELAC chair, we met in one of the DELAC executive
board meeting with the superintendent. I was out of the country and just got back . I am glad for the opportunity
to better serve the Muslim students and help them thrive in a safe learning environment. In addition to the
resources provided by Linda, I would like to add that the following books have been vetted by the IMC:

- Rashad's Ramadan and Eid El fitr
-I am New Here
-Lailah's Lunchbox
-Grand Mosque of Paris
- Four Feet, Two Sandals
-Does My Head Look Big in This
-Outcasts United
-Lost and Found Cat: The True Story of Kunkush's Incredible Journey
- 1001 Inventions and Awesome Facts from Muslim Civilization
- Golden Domes and Silver Lanterns: A Muslim Book of Colors ( available in many schools' library)
Thanks
Lallia

**[180]**

FY20162017 142 3,8,9,11

<http://sig.graphicsfactory.com/>

<http://sig.graphicsfactory.com/>

---

De : Linda Williams <     Redacted     mailto:     Redacted
À : Sharp Andrew <asharp@sandi.net<mailto:asharp@sandi.net>>
Cc : Cindy Marten <cmarten@sandi.net<mailto:cmarten@sandi.net>>; Monreal Staci
<smonreal@sandi.net<mailto:smonreal@sandi.net>>; Anjan Stanley
<sanjan@sandi.net<mailto:sanjan@sandi.net>>; Lallia Allali
<    Redacted    mailto:    Redacted    Simone Arias
<    Redacted    mailto:    Redacted    Valerie Shields
<    Redacted    mailto:    Redacted    Hanif Mohebi
<hmohebi@cair.com<mailto:hmohebi@cair.com>>; Godwin Higa
<    Redacted    mailto:    Redacted    John Michno
<    Redacted    mailto:    Redacted    Marilyn Lyons
<    Redacted    mailto:    Redacted
Envoyé le : Mercredi 9 août 2017 22h28
Objet : Recommended resources to be reviewed/ vetted by SDUSD Curriculum Department

Many thanks, Andrew, for your time on the phone today, and especially for your invitation to share with you some of the resources our Committee has created/ compiled.  We are delighted that the Curriculum departments will be reviewing these resources for potential use in our District!

As noted below, the resources available at the hyperlinks below are only the very beginnings of what could grow into a robust "Toolkit" for Teachers, Counselors, and Administrators.

In addition to the resources listed here, please know that Dr. Simone Arias will soon be sending you recommendations for more resources for the Middle and High School Levels.

PLEASE NOTE:  We would love to have the books currently at IMC be reviewed ASAP, please:
These books are included in the Text Kit resource at this link (previously sent, and below):
Text Kits and Resources to Address
Islamophobia<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf
As noted in a previous e-mail, IMC orders were generously supplemented by Temple Beth Israel's donations.
We even drafted a letter which could accompany the books to the schools, to help facilitate their full use.  Would you like me to send that draft again? :-)
To the best of my knowledge, the following books are currently at the IMC, awaiting Staff action to release them to sites:
ELEMENTARY
   20 copies / K-2:  Rashad's Ramadan and Eid Al-Fitr
   20 copies /
K-2:  I'm New Here
   141 copies / 3-5:  Lailah's Lunchbox  (a Ramadan-themed book)
   20 copies /
Gr.'s 3-5:  Four Feet, Two Sandals (including 6 copies which were already at IMC)

MIDDLE SCHOOL

**[181]**

FY20162017.142 3,8,9,11

92* Grand Mosque of Paris: A Story of How Muslims Rescued Jews During the Holocaust
   (* 60 of which were donated by Temple Beth Israel -- and, the last I heard, they were planning
on    ordering more copies with additional donations)
HIGH SCHOOLS
   20 copies / Gr's. 9-12:
Does my Head Look Big in This?

   20 copies / Gr's. 9-12:
Outcasts United

We are glad to support the District's efforts in this way, and we look forward to further connections!

For the good of the cause --- Blessings,
Linda K. Williams      Redacted
on behalf of the
CAIR Education Committee to Address Islamophobia in the SDUSD



As of 8-9-17, just the very beginnings of a
TOOLKIT OF RESOURCES FOR
ADDRESSING ISLAMOPHOBIA, AND
PROMOTING MUTUAL UNDERSTANDING, RESPECT, AND HARMONY

THE PROBLEMS:
Addressing Islamophobia and its Impact on Children:  PowerPoint by Lallia
Allali<https://wordpress.com/post/addressingislamophobia.wordpress.com/40>
https://wordpress.com/post/addressingislamophobia.wordpress.com/40

CAIR Report on Bullying of Muslim Students -
2013<https://addressingislamophobia.files.wordpress.com/2017/07/cair-2013-growinginfaith.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/cair-2013-growinginfaith.pdf

CAIR Report on Bullying of Muslim Students -
2015<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-5-5-17-cair-ca-2015-bullying-report-mislabeled.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-5-5-17-cair-ca-2015-bullying-report-mislabeled.pdf

Bullying Cost Analysis<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-bullying-cost-analysis-by-john-michno-rev-5-26-17.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-bullying-cost-analysis-by-john-michno-rev-5-26-17.pdf

RECOMMENDED SOLUTIONS/ AVENUES FOR ACTION:
USING BOOKS TO PROMOTE AMERICAN/ ISLAMIC HARMONY
Text Kits and Resources to Address
Islamophobia<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-

[182]

FY20162017.142 3,8,9,11

address-islamophobia.pdf

Book List to Address Islamophobia:(36 texts) by Lallia
Allali<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf>
A List of 36 Books for Promoting American/ Islamic
Harmony<https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf

Compassionate Comprehension with the Common Core
(CC/CC):  <https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf>
Key Questions, Songs, and Support Resources to use with any text, to promote Empathy, Compassion, and understanding of Restorative Justice and Trauma-Informed
Lens<https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf
PLEASE NOTE:
Within the above CC/CC document, you will find hyperlinks to numerous resources for
* Using Community-Building Classroom Circles
* Helping students      ~ develop their vocabularies of feelings words,
                        ~ understand Compassion, Restorative Justice, and Trauma- Informed Lens

USING RESTORATIVE PRACTICES/ RESTORATIVE JUSTICE/ CONFLICT RESOLUTION
Peace Path from Cherokee Point Elementary:  1 p. graphic plus directions in Eng. and
Span.<https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-1-p-graphic-plus-directions-in-eng-and-span.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-1-p-graphic-plus-directions-in-eng-and-span.pdf

Peace Path from Cherokee Point Elementary:  3 pages graphics plus directions in Eng. and
Span.<https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-all-4-pages.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-all-4-pages.pdf

NEA Mini-Poster:  Restorative Policies vs. Zero-Tolerance -- A Tale of Two
Schools<https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf

K-5 Mini-Poster: Restorative Policies vs. Zero Tolerance - A Tale of Two Schools - by
NCRC/SDUSD<https://addressingislamophobia.files.wordpress.com/2017/07/ncrc-flyer-taletwoschools-5-16-17.pdf>
https://addressingislamophobia.files.wordpress.com/2017/07/ncrc-flyer-taletwoschools-5-16-17.pdf

USING A TRAUMA-INFORMED LENS
10 Things About Childhood Trauma Every Teacher Needs to
Know<https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf>

https://addressingislamophobia.files.wordpress.com/2017/07/trauma-informed-10-things-about-childhood-

**[183]**

**EXHIBIT 35**

[184]

## A *BEGINNING* TOOLKIT OF RESOURCES FOR ADDRESSING ISLAMOPHOBIA, AND PROMOTING MUTUAL UNDERSTANDING, RESPECT, AND HARMONY
Compiled and used in presentations as of 8-23-17 by the
**Council on American-Islamic Relations (CAIR)  Committee to Address Islamophobia in the San Diego Unified School District**

### *THE PROBLEMS:*
**Addressing Islamophobia and its Impact on Children:  PowerPoint by Lallia Allali**
https://wordpress.com/post/addressingislamophobia.wordpress.com/40

**CAIR Report on Bullying of Muslim Students - 2013**
https://addressingislamophobia.files.wordpress.com/2017/07/cair-2013-growinginfaith.pdf

**CAIR Report on Bullying of Muslim Students - 2015**
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-5-5-17-cair-ca-2015-bullying-report-mislabeled.pdf

**Bullying Cost Analysis**
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-bullying-cost-analysis-by-john-michno-rev-5-26-17.pdf

### *RECOMMENDED SOLUTIONS/ AVENUES FOR ACTION:*
**USING BOOKS TO PROMOTE AMERICAN/ ISLAMIC HARMONY**
**Text Kits and Resources to Address Islamophobia**
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-22-17-text-kits-and-resources-to-address-islamophobia.pdf

**Book List to Address Islamophobia:(36 texts) by Lallia Allali**
A List of 36 Books for Promoting American/ Islamic Harmony
https://addressingislamophobia.files.wordpress.com/2017/07/tigt-rev-5-10-17-36-on-book-list-to-address-islamophobia.pdf

**Compassionate Comprehension with the Common Core (CC/CC):**
*Key Questions, Songs, and Support Resources to use with any text, to promote Empathy, Compassion, and understanding of Restorative Justice and Trauma-Informed Lens*
https://addressingislamophobia.files.wordpress.com/2017/07/7-9-17-revisions-cc-cc-8-p-master-doc.pdf
PLEASE NOTE:
Within the above CC/CC document, you will find hyperlinks to numerous resources for
* Using Community-Building Classroom Circles
* Helping students     ~ develop their vocabularies of feelings words,
                        ~ understand Compassion, Restorative Justice, and Trauma- Informed Lens

**USING RESTORATIVE PRACTICES/ RESTORATIVE JUSTICE/ CONFLICT RESOLUTION**
**Peace Path** from Cherokee Point Elementary:  1 p. graphic plus directions in Eng. and Span.
https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-1-p-graphic-plus-directions-in-eng-and-span.pdf

**Peace Path** from Cherokee Point Elementary:  3 pages graphics plus directions in Eng. and Span.
https://addressingislamophobia.files.wordpress.com/2017/07/peace-path-from-cpe-all-4-pages.pdf

**NEA Mini-Poster:  Restorative Policies vs. Zero-Tolerance -- A Tale of Two Schools**
https://addressingislamophobia.files.wordpress.com/2017/07/nea-mini-poster-restorative-policies-vs-zero-tolerance_-a-tale-of-two-schools.pdf

**K-5 Mini-Poster: Restorative Policies vs. Zero Tolerance - A Tale of Two Schools - by NCRC/SDUSD**
https://addressingislamophobia.files.wordpress.com/2017/07/ncrc-flyer-taletwoschools-5-16-17.pdf

**USING A TRAUMA-INFORMED LENS**
10 Things About Childhood Trauma Every Teacher Needs to Know

**[185]**

https://addressingislamophobia.files.wordpress.com/2017/07/trauma-informed-10-things-about-childhood-trauma-every-teacher-needs-to-know.pdf

CAIR FLYERS FOR STUDENTS, WHEN READY!!!

**[186]**

**EXHIBIT 36**

## A List of 36 Books for promoting American/ Islamic Harmony

### Favorites compiled May 2017 by Lallia Allai, M.A.

Please contact Mrs. Allali @ salyas121@yahoo.fr, if you are interested in ways to use these books
for classroom discussions with students to promote mutual understanding and respect.  5-10-17

**Why books?**   A quote from www.ADL.org   **Books Matter**

*Books have the potential to create lasting impressions.   They have the power to instill empathy, affirm children's
sense of self, teach about others, transport to new places and inspire actions on behalf of social justice.*

| | |
|---|---|
| **The Grand Mosque of Paris**<br>by Karen Gray Ruel<br><br> | When the Nazis occupied Paris, no Jew was safe from arrest and deportation. Few Parisians were willing to risk their own lives to help. Yet during that perilous time, many Jews found refuge in an unlikely place--the sprawling complex of the Grand Mosque of Paris. Not just a place of worship but a community center, this hive of activity was an ideal temporary hiding place for escaped prisoners of war and Jews of all ages, especially children. Beautifully illustrated and thoroughly researched |
| **Four Feet Two Sandals**<br>by Karen Lynn Williams<br>Khadar Mohammad<br><br> | When relief workers bring used clothing to a refugee camp in Pakistan, ten-year-old Lina is thrilled when she finds a sandal that fits her foot perfectly - until she sees that another girl has the matching shoe. But soon Lina and Feroza meet and decide that it is better to share the sandals than for each to wear only one. The girls discover the true meaning of friendship and sacrifice. "Four Feet, Two Sandals" honors the experiences of refugee children around the world, whose daily existence is marked by uncertainty and fear. Warm colors and bold brush strokes are the perfect complement to this story of courage and hope. |
| **One Green Apple**<br>by Eve Bunting<br><br> | Farah feels alone, even when surrounded by her classmates. She listens and nods but doesn't speak. It's hard being the new kid in school, especially when you're from another country and don't know the language. Then, on a field trip to an apple orchard, Farah discovers there are lots of things that sound the same as they did at home, from dogs crunching their food to the ripple of friendly laughter. As she helps the class make apple cider, Farah connects with the other students and begins to feel that she belongs. |

**[188]**

| | |
|---|---|
| **The Librarian of Basra**<br>by Jeanette Winter<br><br> | "In the Koran, the first thing God said to Muhammad was 'Read.' Alia Muhammad Baker is a librarian in Basra, Iraq. For fourteen years, her library has been a meeting place for those who love books. Until now. Now war has come, and Alia fears that the library--along with the thirty thousand books within it--will be destroyed forever.<br><br>In a war-stricken country where civilians--especially women--have little power, this true story about a librarian's struggle to save her community's priceless collection of books reminds us all how, throughout the world, the love of literature and the respect for knowledge know no boundaries |
| **Silent Music: A Story of Baghdad**<br>by James Rumford<br><br> | WHEN BOMBS BEGIN TO FALL, Ali drowns out the sound of war with a pen.<br><br>Like other children living in Baghdad, Ali loves soccer, music and dancing, but most of all, he loves the ancient art of calligraphy. When bombs begin to fall on his city, Ali turns to his pen, writing sweeping and gliding words to the silent music that drowns out the war all around him. Gorgeously illustrated with collage, pencil and charcoal drawings and, of course, exquisite calligraphy, this timely and yet universal story celebrates art and history but also offers young children a way to understand all they see and hear on the news. |
| **I'm New Here**<br>by Anne Sibley O'Brien<br><br> | Three students are immigrants from Guatemala, Korea, and Somalia and have trouble speaking, writing, and sharing ideas in English in their new American elementary school. Through self-determination and with encouragement from their peers and teachers, the students learn to feel confident and comfortable in their new school without losing a sense of their home country, language, and identity.<br><br>Young readers from all backgrounds will appreciate this touching story about the assimilation of three immigrant students in a supportive school community.<br><br> *I'm New Here* demonstrates how our global community can work together and build a home for all. |

| | |
|---|---|
| **Two Blankets**<br>by: Irena Kolad<br><br> | Cartwheel moves to a new country with her auntie, and everything is strange: the animals, the plants—even the wind. An old blanket gives Cartwheel comfort when she's sad—and a new blanket just might change her world.<br>This multicultural story of friendship is about leaving home, moving to a foreign and strange place, and finding a new friend. It's a story for all who have experienced change. Irena Kobald's poetic text, paired with Kate Greenaway medalist Freya Blackwood's powerful paintings, renders an emotional and heart-warming story about two children from diverse backgrounds coming together to become new friends. |
| **It's Ramadan, Curious George**<br>by H.A Ray & Hana Khan<br><br> | It is the first day of Ramadan, and George is celebrating with his friend Kareem and his family. George helps Kareem with his first fast and joins in the evening celebration of tasting treats and enjoying special meals. Then, George helps make gift baskets to donate to the needy, and watches for the crescent moon with the man in the yellow hat. Finally, George in the Eid festive to mark the end of his very first Ramadan. |
| **Under the Ramadan Moon**<br>by Sylvia Whitman<br><br> | We wait for the moon. We watch for the moon. We watch for the Ramadan moon. We give to the poor, and read Quran, under the moon. We live our faith, until next year under the moon, under the Ramadan moon. Ramadan is one of the most special months of the Islamic year, when Muslims pray, fast, and help those in need. Sylvia Whitman's lyrical story, with luminous illustrations by Sue Williams, serves as an introduction to Ramadan a time for reflection and ritual with family and friends. A detailed note about Ramadan is included. |

[190]

| | |
|---|---|
| **Lailah's Lunchbox**<br>by Reem Farqui<br><br> | Lailah is in a new school in a new country, thousands of miles from her old home, and missing her old friends. When Ramadan begins, she is excited that she is finally old enough to participate in the fasting but worried that her classmates won't understand why she doesn't join them in the lunchroom.<br><br>Lailah solves her problem with help from the school librarian and her teacher and in doing so learns that she can make new friends who respect her beliefs. This gentle, moving story from first-time author Reem Faruqi comes to life in Lea Lyon's vibrant illustrations. Lyon uses decorative arabesque borders on intermittent spreads to contrast the ordered patterns of Islamic observances with the unbounded rhythms of American school days. |
| **Golden Domes and Silver Lanterns: A Muslim Book of Colors**<br>by Hena Khan, Mehrdokht Amin<br><br> | Magnificently capturing the colorful world of Islam for the youngest readers, this breathtaking and informative picture book celebrates Islam's beauty and traditions. From a red prayer rug to a blue hijab, everyday colors are given special meaning as young readers learn about clothing, food, and other important elements of Islamic culture, with a young Muslim girl as a guide. Sure, to inspire questions and observations about world religions and cultures, *Golden Domes and Silver Lanterns* is equally at home in a classroom reading circle as it is being read to a child on a parent's lap |
| **The Ramadan Moon**<br>by Na'ima B. Robert<br><br> | Ramadan, the month of fasting, doesn't begin all at once. It begins with a whisper and a prayer and a wish. Muslims all over the world celebrate Ramadan and the joyful days of Eid-al-Fitr at the end of the month of fasting as the most special time of year. This lyrical and inspiring picture book captures the wonder and joy of this great annual event, from the perspective of a child. Accompanied by Iranian inspired illustrations, the story follows the waxing of the moon from the first new crescent to full moon and waning until Eid is heralded by the first sighting of the second new moon. Written and illustrated by Muslims, this is a book for all children who celebrate Ramadan and those in the wider communities who want to understand why this is such a special experience for Muslims. |

[191]

| **My First Ramadan**<br>by Karen Katz<br> | It's time for Ramadan to begin. Follow along with one young boy as he observes the Muslim holy month with his family.<br><br>This year, the narrator is finally old enough to fast, and readers of all ages will be interested as he shares his experiences of this special holiday in Islam |
| **Night of the Moon**<br>by Hena Khan & Julie Paschkis<br> | Yasmeen, a seven-year-old Pakistani-American girl, celebrates the Muslim holidays of Ramadan, "The Night of the Moon" (Chaand Raat), and Eid. With lush illustrations that evoke Islamic art, this beautiful story offers a window into modern Muslim culture—and into the ancient roots from within its traditions have grown. |
| **Rashad's Ramadan and Eid Al-Fitr**<br>by Lisa Bullard & Holli Conger<br> | For Muslims, Ramadan is a time for fasting, prayer, and thinking of others. Rashad tries to be good all month. When it's time for Eid al-Fitr, he feasts and plays! Find out how people celebrate this special time of year. |

[192]

| | |
|---|---|
| **Raihanna's First Time Fasting**<br>by Qamaer Hassan<br><br> | A heartwarming story about a young girl's first experience fasting for the month of Ramadan. Raihanna learns the meaning of Ramadan, why her family fasts, and how important it is to help her community |
| **The Best Eid Ever**<br>by Asma Mobin-Uddin & Laura Jacobsen<br><br> | Young readers can learn about Eid, a religious holiday celebrated by Muslim families every year, as well as the Hajj pilgrimage, when Muslims travel back to Mecca for the Eid, in this picture book written by Dr. Asma Mobin-Uddin and illustrated by Laura Jacobsen.<br><br>This Eid, Aneesa should be happy. But, her parents are thousands of miles away for the Hajj pilgrimage. To cheer her up, her Nonni gives her a gift of beautiful clothes, one outfit for each of the three days of Eid. At the prayer hall, Aneesa meets two sisters who are dressed in ill-fitting clothes for the holiday. She soon discovers that the girls are refugees – they had to leave everything behind when they left their native country to live in America. Aneesa, who can't stop thinking about what Eid must be like for them, comes up with a plan – a plan to help make it the best Eid holiday ever. |
| **The Shapes of Eid, According to Me**<br>by Samia Khan<br><br><br> | From curvy crescents and swirly swirls to ovals, triangles and spheres, Eid is filled with shapes that are your very own. Follow this rhyming story of the many shapes of this special day. |

**[193]**

| | |
|---|---|
| **The Colour of Home**<br>by Mary Hoffman<br><br> | Hassan feels out of place in a new cold, grey country. At school, he paints a picture showing his colorful Somalian home, covered with the harsh colors of war from which his family has fled. He tells his teacher about their voyage from Mogadishu to Mombasa, the refugee camp and on to England. But gradually things change. When Hassan's parents put up his next picture on the wall, Hassan notices the maroon prayer mat, a bright green cushion and his sister Naima's pink dress - the new colors of home. |
| **My Name is Bilal**<br>by Asma Mobin-Uddin<br><br> | When Bilal and his sister Ayesha move with their family, they must attend a new school. They soon find out that they may be the only Muslim students there. When Bilal sees, his sister bullied on their first day, he worries about being teased himself, and thinks it might be best if his classmates didn't know that he is Muslim. Maybe if he tells kids his name is Bill, rather than Bilal, then they would leave him alone. Mr. Ali, one of Bilal's teachers and Muslim, sees how Bilal is struggling. He gives Bilal a book about the first person to give the call to prayer during the time of the Prophet Muhammad. That person was another Bilal: Bilal Ibn Rabah. What Bilal learns from the book forms the compelling story of a young boy grappling with his identity. |
| **Lost and Found Cat: The True Story of Kunkush's Incredible Journey**<br>by Doug Kuntz & Amy Shrodes<br><br> | When an Iraqi family is forced to flee their home, they can't bear to leave their beloved cat, Kunkush, behind. So, they carry him with them from Iraq to Greece, keeping their secret passenger hidden away.<br>But during the crowded boat crossing to Greece, his carrier breaks and the frightened cat runs from the chaos. In one moment, he is gone. After an unsuccessful search, his family has to continue their journey, leaving brokenhearted.<br><br>A few days later, aid workers in Greece find the lost cat. Knowing how much his family has sacrificed already, they are desperate to reunite them with the cat they love so much. A worldwide community comes together to spread the word on the Internet and in the news media, and after several months the impossible happens—Kunkush's family is found, and they finally get their happy ending in their new home. |

[194]

| | |
|---|---|
| **Amina's Voice**<br>by Hena Khan<br><br> | Amina has never been comfortable in the spotlight. She is happy just hanging out with her best friend, Soojin. Except now that she's in middle school everything feels different. Soojin is suddenly hanging out with Emily, one of the "cool" girls in the class, and even talking about changing her name to something more "American." Does Amina need to start changing too? Or hiding who she is to fit in? While Amina grapples with these questions, she is devastated when her local mosque is vandalized. |
| **The Sandwich Swap**<br>by Queen Rania of Jordan Al Abdullah<br><br> | Lily and Salma are best friends. They like doing all the same things, and they always eat lunch together. Lily eats peanut butter and Salma eats hummus-but what's that between friends? It turns out, a lot. Before they know it, a food fight breaks out. Can Lily and Salma put aside their differences? Or will a sandwich come between them?<br><br>The smallest things can pull us apart-until we learn that friendship is far more powerful than difference. In a glorious three-page gatefold at the end of the book, Salma, Lily, and all their classmates come together in the true spirit of tolerance and acceptance. |
| **Stepping Stones: A Refugee Family's Journey (Arabic and English Edition)**<br>by Margriet Ruurs & Falah Raheem<br><br> | This unique picture book was inspired by the stone artwork of Syrian artist Nizar Ali Badr, discovered by chance by Canadian children's writer Margriet Ruurs. The author was immediately impressed by the strong narrative quality of Mr. Badr's work, and, using many of Mr. Badr's already-created pieces, she set out to create a story about the Syrian refugee crisis. *Stepping Stones* tells the story of Rama and her family, who are forced to flee their once-peaceful village to escape the ravages of the civil war raging ever closer to their home. With only what they can carry on their backs, Rama and her mother, father, grandfather and brother, Sami, set out to walk to freedom in Europe. Nizar Ali Badr's stunning stone images illustrate the story.<br>  Orca Book Publishers is pleased to offer this book as a dual-language (English and Arabic) edition. |

[195]

| | |
|---|---|
| **Ibn al-Haytham: The Man Who Discovered How We See**<br>by National Geographic<br><br> | Meet the scientist known as the "Father of Optics," Ibn al-Haytham!<br>During the golden age of science, knowledge, and invention in Muslim civilization -- also known as the "Dark Ages" in Western Europe -- this incredible scholar discovered how we see and set the stage for the methods we now know as the scientific process. Packed with beautiful and engaging photos, kids will learn all about this fascinating scientist.<br><br>The level 3 text provides accessible, yet wide-ranging, information for independent readers. |
| **1001 Inventions and Awesome Facts from Muslim Civilization**<br>by National Geographic<br><br> | We often think that people from a thousand years ago were living in the Dark Ages. But from the 7th century onward in Muslim civilization there were amazing advances and inventions that still influence our everyday lives. People living in the Muslim world saw what the Egyptians, Chinese, Indians, Greek, and Romans had discovered and spent the next one thousand years adding new developments and ideas. Inventors created marvels like the elephant water clock, explorers drew detailed maps of the world, women made scientific breakthroughs and founded universities, architects built huge domes larger than anywhere else on earth, astronomers mapped the stars and so much more! |
| **The Genius of Islam: How Muslims Made the Modern World**<br>by Bryn Barnard<br><br> | The Middle Ages were a period of tremendous cultural and scientific advancement in the Islamic Empire—ideas and inventions that shaped our world.<br>Did you know that:<br>• the numbers you use every day (Arabic numerals!) are a Muslim invention?<br>• the marching band you hear at football games has its roots in the Middle East?<br>• you are drinking orange juice at breakfast today thanks to Islamic farming innovations?<br>• the modern city's skyline was made possible by Islamic architecture?<br><br>The Muslim world has often been a bridge between East and West, but many of Islam's crucial innovations are hidden within the folds of history. |

[196]

| **Does My Head Look Big In This?** by Randa Abdel-Fattah  | Sixteen-year-old Amal makes the decision to start wearing the hijab full-time and everyone has a reaction. Her parents, her teachers, her friends, people on the street. But she stands by her decision to embrace her faith and all that it is, even if it does make her a little different from everyone else. Can she handle the taunts of "towel head," the prejudice of her classmates, and still attract the cutest boy in school? Brilliantly funny and poignant, Randa Abdel-Fattah's debut novel will strike a chord in all teenage readers, no matter what their beliefs. |
|---|---|
| **Ask Me No Questions** by Marina Budhos  | Since emigrating from Bangladesh, fourteen-year-old Nadira and her family have been living in New York City on expired visas, hoping to realize their dream of becoming legal U.S. citizens. But after 9/11, everything changes. Suddenly being Muslim means you are dangerous -- a suspected terrorist. When Nadira's father is arrested, and detained at the U.S.-Canadian border, Nadira and her older sister, Aisha, are told to carry on as if everything is the same. The teachers at Flushing High don't ask any questions, but Aisha falls apart. Nothing matters to her anymore -- not even college. It's up to Nadira to be the strong one and bring her family back together again. |
| **The Lines We Cross** by Randa Abdel-Fattah  | Michael likes to hang out with his friends and play with the latest graphic design software. His parents drag him to rallies held by their anti-immigrant group, which rails against the tide of refugees flooding the country. And it all makes sense to Michael. Until Mina, a beautiful girl from the other side of the protest lines, shows up at his school, and turns out to be funny, smart -- and a Muslim refugee from Afghanistan. Suddenly, his parents' politics seem much more complicated. Mina has had a long and dangerous journey fleeing her besieged home in Afghanistan, and now faces a frigid reception at her new prep school, where she is on scholarship. As tensions rise, lines are drawn. Michael has to decide where he stands. Mina has to protect herself and her family. Both have to choose what they want their world to look like. |

[197]

| | |
|---|---|
| **Commander of the Faithful,** <br> **The Life and Times of Emir Abd** <br> **el-Kader** <br> by John Kiser <br><br>  | Curious about the city in Iowa "El Kader" named after the Algerian Emir Abdel Kader, and *New York Times* called him "one of the few great men of the century." John Kiser wrote this book. This well-researched and compelling biography of the Muslim warrior-saint who led the Algerian resistance to French colonization in the mid-nineteenth century sheds light on current US involvement with a global Islam. The most famous "jihadist" of his time, Abd el-Kader was known equally for his military brilliance and his moral authority. |
| **1001 Inventions: Muslim** <br> **Heritage in Our World** <br> by Salim T.S. Al-Hassani & Sir <br> Roland Jackson <br><br>  | *1001 Inventions: Muslim Heritage in Our World* presents an excellent overview of Muslim heritage written to appeal to the everyday reader and to amaze and redefine many people's current assumptions of medieval times and of their history and roots. <br><br> This is an essential introduction to the great epoch of Muslim civilization. Readers now have access to one thousand years of missing history, covering medicine, technology, economics, civilization, the environment, and much more. From Spain to China, scholars of different genders, cultures, and various faiths worked together to build upon the knowledge of ancient civilization. |
| **Zeitoun** <br> by Dave Eggers <br><br>  | The true story of one family, caught between America's two biggest policy disasters: the war on terror and the response to Hurricane Katrina. <br> Abdulrahman and Kathy Zeitoun run a house-painting business in New Orleans. In August of 2005, as Hurricane Katrina approaches, Kathy evacuates with their four young children, leaving Zeitoun to watch over the business. In the days following the storm he travels the city by canoe, feeding abandoned animals and helping elderly neighbors. Then, on September 6th, police officers armed with M-16s arrest Zeitoun in his home. Told with eloquence and compassion, *Zeitoun* is a riveting account of one family's unthinkable struggle with forces beyond wind and water. |

[198]

| | |
|---|---|
| **Lost History: The Enduring Legacy of Muslim Scientists, Thinkers, and Artists** by Michael Morgan  | Michael Hamilton Morgan reveals how early Muslim advancements in science and culture lay the cornerstones of the European Renaissance, the Enlightenment, and modern Western society. As he chronicles the Golden Ages of Islam, beginning in 570 a.d. with the birth of Muhammad, and resonating today, he introduces scholars like Ibn Al-Haytham, Ibn Sina, Al-Tusi, Al-Khwarizmi, and Omar Khayyam, towering figures who revolutionized the mathematics, astronomy, and medicine of their time and paved the way for Newton, Copernicus, and many others. And he reminds us that inspired leaders from Muhammad to Suleiman the Magnificent and beyond championed religious tolerance, encouraged intellectual inquiry, and sponsored artistic, architectural, and literary works that still dazzle us with their brilliance. *Lost History* finally affords pioneering leaders with the proper credit and respect they so richly deserve. |
| **Where the Streets Had a Name** by Randa Abdel-Fattah  | Thirteen-year-old Hayaat is on a mission. She believes a handful of soil from her grandmother's ancestral home in Jerusalem will save her beloved Sitti Zeynab's life. The only problem is that Hayaat and her family live behind the impenetrable wall that divides the West Bank, and they're on the wrong side of check points, curfews, and the travel permit system. Plus, Hayaat's best friend Samy always manages to attract trouble. But luck is on the pair's side as they undertake the journey to Jerusalem from the Palestinian Territories when Hayaat and Samy have a curfew-free day to travel. |
| **Outcasts United: The Story of a Refugee Soccer Team That Changed a Town** by Warren St John  | . Clarkston, Georgia, was a typical Southern town until it was designated a refugee settlement center in the 1990s, becoming the first American home for scores of families in flight from the world's war zones—from Liberia and Sudan to Iraq and Afghanistan. Suddenly Clarkston's streets were filled with women wearing the hijab, the smells of cumin and curry, and kids of all colors playing soccer in any open space they could find. The town also became home to Luma Mufleh, an American-educated Jordanian woman who founded a youth soccer team to unify Clarkston's refugee children and keep them off the streets. These kids named themselves the Fugees. Set against the backdrop of an American town that without its consent had become a vast social experiment |

Please contact Mrs. Allali @ salyas121@yahoo.fr, if you are interested in ways to use these books for classroom discussions with students to promote mutual understanding and respect.

[199]

# TEXT KITS AND RESOURCES
# TO ADDRESS ISLAMAPHOBIA

5-22-17  We recommend providing these books and resources at all schools
    \* Introduce Ramadan (De-mystify Islam):  Pre-K through Gr. 12
    \* Promote Respect / Harmony / Empathy:  Pre-K through Gr. 12

Please contact Mrs. Allali @ salyas121@yahoo.fr, if you are interested in ways to use these resources
for classroom discussions with students to promote mutual understanding and respect

| GRADES PRE-K – 2 | |
| --- | --- |
| ## RAMADAN<br><br>**Rashad's Ramadan and Eid al-Fitr**<br><br>By Lisa Bullard<br><br><br><br>A video made by a Muslim student from SDUSD showing Ramadan in San Diego. Ramadan at ICSD (Islamic Center of San Diego; 4:22 minutes - video) https://www.youtube.com/watch?v=badM6jwtwB0 | In this inviting picture book, the first of a new Holidays and Special Days series, a preschooler talks about his Muslim religion with the focus on Ramadan and the meaning behind the holiday's practice and beliefs. "Dad says Ramadan is a time to get closer to Allah. . . . Grown-ups fast between sunrise and sunset.<br><br>The brightly colored, uncluttered illustrations are true to the boy's viewpoint, at the mosque and at home, and colored boxed inserts explain more about the holiday observance and its meaning, including the role of Muhammad and that the calendar for Muslim holidays follows the moon. The boy tries to be good during the month of Ramadan ("my sister and I don't even fight"), just as he knows it is time to care for the poor. The climax is the big celebration of Eid when Ramadan is over.<br><br>Young children of all faiths will find lots to talk about, and the back matter extends the text with a bibliography, glossary, and craft suggestions. |
| ## RESPECT / HARMONY / EMPATHY<br><br>**I'm New Here**<br>By Anne Sibley O'Brien<br><br><br><br>**Classroom or Community Welcoming Event Kit**<br>http://www.imyourneighborbooks.org/wp-content/uploads/2015/12/Im-New-Here-Welcoming-Event-Kit.pdf | Three students are immigrants from Guatemala, Korea, and Somalia and have trouble speaking, writing, and sharing ideas in English in their new American elementary school.<br><br>Through self-determination and with encouragement from their peers and teachers, the students learn to feel confident and comfortable in their new school without losing a sense of their home country, language, and identity.<br><br>Young readers from all backgrounds will appreciate this touching story about the assimilation of three immigrant students in a supportive school community.<br>*I'm New Here* demonstrates how our global community can work together and build a home for all. |

| GRADES 3 – 5 | |
|---|---|
| ## RAMADAN<br><br>### Lailah's Lunchbox<br>By: Reem Farqui <br><br>Teachers' Guide<br>https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/book-of-the-month-lailah-s-lunchbox.pdf | Lailah is in a new school in a new country, thousands of miles from her old home, and missing her old friends. When Ramadan begins, she is excited that she is finally old enough to participate in the fasting but worried that her classmates won't understand why she doesn't join them in the lunchroom.<br><br>Lailah solves her problem with help from the school librarian and her teacher and in doing so learns that she can make new friends who respect her beliefs. This gentle, moving story from first-time author Reem Faruqi comes to life in Lea Lyon's vibrant illustrations. Lyon uses decorative arabesque borders on intermittent spreads to contrast the ordered patterns of Islamic observances with the unbounded rhythms of American school days. |
| ## RESPECT / HARMONY / EMPATHY<br><br>### Four Feet Two Sandals<br>By: Karen Lynn Williams<br>Khadar Mohammad<br><br>Online Reading of the Book<br>https://www.youtube.com/watch?v=qGwRkPX8ETY<br><br>Teachers' Guide<br>http://www.karenlynnwilliams.com/files/sandals_guide.pdf<br><br> | When relief workers bring used clothing to a refugee camp in Pakistan, ten-year-old Lina is thrilled when she finds a sandal that fits her foot perfectly - until she sees that another girl has the matching shoe. But soon Lina and Feroza meet and decide that it is better to share the sandals than for each to wear only one. The girls discover the true meaning of friendship and sacrifice.<br><br>"Four Feet, Two Sandals" honors the experiences of refugee children around the world, whose daily existence is marked by uncertainty and fear. Warm colors and bold brush strokes are the perfect complement to this story of courage and hope. |

| GRADES 6-8 | |
| --- | --- |
| ## RAMADAN<br><br>High School Football and Ramadan (article)<br>http://www.npr.org/templates/story/story.php?storyId=112953540<br><br>Ramadan Forces Muslim World Cup Players to Decide: Religion or Sports? (article)<br>http://www.nbcnews.com/storyline/world-cup/ramadan-forces-muslim-world-cup-players-decide-religion-or-sports-n142986<br><br>What is Ramadan? Fun Facts about Ramadan for Kids (Social Studies Cartoon) ( 3:00 minutes - video)<br>https://www.youtube.com/watch?v=s-zZvH_mXTw<br><br>A video made by a Muslim student from SDUSD showing Ramadan in San Diego. Ramadan at ICSD (Islamic Center of San Diego; 4:22 minutes - video)<br>https://www.youtube.com/watch?v=badM6jwtwB0 | |
| ## RESPECT / HARMONY / EMPATHY<br><br>### The Grand Mosque of Paris<br>by: Karen Gray Ruel<br><br><br><br>Grand Paris Mosque saving Jews in WWII (7:41 minutes- video)<br>https://www.youtube.com/watch?v=t8kQuom7SMQ<br><br>Short-Film "Ensemble" featuring Habib Kadi (English subtitles; 17:41 min.- video)<br>https://www.youtube.com/watch?time_continue=16&v=jfSICx_rRNo<br><br>Teacher Guide<br>http://holidayhouse.com/docs/GrandMosqueofParis9.10.pdf | When the Nazis occupied Paris, no Jew was safe from arrest and deportation. Few Parisians were willing to risk their own lives to help.<br><br>Yet during that perilous time, many Jews found refuge in an unlikely place--the sprawling complex of the Grand Mosque of Paris. Not just a place of worship but a community center, this hive of activity was an ideal temporary hiding place for escaped prisoners of war and Jews of all ages, especially children.<br><br>Beautifully illustrated and thoroughly researched. |

[202]

# GRADES 9-12

## RAMADAN

High School Football and Ramadan (article)  http://www.npr.org/templates/story/story.php?storyId=112953540

Ramadan Forces Muslim World Cup Players to Decide: Religion or Sports? (article)
http://www.nbcnews.com/storyline/world-cup/ramadan-forces-muslim-world-cup-players-decide-religion-or-sports-n142986

What is Ramadan? Fun Facts about Ramadan for Kids (Social Studies Cartoon) ( 3:00 minutes - video)
https://www.youtube.com/watch?v=s-zZvH_mXTw

A video made by a Muslim student from SDUSD showing Ramadan in San Diego. Ramadan at ICSD (Islamic Center of San Diego; 4:22 minutes - video)  https://www.youtube.com/watch?v=badM6jwtwB0

# RESPECT / HARMONY / EMPATHY

### Does My Head Look Big In This?
By:Randa Abdel-Fattah
**Teacher Guide**
http://d7e3a2ab67f1ad794b7c-58ee2046ea610b14668745360eaa8ac0.r44.cf2.rackcdn.com/teachers-guides/9780330421850-tn.p



~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Outcasts United:  The Story of a Refugee Soccer Team that Changed a Town**    by Warren St. John



Resources for Teachers:
       http://www.outcastsunited.com/resources/resources-for-teachers

### DOES MY HEAD LOOK BIG IN THIS?
Sixteen-year-old Amal makes the decision to start wearing the hijab full-time and everyone has a reaction. Her parents, her teachers, her friends, people on the street. But she stands by her decision to embrace her faith and all that it is, even if it does make her a little different from everyone else.
Can she handle the taunts of "towel head," the prejudice of her classmates, and still attract the cutest boy in school? Brilliantly funny and poignant, Randa Abdel-Fattah's debut novel will strike a chord in all teenage readers, no matter their beliefs.

### OUTCASTS UNITED
**(A "1 book, 1 San Diego" text - also a movie)**
The extraordinary tale of a refugee youth soccer team and the transformation of a small American town

Clarkston, Georgia, was a typical Southern town until it was designated a refugee settlement center in the 1990s, becoming the first American home for scores of families in flight from the world's war zones—from Liberia and Sudan to Iraq and Afghanistan. Suddenly Clarkston's streets were filled with women wearing the hijab, the smells of cumin and curry, and kids of all colors playing soccer in any open space they could find. The town also became home to Luma Mufleh, an American-educated Jordanian woman who founded a youth soccer team to unify Clarkston's refugee children and keep them off the streets. These kids named themselves the Fugees.

Set against the backdrop of an American town that without its consent had become a vast social experiment, Outcasts United follows a pivotal season in the life of the Fugees and their charismatic coach, Warren St. John documents the lives of a diverse group of young people as they miraculously coalesce into a band of brothers, while also drawing a fascinating portrait of a fading American town struggling to accommodate its new arrivals. The coach relentlessly drives her players to success on the soccer field while holding together their lives—and the lives of their families—in the face of a series of daunting challenges. This fast-paced chronicle of a single season is a complex and inspiring tale of a small town becoming a global community—and an account of the ingenious and complicated ways we create a home in a changing world.

[203]

**EXHIBIT 37**

[204]



# MISLABELED:

## The Impact of School Bullying and Discrimination on California Muslim Students

[205]

The Council on American-Islamic Relations (CAIR) is the largest American Muslim civil rights and advocacy organization in the United States. Its mission is to enhance a general understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims and build coalitions that promote justice and mutual understanding. CAIR-California is the organization's largest and oldest chapter, with offices in the Greater Los Angeles Area, the Sacramento Valley, San Diego and the San Francisco Bay Area.

Our Vision: To be a leading advocate for justice and mutual understanding.

Our Mission: To enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual understanding.

For questions about this report, or to obtain copies, contact:

Council on American-Islamic Relations San Francisco Bay Area (CAIR-SFBA)
3000 Scott Blvd., Suite 101
Santa Clara, CA 95054
Tel: 408.986.9874
Fax: 408.986.9875
E-mail: info@sfba.cair.com

Council on American-Islamic Relations Sacramento Valley (CAIR-SV)
717 K St., Suite 217
Sacramento, CA 95814
Tel: 916.441.6269
Fax: 916.441.6271
E-mail: info@sacval.cair.com

Council on American-Islamic Relations Greater Los Angeles Area (CAIR-LA)
2180 W. Crescent Ave., Suite F
Anaheim, CA 92801
Tel: 714.776.1847
Fax: 714.776.8340
E-mail: info@losangeles.cair.com

Council on American-Islamic Relations San Diego (CAIR-SD)
7710 Balboa Ave., Suite 326
San Diego, CA 92111
Tel/Fax: 858.278.4547
E-mail: info@sandiego.cair.com

FAIR USE NOTICE: This report may contain copyrighted material, the use of which has not always been specifically authorized by the copyright owner. It is being made available in an effort to advance the understanding of political, human rights, democracy and social justice issues. It is believed that this constitutes a 'fair use' of any such copyrighted material as provided for in section 107 of the United States Copyright Law. In accordance with Title 17 U.S.C. §107, the material in this report is distributed without profit to those who have expressed a prior interest in receiving the included information for research and educational purposes. If you wish to use copyrighted material from this site for purposes of your own that go beyond 'fair use,' you must obtain permission from the copyright owner.

The material in this report is provided for educational and informational purposes only, and is not intended to be a substitute for an attorney's consultation. Please consult an attorney in order to get counsel on your situation. The information in this report does not constitute legal advice.

No part of this publication may be stored in a retrieval system, transmitted or reproduced in any way, including but not limited to, photocopy, photograph, and magnetic or other record, without the prior agreement and written approval of the publisher.

# CONTENTS

Executive Summary

6 Islamophobia and American Muslim Youth
8 Understanding Islamophobia
8 Islamophobia at School

Muslim Youth at School Survey Findings
11 Section 1: School Environment
12 Section 2: Bullying and Discrimination
15 Demographics

21 American Muslim Students in Their Own Words

24 Recommendations

26 Acknowledgements

27 Appendix A: Resources
27 Organizations Providing Educational Resources on Islam
27 Websites on Bullying Prevention
27 Reports on Bullying and Prevention
27 California Laws Relating to Bullying
27 Federal Laws Relating to Harassment
27 Federal Government Reporting Agencies

28 Endnotes

[206]



# EXECUTIVE SUMMARY

T hrough this report, the California chapter of the Council on American-Islamic Relations (CAIR-CA) seeks to provide context to the socio-political climate in which American Muslims attend school. Specifically, it discusses how Islamophobia,[1] the fear or hatred of Islam and Muslims, in larger society filters into the school environment and manifests as teacher discrimination and student bullying.[2] The consequences of encountering Islamophobia at school are numerous. Muslim students may feel marginalized, disempowered, and begin to internalize negative stereotypes. Minority students who feel disconnected or alienated from the school environment will lack confidence, suffer academically, and fail to fully invest in their future.[3]

The report also presents the results of a 2014 follow-up to a 2012 CAIR-CA survey. The purpose of the survey was twofold, to understand how comfortable American Muslim students felt attending their schools and participating in classroom discussions, and discover to what extent American Muslim students were subjected to bias-based bullying and harassment at school. In 2014 CAIR-CA offices surveyed 621 students statewide. The survey was given to American Muslim students between the ages of 11 and 18 who were enrolled in public and non-Muslim private schools in California.

It is important to keep in mind that this survey looks at the American Muslim community primarily through a religious lens. While the American Muslim community in the United States is extremely diverse in terms of race, national and ethnic origin, being native-born or an immigrant, and socioeconomic status, this report does not take into account the intersectionality of these different backgrounds or assess which ones are primarily responsible in shaping the specific experiences of American Muslim students. It provides only a cursory analysis of how those with certain demographic characteristics may experience religion-based student bullying and teacher discrimination. The CAIR-CA survey results demonstrate that the American Muslim students' experience is clearly affected by their religious identity. However, much more work is needed to examine how the convergence of their various identities affects their experience with bullying and discrimination.

Ultimately, 55% of the American Muslim students surveyed reported being subjected to some form of bullying based on their religious identity. This is twice as high as the national statistic of students reporting being bullied at school.[4] Many students experienced multiple types of bullying; however, the most common type of bullying American Muslim students faced was verbal at 52%.

CAIR-CA also considered gender-based differences in survey responses. Remarkably, more male students reported experiencing bullying. However, the percentage of females who reported experiencing discrimination by a teacher or administrator was slightly higher. Of the female respondents who wear a *hijab*, the Islamic headscarf, 29% reported being offensively touched by another student, and 27% reported being discriminated by their teacher.

There were also two key findings in the students' responses to questions about their feelings regarding their school environment. The percentage of students who reported feeling that they were comfortable participating in class discussions about Islam or countries where Muslims live decreased

by 4 percentage points, from 80% in 2012 to 76% in 2014. Moreover, only 67% of students felt teachers and administrators were responsive to their religious accommodation requests. American Muslim youth continue to identify student-teacher relations as needing improvement. Many students' comments referenced increased problems in the classroom during discussions about 9/11, mainly due to teachers either failing to address harassment by other students against Muslim students or discriminating against Muslim students themselves.

Through understanding how Islamophobia functions in the school environment, legislators, administrators, educators, and parents can be better prepared to recognize and prevent it. Recommendations on how Congress, textbook publishers, schools, and parents can work to create safe and inclusive school environments include:

- Congress should pass the Safe Schools Improvement Act (SSIA), an amendment to the Elementary and Secondary Education Act of 1965, prohibiting bullying and harassment based on a student's religion, race, color, national origin, sex, disability, sexual orientation, or gender identity.

- Congress should amend Title VI of the Civil Rights Act of 1964 to include religion as a protected characteristic.

- Textbook publishers should ensure that material discussing Islam and Muslims is current and free of Islamophobic bias.

- Schools should ensure that teachers receive training on how to prevent bullying and harassment in their classrooms.

- Teachers should learn to teach in diverse and multicultural classrooms and create inclusive environments by becoming familiar with the various religious identities of their students in addition to their racial, ethnic, sexual and gender identities.

- Teachers should also be particularly sensitive to lesson plans about Islam, 9/11, and current global politics that may impact American Muslims, and refrain from making their American Muslim students feel as though they must answer for all Muslims.

- Parents should look for signs of bullying and harassment in their children who may not want to raise awareness of the problems they are encountering.

- Parents should know and immediately assert their children's right to learn in a bias-free environment.

We hope that the American public continues striving to understand Islam, and the dangers posed by falling victim to fear and hatred not only of American Muslim students, but to society at large.

[207]

# ISLAMOPHOBIA AND AMERICAN MUSLIM YOUTH

## UNDERSTANDING ISLAMOPHOBIA

Before 9/11, the general attitude toward Islam in America was one of tolerance, or at worst, indifference. Islamophobia, understood as a close-minded prejudice against or hatred of Islam and Muslims, was a relatively uncommon phenomenon. According to hate crime statistics published by the FBI, there were only 33 religion-based hate crimes committed against Muslims in 2000. However, by the end of 2001, the shock of 9/11 coupled with inaccurate and often Islamophobic portrayals of Islam by misinformed media outlets, caused that statistic to rise to 546, an increase of "more than 1,600 percent." These crimes included harassment and physical assaults of Muslims, as well as vandalism of personal property and religious spaces belonging to Muslims. Although these statistics have trailed downward in the past decade, they are nowhere near their pre-9/11 figures. In its most recent report, the FBI announced that 165 such offenses were carried out against Muslims.

However, progress has been one-dimensional as anti-Muslim sentiment and Islamophobia in the United States continues to hold strong. This is in large part due to the media's tendency to emphasize coverage portraying American Muslims as anti-American, anti-liberal, or simply uncivilized and violent. In doing so, they help perpetuate false stereotypes and conflate the tenets of Islam with the actions of radicals.

*"Your existence is always interrogated, investigated and questioned."*

*-Wajahat Ali*

In recent years the media has exemplified an eagerness to cast suspicion upon Muslims in the event of violent attacks, long before details of the perpetrators have even come to light, as was seen in coverage of the 2011 Oslo attacks in Norway. Several media personalities, including some from the Washington Post and CNN, were quick to suggest that Muslims were responsible for the attacks. However, it was later revealed that the attacks were carried out by Norwegian national and white supremacist Anders Behring Breivik. Breivik emailed his Islamophobic manifesto titled 2083: A European Declaration of Independence to hundreds of people just hours before bombing Oslo government buildings and carrying out a mass shooting, killing 69 youth, many of whom were Muslim, attending a youth camp. Such rushes to judgment by the media not only feed into Islamophobic sentiments, but also pose dangers for Muslims who can become direct or indirect targets of hate speech and crimes.

The political discourse of our nation is also rife with Islamophobia, often used by some candidates during elections to gain votes through fear-mongering," discredit their opponents, and fundraise for their campaigns." Recently, in the 2016 cycle of presidential campaigns, two Republican frontrunners unabashedly made derogatory remarks about Islam and Muslims. During a town hall event in Rochester, New Hampshire, famed businessman and Republican presidential candidate Donald Trump failed to correct a number of Islamophobic comments made by a supporter who said, "We have a problem in this country. It's called Muslims. You know our current president is one. You know he's not even an American. Anyway, we have training camps growing where they want to kill us. That's my question: When can we get rid of them?" Instead of calling out the supporter for his hateful rhetoric and distancing himself from the comments, Trump responded, "We're going to be looking at that and many other things." Subsequently, when questioned by reporters, Trump was unapologetic and continued to defend his response." In the same month, in an interview on NBC's "Meet the Press," GOP presidential candidate Dr. Ben Carson stated that he "does not advocate for a Muslim to be president of the United States because he believes Islam to be incompatible with the Constitution."

The mental toll Islamophobia takes on American Muslims who feel they must constantly defend their religion and beliefs is rarely discussed. The stigma associated with being Muslim in America is very real and is best described by Wajahat Ali, co-host of Al Jazeera America's The Stream, who states that as a Muslim in America, "Your existence is always interrogated, investigated and questioned." It is not surprising that American Muslims feel this way when their government allows congressional hearings on Muslim radicalization and continues to perpetuate federal law enforcement policies that allow broad based surveillance and profiling of their communities." Government policies, media portrayal, and the inability to make their voices heard often lead American Muslims to feel disempowered, marginalized, and criminalized.

Islamophobia, however, is not an organic development of recent history. Rather, Islamophobia's rise can be attributed to a small network of organizations and people who have found fear-mongering to be a lucrative industry. Thirty-seven groups comprise the core of this network, and between 2008 and 2011 these groups generated over $119 million in revenue with key individuals benefiting from large salaries, making it their primary job to vilify Islam.



WHY STUDENTS DON'T REPORT BULLYING

**Fear**
"I was scared that the school would not agree with me."
"It'll make things worse."

**Embarrassment**
"I felt embarrassed telling."
"I was scared and embarrassed."
"I don't want anyone to know."

**Thinking It Was A Joke**
"I didn't think it was a big deal."
"It was just a joke."
"It was a joke, but had some connotations of racial profiling."

[208]

W ith such strong and far-reaching support behind Islamophobia, it is expected that its harmful effects are particularly felt by American Muslim youth. The school environment essentially functions as a "microcosm of society, reflecting] the narrow and negative representations of Muslims in the wider world."[18] Accordingly, the Islamophobic stereotype that all Muslims are terrorists is what seeped into the school environment in Irving, Texas, in September of this year, and allowed a 14 year-old American Muslim boy to be arrested and charged for bringing a clock to school. The student, Ahmed Muhammad, brought a homemade clock to show off to his engineering teacher.[19] Due to Ahmed's race and religion, school authorities automatically assumed the project was a bomb and called law enforcement. The incident highlights how, as a consequence of Islamophobia, American Muslim students do not have the academic freedom to pursue their interests without being subject to racism and bigotry. Other ways in which Islamophobia manifests at school is in the form of bullying, including teasing, name-calling, taunting, or even physical harm.[20] Verbal assaults are the most common, specifically those referencing bombs or calling American Muslim students terrorists.[21]

## Bullying (v.):

*Unwanted, aggressive behavior among school aged children that involves a real or perceived power imbalance. The behavior is repeated, or has the potential to be repeated, over time.*

Since 9/11 there have been many religion-based incidents against American Muslim youth. In addition to student bullying, American Muslim students have had to deal with the difficult problem of discrimination at the hands of their teachers. At Galileo Academy of Science & Technology in San Francisco in 2004, a boy approached a 17 year-old *hijab*-wearing student during lunch and began screaming, "Her father is bin Laden! She's going to blow up the school, she's going to blow it up! She has a bomb under her sweater! Everybody run, the jihad[i] girl is going to kill us!" When the Muslim student complained to her teacher, she was told that the male student had a right to express himself, especially since Muslims had caused a lot of problems in the world.[22] A similar situation involving a teacher occurred in March of this year when a 14 year-old Muslim student at Cypress Bay High School in Florida was called a "rag-head Taliban" by an instructor.[23] Such discrimination by teachers can be detrimental to Muslim youth, who as members of a minority may feel further sidelined and alienated, causing them to self-identify as "the other." In the long term, this notion of being seen as an outsider in the school community can lead to poor academic performance and a negative self-image.[24]

*Hijab*-wearing students in particular are targets of Islamophobia in school settings as the *hijab* is an obvious and apparent symbol of their faith. Girls who wear the *hijab* are often stereotyped on a regular basis as uneducated or oppressed for wearing it and must constantly affirm to others that it is their choice to wear it.[25] Reports also suggest that students wearing the *hijab* are more likely to be placed in lower academic levels than those who do not.[26] In addition, schools may fail to accommodate them in certain activities, such as not providing single-sex swimming classes or not allowing them to wear long pants during Physical Education classes.[27] This ultimately leads to their exclusion from activities and further marginalizes the girls from their fellow students. Negative stereotypes and attitudes such as these can prove exhausting as well as detrimental to identity formation, self-confidence, and future success.[28]

Classroom discussions on Islam, the Middle East, and terrorism are another area where American Muslim students can feel marginalized. When these topics arise in a classroom setting, American Muslim students are often put in an uncomfortable situation of defending their beliefs, correcting misconceptions relating to them, or being perceived as unpatriotic.[29] This holds especially true in situations such as the one that arose at Foster High School in Texas earlier this year when a teacher distributed an eight-page pamphlet titled "Islam/Radical Islam (Did You Know)." The pamphlet alluded to Islam being a violent religion that preaches an "ideology of war."[30] There have also been instances of students being disciplined for speaking up and contesting a view held by a teacher.[31]

Another nationally publicized case highlighting Islamophobia's pervasiveness in school environments occurred in March 2015 at the Pine Bush High School in New York.[32] As part of National Foreign Language Week at the school, a student recited the American Pledge of Allegiance in Arabic over the school's intercom. Several students quickly condemned this as an unpatriotic act causing the principal to issue an apology for allowing the pledge to be recited in a language other than English. In addition, the senior class president was reprimanded for allowing the pledge to be recited in Arabic[33] and the student who recited the pledge was called "a terrorist" and told to "go to the Middle East."[34] This incident demonstrates that many see Islam, Arabic, and terrorism as being synonymous.

American Muslim students who witness such Islamophobic responses can feel alienated and may disengage from future school activities.[35] This response may be compounded if figures of authority



## 55% of California Muslim students have been bullied.



## WHY STUDENTS DON'T REPORT BULLYING

**Thinking It Won't Help**

"It's not like it's going to solve anything."

"I felt like they wouldn't care."

"They don't care, they just make it worse, and they don't understand me nor connect."

**Distrust of Adults**

"Insults towards me, as a Muslim, and towards my religion are given jokingly therefore making it difficult to present it as a serious case of bullying."

"Because it is pointless, since it will just happen again and again."

"I don't think my teachers and administrators respect me."

"At the time, I didn't want my teacher to get mad at me. Plus I didn't want to make it into a bigger issue."

"Because I don't feel comfortable with an administrator and I don't have a good relationship with my parents."

---

turn a blind eye to or even support the actions targeting the students.[36] As a direct result of forcing American Muslim students to suppress their culture and native language, the inclusion of which has been proven to help minority students perform better at school, their academic success may suffer and otherwise successful American Muslim students may not reach their full potential.[37]

In less noticeable ways, Islamophobia can also seep into the school environment through outdated or inaccurate textbooks that paint Muslims and Islam as antiquated and incompatible with Western values.[38] Such negative stereotypes, as well as those perpetuated by the media, can have long-term effects on Muslim students and have a ripple effect on their academic success.[39] Furthermore, studies show that constant exposure to negative stereotypes about one's identity can lead to inferiority anxiety.[40] This sense of inferiority can be internalized, becoming a permanent part of a student's personality and further hindering his or her success.[41]

Schools exist to educate, empower, and prepare students to navigate the world. However, when students are discriminated against, bullied, and/or marginalized, they suffer academically and miss out on developing the skills and confidence needed to succeed. As minority students, American Muslim youth are more susceptible to the long term effects of these types of behaviors. As such, a dedicated effort must be made to report and expunge Islamophobia and Islamophobic rhetoric from schools.

## MUSLIM YOUTH AT SCHOOL SURVEY FINDINGS

In 2014 CAIR-CA surveyed 621 students between the ages of 11 and 18 who were enrolled in public and non-Muslim private schools throughout the state of California. The survey was a follow-up to a 2012 survey about the experience of American Muslim youth at school. The purpose of the survey was to understand how comfortable American Muslim students felt attending their schools and participating in classroom discussions about Islam and Muslims. CAIR-CA also sought to discover to what extent American Muslim students were subjected



**29%** of hijab-wearing students experienced offensive touching or pulling of their hijab.

to bias-based bullying and harassment at school. Some modifications were made to the 2012 survey in hopes of obtaining more meaningful responses to the 2012 survey in hopes of obtaining more meaningful responses to clarify their purpose and the addition of four new questions.

The 2014 survey was divided into two main sections. The first section asked students how they perceived their school environment through the frame of their religious identity. The second part questioned whether students were experiencing bullying by their peers and discrimination by their teachers. It also examined how students reacted to instances of bullying and discrimination, whether they reported it, took matters into their own hands, or did nothing.

### SECTION I: SCHOOL ENVIRONMENT

Questions 1 through 8 asked students whether they agreed or disagreed with the statements posed to them.

**1. I feel safe, welcome, and respected at my school.**

Similar to 2012, a majority of students felt safe at school.

**2. I am comfortable participating in class discussions about Islam or countries where Muslims live.**

The number of students who felt comfortable participating in class discussions about Islam and Muslims decreased by 4 percentage points from the previous survey, with more students feeling unsure or uncomfortable



83% AGREE
9% UNSURE
7% DISAGREE
1% NO RESPONSE

79% AGREE
10% UNSURE
9% DISAGREE
1% NO RESPONSE

[210]



# 1 in 5

students experienced discrimination by a school staff member

**3. My teachers and administrators are responsive to my religious needs (e.g. they give me time for prayer, excused absence for Eid, alternative food options, allow me to wear a different P.E. uniform, etc.).**

This statement was not included in the previous survey. Only 60% of students believe that schools are responsive to requests for religious accommodation.

**4. I feel comfortable letting students know that I am Muslim.**

This question was slightly modified; the second part of the statement that read "and talking about Islam outside of the classroom" was dropped. Similar to the 2012 survey, most students felt comfortable expressing their Muslim identity to their peers.

## SECTION 2: BULLYING AND DISCRIMINATION

Questions 5 through 8 asked students if they had experienced either verbal, physical, or cyberbullying because of their religion. Each question addressed a specific type of bullying. Many students experienced multiple types of bullying, with 55% experiencing at least one form. This is 25-30 percentage points higher than the national average of students who have reported bullying." The most common type of bullying experienced by American Muslim students was verbal.

Question 9 asked students whether they had experienced offensive comments by school administrators, teachers, and other staff. This question was added to the 2014 survey after CAIR-CA received many reports of discrimination by school personnel. This question provided a starting point to help determine the scale of the problem.

Question 10 asked students how they responded to bullying and discrimination, particularly whether they reported incidents to a trusted adult or fought and verbally insulted students in retaliation. Questions 11 and 12 examined whether students felt any of these methods worked.



# 19% of respondents experienced cyberbullying because of their religion.

**5. Has a student at school verbally insulted or abused you because of your religion?**

52% of all respondents experienced verbal abuse as a result of their religion. This is a two percentage-point increase from 2012.

**6. Has a student at school physically harmed or harassed you because of your religion?**

Only 9% of students responded that they had been physically bullied because of their religion. This is similar to the 10% reported in 2012.

**7. If you wear hijab, have you had your hijab tugged, pulled, or in any way offensively touched by another student?**

Of the female respondents that stated this question applied to them, 29% experienced offensive touching or pulling of their hijab.





[211]



**Distrust of adults**

**Fear of Being Called A Tattletale**

**8. Has a student from school made offensive comments to you about your religion through e-mail, text message, or on websites and apps like Facebook, Twitter, Snapchat, and Instagram?**

19% of respondents experienced cyberbullying because of their religion.

**9. Have your administrators, coaches, school safety officers, or teachers made offensive comments about your religion or allowed others to make offensive comments at school?**

One in five students experienced discrimination by a school staff member.

**10. If you had any of these experiences, how did you respond? (Mark all that apply)**

This question was reframed from the previous survey. Instead of asking how often students responded in a particular way, they were simply asked to indicate every response used. 44% of students reported instances of bullying to their parents, teacher, or principal. 10% fought, insulted, or made fun of the other students' faith or race. 35% of students failed to do anything at all in response to bullying or discrimination. Students who responded "Other" wrote in answers such as "I told them to leave me alone," "Ignored," "Walked away," and "Fought back with knowledge."



**27%** of girls wearing hijab reported teacher or administrator discrimination.



**11. When I told an adult, it helped solve the problem.**

While 42% of students who reported incidents of bullying and discrimination believed that it helped solve the situation, close to the same percentage, 41%, were unsure or disagreed with the statement that telling an adult helped solve the problem.

**12. When I told the school, I was happy with the response.**

While a little more than one-third of students were happy with the response from the school after reporting bullying and discrimination, 46% were unhappy or unsure about their school's response.

## DEMOGRAPHICS

The Muslim Youth at School survey also collected demographic information about survey participants, including what county they live in, their race or national origin, age, grade, and gender. Unlike the previous report, this report examines the demographic data to understand how the rate of bullying and teacher discrimination changes according to the demographic characteristic.

[212]




## County

Students from over 23 different counties across California participated in CAIR-CA's survey of American Muslim students. In contrast to the 2015 survey where 39% of respondents were from Orange County, the county with the largest number of participants was San Diego County which had previously been underrepresented. A greater effort was made to decrease overrepresentation from Orange County and increase participation in Los Angeles County, which gained 60% more respondents, and Central California.



## Race / National Origin

The racial and ethnic makeup of respondents reflected a percentage point decrease in the number of South Asian respondents and a 5 percentage point increase of Middle Eastern respondents. The respondents' ethnic and racial backgrounds is a good reflection of the American Muslim community's diversity in California, although it may not be a true image of the actual sizes of these populations.

31% MIDDLE EASTERN
31% SOUTH ASIAN
6% AFRICAN
7% NO RESPONSE
5% CAUCASIAN
5% MULTIETHNIC
4% BLACK/AFRICAN AMERICAN
3% NORTH AFRICAN
3% CENTRAL ASIAN
2% ASIAN
1% SOUTHEAST ASIAN
<1% PACIFIC ISLANDER
<1% OTHER



CAIR-CA questioned whether respondents' racial or ethnic background impacted the rate at which they experienced religion-based bullying and discrimination by their teachers. Students of Middle Eastern and North African descent are among those that experience the highest levels of bullying and discrimination. This would seem consistent with the incorrect yet widespread perception that all Muslims are Arab, and thus, those demographics experience higher levels of religion-based bullying. (While the percentages for those of Pacific Islander descent appear much higher than that of other Muslim populations, it may not be an accurate reflection given that only three people from this group participated in the survey)

MIDDLE EASTERN- 194 RESPONDENTS
* 21% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR
* 64% EXPERIENCED BULLYING

SOUTH ASIAN- 190 RESPONDENTS
* 23% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR
* 51% EXPERIENCED BULLYING

AFRICAN - 47 RESPONDENTS
* 21% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR
* 57% EXPERIENCED BULLYING

CAUCASIAN - 32 RESPONDENTS
* 19% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR
* 60% EXPERIENCED BULLYING

NORTH AFRICAN - 19 RESPONDENTS
* 65% EXPERIENCED BULLYING
* 29% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR

BLACK/AFRICAN AMERICAN - 22 RESPONDENTS

CENTRAL ASIAN - 21 RESPONDENTS
* 57% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR

ASIAN - 16 RESPONDENTS

PACIFIC ISLANDER- 3 RESPONDENTS

SOUTHEAST ASIAN - 5 RESPONDENTS
* 55% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR
* 35% EXPERIENCED BULLYING

MULTIETHNIC - 31 RESPONDENTS
* 59% EXPERIENCED BULLYING
* 13% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR


















[213]

## Age and Grade

The survey focused on students between the ages of 11 and 18, who attended fifth through twelfth grade. The survey was distributed relatively evenly amongst the age groups surveyed with 50% of respondents between the ages of 11 and 13 and almost 50% between the ages of 14 and 18.

Similarly, the breakdown between students who attended elementary and middle school and those who attended high school was almost equal.

CAIR-CA also examined whether a student's progression from elementary/middle school into high school affected the frequency of bullying he or she received. Generally, bullying is shown to be a bigger problem in middle school than in high school. However, CAIR-CA's survey results demonstrate that American Muslim students experience more bullying and a significantly greater amount of discrimination from their teachers in high school.



### 308 PARTICIPANTS

— 13% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR

#### ELEMENTARY/MIDDLE SCHOOL (GRADES 5 - 8)

— 47% EXPERIENCED BULLYING

### 303 PARTICIPANTS



#### HIGH SCHOOL (GRADES 9 - 12)

— 64% EXPERIENCED BULLYING

— 28% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR

## Gender

Compared to 2012, where the percentage of female respondents was evenly distributed and male respondents were higher, the 2014 survey respondents were more evenly distributed between the genders.



52% FEMALE
46% MALE
2% NO RESPONSE

CAIR-CA looked at differences in survey responses between the genders. While more male students experienced bullying than female students, the percentage of females who experienced discrimination by a teacher was slightly higher.

Amongst female students who wear hijab, the reports of discrimination by a teacher were higher.

### FEMALE - 321 RESPONDENTS

— 52% EXPERIENCED BULLYING

— 21% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR

### MALE - 286 RESPONDENTS

— 60% EXPERIENCED BULLYING

— 19% EXPERIENCED DISCRIMINATION BY A TEACHER OR ADMINISTRATOR



Overall, male and female students viewed their school environment favorably with almost no difference between the genders. Reported differences based on gender appeared when it came to experiencing bullying. Not only did male students experience more bullying, but their response to the bullying also differed. Male students were more likely to fight back and insult or name-call in retaliation while female students were considerably less likely to do either. Male students were also less likely to report incidents to their parents yet slightly more likely to report incidents to their teacher or principal.

WHY STUDENTS DON'T REPORT BULLYING





# AMERICAN MUSLIM STUDENTS IN THEIR OWN WORDS

"*Someone threatened to kill me if I went to school on 9/11.*"

Students were asked to share any experiences that made them feel unsafe or unwelcome as a Muslim at school. Many of the responses demonstrated similar themes such as negative reactions to wearing a *hijab*, social ostracism, being called a terrorist, negativity from teachers, reactions to accommodation requests, and increased scrutiny on 9/11. The comments have only been edited for readability.

## ON RESPONSES TO ACCOMMODATION REQUESTS

"*When I was fasting they still made me run the mile.*"

"*Sometimes when I have asked the librarian to pray in the library she always agrees to allow me to pray but with a weak hesitant smile.*"

## ON NEGATIVITY FROM TEACHERS

"*My teacher would blame me or say my answers were never the best just because I wore a scarf.*"

"*My teacher said, 'You're not American enough to understand.*'"

[215]



## ON WEARING A HIJAB

*"I just feel like an outsider a lot of the time because I wear the hijab."*

*"When I wear my hijab in schools sometimes people ask me if I'm related to Osama bin Laden."*

**"They would call me a terrorist and towel head and throw rocks at me."**

*"Some people at my school tell me that I should just come without my hijab for one day just so they can see my hair. They sometimes tell me that I would just look so much better without my hijab, and that makes me feel uncomfortable."*

*"When I first started wearing hijab, people would laugh and snicker at me to each other; I get a lot of stares and some people that normally did not, started avoiding me. I just decided to deal with it, and I eventually took it off. I want to put it on again but I'm not comfortable."*

## ON SOCIAL OSTRACISM

*"When I want to play with anyone they run away or they bully me or they say I can't play."*

*"I told the school and the kid got in trouble and now I am known as a tattletale! Now the kid still bullies me."*

*"I heard another student call a Muslim student a terrorist and felt scared to portray my faith."*

**"I'm judged because I'm Muslim."**

*"It makes me feel unwelcome because people stare and whisper and sometimes it hurts."*

## ON BEING CALLED A TERRORIST

*"One student would call me a terrorist but in a joking way and I did not take offense to it and laughed it off but deep down it was really irritating and at times I have thought of calling them out about it but I thought it would make a bigger issue than it really was."*

**"They would say I was a terrorist and always ask me, 'How is the bomb you are working on?'"**

*"Sometimes I get shoved, or punked because I am a Muslim. They call me names like 'bomb boy' or 'Osama Bin Laden or 'terrorist."*

*"People always call Muslims terrorists and that they are dangerous people in a joking way*

## ON INCREASED SCRUTINY ON 9/11

*and I have a hard time responding to that. I don't like being judged."*

*"Experience that made me feel unsafe or unwelcome would be during 9/11 or when something bad happened on TV that is about Muslims."*

*"Every September 11th, at my school there is a moment of silence. This entire day, and especially during that moment of silence, everyone just stares at me. I can feel their begrudging glares towards me and it very much irritates me."*

**"Someone threatened to kill me if I went to school on 9/11."**

[216]



# RECOMMENDATIONS

**CONGRESS** must pass the Safe Schools Improvement Act ("SSIA"), which is an amendment to the Elementary and Secondary Education Act of 1965. The act would prohibit bullying and harassment based on a student's religion, race, color, national origin, sex, disability, sexual orientation, or gender identity.[44] While California already has laws that prohibit such bullying, many other state laws are not as expansive in their protections and do not include discrimination based on religion.[45] The U.S. Department of Education's 2011 analysis of state bullying laws found that while many states had developed anti-bullying legislation and policies, problems related to implementation potentially rendered them ineffective in actually reducing bullying.[46] In addition to prohibiting bullying based on religion, SSIA would standardize anti-bullying best practices by requiring notice of prohibited conduct and communication of procedures that students and parents could follow to file complaints.[47] The act would also require data collection by states and biannual reporting to Congress and the President.[48]

**CONGRESS** should amend the Title VI of the Civil Rights Act of 1964. Currently, Title VI does not prohibit discrimination on the basis of religion. While the Department of Education's Office of Civil Rights has addressed the issue of discrimination and harassment based on religion in a "Dear Colleague" letter and their ability to enforce the jurisdiction through the prohibition against national origin discrimination, the extent of this protection is weak and insufficient.[49] Amending Title VI would directly allow the Department of Education to ensure that schools receiving federal funding would be answerable for failing to prevent bullying and harassment based on religion.

**TEXTBOOK PUBLISHERS** should ensure that material discussing Islam and Muslims is current and free of Islamophobic bias. Textbooks are the primary source of information for most students.[50] The information provided in textbooks is generally accepted by students as the authoritative word on the subject.[51] Biased information has been shown to negatively affect the attitudes, personality development, behavior, and academic and occupational achievements of minority students.[52] Due to the crucial role of textbooks in the classroom, publishers must take great care in their production. With respect to providing information about Islam and Muslims, specific care should be taken to differentiate between what practices are considered as part of the religion as opposed to what are the cultural norms of Muslim countries. Too often classroom materials fail to distinguish between the two, thus creating misperceptions about Muslims and providing inaccurate representations of Islam.

**SCHOOLS** should ensure that teachers receive training on how to prevent bullying and harassment in their classrooms. Teachers often report that they do not have sufficient training to address such incidents.[53] It is often simpler to ignore conflict between students and hope that they will work it out between themselves, than to address a problem they feel unequipped to handle. In schools where zero-tolerance policies are implemented, teachers may report both the bully and victim to administrators and leave it to them to deal with the problem. The victimized student in these situations may feel disempowered at best, or at worst, face suspension or expulsion because of zero-tolerance policies. Lack of training to prevent bullying thus impacts teachers and students alike.

**TEACHERS** should learn how to teach in diverse and multicultural classrooms so they can create an inclusive environment for all students. It is important for educators to be familiar not only with the various religious identities of their students, but also their racial, ethnic, sexual, and gender identities. Teachers who are not respectful of these characteristics risk marginalizing students. Minority students who feel that they do not have a place in the classroom may not perform as well.[54] The repercussions are more long-lasting in minority students who feel discriminated against by teachers because they may internalize feelings of inferiority and feel discouraged from investing in their futures.[55]

**TEACHERS** should also be particularly sensitive to lesson plans about Islam, 9/11, and current global politics that may impact American Muslims. American Muslim students should not be made to feel as though they must answer for all Muslims. Many American Muslim students feel pressured by their fellow students and teachers to speak authoritatively on these subjects when they may not be equipped to do so. Instead, it teachers believe they do not have the training to present on these subjects, they should look for professionals in their community who are qualified. Recommendations for teaching resources may be found in the Appendix.

**PARENTS** should be vigilant in looking for signs of bullying and harassment. Signs can include physical manifestations such as scrapes, bruises, property stolen from children, or more subtle changes in behavior where a child becomes withdrawn, anxious, and has excessive absences from school.[56] Oftentimes, children will not inform their parents that they have been bullied. Thus, parents must foster relationships of trust with their children, so that they feel comfortable telling them. Parents must also understand that it is not a child's fault if they are bullied nor should it be considered a natural part of growing up. They should also make sure that their children understand this as well. Moreover, parents need to teach their children what to do if they are bullied, particularly if the bullying is taking place online. The increase in cyberbullying in recent years requires parents to closely monitor their children's online activity.

**PARENTS** should immediately assert their children's right to learn in a bias-free environment. California state law requires schools to have policies and procedures in place to respond to complaints of bullying and harassment. Parents should use the stated procedure to make complaints and then follow up to ensure a response from the school. Parents should also report any instances of bullying and discriminatory harassment to their local CAIR-CA office.

[217]



26

## ACKNOWLEDGEMENTS

The primary author of this report is *Fatima Dadabhoy* and its primary editor is *Sabiha Khan.* The author would like to thank *Rabiya Hicken* for drafting and research support, as well as *Zahra Billoo, Brice Hamack,* and *Fatima Iqbal* for editorial support.

Invaluable feedback on the survey was provided by *Ameena Jandali at Islamic Networks Group, Tajpreet Kaur at Sikh Coalition,* and *Alejandro Beutel at the Institute for Social Policy and Understanding.* Additionally, law clerks, support staff, interns, and volunteers helped to gather the data used in the survey and in this report, including: *Zienab Abdelgany, Diana Demchenko, Nour Kweider, Maureen Dadabhoy, Jamilah Hawutmeh, Yalda Setter, Farida Chehata, Lucy Porras, Donna Elveli, Maheen Ahmed, Terri Smith, Susanne Avani, Mostafa Mahboob,* and *Ali Mir.*

A special thank you to these community centers, mosques, and organizations that helped facilitate the survey: *Al Minzar Weekend School, Brentwood Muslim Community Center, Chino Valley Islamic Center, Evergreen Islamic Center, Huda Community Center, Institute of Knowledge, Islamic Center of Hawthorne, Islamic Center of Irvine, Islamic Center of Mill Valley, Islamic Center of San Diego, Islamic Institute of Orange County, Islamic Movement of North America, The Islamic School of Silicon Valley, Islamic Society of Corona-Norco, Islamic Society of Orange County, Kurdish Community Islamic Center, Masjid Annur, Muslim American Society, Muslim Community Association of the Bay Area, Muslim Community Center of San Diego, North County Islamic Foundation,* and *West Valley Muslim Association.*

CAIR-CA would also like to acknowledge the following partner organizations: *Islamic Networks Group, Sikh Coalition,* and the *Sikh American Legal Defense & Education Fund.*

## APPENDIX A: RESOURCES

### ORGANIZATIONS PROVIDING EDUCATIONAL RESOURCES ON ISLAM

Islamic Networks Group (ING)
www.ing.org

Islamic Speakers Bureau of Southern California
http://www.isbscal.org

Teaching Tolerance: A Project of the Southern Poverty Law Center
www.teachingtolerance.org

Unity Productions Foundation
http://www.upf.tv

### WEBSITES ON BULLYING PREVENTION

Act to Change
https://acttochange.org

Islamic Networks Group (ING)
www.ing.org

National Education Association
www.nea.org

National Crime Prevention Council
www.ncpc.org

PACER National Bullying Prevention Center
www.pacer.org

Teaching Tolerance: A Project of the Southern Poverty Law Center
www.teachingtolerance.org

U.S. Department of Health & Human Services
www.stopbullying.gov

### REPORTS ON BULLYING AND PREVENTION

Bullying Prevention Guide
Islamic Networks Group
http://www.ing.org/downloads/ING_Bullying_Prevention_Guide.pdf

Go Home Terrorist
Asian American Legal Defense and Education Fund & Sikh Coalition

http://www.aaldef.org/docs/AALDEF-bullying-home-terrorist.pdf

Growing in Faith
Council on American-Islamic Relations - California
http://ca.cair.com/downloads/GrowinginFaith.pdf

State of American Muslim Youth, Research & Recommendations
Institute for Social Policy and Understanding
http://www.ispu.org/pdf/ISPU_FYI_Report_American_Muslim_Youth_Final.pdf

### CALIFORNIA LAWS RELATING TO BULLYING

California Education Code § 234 - 234.5 (Safe Place to Learn Act)

California Education Code 32261 - 32262 (Interagency School Safety Demonstration Act of 1985)

California Education Code 32265

California Education Code 32270

California Education Code 32282

### FEDERAL LAWS RELATING TO HARASSMENT

**Disability**
Section 504 of the Rehabilitation Act of 1973

Title II of the Americans with Disabilities Act of 1990

**Race, Color, & National Origin**
Title VI of the Civil Rights Act of 1964

**Sex**
Title IX of the Education Amendments of 1972

### FEDERAL GOVERNMENT REPORTING AGENCIES

Department of Education Office of Civil Rights
www2.ed.gov/about/offices/list/ocr/index.html

Department of Justice Civil Rights Division
www.justice.gov/crt/

27

[218]

# ENDNOTES

## EXECUTIVE SUMMARY

1. Islamophobia is defined as the close-minded prejudice against or hatred of Islam and Muslims. University of California, Berkeley's Center for Race and Gender and the Council on American-Islamic Relations, Same Hate, New Target: Islamophobia and its Impact in the United States, January 2009-December 2010, (Washington, DC: Council on American Islamic-Relations, 2010), ii. Accessed September 17, 2015, http://crg.berkeley.edu/sites/default/files/Islamophobiareport2009-2010.pdf.

2. In this report and the CAIR-CA survey, the term "bullying" refers exclusively to bias-related actions committed by students while the term "discrimination" refers exclusively to bias-related actions committed by administrators and teachers. This is due to the differing relationships the perpetrators and victims have with each other in the school hierarchy. Since teachers have official authority over children and are expected to treat each student in a fair manner, discrimination is the term used, while students are said to engage in bullying as they seek to assert power and authority over their equals or peers.

3. OSCE Office for Democratic Institutions and Human Rights (OSCE/ODIHR), Council of Europe (CoE), and United Nations Educational, & Scientific and Cultural Organization (UNESCO), Guidelines for Educators on Countering Intolerance and Discrimination against Muslims, Addressing Islamophobia through Education, (Warsaw: OSCE Office for Democratic Institutions and Human Rights, 2011) 20, accessed September 17, 2015, http://unesdoc.unesco.org/images/0021/002132/213299e.pdf.

4. "Facts about Bullying," U.S. Department of Health & Human Services, StopBullying.gov, last modified October 14, 2014, accessed September 17, 2015, http://www.stopbullying.gov/news/media/facts/#listing

## ISLAMOPHOBIA AND MUSLIM YOUTH

5. U.S. Department of Justice, Federal Bureau of Investigation, Hate Crimes Statistics, 2000, (Washington, DC: 2001), http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2000/hatecrime00.pdf.

6. U.S. Department of Justice, Federal Bureau of Investigation, Hate Crimes Statistics, 2001, (Washington, DC: 2002), http://www.fbi.gov/ucr/01hate.pdf.

7. "Hate Crimes Statistics, 2013," U.S. Department of Justice, Federal Bureau of Investigation, accessed September 17, 2015, http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2013/tables/table-1/table_1_incidents_offenses_victims_and_known_offenders_by_bias_motivation_2013.xls.

8. "Islamophobia Understanding Anti-Muslim Sentiment in the West," Gallup World, 2015, accessed September 17, 2015, http://www.gallup.com/poll/157082/islamophobia-understanding-anti-muslim-sentiment-west.aspx.

9. Ned Resnikoff, "Media Rushed To Suggest Radical Muslims Might Have Been To Blame For Norway Terrorism," Media Matters For America, July 25, 2011, accessed September 17, 2015, http://mediamatters.org/research/2011/07/25/media-rushed-to-suggest-radical-muslim-migh/181348.

10. Sophia Tesfaye, "Terrifying New Poll: Nearly 1 in 3 Iowa Republicans Thinks Islam Should Be Illegal," Salon, www.salon.com/2015/09/22/terrifying_new_poll_nearly_1_in_3_iowa_republicans_think_islam_should_be_illegal/.

11. John Yang, "Ben Carson Nabs Big Fundraising Haul After Islam Comments," MSNBC, September 23, 2015, accessed October 17, 2015, http://www.msnbc.com/msnbc/ben-carson-nabs-big-fundraising-haul-after-islam-comments.

12. Theodore Schleifer, "Trump Doesn't Challenge Anti-Muslim Questioner at Event," CNN, last modified September 18, 2015, accessed October 17, 2015, http://www.cnn.com/2015/09/17/politics/donald-trump-obama-muslim-new-hampshire/.

13. M.J. Lee, "Donald Trump: Some Muslims Area Problem," CNN, last modified September 30, 2015, accessed September 30, 2015, http://www.cnn.com/2015/09/30/politics/donald-trump-donlemon-interview-muslims/.

14. Aaron Blake, "Ben Carson Says a Muslim Shouldn't Be President. Many Americans Agree." The Washington Post, September 20, 2015, accessed October 8, 2015, http://www.washingtonpost.com/news/the-fix/wp/2015/09/20/ben-carson-says-a-muslim-shouldnt-be-president-many-americans-agree/.

15. Shay Lari-Hosain, "Interview: Being Muslim in America is Exhausting," Dawn, July 12, 2015, accessed September 17, 2015, http://www.dawn.com/news/1195900.

16. James Zogby, "CVE in the US: More Harm Than Good," The Huffington Post, July 25, 2015, accessed September 17, 2015, http://www.huffingtonpost.com/james-zogby/cve-in-the-us-more-harm-t_b_7868880.html.

17. "Council on American-Islamic Relations, Legislating Fear: Islamophobia and its Impact in the United States," (Washington, DC: Council on American-Islamic Relations, 2013), 19, accessed September 17, 2015, http://www.cair.com/images/islamophobia/Legislating-Fear.pdf.

18. Cynthia W. Tindongan, "Negotiating Muslim Youth Identity in a Post-9/11 World," High School Journal 95, no.1 (2011): 72, 73.

19. "Ahmed Mohamed, No Charges for boy, 14, arrested over clock," BBC News, September 16, 2015, accessed October 15, 2015, http://www.bbc.com/news/world-us-canada-34266369.

20. According to the U.S. Department of Health and Human Services, bullying is defined as "unwanted, aggressive behavior among school aged children that involves a real or perceived power imbalance. The behavior is repeated or has the potential to be repeated over time." "Effects of Bullying," U.S. Department of Health & Human Services, StopBullying.gov, accessed September 17, 2015, http://www.stopbullying.gov/at-risk/effects/index.html.

21. Fatima Dadabhoy, Sadaf Hasni, and Rachel Roberts, Growing in Faith: California Muslim Youth Experiences with Bullying, Harassment & Religious Accommodation in Schools, (Council on American-Islamic Relations-California, 2013), 10, 16, accessed September 17, 2015, http://ca.cair.com/downloads/GrowinginFaith.pdf. Write Survey also indicate that the overwhelming number of verbal assaults mention the words "bomb" and "terrorist."

22. Cristi Hegranes, "Suffer the Little Muslims," SFWeekly, August 17, 2005, accessed September 17, 2015, http://www.sfweekly.com/sanfrancisco/suffer-the-little-muslims/Content?oid=1215727.

23. Ann Henson Feltgen, "Weston Teacher Faces Discipline Over Alleged Slur of Muslim Student," Miami Herald, March 2, 2015, http://www.miamiherald.com/news/local/community/broward/article31924605.html#storylink=cpy.

24. OSCE/ODIHR, CoE, and UNESCO, Guidelines for Educators, 20.

25. Selcuk B. Sirin and Michelle Fine, "Hyphenated Selves: Muslim American Youths with Negotiating Identities on the Fault Lines of Global Conflict," Applied Developmental Science 11, no.3 (2007): 151, 157.

26. OSCE/ODIHR, CoE, and UNESCO, Guidelines for Educators, 19.

27. Ibid.

28. Tindongan, "Negotiating Muslim Youth Identity," 75-78, discusses how minorities struggle to create identities within a dominant group society.

29. Tindongan, "Negotiating Muslim Youth Identity," 83-84, discusses impact of U.S. foreign policies and conflicts in the Middle East on American Muslim students and how minorities struggle to create identities within a dominant group society.

30. Doyle Murphy, "Texas Teacher Facing Discipline for Anti-Muslim Handouts That Describe Islam as Ideology of War," New York Daily News, April 8, 2015, accessed September 17, 2015, http://www.nydailynews.com/news/islamophobic-classroom-5903329505a01.html.

31. Tindongan, "Negotiating Muslim Youth Identity," 83.

32. Khaled A. Beydoun, "Pledging Allegiance to Islamophobia in US Classrooms," Al Jazeera, March 23, 2015, accessed September 17, 2015, http://www.aljazeera.com/indepth/opinion/2015/03/pledging-allegiance-islamophobia-classroom-150323205405401.html.

33. Jack Jenkins, "High School Punishes Student For Allowing Arabic Translation Of Pledge Of Allegiance," ThinkProgress, March 30, 2015, accessed September 17, 2015, http://thinkprogress.org/education/2015/03/30/3640671/school-punishes-student-president-allowing-arabic-translation-pledge-allegiance/.

34. Elahe Izadi, "Pledge of Allegiance Reading In Arabic Sparks Controversy At New York School," The Washington Post, March 19, 2015, accessed September 17, 2015, http://www.washingtonpost.com/news/post-

[219]



nation/wp/2015/03/19/pledge-of-allegiance-reading-in-arabic-sparks-controversy-at-news-oak-school/.

35. OSCE/ODIHR, CoE, and UNESCO, *Guidelines for Educators*, 20.

36. Allan McEvoy, "Abuse of Power," *Teaching Tolerance*, Fall 2014, 51, discusses how bullying by teachers can lead to sense of powerlessness amongst targeted students, impacting their social relationships, and creating exposure for bullying by fellow students.

37. Jim Cummins, "Empowering Minority Students: A Framework for Intervention," *Harvard Education Review* 56, no.1 (1986): 656, 660–661.

38. OSCE/ODIHR, CoE, and UNESCO, *Guidance for Educators*, 19–20. Susan L. Douglass, & Ross E. Dunn, "Interpreting Islam in American Schools," in Hastings, Donnan, ed. *Interpreting Islam* (London: Sage Publications, 2002), 93.

39. Sweeda Shah, "Leading Multiethnic Schools, A New Understanding of Muslim Youth Identity," *Educational Management Administration & Leadership* 32, no.2 (2006): 220.

40. Claude M. Steele, "A Threat in the Air: How Stereotypes Shape Intellectual Identity and Performance," *American Psychologist* 52, no.6 (1997): 613, 617.

41. Ibid.

SURVEY FINDINGS

42. "Facts about Bullying"

RECOMMENDATIONS

43. Phil Nast, "Teaching Students to Prevent Bullying," National Education Association, accessed September 17, 2015, http://www.nea.org/tools/lessons/teaching-students-to-prevent-bullying.html

44. Safe Schools Improvement Act of 2015, S. 311, 114th Cong. (2015).

45. Dena T. Sacco, et al, *An Overview of State Anti-Bullying Legislation and Other Related Laws*, Born This Way Foundation, Berkman Center for Internet & Society

at Harvard University & John D. & Catherine T. MacArthur Foundation, 2012, accessed September 17, 2015, http://cyber.law.harvard.edu/sites/cyber.law.harvard.edu/files/State_Anti_Bullying_Legislation_Overview_0.pdf.

46. U.S. Department of Education, Office of Planning, Evaluation and Policy Development, Policy and Program Studies Service, *Analysis of State Bullying Laws and Policies*, by Victoria Stuart-Cassel, Ariana Bell, and J. Fred Springer (Washington, DC: U.S. Department of Education, 2011), https://www2.ed.gov/rschstat/eval/bullying/state-bullying-laws/state-bullying-laws.pdf

47. S. 311, 114th Cong. (2015).

48. Ibid.

49. Russlynn Ali, "Dear Colleague Letter," U.S. Department of Education, October 26, 2010, accessed September 17, 2015, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

50. Jim Parsons, "The Nature and Implication of Textbook Bias," (1982) 8, accessed September 17, 2015, ERIC (ED230895).

51. Ibid, 9.

52. Ibid, 9.

53. Leslie Titsor, "Teachers Say That Training Must Support Laws," Michigan State University School of Journalism, The New Bullying, February 13, 2012, accessed September 17, 2015, http://news.jrn.msu.edu/bullying/2012/02/13/teacher-anti-bullying-training-schools/.

54. Anthony Berryhill, "How Difference Affects the Classroom: Possible Effects and Ideas for Addressing Each Category," Yale Office for Diversity and Equal Opportunity, 2008, accessed September 17, 2015, http://cityled.edu/sites/default/files/files/diversity_classroom_effects.pdf

55. Pema Hanna and Leigh Linden, "Measuring Discrimination in Education," National Bureau of Economic Research Working Paper No. 15057, 2009, accessed September 17, 2015, http://www.nber.org/papers/w15057.pdf

56. "Warning Signs," U.S. Department of Health & Human Services: StopBullying.gov, accessed October 8, 2015, http://www.stopbullying.gov/at-risk/warning-signs/.

[220]



**Council on American-Islamic Relations**
**San Francisco Bay Area (CAIR-SFBA)**
3000 Scott Blvd., Suite 101
Santa Clara, CA 95054
Tel: 408.986.9874
Fax: 408.986.9875
E-mail: info@sfba.cair.com

**Council on American-Islamic Relations**
**Greater Los Angeles Area (CAIR-LA)**
2180 W. Crescent Ave., Suite F
Anaheim, CA 92801
Tel: 714.776.1847
Fax: 714.776.8340
E-mail: info@losangeles.cair.com

**Council on American-Islamic Relations**
**Sacramento Valley (CAIR-SV)**
717 K St., Suite 217
Sacramento, CA 95814
Tel: 916.441.6269
Fax: 916.441.6271
E-mail: info@sacval.cair.com

**Council on American-Islamic Relations**
**San Diego (CAIR-SD)**
7710 Balboa Ave., Suite 326
San Diego, CA 92111
Tel/Fax: 858.278.4547
E-mail: info@sandiego.cair.com

**[221]**

**EXHIBIT 38**

[222]



**San Diego Unified**
SCHOOL DISTRICT

**ADMINISTRATIVE PROCEDURE**

| | |
|---|---|
| NO: | **6381** |
| PAGE: | **1** OF **10** |
| EFFECTIVE: | 11-8-11 |
| REVISED: | **8-24-15** |

CATEGORY:   **Students, Welfare**

SUBJECT:   **Bullying and Intimidation**
          **(Student-to-Student, Adult-to-Student)**

**A.   PURPOSE AND SCOPE**

1.   To outline the district's prohibition on bullying and intimidation, responsibilities for leadership, and administrative procedures governing the reporting process.  This procedure applies to allegations of bullying and intimidation of students by students or adults.

2.   The district believes that all students have a right to a safe and healthy school environment.  The district, schools, and community have an obligation to promote mutual respect, tolerance and acceptance.

3.   The district will not tolerate behavior that infringes on the rights and safety of any student.  Neither staff nor students shall intimidate, harass, or bully another student through words or actions.  Such behavior includes:  direct physical contact, such as hitting or shoving; verbal assaults, such as teasing or name-calling; and social isolation or manipulation.

4.   The district expects students, staff, parents/guardians, volunteers and visitors to promptly report incidents of bullying to the site principal/administrator or designee.  Staff who witness such acts must take prompt steps to intervene when safe to do so.  Each complaint of bullying should be promptly investigated.  Complaints may be investigated informally by the site or through the formal complaint process under this procedure at the discretion of the complainant.  This policy applies to students and adults on school grounds, while traveling to and from school or a school-sponsored activity, during the lunch period, whether on or off campus, and during a school-sponsored activity.

5.   **Related Procedures:**
     Nondiscrimination on the Basis of Sex ……………………………………………   0112
     Nondiscrimination of Students Who Are Transgendered …………………………   0114
     Uniform Complaint Process ……………………………………………………..   1700

**B.   LEGAL AND POLICY BASIS**

1.   **References:**  Board policy A-3550; California Education Code §200, 201, 220, 234, 234.1, 32261, 35294 *et seq.*, 48900.3, and 48985; Assembly Bill 394 (2008), "Safe Place to Learn Act;" Assembly Bill 9 (2011), "Seth's Law," amending Education Code §324; Assembly Bill 1156 (2011), "Tabitha's Law," amending Education Code Sections 32261, 32282, 32283, 46600 and 48900.

2.   **Relationship to Other Laws:**  This procedure applies only to bullying and intimidation.  Other laws address related issues such as sexual harassment or discrimination, including: California Education Code §212.5, sexual harassment defined; California Penal Code §422.55, hate crimes defined; and Title 5, California Code of Regulations §4900, Prohibition of Discrimination in Public Schools.

3.   The district will ensure its compliance with all laws regarding bullying, harassment and intimidation.  Nothing in this procedure prevents a student, parent/guardian, school or district from taking action to remediate harassment or discrimination based on a person's gender or membership in a legally protected class under local, state, or federal law.

[223]

| SUBJECT: | **Bullying and Intimidation**<br>**(Student-to-Student, Adult-to-Student)** | NO: | **6381** |
|---|---|---|---|
| | | PAGE: | **2** OF **10** |
| | | EFFECTIVE: | 11-8-11 |
| | | REVISED: | **8-24-15** |

## C.   GENERAL

1.   **Originating Office.**  Suggestions or questions concerning this procedure should be directed to the Student Services Office.

2.   **Definitions.**

a.   **Bullying** (as defined in AB 1156):  Severe or pervasive physical or verbal act or conduct, including communications made in writing or by means of an electronic act, that has the effect of or can reasonably be predicted to have the effect of:

(1)   Placing a reasonable student in fear of harm to his or her person or property;

(2)   Causing a reasonable student to experience a substantially detrimental effect on his or her physical or mental health;

(3)   Causing a reasonable student to experience substantial interference with his or her academic performance; or

(4)   Causing a reasonable student to experience substantial interference with his or her ability to participate in or benefit from the services, activities, or privileges provided by a school.

b.   **Cyberbullying:** Intentional mistreatment of others through the use of technology, such as computers, cell phones and other electronic devices.  This includes, but is not limited to:

(1)   Sending malicious, hurtful or threatening messages or images about another;

(2)   Posting sensitive, private information about another person for the purpose of hurting or embarrassing the person;

(3)   Pretending to be someone else in order to make that person look bad and/or to intentionally exclude someone from an online group.

c.   **Electronic Act:** Transmission of a communication, including but not limited to, a message, text, sound, image or a post on a social network Internet website, or image by means of an electronic device, including but not limited to a telephone, wireless telephone or other wireless communication device, computer or pager.

d.   **Hostile Environment:**  A situation in which bullying causes the school environment to be permeated with intimidation, ridicule or insult that is sufficiently severe or pervasive to alter the conditions of a student's education.

e.   **Intimidation:**  The unlawful act of intentionally coercing or frightening another to behave in a certain way against their will through force, fear or threats.

f.   **Reasonable Student:** A student who exercises average care, skill, and judgment in conduct for a person of their age and/or their exceptional needs.

[224]

| SUBJECT: | **Bullying and Intimidation**<br>*(Student-to-Student, Adult-to-Student)* | NO: | **6381** |
|---|---|---|---|
| | | PAGE: | **3** OF **10** |
| | | EFFECTIVE: | 11-8-11 |
| | | REVISED: | **8-24-15** |

g.   **Retaliation:**  When an aggressor harasses, intimidates, or bullies a student who has reported incidents of bullying.

**D.   IMPLEMENTATION**

1.   **Education, Dissemination, and Accountability.**

a.   Each school shall provide notice to students and staff of the district's Bullying and Intimidation Prohibition Policy A-3550 and this Administrative Procedure through:

(1)   Appropriate references in the student handbook, and

(2)   An annual assembly to discuss the policy and procedure with students and staff.

b.   The district shall annually inform parents/guardians of its prohibition on bullying, harassment, and intimidation via the Facts for Parents publication/website.

c.   The site principal/administrator of each school will publicize through the student handbook and annual assembly to students, staff, volunteers, visitors, and parents/guardians how a verbal or written report of bullying or intimidation may be filed and how this report will be handled.

2.   **Training.**

a.   Staff will receive annual training discussing the district's policy and procedure related to bullying and intimidation; instructing staff of their roles and responsibilities, investigation requirements, and effective methods to prevent and/or cease bullying or intimidating behavior when it is observed.

b.   The district will provide, at the request of the site principal/administrator, staff development training in bullying prevention and methods to cultivate acceptance and understanding in all students and staff, to build each school's capacity to maintain a safe and healthy learning environment.

c.   Teachers should discuss this policy with their students in age-appropriate ways and should assure them that they need not endure any form of bullying.

d.   Students who bully are in violation of this policy and are subject to disciplinary action as provided for in the California Education Code.

3.   **Prevention Strategies.**  The district will implement a range of prevention strategies including individual, classroom, school, and district-level approaches.

4.   **Reports and Complaints.**  Any student, parent/guardian, third party or other individual or organization who believes that a student or student group has been subjected to bullying and/or intimidation, or who has witnessed such conduct, may report the conduct orally to any school employee or administrator, and/or file a formal written complaint utilizing the Bullying and Intimidation Complaint Form (Attachment 1).

a.   **Oral reports to any school employee or administrator.**

[225]

SUBJECT:   **Bullying and Intimidation**
**(Student-to-Student, Adult-to-Student)**

NO:           **6381**

PAGE:         **4** OF **10**

EFFECTIVE:    11-8-11

REVISED:      **8-24-15**

(1)   A staff member who receives a report of bullying and/or intimidation, shall, within one school day or as soon as possible thereafter, report this to the site principal/administrator or designee.  In addition, any school employee who observes any incident of bullying and/or intimidation involving a student shall, within one school day or as soon as possible thereafter, report this observation to the principal/designee; whether or not the victim makes a report.

(2)   Where an oral report is made of bullying and/or intimidation on the part of the site principal/administrator or designee to whom the report would ordinarily be communicated, the employee who receives the report or who observes the incident shall instead make the report to the Quality Assurance Office (QAO).

(3)   The site principal/administrator or designee (or Quality Assurance Office, pursuant to Section D.4.a.[2]) who receives an oral report of bullying and/or intimidation shall promptly inform the individual making the report of the resolution options under these procedures, including the right to file a written complaint utilizing the Bullying and Intimidation Complaint Form (Attachment 1). If a complainant is unable to put a complaint in writing due to conditions such as a disability or illiteracy, district staff shall assist him/her in filing of the complaint.

(4)   If the bullying or intimidation is on the basis of actual or perceived characteristics such as sex, sexual orientation, gender, ethnic group identification, ancestry, national origin, race or ethnicity, religion, color, or mental or physical disability, gender expression, gender identity, nationality or age, or on the basis of a person's association with a person or group with one or more of these actual or perceived characteristics, in any program or activity conducted by the district, which is funded directly by, or that receives its benefits from any state financial assistance, the site principal/administrator or designee must advise the complainant of their right to file a Uniform Complaint in accordance with Administrative Procedure 1700.

(5)   If the site principal/administrator or designee or the Quality Assurance Office receives an anonymous complaint or media report about alleged bullying and/or intimidation, the site principal/administrator or designee or the Quality Assurance Office shall determine whether it is appropriate to pursue an investigation considering the specificity and reliability of the information, the seriousness of the alleged incident, and whether any individuals can be identified who were subjected to the alleged conduct.

b.   **Interim measures.**  After a report or complaint is made, the responsible site principal/administrator or designee shall determine whether interim measures are necessary to stop, prevent or address the effects of bullying and/or intimidation, including retaliation, harassment or bullying during and pending any informal resolution and/or investigation, such as placing students in separate classes or transferring a student to a class taught by a different teacher.  Interim measures will be implemented in a manner that minimizes the burden on the individual who was the target of bullying and/or intimidation.

c.   **Optional mediation.**  In cases of student-to-student bullying and intimidation, when both the student who complained, and where appropriate, his/her parent/guardian, and the accused student and where appropriate, his or her parent/guardian so agrees, the

[226]

| SUBJECT: | **Bullying and Intimidation**<br>*(Student-to-Student, Adult-to-Student)* | NO: | **6381** |
|---|---|---|---|
| | | PAGE: | **5** OF **10** |
| | | EFFECTIVE: | 11-8-11 |
| | | REVISED: | **8-24-15** |

site principal/administrator or designee may arrange for them to resolve the complaint informally with the help of a counselor, teacher or administrator (e.g., restorative practices may be utilized to bring together those involved in and affected by the incident to allow the perpetrator to accept responsibility, allow the victim to voice the impact of the bullying, provide a forum for rebuilding relationships, develop collaborative action plans, and respond to student needs in a safe and respectful environment with the assistance of a trained facilitator). The individual who is the subject of the complaint or his/her parent/guardian may not be asked or required to meet directly with the accused individual as part of the informal resolution process. All parties should be advised that they may file a formal complaint at any time during or after the informal process.

    d.    At the conclusion of ten school days or as soon as possible thereafter, the site principal/administrator or designee will document, utilizing the School Investigation Report Summary (Attachment 2) whether informal resolution has been attempted; and if so, whether it was successful in resolving the complaint to the satisfaction of the subject individual, and if appropriate, his/her parent/guardian. The site principal/administrator or designee shall notify the complainant in writing of the outcome of the informal resolution. A copy of the School Investigation Report Summary shall be forwarded to the Quality Assurance Office.

    e.    **Formal Complaint.**

        (1)    Initiation of investigation. At each school, the site principal/administrator or designee shall initiate an impartial investigation of an allegation of bullying and/or intimidation within ten school days of receiving a formal complaint under this procedure, or as soon as possible thereafter, unless the site principal/administrator or designee has confirmed that the complaint has been resolved informally to the satisfaction of the subject individuals and where appropriate, his/her parent/guardian.

        (2)    Initial interview with the subject of the complaint. At the beginning of an investigation, the site principal/administrator or designee or the Quality Assurance Office (if the complaint is related to the principal), shall discuss what actions are being sought in response to the complaint. The subject of the complaint shall have an opportunity to describe the incident, identify witnesses who may have relevant information and provide other evidence or information leading to evidence of the alleged conduct. A complainant's refusal to provide the district's investigator with documents or other evidence related to the allegations in the complaint, failure or refusal to cooperate in the investigation, or engagement in any other obstruction of the investigation may result in the dismissal of the complaint because of a lack of evidence to support the allegation.

        (3)    If the subject of the complaint and/or his or her parent/guardian requests confidentiality, he or she shall be informed that such a request may limit the district's ability to investigate or take other action. If the subject individual insists that his or her name not be revealed, the site principal/administrator or designee or the Quality Assurance Office (if the complaint is related to the principal), must take all reasonable steps to investigate and respond to the complaint consistent with the request.

[227]

SUBJECT:   **Bullying and Intimidation**
**(Student-to-Student, Adult-to-Student)**

NO:   **6381**

PAGE:   **6** OF **10**

EFFECTIVE:   11-8-11

REVISED:   **8-24-15**

(4)   Investigation process.  The site principal/administrator or designee or Quality Assurance Office shall keep the complaint and allegation confidential, except as necessary to carry out the investigation or take other subsequent necessary action.

(a)   The site principal/administrator or designee (or Quality Assurance Office, pursuant to Section D.4.a.[2]) shall interview individuals who have information relevant to the investigation, including but not limited to, the subject of the complaint and, where appropriate, his or her parents/guardians, the person accused of bullying and/or intimidation, anyone who witnessed the reported conduct, and anyone mentioned as having relevant information.  The site principal/administrator or designee or the Quality Assurance Office will also review any records, notes, or statements related to the complaint and make take other steps such as visiting the location where the conduct is alleged to have taken place.

(b)   When necessary to carry out his/her investigation or to protect student safety, and consistent with federal and state privacy laws, the site principal/administrator or designee or the Quality Assurance Office also may discuss the complaint with the Superintendent or designee, the parent/guardian of the accused individual if the accused individual is a student, a teacher or staff member whose knowledge of the students involved may help in determining the facts, law enforcement and/or Child Protective Services, and the district's Legal Counsel or Risk Manager. Participation in an investigation does not alleviate any mandated reporter from making a mandated report as required by law.

(c)   Interviews of the alleged victim, alleged perpetrator, and all relevant witnesses should be conducted privately, separately, and kept confidential. At no time should the alleged perpetrator and victim be interviewed together.  The Witness Declaration Form (Attachment 3) shall be used to document statements.

(d)   Interviews and other information gathered will be documented. Documentation of complaints and their resolution will be maintained in the site file for a minimum of two years.

(5)   Factors in reaching a determination.  In reaching a decision about the complaint, the site principal/administrator or designee may take into account:

(a)   Statements made by the subject of the complaint, the individual accused, and other persons with knowledge relevant to the allegations.

(b)   The details and consistency of each person's account.

(c)   Evidence of how the subject of the complaint reacted to the incident.

(d)   Evidence of any past instances of bullying and/or intimidation, or other misconduct by the accused individual.

[228]

SUBJECT:   **Bullying and Intimidation**
           *(Student-to-Student, Adult-to-Student)*

NO:          **6381**

PAGE:        **7** OF **10**

EFFECTIVE:   11-8-11

REVISED:     **8-24-15**

---

(6)   To judge the severity of the bullying and/or intimidation where it is determined that bullying and/or intimidation has occurred, the site principal/administrator or designee may take into consideration:

(a)   How the misconduct affected the subject of the complaint.

(b)   The type, frequency and duration of the misconduct.

(c)   The age, race, gender/gender identity and/or disability of the subject of the complaint and the individual accused of the conduct, and the relationship between them.

(d)   The number of persons engaged in the alleged conduct.

(e)   The size of the school, location of the incidents, and context in which they occurred.

(f)   Other incidents of bullying and/or intimidation at the school.

f.   **Written report on findings and follow-up.**  Within 60 calendar days of receiving the complaint or as soon as possible thereafter, the site principal/administrator or designee (or the Quality Assurance Office, if investigating pursuant to Section D.4.a.[5]) shall conclude the investigation and prepare a written report of the findings as described below.  This timeline may be extended for good cause.  If an extension is needed, the site principal/administrator or designee or Quality Assurance Office shall notify the complainant and explain the reasons for the extension.

(1)   The district's decision shall be in writing and sent to the complainant.  The district's decision shall be written in English, and, when required by Education Code §48985, or pursuant to federal law, the decision shall be translated into the complainant's or parent/guardian's primary language.

(2)   For all complaints, the decision shall include:

(a)   The findings of fact based on the evidence gathered.

(b)   As to each allegation, the district's conclusion(s) as to whether bullying and/or intimidation has occurred.

(c)   Rationale for such conclusion(s).

(d)   Remedial actions, if any are warranted, that relate directly to the subject of the complaint; complainant or the law, including individual remedies offered or provided to the subject of the complaint, such as counseling, academic remedies or other measures, and systematic measures taken to eliminate any hostile environment and prevent the bullying and/or intimidation from recurring.

(e)   Notice that the complainant and/or, where appropriate, his/her parent/guardian should immediately report any reoccurrence of the conduct or retaliation to the principal/designee.

**[229]**

| SUBJECT: | **Bullying and Intimidation** *(Student-to-Student, Adult-to-Student)* | NO: | **6381** |
|---|---|---|---|
| | | PAGE: | **8** OF **10** |
| | | EFFECTIVE: | 11-8-11 |
| | | REVISED: | **8-24-15** |

      (f)    Notice of the complainant's right to appeal the district's decision within 15 calendar days to the Office of Youth Advocacy and procedures to be followed for initiating such an appeal.

g.    **Remedial action** will be designed to end the bullying and/or intimidation conduct, prevent its recurrence and address its effects on the targeted student.  Examples of appropriate action include:

    (1)    Interventions for the individual who engaged in the bullying and/or intimidation, such as parent or supervisor notification, discipline, counseling or training.

    (2)    Interventions for the targeted individual, such as counseling, academic support and information on how to report further incidents of bullying and/or intimidation.

    (3)    Separating the targeted individual and the individual who engaged in the bullying and/or intimidation, provided the separation does not penalize the targeted student.

    (4)    Follow-up inquiries with the targeted individual and witnesses to ensure that the bullying and/or intimidation conduct has stopped and that they have not experienced any retaliation.

    (5)    Training or other intervention for the larger school community to ensure that students, staff and parents understand the types of behavior that constitute bullying and/or intimidation, that the district does not tolerate it, and how to report it.

    (6)    In addition, the site principal/administrator or designee shall ensure that the individual who was the target of bullying and/or intimidation and where appropriate, his/her parent/guardian, are informed of the procedures for reporting any subsequent problems.

h.    **Disciplinary action.**

    (1)    Students who are found to have engaged in bullying and/or intimidation conduct may be subject to discipline pursuant to California Education Code.  Disciplinary action may include oral warnings, written warnings, mandatory training, counseling, suspension, transfer or expulsion for students.  Such disciplinary action shall be in accordance with district policy and state law.  Suspension and recommendations for expulsion must follow applicable law.

    (2)    Staff members who are found to have engaged in bullying and/or intimidation conduct toward students shall be subject to discipline.  Disciplinary action may include oral warnings, written warnings, mandatory training, counseling, suspension, transfer, demotion, or termination of employees.  Such disciplinary action shall be determined by site and district administration in accordance with applicable policies, laws, and/or collective bargaining agreements.

    (3)    In identifying appropriate disciplinary action, repeated incidents and/or multiple victims will result in more severe penalties.

[230]

| SUBJECT: | **Bullying and Intimidation**<br>*(Student-to-Student, Adult-to-Student)* | NO: | **6381** |
|---|---|---|---|
| | | PAGE: | **9** OF **10** |
| | | EFFECTIVE: | 11-8-11 |
| | | REVISED: | **8-24-15** |

(4)　Disciplinary action taken shall not be reported to the complainant where doing so would violate the privacy rights of involved students or staff.

i.　**Appeals procedures.**

   (1)　Appeals to the Office of Youth Advocacy.  If dissatisfied with the district's decision under this procedure, the complainant may appeal in writing to the Office of Youth Advocacy.

      (a)　The complainant shall file his or her appeal within 15 calendar days of receiving the district's decision and the appeal shall specify the basis for the appeal of the decision and whether the facts are incorrect and/or district procedure has been misapplied.  A response to the appeal will be provided within 60 calendar days of receipt.

      (b)　Upon notification by the Office of Youth Advocacy that the complainant has appealed the district's decision, the site principal/administrator or designee shall forward the following documents to the Office of Youth Advocacy:

         (i)　A copy of the original complaint.

         (ii)　A copy of the decision.

         (iii)　A summary of the nature and extent of the investigation conducted by the district, if not covered by the decision.

         (iv)　A copy of the investigation file, including but not limited to all notes, interviews, and documents submitted by the parties and gathered by the investigator.

         (v)　A report of any action taken to resolve the complaint.

         (vi)　A copy of the district's Uniform Complaint procedures.

         (vii)　Other relevant information requested by the Office of Youth Advocacy.

j.　**Civil law remedies.**

   (1)　A complainant may pursue available civil law remedies outside of the district's complaint procedures.  Complainants may seek assistance from mediation centers or public/private interest attorneys.  Civil law remedies that may be imposed by a court include, but are not limited to, injunctions and restraining orders.

   (2)　Complaints alleging bullying and/or intimidation based on race, color, national origin, sex/gender, disability or age may also be filed with the US Department of Education, Office for Civil Rights (www.ed.gov/ocr).  Such complaints must generally be filed within 180 days of the alleged bullying and/or intimidation.

**[231]**

| SUBJECT: | **Bullying and Intimidation**<br>*(Student-to-Student, Adult-to-Student)* | NO: | **6381** |
|---|---|---|---|
| | | PAGE: | **10** OF **10** |
| | | EFFECTIVE: | 11-8-11 |
| | | REVISED: | **8-24-15** |

## E.   FORMS AND AUXILIARY REFERENCES

1.   California Department of Education publication, Bullying at School (2003), available online at www.cde.ca.gov

2.   Facts for Parents, available online at http://www.sandi.net/factsforparents

3.   Bullying and Intimidation Complaint Form (Attachment 1)

4.   School Investigation Report Summary (Attachment 2)

5.   Witness Declaration Form (Attachment 3)

## F.   REPORTS AND RECORDS

1.   The site principal/administrator or designee shall complete a School Investigation Report (Attachment 3).  The report shall be maintained at the school site in accordance with student confidentiality laws.  A copy of the report shall be forwarded to the Quality Assurance Office for issuance of a district tracking number and for district-wide data compilation and reporting purposes.  A copy may also be provided to the appropriate Area Superintendent or department head.

2.   Short term suspension records and information shall be maintained by each school.

## G.   APPROVED BY

General Counsel, Legal Services
As to form and legality

## H.   ISSUED BY

Chief of Staff

[232]

**EXHIBIT 39**

[233]



# SUNDAY

**Michigan, North Carolina win men's semifinals** /1C

**Texas Tech, Ohio State women reach final** /12C

**ARTS**
Twin Cities back on the music map ★

**VARIETY**
**4** who beat the odds

**SPECIAL SECTION**
Winfield completes the journey

# Star Tribune

**MINNEAPOLIS** EDITION

■ Tinkering continues at Legislature/**1B**

■ Moorhead Hispanics look for respect/**1B**

SUNDAY/April 4/1993     NEWSPAPER OF THE TWIN CITIES     $1.50

[234]

# Reader says use of 'fundamentalist' hurting Muslims

Ibrahim Hooper, who says his Islamic Information Service represents Minnesota's estimated 15,000 Muslims, has reiterated his request that "fundamentalists" not be used to describe those charged in the World Trade Center bombing in New York.

To be a Muslim you must believe in Islam's sacred text, the Koran, and that makes every Muslim a fundamentalist, Hooper says.

Roger Buoen, Star Tribune national editor, agrees that "fundamentalist" is an imperfect term to describe the alleged bombers, but says, "I've yet to hear an alternative that's better."

Typical of the "fundamentalist" usage was a March 27 Associated Press article that said, "The suspects appear to be fundamentalist Muslims, which raised the prospect of anti-Western zealotry."

R. Scott Appleby, who headed a six-year study of fundamentalism for the American Academy of Arts and Sciences, defends the use of "fundamentalists."

He says it describes those committed to an Islamic state. "They feel that Islamic law must be implemented as the basis for all legal decisions, for all courts, for all legislation," he says.

The academy's study, reported in London's Economist, said, "Funda-



**If you ran the paper**

**Lou Gelfand**

mentalists may have started as traditionalists but have been forced, by events or history or the world at large, into activism. All see themselves as 'fighting back,' using violence if necessary, against the forces of secularism or modernism."

Hooper objects. "That's a standard non-Muslim interpretation. Most non-Muslims believe in the separation between church and state. To have an Islamic society you must have Islamic rulers. We aren't allowed to take over (the United States and) other governments. What we fight for here and in the remainder of the world is to practice our beliefs.

"I wouldn't want to create the impression that I wouldn't like the government of the United States to be

Islamic sometime in the future," Hooper says. "But I'm not going to do anything violent to promote that. I'm going to do it through education."

Buoen said the Star Tribune uses "fundamentalist" to "describe individuals and groups who favor and seek an Islamic religious state. The term may be imperfect, but I've yet to hear an alternative that's better. Our news services use the term, and many scholars favor its use.

"Still," Buoen says, "I agree with critics that the term is loaded with negative connotations and can be misleading. I think it's best to avoid the label when possible, and instead use more specific descriptions of individuals or groups.

"We have attempted to do this when reporting on the arrests arising out of the World Trade Center bombing. Our stories will often say the suspects 'have links to a Muslim cleric who advocates the overthrow of Egypt's secular government,' or something along those lines. But unfortunately this level of detail is not always practical — in headlines, cutlines, briefs, passing references in stories — and we're forced to use the shorthand term 'fundamentalist.' "

Is "black" or "African American" the appropriate description?

Jean Griffith-Thompson, Baltimore Sun editor, a speaker at a meeting of newspaper ombudsmen last week, said the answer is easy: "Ask sources how they want to be identified."

For herself she prefers 'black,' because she is from Barbados in the Caribbean. "Africa is one step removed from the origins of my family."

■

A Minneapolis couple, testifying at the Minnesota Supreme Court's public hearing on juvenile justice reform, said they had to discover on their own that their son, arrested for drugs, had been in jail overnight.

Reporter Kevin Diaz identified the parents in recounting their trauma in a March 26 article.

"We knew it was a public hearing," said the mother, "but we didn't think the newspaper would identify us" because of the impact it would have on the son.

"I sympathize with the family's position," Diaz said. "I'm sure their decision to go public was an anguished one, and it occurred to me that the press exposure might be difficult for them. But despite the sensitivity of their predicament, I had to balance that against the simple fact that they voluntarily thrust themselves into a public discussion with the purpose of

influencing matters of judicial policy.

"Quite simply, they had a unique perspective and something worthwhile to say. They were publicly leveling charges of racism against the courts. That is not the sort of thing one should expect or be expected to do in a public forum while at the same time ducking for cover. Hiding them behind a veil of anonymity, as if they had done something wrong, would decrease the power of their voices.

"Nor, I felt, would it protect them in any meaningful way. Unless things have drastically changed since I was in high school, their child's problems with the law are no doubt already well known to his peers."

*Comment:* From experience, I know Diaz is no hip-shooter. So his position is not easily put aside. But I think the parents' message without their names would have had the same impact on readers. Regrettably, the youth's problem is a common one, and identifying him made certain his peers would be aware.

■

The reader representative catches bouquets and brickbats from 8:30 a.m. to 4:30 p.m. Monday through Friday. Call 673-4450. Outside the metro area call 1-800-827-8742.

•

**[235]**

**EXHIBIT 40**

[236]

# FREEDOM *of* CONSCIENCE
## ——— DEFENSE FUND ———

CHARLES S. LiMANDRI*
PAUL M. JONNA

TERESA L. MENDOZA
JEFFREY M. TRISSELL

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
  ADMITTED TO THE CALIFORNIA BAR
  ADMITTED TO THE DISTRICT OF COLUMBIA BAR
  ADMITTED TO THE NEW YORK BAR
  ADMITTED TO THE U.S. SUPREME COURT

POST OFFICE BOX 9520
RANCHO SANTA FE, CA  92067
TELEPHONE:  (858) 759-9948
FACSIMILE:   (858) 759-9938

WEBSITE:  www.fcdflegal.org

PHYSICAL ADDRESS:

16236 SAN DIEGUITO ROAD
BUILDING 3, SUITE 3-15
RANCHO SANTA FE, CA  92091

KATHY DENWORTH
Office Administrator

July 31, 2017

**Via Certified Mail - Return Receipt**

Public Information Office
Attn: Mr. Andrew Sharp
San Diego Unified School District
4100 Normal St., Rm. 2232
San Diego, CA 92103

> RE:    **Public Records Act Request FY20162017.142**

Dear Mr. Sharp:

This is a request for expedited processing
of this modification to Public Records Act Request FY20172017.142 (copy attached), which I submitted on May 5, 2017, on behalf of the Freedom of Conscience Defense Fund (FCDF) under the California Public Records Act ("Act") § 6250 *et seq.* FCDF requests expedited processing because the requested records contain subject matter relevant to pending litigation in the United States District Court for the Southern District of California in the case entitled *Citizens for Quality Education San Diego, et al. v. San Diego Unified School District, et al.*, Case 3:17-cv-01054. Due to the time sensitive nature of the pending litigation, please provide expedited copies of the below public records[1].

---

[1] For purposes of this request, "public records" is consistent with the meaning of the term under the Act. The Act defines "public records" as "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics". A writing is defined as "any handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored."

[237]

1. Any and all records regarding incidents of harassment and/or bullying of K-12 students based on a student's religion since January 1, 2015;

2. Any and all records regarding SDUSD's K-12 Protected Class Reports since January 1, 2015;

3. Any and all communications, including e-mails, between the following current or past SDUSD officials and any official, employee, representative, and/or agent of CAIR National, CAIR-California, and/or CAIR-San Diego since January 1, 2010:
   a. Richard Barrera, Board President
   b. Kevin Beiser, Board Vice President
   c. Sharon Whitehurst-Payne, Trustee
   d. Michael McQuary, Trustee
   e. John Lee Evans, Trustee
   f. Cynthia Marten, Superintendent
   g. Stanley Anjan, FACE Executive Director
   h. Olga Venegas, FACE Administrator
   i. Marne Foster, former Board President
   j. Kamal Boulazreg, Psychologist
   k. Agin Shaheed, Race/Human Relations Manager
   l. Andrew Sharp, Public Information Officer
   m. Cheryl Ward, Director Board Services
   n. Staci Monreal, Chief of Staff
   o. Melissa Hudson, Admin. Assistant
   p. Josefina Viorato, Admin Assistant

4. Any and all records regarding assistance, recommendations, materials, resources, and strategies provided to SDUSD by CAIR National, CAIR-California, and/or CAIR-San Diego or any one of its officials, employees, representatives, and/or agents since January 1, 2010;

5. Any and all records from all SDUSD meetings since January 1, 2010, which include communications about one or all of the following: CAIR National, CAIR-California, and CAIR-San Diego, Islamophobia, and the bullying of, or discrimination against, Muslim students;

6. Any and all records regarding any current or proposed instructional and/or education materials, training resources, and strategies related to Muslim and/or Islamic history and culture since January 1, 2012;

[238]

7. Any current or proposed materials, resources, and strategies relating to Islamophobia and the bullying of, and discrimination against, Muslim students in the Annual Employee Notifications (AP 6381);

8. Any current or proposed communications, materials, resources, and strategies relating to forming, exploring, and engaging of formal or informal partnerships with CAIR National, CAIR-California, and CAIR-San Diego or any of its officials, employees, representatives, and/or agents since January 1, 2010;

9. Any current or proposed communications, materials, resources, and strategies regarding events held or to be held on SDUSD property in conjunction and/or related to one or all of the following: Muslims, Islam, Muslim holidays, Islamophobia, and the bullying and discrimination of Muslim students;

10. Any current or proposed communications, materials, resources, and strategies regarding events held or to be held off SDUSD property since January 1, 2012, in conjunction and/or related to one or all of the following: CAIR National, CAIR-California, CAIR-San Diego, Muslims, Islam, Islamophobia, bullying and discrimination of Muslim students, and Muslim holidays;

11. Any and all records, including communications, regarding the presence of any official, employee, representative, and/or agent of CAIR National, CAIR-California, and/or CAIR-San Diego at any SDUSD school during instructional hours between 8:00 a.m. and 5:00 p.m., Monday through Friday, since January 1, 2012; and

12. Any current or proposed communications, materials, resources, and strategies regarding collaboration between non-governmental nonprofit organizations other than CAIR National, CAIR-California, CAIR-San Diego, and district departments relating to Muslims, Islamophobia, and bullying and/or discrimination of Muslim students since January 1, 2012.

If there are any fees for searching or copying these records, please inform me if the cost will exceed $500.00. CPRA requires a response within ten business days. If you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release. Please provide a detailed ledger that includes the following:

1. Basic factual material about each withheld record, including the originator, date, length, general subject matter, and location of each item; and

**[239]**

2. Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination. Your written justification may help to avoid litigation.

To minimize any burden on SDUSD, this CPRA request has been narrowly tailored and modified from the previous request, and therefore SDUSD can expedite its processing. If you have questions that would clarify or otherwise assist you in expediting this request, please contact me by email or telephone. To expedite compliance, I am sending a copy of this request to SDUSD's legal counsel.

Thank you for your prompt attention to this request.

Sincerely,

FREEDOM OF CONSCIENCE DEFENSE FUND

/s

Charles S. LiMandri
President & Chief Counsel

cc:   Andra M. Donovan, Esq.
      General Counsel
      4100 Normal St., Rm. 2148
      San Diego, CA 92103

**EXHIBIT 41**

[241]

# FREEDOM *of* CONSCIENCE
## DEFENSE FUND

CHARLES S. LiMANDRI*
PAUL M. JONNA

TERESA L. MENDOZA
JEFFREY M. TRISSELL

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
  ADMITTED TO THE CALIFORNIA BAR
  ADMITTED TO THE DISTRICT OF COLUMBIA BAR
  ADMITTED TO THE NEW YORK BAR
  ADMITTED TO THE U.S. SUPREME COURT

POST OFFICE BOX 9520
RANCHO SANTA FE, CA 92067
TELEPHONE: (858) 759-9948
FACSIMILE:   (858) 759-9938

WEBSITE:  www.fcdflegal.org

PHYSICAL ADDRESS:

16236 SAN DIEGUITO ROAD
BUILDING 3, SUITE 3-15
RANCHO SANTA FE, CA 92091

KATHY DENWORTH
Office Administrator

August 1, 2017

**Via Certified Mail - Return Receipt**

Public Information Office
Attn: Mr. Andrew Sharp
San Diego Unified School District
4100 Normal St., Rm. 2232
San Diego, CA 92103

   **RE: Public Records Act Request FY20162017.158**

Dear Mr. Sharp:

  This is a request for expedited processing of this modification to Public Records Act Request FY20172017.158 (copy attached), which I submitted on May 31, 2017, on behalf of the Freedom of Conscience Defense Fund (FCDF) under the California Public Records Act ("Act") § 6250 *et seq.* FCDF requests expedited processing because the requested records contain subject matter relevant to pending litigation in the United States District Court for the Southern District of California in the case entitled *Citizens for Quality Education San Diego, et al. v. San Diego Unified School District, et al*., Case 3:17-cv-01054. Due to the time sensitive nature of the pending litigation, please provide expedited copies of the below public records[1].

---

[1] For purposes of this request, "public records" is consistent with the meaning of the term under the Act. The Act defines "public records" as "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics". A writing is defined as "any handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored."

[242]

For purposes of this request, "subject incident" refers to the incident at Patrick Henry High School in which a student threatened to "shoot up the school" on or about May 12, 2017.

1. Any and all incident and investigative reports for the subject incident;

2. Any and all correspondence to or from Superintendent Cynthia Marten or her staff concerning the subject incident;

3. Any and all correspondence to or from any of the following SDUSD officials:

   a. Richard Barrera, Board President
   b. Kevin Beiser, Board Vice President
   c. Sharon Whitehurst-Payne, Trustee
   d. Michael McQuary, Trustee
   e. John Lee Evans, Trustee
   f. Cynthia Marten, Superintendent
   g. Kamal Boulazreg, Psychologist
   h. Agin Shaheed, Race/Human Relations Manager
   i. Andrew Sharp, Public Information Officer
   j. Cheryl Ward, Director Board Services
   k. Staci Monreal, Chief of Staff
   l. Melissa Hudson, Admin. Assistant
   m. Josefina Viorato, Admin Assistant

4. Any and all correspondence to or from Patrick Henry High School Principal Elizabeth Gillingham or her staff concerning the subject incident;

5. Any and all correspondence to or from the Patrick Henry High School Police concerning the subject incident; and

6. Any and all SDUSD correspondence to or from the San Diego Police Department concerning the subject incident.

If there are any fees for searching or copying these records, please inform me if the cost will exceed $500.00. CPRA requires a response within ten business days. If you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release. Please provide a detailed ledger that includes the following:

[243]

1. Basic factual material about each withheld record, including the originator, date, length, general subject matter, and location of each item; and

2. Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination. Your written justification may help to avoid litigation.

To minimize any burden on SDUSD, this CPRA request has been narrowly tailored and modified from the previous request, and therefore SDUSD can expedite its processing. If you have questions that would clarify or otherwise assist you in expediting this request, please contact me by email or telephone. To expedite compliance, I am sending a copy of this request to SDUSD's legal counsel.

Thank you for your prompt attention to this request.

Sincerely,

FREEDOM OF CONSCIENCE DEFENSE FUND

/s

Charles S. LiMandri
President & Chief Counsel

cc:     Andra M. Donovan, Esq.
        General Counsel
        4100 Normal St., Rm. 2148
        San Diego, CA 92103

[244]

**Exhibit 42**

## Charles Limandri

| | |
|---|---|
| **From:** | Day Jeffrey <jday1@sandi.net> |
| **Sent:** | Thursday, September 14, 2017 1:04 PM |
| **To:** | Charles Limandri |
| **Cc:** | Donovan Andra |
| **Subject:** | Your Public Records Act Request FY20162017.158 Part 1 of 3 |
| **Attachments:** | Responsive Emails FY20162017.158 4,5,6,8,9_Part1.pdf |

Mr. LiMandri ,

In regards to Your Public Records Act Request, FY20162017.158.  This letter shall constitute the District's final response under the California Public Records Act to your request numbers 1, 2 and 4 through 9.

***Initial Request 1***:   "FCDF requests copies of the following public records 1: For purposes of this request, "subject incident" refers to the incident at Patrick Henry High School in which a student threatened to "shoot up the school" on May 12, 2017.
Any and all SDUSD policies and procedures which define a "terrorist" threat.

***Final Response 1:*** As stated above to the extent that any of the records you seek can be found via our District website (www.sandieunified.org) we will not provide copies of those documents as they are available to the public 24 hours per day, 7 days per week. All the San Diego Unified School District policies are available on our website. Therefore, will consider this portion of your request closed as of today's date and will be updating our records accordingly.

***Initial Request 2***: Any and all SDUSD policies and procedures which discuss how to deal with the situation in which a student poses a potential security risk to a school.

***Final Response 2:*** As stated above to the extent that any of the records you seek can be found via our District website (www.sandiegounified.org) we will not provide copies of those documents as they are available to the public 24 hours per day, 7 days per week. All the San Diego Unified School District policies are available on our website. Therefore, will consider this portion of your request closed as of today's date and will be updating our records accordingly.

***Initial Request 4:*** Any and all correspondence to or from Superintendent Cynthia Marten or her staff concerning the subject incident.

***Final Response 4:*** Attached please find all non-privileged documents responsive to your request.

***Initial Request 5:*** Any and all correspondence to or from Superintendent Cynthia Marten or her staff concerning the subject incident.

***Final Response 5:*** Duplicative of Request 4.

***Initial Request 6:*** Any and all correspondence to or from any SDUSD Board Members or their staffs concerning the subject incident.

***Final Response 6:*** Attached please find all non-privileged documents responsive to your request.

**[246]**

*Initial Request 7*: Any and all documents identifying the student who made the threat in the subject incident as a Muslim.

*Final Response 7:* There are no non-exempt responsive documents to this portion of your request. Therefore, we will consider this portion of your request closed as of today's date and will be updating our records accordingly.


*Initial Request 8*: Any and all correspondence to or from Patrick Henry High School Principal Elizabeth Gillingham or her staff concerning the subject incident.

*Final Response 8:* Attached please find all non-privileged documents responsive to your request.


*Initial Request 9:* Any and all correspondence to or from the Patrick Henry High School Police concerning the subject incident.

*Final Response 9:* Attached please find all non-privileged documents responsive to your request.

Due to the size of the file I will be sending this response in three parts.  This is part 1 of 3.  We continue to work on fulfilling the remainder of your request and expect to provide additional responses in the near future.


Jeffrey Day
Legal Specialist
(619) 725-5630



Please consider the environment before printing this e-mail.

[247]

**Charles Limandri**

| | |
|---|---|
| **From:** | Day Jeffrey <jday1@sandi.net> |
| **Sent:** | Thursday, September 14, 2017 1:04 PM |
| **To:** | Charles Limandri |
| **Cc:** | Donovan Andra |
| **Subject:** | Your Public Records Act Request FY20162017.158 Part 2 of 3 |
| **Attachments:** | Responsive Emails FY20162017.158 4,5,6,8,9_Part2.pdf |

Your Public Records Act Request FY20162017.158 Part 2 of 3

Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

**[248]**

1

**Charles Limandri**

| | |
|---|---|
| **From:** | Day Jeffrey <jday1@sandi.net> |
| **Sent:** | Thursday, September 14, 2017 1:04 PM |
| **To:** | Charles Limandri |
| **Cc:** | Donovan Andra |
| **Subject:** | Your Public Records Act Request FY20162017.158 Part 3 of 3 |
| **Attachments:** | Responsive Emails FY20162017.158 4,5,6,8,9_Part3.pdf |

Your Public Records Act Request FY20162017.158 Part 3 of 3

Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

[249]

Teresa Mendoza

| | |
|---|---|
| **From:** | Charles Limandri |
| **Sent:** | Thursday, September 28, 2017 12:24 PM |
| **To:** | Daniel Piedra; Teresa Mendoza; Kathy Denworth |
| **Subject:** | FW: Your Public Records Act Request FY20162017.142 Expedited Requests 4,5 and 8 Part 1 of 2 |
| **Attachments:** | Responsive Documents FY20162017.142 Requests 4,5 and 8 Part 1.pdf |

**From:** Day Jeffrey [mailto:jday1@sandi.net]
**Sent:** Thursday, September 28, 2017 12:15 PM
**To:** Charles Limandri <CLimandri@limandri.com>
**Subject:** Your Public Records Act Request FY20162017.142 Expedited Requests 4,5 and 8 Part 1 of 2

Mr. LiMandri,

In regards to Your Public Records Act Request, FY20162017.142 Expedited.  This letter shall constitute the District's final response under the California Public Records Act regarding Requests 4, 5 and 8.

*Initial Request 4*: Any and all records regarding assistance, recommendations, materials, resources, and strategies provided to SDUSD by CAIR National, CAIR-California, and/or CAIR-San Diego or any one of its officials, employees, representatives, and/or agents since January 1, 2010;

*Final Response Initial Request 4:*  Attached please find all non-privileged documents responsive to your request.

*Initial Request 5*: Any and all records from all SDUSD meetings since January 1, 2010, which include communications about one or all of the following: CAIR National, CAIR-California, and CAIR-San Diego, Islamophobia, and the bullying of, or discrimination against, Muslim students;

*Final Response Initial Request 5:*  Attached please find all non-privileged documents responsive to your request.

*Initial Request 8*: Any current or proposed communications, materials, resources, and strategies relating to forming, exploring, and engaging of formal or informal partnerships with CAIR National, CAIR-California, and CAIR-San Diego or any of its officials, employees, representatives, and/or agents since January 1, 2010;

*Final Response Initial Request 8:*  Attached please find all non-privileged documents responsive to your request.  Due to the size of the files I will be sending this in two parts.  This is Part 1 of 2.


We will consider these portions of your request closed as of today's date and will update our records accordingly.


Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

**[250]**

Teresa Mendoza

| | |
|---|---|
| **From:** | Charles Limandri |
| **Sent:** | Thursday, September 28, 2017 12:26 PM |
| **To:** | Teresa Mendoza; Daniel Piedra; Kathy Denworth |
| **Subject:** | FW: Your Public Records Act Request FY20162017.142 Expedited Requests 4,5 and 8 Part 2 of 2 |
| **Attachments:** | Responsive Documents FY20162017.142 Requests 4,5 and 8 Part 2.pdf; Responsive Documents FY20162017.142 Request 4.pdf |

**From:** Day Jeffrey [mailto:jday1@sandi.net]
**Sent:** Thursday, September 28, 2017 12:15 PM
**To:** Charles Limandri <CLimandri@limandri.com>
**Subject:** Your Public Records Act Request FY20162017.142 Expedited Requests 4,5 and 8 Part 2 of 2

Mr. LiMandri,

In regards to Your Public Records Act Request, FY20162017.142 Expedited.  This letter shall constitute the District's final response under the California Public Records Act regarding Requests 4, 5 and 8.

*Initial Request 4*: Any and all records regarding assistance, recommendations, materials, resources, and strategies provided to SDUSD by CAIR National, CAIR-California, and/or CAIR-San Diego or any one of its officials, employees, representatives, and/or agents since January 1, 2010;

*Final Response Initial Request 4:*  Attached please find all non-privileged documents responsive to your request.

*Initial Request 5*: Any and all records from all SDUSD meetings since January 1, 2010, which include communications about one or all of the following: CAIR National, CAIR-California, and CAIR-San Diego, Islamophobia, and the bullying of, or discrimination against, Muslim students;

*Final Response Initial Request 5:*  Attached please find all non-privileged documents responsive to your request.

*Initial Request 8:*  Any current or proposed communications, materials, resources, and strategies relating to forming, exploring, and engaging of formal or informal partnerships with CAIR National, CAIR-California, and CAIR-San Diego or any of its officials, employees, representatives, and/or agents since January 1, 2010;

*Final Response Initial Request 8:*  Attached please find all non-privileged documents responsive to your request. Due to the size of the files I will be sending this in two parts.  This is Part 2 of 2.

We will consider these portions of your request closed as of today's date and will update our records accordingly.

Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

**[251]**

[252]

Teresa Mendoza

| | |
|---|---|
| **From:** | Charles Limandri |
| **Sent:** | Thursday, September 28, 2017 3:51 PM |
| **To:** | Teresa Mendoza; Kathy Denworth; Daniel Piedra |
| **Subject:** | FW: Your Public Records Act Request FY20162017.158 Expedited |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Charles S. LiMandri**
**LiMANDRI & JONNA LLP** | P.O. Box 9120 | Rancho Santa Fe, CA 92067
Tel: (858) 759-9930 | Fax: (858) 759-9938
cslimandri@limandri.com | www.limandri.com

Board Certified in Pre-Trial Practice and Trial Advocacy by the National Board of Trial Advocacy
Member American Board of Trial Advocates
Admitted to Practice in CA, NY, DC and before the U.S. Supreme Court

This communication (including any attachments) contains confidential information protected by the attorney-client privilege and/or attorney work-product privilege intended only for a specific person(s) or entity(ies) named as the recipient(s). If you are not the intended recipient(s), you should delete this communication and/or shred the materials and any attachments and are hereby notified that any disclosure, copying, use or distribution of this communication, or the taking of any action based in it, is strictly prohibited by law. If you receive this transmission by error, please notify us by telephone immediately. Thank you.

**From:** Day Jeffrey [mailto:jday1@sandi.net]
**Sent:** Thursday, September 28, 2017 12:24 PM
**To:** Charles Limandri <CLimandri@limandri.com>
**Subject:** Your Public Records Act Request FY20162017.158 Expedited

Mr. LiMandri,

In regards to Your Public Records Act Request, FY20162017.158 Expedited. This letter shall constitute the District's final response under the California Public Records Act.

*Initial Request 1*: "For purposes of this request, "subject incident" refers to the incident at Patrick Henry High School in which a student threatened to "shoot up the school" on or about May 12, 2017.
1. Any and all incident and investigative reports for the subject incident;

*Final Response Initial Request 1:* I am informed that The San Diego Unified School District Police Department responded to this incident, conducted a criminal investigation, completed a crime report, and made a juvenile detention (the juvenile version of an adult arrest). The crime and juvenile detention report were forwarded to the San Diego County District Attorney's Office, Juvenile Division, for review/evaluation of charges. The police report number is 17-018963. The San Diego Police Department is the official keeper of records for School Police. As such, School Police does not release reports. Interested parties may request copies of police reports through the San Diego Police Department's Records Division, at 1401 Broadway, San Diego, 92101 (visit https://www.sandiego.gov/police/services/faqs/information).

*Initial Requests 2 - 6*: "For purposes of this request, "subject incident" refers to the incident at Patrick Henry High School in which a student threatened to "shoot up the school" on or about May 12, 2017.
2. Any and all correspondence to or from Superintendent Cynthia Marten or her staff concerning the subject incident;
3. Any and all correspondence to or from any of the following SDUSD officials:
a. Richard Barrera, Board President
b. Kevin Beiser, Board Vice President

**[253]**

1

c. Sharon Whitehurst-Payne, Trustee
d. Michael McQuary, Trustee
e. John Lee Evans, Trustee
f. Cynthia Marten, Superintendent
g. Kamal Boulazreg, Psychologist
h. Agin Shaheed, Race/Human Relations Manager
i. Andrew Sharp, Public Information Officer
j. Cheryl Ward, Director Board Services
k. Staci Monreal, Chief of Staff
l. Melissa Hudson, Admin. Assistant
m. Josefina Viorato, Admin Assistant
4. Any and all correspondence to or from Patrick Henry High School Principal Elizabeth Gillingham or her staff concerning the subject incident;
5. Any and all correspondence to or from the Patrick Henry High School Police concerning the subject incident; and
6. Any and all SDUSD correspondence to or from the San Diego Police Department concerning the subject incident."

***Final Response Initial Requests 2 - 6:*** All non-privileged documents responsive to your request, Parts 1-3, were emailed to you on September 14, 2017.

We will consider your request closed as of today's date and will update our records accordingly.

Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

[254]

Teresa Mendoza

| | |
|---|---|
| **From:** | Charles Limandri |
| **Sent:** | Friday, September 29, 2017 1:09 PM |
| **To:** | Daniel Piedra; Teresa Mendoza; Kathy Denworth |
| **Subject:** | FW: Your Public Records Act Request FY20162017.142 |
| **Attachments:** | Responsive Emails FY20162017.142 Requests 3,8,9 and 11.pdf |

**From:** Day Jeffrey [mailto:jday1@sandi.net]
**Sent:** Friday, September 29, 2017 11:21 AM
**To:** Charles Limandri <CLimandri@limandri.com>
**Subject:** Your Public Records Act Request FY20162017.142

Mr. LiMandri,

In regards to Your Public Records Act Request, FY20162017.142 Expedited. This letter shall constitute the District's final response under the California Public Records Act regarding Requests 3, 8, 9 and 11.

*Initial Request 3:* Any and all communications, including e-mails, between the following current or past SDUSD officials and any official, employee, representative, and/or agent of CAIR National, CAIR-California, and/or CAIR-San Diego since January 1, 2010:
a. Richard Barrera, Board President; b. Kevin Beiser, Board Vice President; c. Sharon Whitehurst-Payne, Trustee; d. Michael McQuary, Trustee; e. John Lee Evans, Trustee; f. Cynthia Marten, Superintendent; g. Stanley Anjan, FACE Executive Director; h. Olga Venegas; FACE Administrator; i. Marne Foster, former Board President; j. Kamal Boulazreg, Psychologist; k. Agin Shaheed, Race/Human Relations Manager; l. Andrew Sharp, Public Information Officer; m. Cheryl Ward, Director Board Services; n. Staci Monreal, Chief of Staff; o. Melissa Hudson, Admin. Assistant; p. Josefina Viorato, Admin Assistant

*Final Response Initial Request 3:* Attached please find all non-privileged documents responsive to your request.

*Initial Request 8:* Any current or proposed communications, materials, resources, and strategies relating to forming, exploring, and engaging of formal or informal partnerships with CAIR National, CAIR-California, and CAIR-San Diego or any of its officials, employees, representatives, and/or agents since January 1, 2010;

*Final Response Initial Request 8:* Attached please find all non-privileged documents responsive to your request.

*Initial Request 9:* Any current or proposed communications, materials, resources, and strategies regarding events held or to be held on SDUSD property in conjunction and/or related to one or all of the following: Muslims, Islam, Muslim holidays, Islamophobia, and the bullying and discrimination of Muslim students;

*Final Response Initial Request 9:* Attached please find all non-privileged documents responsive to your request.

*Initial Request 11:* Any and all records, including communications, regarding the presence of any official, employee, representative, and/or agent of CAIR National, CAIR-California, and/or CAIR-San Diego at any SDUSD school during instructional hours between 8:00 a.m. and 5:00 p.m., Monday through Friday, since January 1, 2012;

*Final Response Initial Request 11:* Attached please find all non-privileged documents responsive to your request.

We will consider these portions of your request closed as of today's date and will update our records accordingly.

**[255]**

Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

**[256]**

Teresa Mendoza

| | |
|---|---|
| **From:** | Charles Limandri |
| **Sent:** | Wednesday, October 04, 2017 12:08 PM |
| **To:** | Daniel Piedra; Teresa Mendoza |
| **Subject:** | FW: Your Public Records Act Request FY20162017.142 Request 7 |
| **Attachments:** | Responsive Documents FY20162017.142 Expedited Request 7.pdf |

**From:** Day Jeffrey [mailto:jday1@sandi.net]
**Sent:** Wednesday, October 4, 2017 12:02 PM
**To:** Charles Limandri <CLimandri@limandri.com>
**Subject:** Your Public Records Act Request FY20162017.142 Request 7

Mr. LiMandri,

In regards to Your Public Records Act Request, FY20162017.142 Expedited. This letter shall constitute the District's final response under the California Public Records Act regarding Request 7.

*Initial Request 7*: Any current or proposed materials, resources, and strategies relating to Islamophobia and the bullying of, and discrimination against, Muslim students in the Annual Employee Notifications (AP 6381 )

*Final Response Initial Request 7:* Attached please find all non-privileged documents responsive to your request.

We will consider this portion of your request closed as of today's date and update our records accordingly.

Jeffrey Day
Legal Specialist
(619) 725-5630

 San Diego Unified
SCHOOL DISTRICT

Please consider the environment before printing this e-mail.

1

**[257]**

**Exhibit 43**

[258]

1 Charles S. LiMandri, SBN 11084
2 Paul M. Jonna, SBN 265389
  Teresa L. Mendoza, SBN 185820
3 Jeffrey M. Trissell, SBN 292480
4 FREEDOM OF CONSCIENCE DEFENSE FUND
  P.O. Box 9520
5 Rancho Santa Fe, California 92067
  Tel: (858) 759-9948; Fax: (858) 759-9938
6 cslimandri@limandri.com
7
  Attorneys for PLAINTIFFS
8

9             **UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11 **Citizens For Quality Education** | Case No. 3:17-cv-1054-BAS (JMA) |
| 12 **San Diego,** *et al.***,** | |
| 13           Plaintiffs, | **DECLARATION OF CITIZENS FOR QUALITY EDUCATION SAN DIEGO IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| 14 vs. | |
| 15 | |
| 16 **San Diego Unified School District,** *et al.***,** | |
| 17 | |
| 18           Defendants. | |
| 19 | |

20

21      I, MARY BAKER, declare as follows:

22      1.      I am the Co-Founder and President of Citizens for Quality Education San

23 Diego (CQE-SD), a Plaintiff in this case. I live and pay taxes in San Diego County.

24      2.      As President of CQE-SD, I act as chief executive officer of the association

25 and respond to the interests and concerns of its members. CQE-SD's claims are limited to

26 injunctive and declaratory relief, which do not require the participation of individual mem-

27 bers in this action.

28

**[259]**

3.     I have served on several nonprofit executive leadership teams, including San Diego / Orange County Chapter of Citizens' Alliance for Property Rights and local women's political groups. Since 2013, I have held workshops for over 1,000 people on how to participate in the civic process effectively and how to engage in civil discourse. In 2016, I published the book *Citizen Ninja: Stand Up to Power*, which is about engaging elected public servants to create policies that benefit the interests of the whole community.

4.     CQE-SD is an unincorporated nonprofit association located in San Diego County, California. It was founded in 2012 as a non-partisan group of civic-minded individuals who care about how American children are educated. Its mission is to tackle a variety of educational issues as they relate to Common Core State Standards (CCSS) and Local Control and Accountability Plans (LCAPs) including and among other issues: student data privacy, data mining, budgets, Common Core testing, and inappropriate sexual education curriculum.

5.     As part of its regular activities, CQE-SD engages in educational and outreach campaigns throughout San Diego County regarding student academic achievement, quality school curricula, and parent involvement in schools. These campaigns include informing members and the public about local school districts' implementation of CCSS and their respective LCAPs, which outline key goals for students as well as the specific actions school districts will take to achieve those goals.

6.     CQE-SD maintains a Facebook page that currently has 319 members. The CQE-SD Facebook group is a closed group: anyone who wishes to join it must receive prior approval. Members of CQE-SD include parents residing within the School District and other taxpaying members of the community.

7.     CQE-SD sends out email newsletters regarding relevant issues. CQE-SD currently has 440 subscribers to its email newsletter.

8.     I understand that the defendants began planning for the Initiative on July 26, 2016, and formally enacted it on April 4, 2017.

**[260]**

9.     The defendants' actions and policies have frustrated CQE-SD's mission and have caused the organization to divert time and resources from pursuing other related goals to counteract the defendants' Anti-Islamophobia Initiative, which includes address-ing both its members' and the public's concerns about the Initiative's effect and attending District Board meetings to be involved in the civil process about the Initiative.

10.    The Initiative, for example, has caused and continues to cause CQE-SD to divert resources away from its core mission to educate its members and the public about education issues such as Common Core and local LCAPs.

11.    As long as it remains in effect, the Initiative will negatively impact CQE-SD's mission of promoting educational quality for all students.

I declare under penalty of perjury that the foregoing is true and correct.


Executed in San Diego, California, on February  15th , 2018.




By:     _____
Mary Baker

**EXHIBIT 44**

[262]

Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Citizens For Quality Education San Diego**, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>**San Diego Unified School District**, *et al.*,<br><br>Defendants. | Case No. 3:17-cv-1054-BAS (JMA)<br><br>**DECLARATION OF SAN DIEGO ASIAN AMERICANS FOR EQUALITY FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, FRANK XU, declare as follows:

1.     I am the Vice-President of the San Diego Asian Americans for Equality Foundation (SDAAFE), a Plaintiff in this case. I live and pay taxes in San Diego County.

2.     As Vice-President of SDAAFE, I respond to the interests and concerns of SDAAFE members. In this suit, SDAAFE's claims are limited to injunctive and declaratory relief, which do not require the participation of SDAAFE's individual members in this action.

**[263]**

3.      SDAAFE is a nonpartisan, public-benefit corporation dedicated to empowering Asian Americans to win equal opportunity and justice through active participation in civic and public affairs in San Diego County. Specifically, SDAAFE's mission is to advocate for full equality for San Diego Asian Americans by promoting Asian American values and mobilizing the Asian American community on issues of concern, including discrimination in educational institutions.

4.      Members of SDAAFE come from diverse cultural and religious backgrounds. Accordingly, some of SDAAFE's core activities include advocating for equal education and opposing discrimination based on race or religion, including opposing policies that single out a classified group for special benefits and resources.

5.      I understand that the defendants began planning for the Anti-Islamophobia Initiative on July 26, 2016, and formally enacted it on April 4, 2017.

6.      The defendants' actions and policies have frustrated SDAAFE's mission and have caused the foundation to divert time and resources from pursuing other related goals to counteract them. This includes addressing both its members' and the public's concerns about the Initiative's effect and frustrating central activities such as organizing and operating events concerning Asian American interests and operating the foundation's website and digital library.

7.      As long as it remains in effect, the Anti-Islamophobia Initiative will negatively affect SDAAFE's mission of promoting racial and religious equality for all students.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in San Diego, California, on February 5th, 2018.

By:     _____
Frank Xu

- 1 -

DECLARATION OF SAN DIEGO ASIAN AMERICANS FOR EQUALITY FOUNDATION IN SUPPORT OF

[264]

**EXHIBIT 45**

[265]

Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Citizens For Quality Education San Diego,** *et al.*,<br><br>                    Plaintiffs,<br><br>vs.<br><br>**San Diego Unified School District,** *et al.*,<br><br>                    Defendants. | Case No. 3:17-cv-1054-BAS (JMA)<br><br>**DECLARATION OF SCOTT HASSON IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, SCOTT HASSON, declare as follows:

   1.    I am a Plaintiff in this case on behalf of myself and as next friend of my minor, C.H.

   2.    C.H., is a second-grade student in the San Diego Unified School District, San Diego County, California.

   3.    I currently live and pay taxes in San Diego, California.

   4.    C.H. and I are not Muslim. Therefore, we practice do not Islam.

   5.    I understand that the defendants are the San Diego Unified School District's

Superintendent and each individual member of the District's Board of Education.

6.      I entrust the defendants with the education and well-being of my child. Each day I send my child to school, I expect the defendants to obey the law, including the California and the United States constitutions. I expect them to be neutral about religion and treat every student the same, regardless of race, religion, or ethnicity. I also know that my child and I have a constitutional right to receive an education that is consistent with the First Amendment's Establishment Clause.

7.      I fully understand the defendants' anti-Islamophobia initiative and the official policy that they enacted on April 4, 2017. When they adopted the plan, the defendants violated my trust and my spiritual, value-laden beliefs. And as long as this program is allowed to continue, my child and I will continue to suffer irreparable harm.

8.      My spiritual beliefs are an essential part of who I am. I try to instill these spiritual values in my child.  But every day my child attends school or participates in a school activity, we are directly exposed to the defendants' unwelcome endorsement of religion, and we are forced to assume special burdens because of that. As a result, we are spiritually affronted and psychologically harmed by defendants' actions and policies. They send a message to my child and me that we are outsiders in the school community. They also send a message that Muslim students are insiders and that Islam is the favored religion in the school district.

9.      We are also spiritually affronted that the defendants are entangled with a religious organization that is advancing a sectarian agenda in my child's classrooms.

10.     I am also directly offended by the fact that the defendants are collaborating with the Council on American-Islamic Relations (CAIR), a religious organization that promotes Islam.

11.     The defendants' discriminatory actions and policies have caused us psychological harm, including feelings of marginalization and exclusion. As a result, the defendants have chilled our participation in the school community, and we are less likely to be involved in educational activities as a result.

12.  We have been irreparably harmed by C.H.'s forced inclusion in the initiative by being compelled to "be allies" to Muslim students and assume special burdens to accommodate Islamic religious practices. At the same time, we have been irreparably harmed in that the defendants' are denying my child an educational benefit and access to taxpayer-funded resources that are only given to Muslim students.

13.  I object to the fact that my taxpayer dollars are funding a government program that violates government neutrality in religion, promotes one religion over another, and advances a sectarian agenda. I also object to the fact that my taxpayer dollars have paid for instructional materials that CAIR recommended and directed District officials to order.

I declare under penalty of law that all of the above is true and correct.

Executed in San Diego, California, on February *15*, 2018.

By: _Scott Hasson_

Scott Hasson

---

- 1 -

**EXHIBIT 46**

[269]

Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITIZENS FOR QUALITY EDUCATION SAN DIEGO, an unincorporated nonprofit association; SAN DIEGO ASIAN AMERICANS FOR EQUALITY FOUNDATION, a nonprofit public-benefit corporation; SCOTT HASSON, individually and as next friend on behalf of his minor child, C.H; CHAOYIN HE, individually and as next friend on behalf of her minor child, B.H; XUEXUN HU, individually and as next friend on behalf of his minor child, R.H; KEVIN STEEL and MELISSA STEEL, individually and as next friends on behalf of their minor child, K.S; and JOSE VELAZQUEZ, individually and as next friend on behalf of his minor child, J.V., <br><br> Plaintiffs, <br><br> vs. <br><br> SAN DIEGO UNIFIED SCHOOL DISTRICT; RICHARD BARRERA, in his official capacity as Board President; KEVIN BEISER, in his official capacity as Board Vice President; JOHN LEE EVANS, in his official capacity as Board member; MICHAEL MCQUARY, in his official capacity as Board member; SHARON WHITEHURST-PAYNE, in her official capacity as Board member; and CYNTHIA MARTEN, in her official capacity as Superintendent, <br><br> Defendants. | Case No. 3:17-cv-1054-BAS (JMA) <br><br><br> **DECLARATION OF CHAOYIN HE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

**[270]**

## DECLARATION OF CHAOYIN HE

I, CHAOYIN HE, declare as follows:

1.      I am a Plaintiff in this case on behalf of myself and as next friend of my son, B.H. I also go by the name Amy Ho.

2.      In DATE, I emigrated from WHERE. I have lived in the United States for NUMBER years. I currently live and pay taxes in San Diego, California.

3.      My son, B.H., is a fifth-grade student at NAME elementary school in the San Diego Unified School District, San Diego County, California.

4.      Neither my son nor I am Muslim. Nor do we practice Islam.

5.      I understand that the defendants in this case are the San Diego Unified School District's Superintendent and each individual member of the District's Board of Education.

6.      I entrust the defendants, as superintendent and school board members, with the education and well-being of my son. Each day I send my son to school, I expect the defendants to obey the law, including the California and the United States constitutions. I expect them to be neutral about religion and treat every student the same, regardless of race, religion, or ethnicity. I also know that my son and I have a constitutional right to receive an education that is consistent with the First Amendment's Establishment Clause.

7.      I fully understand the defendants' anti-Islamophobia initiative and the official policy that they enacted on April 4, 2017. The defendants violated my trust and spiritual, value-laden beliefs when they adopted the policy. They continue to do so as long as this program remains in effect.

8.      Both my son and I have direct and unwelcome experience with this initiative. This has caused an extraordinary amount of spiritual and psychological harm to us. I am also offended that the defendants' are denying my son an educational benefit and access to taxpayer-funded resources because he is not Muslim. And I sincerely object to the fact that my taxpayer dollars are funding a government program that promotes one religion and helps advance the agenda of the Council on American-Islamic Relations, which I

know is an Islamic religious organization.

9.   As long as this program is allowed to continue, my son and I will continue to suffer irreparable harm.

10.   In fact, as long as the Anti-Islamophobia Initiative is allowed to continue, I intend to remove my son from the District and enroll him in the Poway Unified School District.

**A.   *The defendants' actions and policies are spiritually offensive to my son and me, and our direct and unwelcome contact with them violates our beliefs*.**

11.   My spiritual beliefs are an essential part of who I am. I try to instill these spiritual values in my son.

12.   I am spiritually affronted by the defendants' actions and policies. They send a message to my son and me that we are outsiders in the District. They also send a message to us that Muslim students are insiders and that Islam is the favored religion.

13.   The defendants' relationship with CAIR makes it appear that they favor Islam and disfavor all other religion and spiritual beliefs, including those of my son and myself.

14.   Every day my son attends school, we are directly exposed to the defendants' unwelcome endorsement of religion, and we are forced to assume special burdens because of that.

**B.   *The defendants' actions and policies have directly inflicted psychological harm on my son and me, including anxiety and distress about my son's education, safety, and wellbeing.***

15.   I believe the defendants are excluding my son from the school community because he is viewed as less important and valued because he is not a Muslim.

16.   I believe it is important that schoolchildren learn about different cultures and world religions. I do not object to lessons that teach about Islam and its role in world history. But changing the curriculum to make Islam seem more special than it is currently being taught harms my son's right to a fair and balanced education.

17.   I also know that my son is impressionable, and even more so at school where

he is under the influence of teachers and school employees. The defendants' actions and policies send a message to my son and me that Islam is the favored religion, and anyone who is not Muslim is special and favored.

18.    I am afraid that because Muslim students are protected and favored by school authorities, my son will be marginalized and perhaps even more likely to be bullied because the defendants are focused on protecting Muslim students.

19.    I am terrified that the defendants are allowing CAIR, which has ties to terrorism and anti-Semitism, access to my son in a mandatory learning environment.

### C.    *Being forced to accommodate Muslim students and treat them with special care, under threat of punishment, is offensive both spiritually and psychologically.*

20.    I believe my son and I should not be subjected to unwelcome religious exercises. Nor should we be forced to assume special burdens because we are not Muslim.

21.    I want my son to get along with everybody at school, including Muslim students. So, I do not object to school programs that help students learn and respect each other's religious, ethnic, and cultural backgrounds. But being forced to participate in a program that favors one religious group and religion is offensive and harmful to my son's education and wellbeing.

### D.    *The denial of a taxpayer-funded, educational benefit to my son because he is not Muslim is an outrageous violation of our rights.*

22.    I am proud that my son is growing up in America, which is a country that believes in the principles of equality and neutrality. And without equality under the law, I am afraid that my son will not advance as far in life.

23.    The fact that my son is excluded from educational benefits because he is not Muslim offends my sensibilities as an American and as a minority in American society.

24.    In the past, my son has been teased and made fun of. My son would benefit from any extra time and money that the District would spend to stop bullying and harassment. Because the defendants are focusing on protecting Muslim students, I believe students like my son are being marginalized. I feel like he is now an outcast.

25.     As a taxpayer, I object to the defendants' spending of public money to help CAIR advance its agenda and mission in the School District.

26.     In November 2017, my son and I had direct contact with CAIR's books, as they are available for checkout at his school library. In addition to being spiritually affronted and psychologically offended by the defendants' promotion and advancement of a religious group's agenda, I am upset that the defendants allowed taxpayer money to be spent on a religious purpose.

27.     The defendants do not have any educational reason to partner with CAIR and buy books CAIR that tells them to order. I object to the use of taxpayer funds to collaborate and engage in formal partnerships with CAIR, which uses public schools as a means to promote its religious agenda.

28.     Every day that my son attends school, he is subjected to a policy that singles out a particular religious group for special benefits and advances the agenda of a religious organization. And I am terrified about the harmful effects on my son when CAIR people visit his schools and pass out pamphlets that promote Muslims and Islam.

29.     I know that other parents have similar feelings about the Initiative and are worried about its effects on their children's education and wellbeing.


I declare under penalty of law that all of the above is true and correct.

Executed in San Diego, California, on January XX, 2018.


By: /s/ Chaoyin He___

**EXHIBIT 47**

[275]

Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Citizens For Quality Education San Diego**, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>**San Diego Unified School District**, *et al.*,<br><br>Defendants. | Case No. 3:17-cv-1054-BAS (JMA)<br><br>**DECLARATION OF XUEXUN HU IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, XUEXUN HU, declare as follows:

1.     I am a Plaintiff in this case on behalf of myself and as next friend of my minor child, R.H.

2.     My child, R.H., is a fifth-student in the San Diego Unified School District, San Diego County, California.

3.     I currently live and pay taxes in San Diego, California.

4.     My child and I are not Muslim. Therefore, we do not practice Islam.

5.     I understand that the defendants are the San Diego Unified School District's

[276]

Superintendent and each individual member of the District's Board of Education.

6.     I entrust the defendants with the education and well-being of my child. Each day I send my child to school, I expect the defendants to obey the law, including the California and the United States constitutions. I expect them to be neutral about religion and treat every student the same, regardless of race, religion, or ethnicity. I also know that my child and I have a constitutional right to receive an education that is consistent with the First Amendment's Establishment Clause.

7.     I fully understand the defendants' anti-Islamophobia initiative and the official policy that they enacted on April 4, 2017. When they adopted the plan, the defendants violated my trust and my spiritual, value-laden beliefs. And as long as this program is allowed to continue, my child and I will continue to suffer irreparable harm.

8.     My spiritual beliefs are an essential part of who I am. I try to instill these spiritual values in my child.  But every day my child attends school or participates in a school activity, we are directly exposed to the defendants' unwelcome endorsement of religion, and we are forced to assume special burdens because of that. As a result, we are spiritually affronted and psychologically harmed by defendants' actions and policies. They send a message to my child and me that we are outsiders in the school community. They also send a message that Muslim students are insiders and that Islam is the favored religion in the school district.

9.     We are also spiritually affronted that the defendants are entangled with a religious organization that is advancing a sectarian agenda in my child's classrooms.

10.     I am also directly offended by the fact that the defendants are collaborating with the Council on American-Islamic Relations (CAIR), which was founded by members of the Muslim Brotherhood and Hamas, and which actively demonizes Israel and the Jewish people.

11.     The defendants' discriminatory actions and policies have caused us psychological harm, including feelings of marginalization and exclusion. As a result, defendants

[277]

have chilled our participation in the school community, and we are less likely to be involved in educational activities as a result.

12.   We have been irreparably harmed by child's forced inclusion in the initiative by being compelled to "be allies" to Muslim students and assume special burdens to accommodate Islamic religious practices. At the same time, we have been irreparably harmed in that the defendants' are denying my child an educational benefit and access to taxpayer-funded resources that are only given to Muslim students.

13.   I object to the fact that my taxpayer dollars are funding a government program that violates government neutrality in religion, promotes one religion over another, and advances a sectarian agenda. I also object to the fact that my taxpayer dollars have paid for instructional materials that CAIR recommended and directed District officials to order.

I declare under penalty of law that all of the above is true and correct.

Executed in San Diego, California, on February _16_, 2018.

By: _____

Xuexun Hu

**[278]**

**EXHIBIT 48**

[279]

Charles S. LiMandri, SBN 11084
Paul M. Jonna, SBN 265389
Teresa L. Mendoza, SBN 185820
Jeffrey M. Trissell, SBN 292480
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, California 92067
Tel: (858) 759-9948; Fax: (858) 759-9938
cslimandri@limandri.com

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Citizens For Quality Education San Diego**, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>**San Diego Unified School District**, *et al.*,<br><br>Defendants. | Case No. 3:17-cv-1054-BAS (JMA)<br><br>**DECLARATION OF KEVIN STEEL IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, KEVIN STEEL, declare as follows:

1. I am a Plaintiff in this case on behalf of myself and as next friend of my minor child, K.S.

2. K.S. is an eighth-grade student in the San Diego Unified School District, San Diego County, California.

3. My wife, Plaintiff Melissa Steel, and I currently live and pay taxes in San Diego, California.

4. Our family is not Muslim. Therefore, we practice do not Islam.

**[280]**

5.      We understand that the defendants are the San Diego Unified School District's Superintendent and each individual member of the District's Board of Education.

6.      We entrust the defendants with the education and well-being of our child. Each day we send our child to school, we expect the defendants to obey the law, including the California and the United States constitutions. We expect them to be neutral about religion and treat every student the same, regardless of race, religion, or ethnicity. We also know that we and our child have a constitutional right to receive an education that is consistent with the First Amendment's Establishment Clause.

7.      We fully understand the defendants' anti-Islamophobia initiative and the official policy that they enacted on April 4, 2017. When they adopted the plan, the defendants violated our trust and our spiritual, value-laden beliefs. And as long as this program is allowed to continue, we and our child will continue to suffer irreparable harm.

8.      Our spiritual beliefs are an essential part of who we are as a family. We try to instill these spiritual values in our child.  But every day our child attends school or participates in a school activity, we are directly exposed to the defendants' unwelcome endorsement of religion, and we are forced to assume special burdens because of that. As a result, we are spiritually affronted and psychologically harmed by defendants' actions and policies. They send a message to our child and us that we are outsiders in the school community. They also send a message that Muslim students are insiders and that Islam is the favored religion in the school district.

9.      We are also spiritually affronted that the defendants are entangled with a religious organization that is advancing a sectarian agenda in our child's classrooms.

10.     We are also directly offended by the fact that the defendants are collaborating with the Council on American-Islamic Relations (CAIR), a religious organization that promotes Islam.

11.     The defendants' discriminatory actions and policies have caused us psychological harm, including feelings of marginalization and exclusion. As a result, the defendants have chilled our participation in the school community, and we are less likely to be

1  involved in educational activities as a result.

2      12.   We have been irreparably harmed by K.S.'s forced inclusion in the initiative

3  by being compelled to "be allies" to Muslim students and assume special burdens to ac-

4  commodate Islamic religious practices. At the same time, we have been irreparably

5  harmed in that the defendants' are denying our child an educational benefit and access to

6  taxpayer-funded resources that are only given to Muslim students.

7      13.   We object to the fact that our taxpayer dollars are funding a government

8  program that violates government neutrality in religion, promotes one religion over an-

9  other, and advances a sectarian agenda. We also object to the fact that our taxpayer dollars

10 have paid for instructional materials that CAIR recommended and directed District offi-

11 cials to order.

12     We declare under penalty of law that all of the above is true and correct.

13

14 Executed in San Diego, California, on February _15_, 2018.

15

16                          By: _____ & _William_ _____

17                               Kevin & Melissa Steel

18

19

20

21

22

23

24

25

26

27

28

- 1 -

**EXHIBIT 49**

[283]

1  Charles S. LiMandri, SBN 11084
2  Paul M. Jonna, SBN 265389
   Teresa L. Mendoza, SBN 185820
3  Jeffrey M. Trissell, SBN 292480
4  FREEDOM OF CONSCIENCE DEFENSE FUND
   P.O. Box 9520
5  Rancho Santa Fe, California 92067
   Tel: (858) 759-9948; Fax: (858) 759-9938
6  cslimandri@limandri.com
7
   Attorneys for PLAINTIFFS
8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11 | **Citizens For Quality Education** | Case No. 3:17-cv-1054-BAS (JMA)
   | **San Diego**, *et al.*,
12 |
13 | | **DECLARATION OF JOSE**
   |               Plaintiffs, | **VELAZQUEZ IN SUPPORT OF**
14 | | **PLAINTIFFS' MOTION FOR A**
   | vs. | **PRELIMINARY INJUNCTION**
15 |
16 | **San Diego Unified School District,** *et al.*,
17 |
18 |
   |               Defendants.
19

20 I, JOSE VELAZQUEZ, declare as follows:

21     1.    I am a Plaintiff in this case on behalf of myself and as next friend of my

22 minor, J.V.

23     2.    J.V. is a tenth-grade student in the San Diego Unified School District, San

24 Diego County, California.

25     3.    I currently live and pay taxes in San Diego, California.

26     4.    J.V. and I are not Muslim. Therefore, we practice do not Islam.

27     5.    I understand that the defendants are the San Diego Unified School District's

28

                                                                    **[284]**

Superintendent and each individual member of the District's Board of Education.

6.     I entrust the defendants with the education and well-being of my child. Each day I send my child to school, I expect the defendants to obey the law, including the California and the United States constitutions. I expect them to be neutral about religion and treat every student the same, regardless of race, religion, or ethnicity. I also know that my child and I have a constitutional right to receive an education that is consistent with the First Amendment's Establishment Clause.

7.     I fully understand the defendants' anti-Islamophobia bullying initiative and the official policy that they enacted on April 4, 2017. When they adopted the plan, the defendants violated my trust and my spiritual, value-laden beliefs. And as long as this program is allowed to continue, my child and I will continue to suffer irreparable harm.

8.     My spiritual beliefs are an essential part of who I am. I try to instill these spiritual values in my child.  But every day my child attends school or participates in a school activity, we are directly exposed to the defendants' unwelcome endorsement of religion, and we are forced to assume special burdens because of that. As a result, we are spiritually affronted and psychologically harmed by defendants' actions and policies. They send a message to my child and me that we are outsiders in the school community. They also send a message that Muslim students are insiders and that Islam is the favored religion in the school district.

9.     We are also spiritually affronted that the defendants are entangled with a religious organization that is advancing a sectarian agenda in my child's classrooms.

10.     I am also directly offended by the fact that the defendants are collaborating with the Council on American-Islamic Relations (CAIR), a religious organization that promotes Islam and demonizes Jewish people and nonbelievers.

11.     The defendants' discriminatory actions and policies have caused us psychological harm, including feelings of marginalization and exclusion. As a result, the defendants have chilled our participation in the school community, and we are less likely to be involved in educational activities as a result.

12.    We have been irreparably harmed by J.V.'s forced inclusion in the initiative by being compelled to "be allies" to Muslim students and assume special burdens to accommodate Islamic religious practices. At the same time, we have been irreparably harmed in that the defendants' are denying my child an educational benefit and access to taxpayer-funded resources that are only given to Muslim students.

13.    I object to the fact that my taxpayer dollars are funding a government program that violates government neutrality in religion, promotes one religion over another, and advances a sectarian agenda. I also object to the fact that my taxpayer dollars have paid for instructional materials that CAIR recommended and directed District officials to order.

I declare under penalty of law that all of the above is true and correct.

Executed in San Diego, California, on February _15_, 2018.

By: _Jose Velazquez_ _____

Jose Velazquez

[286]

**EXHIBIT 50**

[287]

102 S.Ct. 1673
Supreme Court of the United States

John R. LARSON,
etc., et al., Appellants,
v.
Pamela VALENTE et al.

No. 80−1666.
|
Argued Dec. 9, 1981.
|
Decided April 21, 1982.
|
Rehearing Denied June 7, 1982.
|
See 457 U.S. 1111, 102 S.Ct. 2916.

**Synopsis**
An order of the United States District Court for the District of Minnesota permanently enjoined enforcement of the Minnesota charitable solicitation statute. The Court of Appeals, Eighth Circuit, 637 F.2d 562, vacated and remanded for entry of a modified injunction. The Supreme Court noted probable jurisdiction. The Supreme Court, Justice Brennan, held that the Minnesota statute, in imposing certain registration and reporting requirements upon only those religious organizations that solicit more than 50% of their funds from nonmembers discriminates against such organizations in violation of the establishment clause of the First Amendment.

Affirmed.

Justice Stevens filed a concurring opinion.

Justice White dissented and filed opinion in which Justice Rehnquist joined.

Justice Rehnquist dissented and filed opinion in which the Chief Justice, Justice White and Justice O'Connor joined.

**1674 *228 *Syllabus* *

A section (§ 309.515, subd. 1(b)) of Minnesota's charitable solicitations Act provides that only those religious organizations that receive more than half of their total contributions from members or affiliated organizations are exempt from the registration and reporting requirements of the Act. The individual appellees, claiming to be followers of the tenets of appellee Unification Church (later joined as a plaintiff) **1675 brought suit in Federal District Court seeking a declaration that the statute on its face and as applied to them violated, *inter alia*, the Establishment Clause of the First Amendment, and also seeking injunctive relief. After obtaining a preliminary injunction, appellees moved for summary judgment. Upon finding that the "overbreadth" doctrine gave appellees standing to challenge the statute, the Magistrate to whom the action had been transferred held that the application of the statute to religious organizations violated the Establishment Clause, and therefore recommended declaratory and permanent injunctive relief. The District Court, accepting this recommendation, entered summary judgment for appellees. The Court of Appeals affirmed on both the

[288]

standing issue and on the merits. But the court, disagreeing with the District Court's conclusion that appellees and others should enjoy the religious-organization exemption from the Act merely by claiming to be such organizations, held that proof of religious-organization status was required in order to gain the exemption, and left the question of appellees' status "open ... for further development." Accordingly, the court vacated the District Court's judgment and remanded for entry of a modified injunction and further proceedings.

*Held* :

1. Appellees have Art. III standing to raise their Establishment Clause claims. The State attempted to use § 309.515, subd. 1(b)'s fifty per cent rule to compel the Unification Church to register and report under the Act. The fact that the fifty per cent rule only applies to religious organizations compels the conclusion that, at least for purposes of this suit challenging that application, appellee Unification Church is a religious organization within the meaning of the Act. The controversy between **\*229** the parties is not rendered any less concrete by the fact that appellants, in the course of this litigation, have changed their position to contend that the Unification Church is not a religious organization within the meaning of the Act and that therefore it would not be entitled to an exemption under § 309.515, subd. 1(b) even if the fifty per cent rule were declared unconstitutional. This is so because the threatened application of § 309.515, subd. 1(b), and its fifty per cent rule to appellees amounts to a distinct

and palpable injury to them, in that it disables them from soliciting contributions in Minnesota unless they comply with the registration and reporting requirements of the Act. Moreover, there is a causal connection between the claimed injury and the challenged conduct. The fact that appellees have not yet shown an entitlement to a permanent injunction barring the State from subjecting them to the Act's registration and reporting requirements does not detract from the palpability of the particular and discrete injury caused to appellees. Pp. 1680–1683.

2. Section 309.515, subd. 1(b), in setting up precisely the sort of official denominational preference forbidden by the First Amendment, violates the Establishment Clause. Pp. 1683–1689.

(a) Since the challenged statute grants denominational preferences, it must be treated as suspect, and strict scrutiny must be applied in adjudging its constitutionality. Pp. 1683–1684.

(b) Assuming, *arguendo*, that appellants' asserted interest in preventing fraudulent solicitations is a "compelling" interest, appellants have nevertheless failed to demonstrate that § 309.515, subd. 1(b)'s fifty per cent rule is "closely fitted" to that interest. Appellants' argument to the contrary is based on three premises: (1) that members of a religious organization can and will exercise supervision and control over the solicitation activities of the organization when membership contributions exceed fifty per cent; (2) that membership control,

**[289]**

assuming its existence, is an adequate safeguard against abusive solicitations of the public; and (3) that the need for public disclosure rises in proportion with the *percentage* of nonmember contributions. There is no substantial support in **1676 the record for any of these premises. Pp. 1684–1687.

(c) Where the principal effect of § 309.515, subd. 1(b)'s fifty per cent rule is to impose the Act's registration and reporting requirements on some religious organizations but not on others, the "risk of politicizing religion" inhering in the statute is obvious. Pp. 1687–1689.

637 F.2d 562, affirmed.

**Attorneys and Law Firms**

 ***230** Larry Salustro, St. Paul, Minn., for appellants.

Barry A. Fisher, Los Angeles, Cal., for appellees.

**Opinion**

Justice BRENNAN delivered the opinion of the Court.

The principal question presented by this appeal is whether a Minnesota statute, imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers, discriminates against such organizations in

violation of the Establishment Clause of the First Amendment.[1]

I

Appellants are John R. Larson, Commissioner of Securities, and Warren Spannaus, Attorney General, of the State of Minnesota. They are, by virtue of their offices, responsible for the implementation and enforcement of the Minnesota Charitable Solicitation Act, Minn.Stat. §§ 309.50–309.61 (1969 and Supp.1982). This Act, in effect since 1961, provides for a system of registration and disclosure respecting ***231** charitable organizations, and is designed to protect the contributing public and charitable beneficiaries against fraudulent practices in the solicitation of contributions for purportedly charitable purposes. A charitable organization subject to the Act must register with the Minnesota Department of Commerce before it may solicit contributions within the State. § 309.52. With certain specified exceptions, all charitable organizations registering under § 309.52 must file an extensive annual report with the Department, detailing, *inter alia*, their total receipts and income from all sources, their costs of management, fundraising, and public education, and their transfers of property or funds out of the State, along with a description of the recipients and purposes of those transfers. § 309.53. The Department is authorized by the Act to deny or withdraw the registration of any charitable organization if the Department finds that it would be in "the public interest" to do so and if the

**[290]**

organization is found to have engaged in fraudulent, deceptive, or dishonest practices. § 309.532, subd. 1 (Supp.1982). Further, a charitable organization is deemed ineligible to maintain its registration under the Act if it expends or agrees to expend an "unreasonable amount" for management, general, and fundraising costs, with those costs being presumed unreasonable if they exceed thirty per cent of the organization's total income and revenue. § 309.555, subd. 1a (Supp.1982).

From 1961 until 1978, all "religious organizations" were exempted from the requirements of the Act. [2] But effective **1677 March 29, 1978, the Minnesota Legislature amended the Act so as to include a "fifty per cent rule" in the exemption provision covering religious organizations. § 309.515, subd. 1(b). This fifty per cent rule provided that only those religious organizations that received more than half of their total contributions from *232 members or affiliated organizations would remain exempt from the registration and reporting requirements of the Act. 1978 Minn.Laws, ch. 601, § 5. [3]

Shortly after the enactment of § 309.515, subd. 1(b), the Department notified appellee Holy Spirit Association for the Unification of World Christianity (Unification Church) that it was required to register under the Act because of the newly enacted provision. [4] Appellees Valente, Barber, Haft, and Korman, claiming to be followers of the tenets of the Unification *233 Church, responded by bringing the present action in the United States District Court

for the District of Minnesota. Appellees sought a declaration that the Act, on its face and as applied to them through § 309.515, subd. 1(b)'s fifty per cent rule, constituted an abridgment of their First Amendment rights of expression and free exercise of religion, as well as a denial of their right to equal protection of the laws, guaranteed by the Fourteenth Amendment; [5] appellees also sought *234 temporary and permanent injunctive relief. Appellee Unification **1678 Church was later joined as a plaintiff by stipulation of the parties, and the action was transferred to a United States Magistrate.

After obtaining a preliminary injunction, [6] appellees moved for summary judgment. Appellees' evidentiary support for this motion included a "declaration" of appellee Haft, which described in some detail the origin, "religious principles," and practices of the Unification Church. App. A–7—A–14. The declaration stated that among the activities emphasized by the Church were "door-to-door and public-place proselytizing and solicitation of funds to support the Church," *id.*, at A–8, and that the application of the Act to the Church through § 309.515, subd. 1(b)'s fifty per cent rule would deny its members their "religious freedom," *id.*, at A–14. Appellees also argued that by discriminating among religious organizations, § 309.515, subd. 1(b)' s fifty per cent rule violated the Establishment Clause.

Appellants replied that the Act did not infringe appellees' freedom to exercise their religious beliefs. Appellants sought

[291]

to distinguish the present case from *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), where this Court invalidated a municipal ordinance that had required the licensing of Jehovah's Witnesses who solicited donations in exchange for **\*235** religious literature, by arguing that unlike the activities of the petitioners in *Murdock*, appellees' solicitations bore no substantial relationship to any religious expression, and that they were therefore outside the protection of the First Amendment.[7] Appellants also contended that the Act did not violate the Establishment Clause. Finally, appellants argued that appellees were not entitled to challenge the Act until they had demonstrated that the Unification Church was a religion and that its fundraising activities were a religious practice.

The Magistrate determined, however, that it was not necessary for him to resolve the questions of whether the Unification Church was a religion, and whether appellees' activities were religiously motivated, in order to reach the merits of appellees' claims. Rather, he found that the "overbreadth" doctrine gave appellees standing to challenge the Act's constitutionality. On the merits, the Magistrate held that the Act was facially unconstitutional with respect to religious organizations, and was therefore entirely void as to such organizations, because § 309.515, subd. 1(b)'s fifty per cent rule failed the second of the three Establishment Clause "tests" set forth by this Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).[8] The Magistrate also **\*\*1679** held on due **\*236**

process grounds that certain provisions of the Act were unconstitutional as applied to any groups or persons claiming the religious-organization exemption from the Act. The Magistrate therefore recommended, *inter alia*, that appellees be granted the declarative and permanent injunctive relief that they had sought—namely, a declaration that the Act was unconstitutional as applied to religious organizations and their members, and an injunction against enforcement of the Act as to any religious organization. Accepting these recommendations, the District Court entered summary judgment in favor of appellees on these issues.[9]

On appeal, the United States Court of Appeals for the Eighth Circuit affirmed in part and reversed in part. 637 F.2d 562 (1981). On the issue of standing, the Court of Appeals affirmed the District Court's application of the overbreadth doctrine, citing *Village of Schaumburg v. Citizens for Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 834–835, 63 L.Ed.2d 73 (1980), for **\*237** the proposition that "a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." 637 F.2d, at 564–565. On the merits, the Court of Appeals affirmed the District Court's holding that the "inexplicable religious classification" embodied in the fifty per cent rule of § 309.515, subd. 1(b), violated the Establishment Clause.[10] *Id.*, at 565–570. Applying the Minnesota rule of severability, the Court of Appeals also held that § 309.515, subd. 1(b), as a whole should not

[292]

be stricken from the Act, but rather that the fifty per cent rule should be stricken from § 309.515, subd. 1(b). *Id.*, at 570. But the court disagreed with the District Court's conclusion that appellees and others should enjoy the religious-organization exemption from the Act merely by claiming to be such organizations: The court held that proof of religious-organization status was required in order to gain the exemption, and left the question of appellees' status "open ... for further development." *Id.*, at 570–571. The Court of Appeals accordingly vacated the judgment of the District Court and remanded the action for entry of a modified injunction and for further appropriate proceedings. *Id.*, at 571.[11] We noted probable **\*\*1680** jurisdiction. 452 U.S. 904, 101 S.Ct. 3028, 69 L.Ed.2d 404 (1981).

**\*238** II

Appellants argue that appellees are not entitled to be heard on their Establishment Clause claims. Their rationale for this argument has shifted, however, as this litigation has progressed. Appellants' position in the courts below was that the Unification Church was not a religion, and more importantly that appellees' solicitations were not connected with any religious purpose. From these premises appellants concluded that appellees were not entitled to raise their Establishment Clause claims until they had demonstrated that their activities were within the protection of that Clause. The courts below rejected this conclusion, instead applying

the overbreadth doctrine in order to allow appellees to raise their Establishment Clause claims. In this Court, appellants have taken an entirely new tack. They now argue that the Unification Church is not a "religious organization" within the meaning of Minnesota Charitable Solicitation Act, and that the Church therefore would not be entitled to an exemption under § 309.515, subd. 1(b), even if the fifty per cent rule were declared unconstitutional. From this new premise appellants conclude that the courts below erred in invalidating § 309.515, subd. 1(b)'s fifty per cent rule without first requiring appellees to demonstrate that they would have been able to maintain their exempt status but for that rule, and thus that its adoption had caused them injury in fact. We have considered both of appellants' rationales, and hold that neither of them has merit.

**[1]** "The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure **\*239** that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). This requirement of a "personal stake" must consist of "a 'distinct and palpable injury ...' to the plaintiff," *Duke Power Co., supra*, at 72, 98 S.Ct., at 2630, quoting *Warth v. Seldin*, 422 U.S.

**[293]**

490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," *Duke Power Co., supra*, at 72, 98 S.Ct., at 2630, quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). Application of these constitutional standards to the record before us and the factual findings of the District Court convince us that the Art. III requirements for standing are plainly met by appellees.

 **[2]**   Appellants argue in this Court that the Unification Church is not a "religious organization" within the meaning of the Act, and therefore that appellees cannot demonstrate injury in fact. We note at the outset, however, that in the years before 1978 the Act contained a general exemption provision for all religious organizations, and that during those years the Unification Church was not required by the State to register and report under the Act. It was only in 1978, shortly after the addition of the fifty per cent rule to the religious-organization exemption, that the State first attempted to impose the requirements of the Act upon the Unification Church. And when the State made this attempt, it deliberately **\*\*1681** chose to do so in express and exclusive reliance upon the newly enacted fifty per cent rule of § 309.515, subd. 1(b). See n. 4,*supra.* [12] The present suit was initiated by appellees in direct response to that attempt by the State to force the Church's registration. It is thus plain that appellants' **\*240**  stated rationale for the application of the Act to appellees was that § 309.515, subd.

1(b), *did* apply to the Unification Church. [13] But § 309.515, subd. 1(b), by its terms applies only to religious organizations. It follows, therefore, that an essential premise of the State's attempt to require the Unification Church to register under the Act by virtue of the fifty per cent rule in § 309.515, subd. 1(b), is that the Church *is* a religious organization. It is logically untenable for the State to take the position that the Church is not such an organization, because that position destroys an essential premise of the exercise of statutory authority at issue in this suit.

In the courts below, the State joined issue precisely on the premise that the fifty per cent rule of § 309.515, subd. 1(b), was sufficient authority in itself to compel appellees' registration. The adoption of that premise precludes the position **\*241** that the Church is not a religious organization. And it remains entirely clear that if we were to uphold the constitutionality of the fifty per cent rule, the State would, without more, insist upon the Church's registration. In this Court, the State has changed its position, and purports to find independent bases for denying the Church an exemption from the Act. Considering the development of this case in the courts below, and recognizing the premise inherent in the State's attempt to apply the fifty per cent rule to appellees, we do not think that the State's change of position renders the controversy between these parties any less concrete. The fact that appellants chose to apply § 309.515, subd. 1(b), and its fifty per cent rule as the sole statutory authority requiring the Church to register under the Act compels the conclusion that, at least for purposes of

**[294]**

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

this suit challenging that State application, the Church is indeed a religious organization within the meaning of the Act.

 **[3]**   With respect to the question of injury in fact, we again take as the starting point of our analysis the fact that the State attempted to use § 309.515, subd. 1(b)'s fifty per cent rule in order to compel the Unification Church to register and report under the Act. That attempted use of the fifty per cent rule as the State's instrument of compulsion necessarily gives appellees standing to challenge the constitutional validity of the rule. The threatened application of § 309.515, subd. 1(b), and its fifty per cent rule to the Church surely amounts   **\*\*1682**   to a distinct and palpable injury to appellees: It disables them from soliciting contributions in the State of Minnesota unless the Church complies with registration and reporting requirements that are hardly *de minimis.* [14] Just as surely, there is a fairly traceable causal connection between the claimed injury and the challenged conduct—here, between the claimed disabling and the threatened application of § 309.515, subd. 1(b), and its fifty per cent rule.

 **\*242   [4]**   Of course, the Church cannot be assured of a continued religious-organization exemption even in the absence of the fifty per cent rule. See n. 30, *infra.* Appellees have not yet shown an entitlement to the entirety of the broad injunctive relief that they sought in the District Court— namely, a permanent injunction barring the State from subjecting the Church to the registration and reporting requirements of

the Act. But that fact by no means detracts from the palpability of the particular and discrete injury caused to appellees by the State's threatened application of § 309.515, subd. 1(b)'s fifty per cent rule. See *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S., at 261–262, 97 S.Ct., at 561– 562. The Church may indeed be compelled, ultimately, to register under the Act on some ground other than the fifty per cent rule, and while this fact does affect the nature of the relief that can properly be granted to appellees on the present record, it does not deprive this Court of jurisdiction to hear the present case. Cf. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). In sum, contrary to appellants' suggestion, appellees have clearly demonstrated injury in fact.

Justice REHNQUIST's dissent attacks appellees' Art. III standing by arguing that appellees "have failed to show that a favorable decision of this Court will redress the injuries of which they complain." *Post*, at 1696. This argument follows naturally from the dissent's premise that the only meaningful relief that can be given to appellees is a total exemption from the requirements of the Act. See *post*, at 1693– 1694, 1696. But the argument, like the premise, is incorrect. This litigation began after the State attempted to compel the Church to register and report under the Act solely on the authority of § 309.515, subd. 1(b)'s fifty per cent rule. If that rule is declared unconstitutional, as appellees have requested, then the Church cannot be required to register and report under the Act by virtue of that rule. Since that rule

**[295]**

was the sole basis for the State's attempt to compel registration that gave **\*243** rise to the present suit, a discrete injury of which appellees now complain will indeed be completely redressed by a favorable decision of this Court.

**[5]**   Furthermore, if the fifty per cent rule of § 309.515, subd. 1(b), is declared unconstitutional, then the Church cannot be compelled to register and report under the Act unless the Church is determined not to be a religious organization. And as the Court of Appeals below observed:

> "[A] considerable burden is on the state, in questioning a claim of a religious nature. Strict or narrow construction of a statutory exemption for religious organizations is not favored. *Washington Ethical Society v. District of Columbia*, 249 F.2d 127, 129 (D.C.Cir.1957, Burger, J.)." 637 F.2d, at 570.

At the very least, then, a declaration that § 309.515, subd. 1(b)'s fifty per cent rule is unconstitutional would put the State to the task of demonstrating that the Unification Church is not a religious organization within the meaning of the Act—and such a task is surely more burdensome than that of demonstrating that the Church's proportion of nonmember contributions exceeds fifty per cent. Thus appellees will be given substantial and meaningful relief by a favorable decision of this Court. [15]

**\*244**   **\*\*1683** Since we conclude that appellees have established Art. III standing, we turn to the merits of the case. [16]

## III

### A

**[6]**   The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. Before the Revolution, religious establishments of differing denominations were common throughout the Colonies. [17] But the Revolutionary generation emphatically disclaimed that European legacy, and "applied the logic of secular liberty to the condition of religion and the churches:" [18] If Parliament had lacked the authority to tax unrepresented colonists, then by the same token the newly independent States should be powerless to tax their citizens for the support of a denomination to which they did not belong. [19] The **\*245** force of this reasoning led to the abolition of most denominational establishments at the state level by the 1780's, [20] and led ultimately to the inclusion of the Establishment Clause in the First Amendment in 1791. [21]

This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause. Madison once noted: **\*\*1684** "Security for civil rights must be the same as that for religious rights. It consists in the one case in the multiplicity of interests and in the other in the multiplicity of sects." [22] Madison's vision —freedom for all religion being guaranteed

[296]

by free competition between religions— naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference. Free exercise thus can be guaranteed only when legislators—and voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations. As Justice Jackson noted in another context, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority **\*246** must be imposed generally." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112, 69 S.Ct. 463, 466–467, 93 L.Ed. 533 (1949) (concurring opinion).

**[7]** Since *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), this Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can "pass laws which aid one religion" or that "prefer one religion over another." *Id.*, at 15, 67 S.Ct., at 511. This principle of denominational neutrality has been restated on many occasions. In *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), we said that "[t]he government must be neutral when it comes to competition between sects." *Id.*, at 314, 72 S.Ct., at 684. In *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), we stated unambiguously: "The First Amendment mandates governmental neutrality between religion and religion....

The State may not adopt programs or practices ... which 'aid or oppose' any religion.... This prohibition is absolute." *Id.*, at 104, 106, 89 S.Ct., at 270, 271, citing *Abington School District v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). And Justice Goldberg cogently articulated the relationship between the Establishment Clause and the Free Exercise Clause when he said that "[t]he fullest realization of true religious liberty requires that government ... effect no favoritism among sects ... and that it work deterrence of no religious belief." *Abington School District, supra*, at 305, 83 S.Ct., at 1615. In short, when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality.

### B

**[8]** The fifty per cent rule of § 309.515, subd. 1(b), clearly grants denominational preferences of the sort consistently and firmly deprecated in our precedents.[23] **\*\*1685** Consequently, **\*247** that rule must be invalidated unless it is justified by a compelling governmental interest, cf. *Widmar v. Vincent*, 454 U.S. 263, 269–270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981), and unless it is closely fitted to further that interest, *Murdock v. Pennsylvania*, 319 U.S. 105, 116–117, 63 S.Ct. 870, 876–877, 87 L.Ed. 1292 (1943). With that standard of review in mind, we turn to an examination

[297]

102 S.Ct. 1673, 72 L.Ed.2d 33

of the governmental interest asserted by appellants.

**\*248** **[9]** Appellants assert, and we acknowledge, that the State of Minnesota has a significant interest in protecting its citizens from abusive practices in the solicitation of funds for charity, and that this interest retains importance when the solicitation is conducted by a religious organization. We thus agree with the Court of Appeals, 637 F.2d, at 567, that the Act, "viewed as a whole, has a valid secular purpose," and we will therefore assume, *arguendo*, that the Act generally is addressed to a sufficiently "compelling" governmental interest. But our inquiry must focus more narrowly, upon the distinctions drawn by § 309.515, subd. 1(b), itself: Appellants must demonstrate that the challenged fifty per cent rule is closely fitted to further the interest that it assertedly serves.

**[10]** Appellants argue that § 309.515, subd. 1(b)'s distinction between contributions solicited from members and from nonmembers is eminently sensible. They urge that members are reasonably assumed to have significant control over the solicitation of contributions from themselves to their organization, and over the expenditure of the funds that they contribute, as well. Further, appellants note that as a matter of Minnesota law, members of organizations have greater access than nonmembers to the financial records of the organization. Appellants conclude:

> "Where the safeguards of membership funding do not exist, the need for public disclosure is obvious....

> "... As public contributions increase as a percentage of total contributions, the need for public disclosure increases.... The particular point at which public disclosure should be required ... is a determination for the legislature. In this case, the Act's 'majority' distinction is a compelling point, since it is at this point that the organization becomes predominantly public-funded." Brief for Appellants 29.

We reject the argument, for it wholly fails to justify the only aspect of § 309.515, subd. 1(b), under attack—the selective fifty per cent rule. Appellants' argument is based on three distinct premises: that members of a religious organization **\*249** can and will exercise supervision and control over the organization's solicitation activities when membership contributions exceed fifty per cent; that membership control, assuming its existence, is an adequate safeguard against abusive solicitations of the public by the organization; and that the need for public disclosure rises in proportion **\*\*1686** with the *percentage* of nonmember contributions. Acceptance of all three of these premises is necessary to appellants' conclusion, but we find no substantial support for any of them in the record.

Regarding the first premise, there is simply nothing suggested that would justify the assumption that a religious organization will be supervised and controlled by its members simply because they contribute more than half of the organization's solicited income. Even were we able to accept appellants' doubtful assumption that members will *supervise* their religious organization under

[298]

such circumstances,[24] the record before us is wholly barren of support for appellants' further assumption that members will effectively *control* the organization if they contribute more than half of its solicited income. Appellants have offered no evidence whatever that members of religious organizations exempted **250** by § 309.515, subd. 1(b)'s fifty per cent rule in fact control their organizations. Indeed, the legislative history of § 309.515, subd. 1(b), indicates precisely to the contrary.[25] In short, the first premise of appellants' argument has no merit.

Nor do appellants offer any stronger justification for their second premise—that membership control is an adequate safeguard against abusive solicitations of the public by the organization. This premise runs directly contrary to the central thesis of the entire Minnesota charitable solicitations Act—namely, that charitable organizations soliciting contributions from the public cannot be relied upon to regulate themselves, and that state regulation is accordingly necessary.[26] Appellants offer nothing to suggest why religious organizations should be treated any differently in this respect. And even if we were to assume that the members of religious organizations have some incentive, absent in non-religious organizations, to protect the interests of nonmembers solicited by the organization, appellants' premise would still **251** fail to justify the fifty per cent rule: Appellants offer no reason why the members of religious organizations exempted under § 309.515, subd. 1(b)'s fifty per cent rule **1687** should have any *greater* incentive to protect nonmembers than the members of nonexempted religious organizations have. Thus we also reject appellants' second premise as without merit.

Finally, we find appellants' third premise—that the need for public disclosure rises in proportion with the *percentage* of nonmember contributions—also without merit. The flaw in appellants' reasoning here may be illustrated by the following example. Church A raises $10 million, 20 per cent from nonmembers. Church B raises $50,000, 60 per cent from nonmembers. Appellants would argue that although the public contributed $2 million to Church A and only $30,000 to Church B, there is less need for public disclosure with respect to Church A than with respect to Church B. We disagree; the need for public disclosure more plausibly rises in proportion with the *absolute amount*, rather than with the *percentage*, of nonmember contributions.[27] The State of Minnesota has itself adopted this view elsewhere in § 309.515: With qualifications not relevant here, charitable organizations that receive annual nonmember contributions of less than $10,000 are exempted from the registration and reporting requirements of the Act. § 309.515, subd. 1(a).

**[11]** We accordingly conclude that appellants have failed to demonstrate that the fifty per cent rule in § 309.515, subd. 1(b), is "closely fitted" to further a "compelling governmental interest."

**[299]**

C

[12]  In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), we announced three "tests" that a statute must pass in order to avoid the prohibition of the Establishment Clause.

> **\*252**  "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen*, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster 'an excessive governmental entanglement with religion.' *Walz* [*v. Tax Comm'n*, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) ]." *Id.*, at 612–613, 91 S.Ct., at 2111.

As our citations of *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), and *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), indicated, the *Lemon v. Kurtzman* "tests" are intended to apply to laws affording a uniform benefit to *all* religions,[28] and not to provisions, like § 309.515, subd. 1(b)'s fifty per cent rule, that discriminate *among* religions. Although application of the *Lemon* tests is not necessary to the disposition of the case before us, those tests do reflect the same concerns that warranted the application of strict scrutiny to § 309.515, subd. 1(b)'s fifty per cent rule. The Court of Appeals found that rule to be invalid under the first two *Lemon* tests. We view the third

of those tests as most directly implicated in the present case. Justice Harlan well described the problems of entanglement in his separate opinion in *Walz*, where he observed that governmental involvement in programs concerning religion

> "may be so direct or in such degree as to engender a risk of politicizing religion.... [R]eligious groups inevitably represent certain points of view and not **\*\*1688** infrequently assert them in the political arena, as evidenced by the continuing debate respecting birth control and abortion laws. Yet history cautions that political fragmentation on sectarian lines must be guarded **\*253** against.... [G]overnment participation in certain programs, whose very nature is apt to entangle the state in details of administration and planning, may escalate to the point of inviting undue fragmentation." 397 U.S., at 695, 90 S.Ct., at 1425.

The Minnesota statute challenged here is illustrative of this danger. By their "very nature," the distinctions drawn by § 309.515, subd. 1(b), and its fifty per cent rule "engender a risk of politicizing religion"— a risk, indeed, that has already been substantially realized.

It is plain that the principal effect of the fifty per cent rule in § 309.515, subd. 1(b), is to impose the registration and reporting requirements of the Act on some religious organizations but not on others. It is also plain that, as the Court of Appeals noted, "[t]he benefit conferred [by exemption] constitutes a substantial

[300]

102 S.Ct. 1673, 72 L.Ed.2d 33

advantage; the burden of compliance with the Act is certainly not *de minimis.*" 637 F.2d, at 568.[29] We do not suggest that the burdens of compliance with the Act would be intrinsically impermissible if they were imposed evenhandedly. But this statute does not operate evenhandedly, nor was it designed to do so: The fifty per **\*254** cent rule of § 309.515, subd. 1(b), effects the *selective* legislative imposition of burdens and advantages upon particular denominations. The "risk of politicizing religion" that inheres in such legislation is obvious, and indeed is confirmed by the provision's legislative history. For the history of § 309.515, subd. 1(b)'s fifty per cent rule demonstrates that the provision was drafted with the explicit intention of including particular religious denominations and excluding others. For example, the second sentence of an early draft of § 309.515, subd. 1(b), read: "A religious society or organization which solicits from its religious affiliates who are qualified under this subdivision and who are represented in a body or convention *that elects and controls the governing board of the religious society or organization* is exempt from the requirements of ... Sections 309.52 and 309.53." Minn.H. 1246, 1977–1978 Sess., § 4 (read Apr. 6, 1978). The legislative history discloses that the legislators perceived that the italicized language would bring a Roman Catholic Archdiocese within the Act, that the legislators did not want the amendment to have that effect, and that an amendment deleting the italicized clause was passed in committee for the sole purpose of exempting the Archdiocese from the provisions of the Act. Transcript of Legislative Discussions

of § 309.515, subd. 1(b), as set forth in Declaration of Charles C. Hunter (on file in this Court) 8–9. On the other hand, there were certain religious organizations that the legislators did not want to exempt from the Act. One State Senator explained that the fifty per cent rule was "an attempt to deal with the religious **\*\*1689** organizations which are soliciting on the street and soliciting by direct mail, but who are not substantial religious institutions in ... our state." *Id.*, at 13. Another Senator said, "what you're trying to get at here is the people that are running around airports and running around streets and soliciting people and you're trying to remove them from the exemption that normally applies to religious organizations." *Id.*, at 14. Still another Senator, who apparently **\*255** had mixed feelings about the proposed provision, stated, "I'm not sure why we're so hot to regulate the Moonies anyway." *Id.*, at 16.

In short, the fifty per cent rule's capacity —indeed, its express design—to burden or favor selected religious denominations led the Minnesota Legislature to discuss the characteristics of various sects with a view towards "religious gerrymandering," *Gillette v. United States*, 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168 (1971). As THE CHIEF JUSTICE stated in *Lemon*, 403 U.S., at 620, 91 S.Ct., at 2115: "This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction ... of churches."

**[301]**

## IV

**[13]**   In sum, we conclude that the fifty per cent rule of § 309.515, subd. 1(b), is not closely fitted to the furtherance of any compelling governmental interest asserted by appellants, and that the provision therefore violates the Establishment Clause. Indeed, we think that § 309.515, subd. 1(b)'s fifty per cent rule sets up precisely the sort of official denominational preference that the Framers of the First Amendment forbade. Accordingly, we hold that appellees cannot be compelled to register and report under the Act on the strength of that provision. [30]

The judgment of the Court of Appeals is

*Affirmed.*


 **\*256**  Justice STEVENS, concurring.
As the Court points out, *ante*, at 1682, invalidation of the 50-percent rule would require the State to shoulder the considerable burden of demonstrating that the Unification Church is not a religious organization if the State persists in its attempt to require the Church to register and file financial statements. The burden is considerable because the record already establishes a prima facie case that the Church is a religious organization, [1] and because a strict construction of a statutory exemption for religious organizations is disfavored and may give rise to constitutional questions.

 **\*\*1690**  [2]  Justice REHNQUIST therefore is plainly wrong when he asserts in dissent that "invalidation of the fifty percent rule will have absolutely no effect on the Association's obligation to register and report as a *charitable organization* under the Act." *Post*, at 1694, n. 3 (emphasis in original). The 50-percent rule has caused appellees a significant injury in fact because it has **\*257** substituted a simple method of imposing registration and reporting requirements for a more burdensome and less certain method of accomplishing that result. I therefore agree with the Court's conclusion that the appellees have standing to challenge the 50-percent rule in this case.

The more difficult question for me is whether the Court's policy of avoiding the premature adjudication of constitutional issues [3] counsels postponement of any decision on the validity of the 50-percent rule until after the Unification Church's status as a religious organization within the meaning of the Minnesota statute is finally resolved. My difficulty stems from the fact that the trial and resolution of the statutory issue will certainly generate additional constitutional questions. [4] Therefore, it is clear that at least one decision of constitutional moment is inevitable. [5] Under these circumstances, it seems to me that reaching the merits is consistent with our "policy of strict necessity in disposing of constitutional issues," **\*258** *Rescue Army v. Municipal Court*, 331 U.S. 549, 568, 67 S.Ct. 1409, 1419, 91 L.Ed. 1666. Moreover, a resolution of the question that has been fully considered by the District Court and by the Court of Appeals and that has been fully briefed and argued in this

**[302]**

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Court is surely consistent with the orderly administration of justice.

I agree with the Court's resolution of the Establishment Clause issue. Accordingly, I join the Court's opinion.

Justice WHITE, with whom Justice REHNQUIST joins, dissenting.
I concur in the dissent of Justice REHNQUIST with respect to standing. I also dissent on the merits.

I

It will be helpful first to indicate what occurred in the lower courts and what the Court now proposes to do. Based on two reports of a Magistrate, the District Court held unconstitutional the Minnesota limitation denying an exemption to religious organizations receiving less than 50 percent **1691 of their funding from their own members. The Magistrate recommended this action on the ground that the limitation could not pass muster under the second criterion set down in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), for identifying an unconstitutional establishment of religion—that the principal or primary effect of the statute is one that neither enhances nor inhibits religion. The 50-percent limitation failed this test because it subjected some churches to far more rigorous requirements than others, the effect being to "severely inhibit plaintiff's religious activities." App. to Juris. Statement A–63.

This created a preference offensive to the Establishment Clause. *Id.*, at A–33.[1] The Magistrate relied on the inhibiting effect of the 50-percent rule without reference *259 to whether or not it was the principal or primary effect of the limitation. In any event, the Magistrate recommended, and the District Court agreed, that the exemption from registration be extended to all religious organizations.

The Court of Appeals agreed with the District Court that the 50-percent rule violated the Establishment Clause. Its ruling, however, was on the ground that the limitation failed to satisfy the first *Lemon* criterion—that the statute have a secular rather than a religious purpose. The court conceded that the Act as a whole had the valid secular purpose of preventing fraudulent or deceptive practices in the solicitation of funds in the name of charity. The court also thought freeing certain organizations from regulation served a valid purpose because for those organizations public disclosure of funding would not significantly enhance the availability of information to contributors. Patriotic and fraternal societies that limit solicitation to voting members and certain charitable organizations that do not solicit in excess of $10,000 annually from the public fell into this category. But the court found no sound secular legislative purpose for the 50-percent limitation with respect to religious organizations because it "appears to be designed to shield favored sects, while continuing to burden other sects." 637 F.2d 562, 567. The challenged provision, the Court of Appeals said, "expressly separates

[303]

two classes of religious organizations and makes the separation for no valid secular purpose that has been suggested by defendants. Inexplicable disparate treatment will not generally be attributed to accident; it seems much more likely that at some stage of the legislative process special solicitude for particular religious organizations affected the choice of statutory language. The resulting discrimination is constitutionally invidious." *Id.*, at 568. The Court of Appeals went on to say that if it were necessary to apply the second part of the *Lemon* test, the provision would also fail to survive that examination because it advantaged some organizations and disadvantaged others.

**\*260** In this Court, the case is given still another treatment. The *Lemon v. Kurtzman* tests are put aside because they are applicable only to laws affording uniform benefit to all religions, not to provisions that discriminate among religions. Rather, in cases of denominational preference, the Court says that "our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Ante*, at 1684. The Court then invalidates the challenged limitation.

It does so by first declaring that the 50-percent rule makes explicit and deliberate distinctions between different religious organizations. The State's submission that the 50-percent limitation is a law based on secular criteria which happens not to have an identical effect on all religious organizations is rejected. The Court then holds that the challenged rule is not closely fitted **\*\*1692** to serve any compelling state interest and rejects each of the reasons submitted

by the State to demonstrate that the distinction between contributions solicited from members and from nonmembers is a sensible one. Among others, the Court rejects the proposition that membership control is an adequate safeguard against deceptive solicitations of the public. The ultimate conclusion is that the exemption provision violates the Establishment Clause.

II

I have several difficulties with this disposition of the case. First, the Court employs a legal standard wholly different from that applied in the courts below. The premise for the Court's standard is that the challenged provision is a deliberate and explicit legislative preference for some religious denominations over others. But there was no such finding in the District Court. That court proceeded under the second *Lemon* test and then relied only on the disparate impact of the provision. There was no finding of a discriminatory or preferential legislative purpose. If this case is to be judged by a standard not employed by the courts below and if the **\*261** new standard involves factual issues or even mixed questions of law and fact that have not been addressed by the District Court, the Court should not itself purport to make these factual determinations. It should remand to the District Court.

In this respect, it is no answer to say that the Court of Appeals appeared to find, although rather tentatively, that the state legislature had acted out of intentional denominational

**[304]**

Larson v. Valente, 456 U.S. 228 (1982)
102 S.Ct. 1673, 72 L.Ed.2d 33

preferences. That court was no more entitled to supply the missing factual predicate for a different legal standard than is this Court. It is worth noting that none of the Court of Appeals' judges on the panel in this case is a resident of Minnesota.

Second, apparently realizing its lack of competence to judge the purposes of the Minnesota Legislature other than by the words it used, the Court disposes in a footnote of the State's claim that the 50-percent rule is a neutral, secular criterion that has disparate impact among religious organizations. The limitation, it is said, "is not simply a facially neutral statute" but one that makes "explicit and deliberate distinctions between different religious organizations." *Ante*, at 1684, n. 23. The rule itself, however, names no churches or denominations that are entitled to or denied the exemption. It neither qualifies nor disqualifies a church based on the kind or variety of its religious belief. Some religions will qualify and some will not, but this depends on the source of their contributions, not on their brand of religion.

To say that the rule on its face represents an explicit and deliberate preference for some religious beliefs over others is not credible. The Court offers no support for this assertion other than to agree with the Court of Appeals that the limitation might burden the less well organized denominations. This conclusion, itself, is a product of assumption and speculation. It is contrary to what the State insists is readily evident from a list of those charitable organizations that have registered under the Act and of those that

are exempt. It is claimed that both categories include not only well-established, **\*262** but also not so well-established, organizations. The Court appears to concede that the Minnesota law at issue does not constitute an establishment of religion merely because it has a disparate impact. An intentional preference must be expressed. To find that intention on the face of the provision at issue here seems to me to be patently wrong.

Third, I cannot join the Court's easy rejection of the State's submission that a valid secular purpose justifies basing the exemption on the percentage of external funding. Like the Court of Appeals, the majority accepts the prevention of fraudulent solicitation as a valid, even compelling, secular interest. Hence, charities, including religious organizations, may be required to register if the State chooses to insist. But here the State has excused **\*\*1693** those classes of charities it thought had adequate substitute safeguards or for some other reason had reduced the risk which is being guarded against. Among those exempted are various patriotic and fraternal organizations that depend only on their members for contributions. The Court of Appeals did not question the validity of this exemption because of the built-in safeguards of membership funding. The Court of Appeals, however, would not extend the same reasoning to permit the State to exempt religious organizations receiving more than half of their contributions from their members while denying exemption to those who rely on the public to a greater extent. This Court, preferring its own judgment of the realities

**[305]**

of fundraising by religious organizations to that of the state legislature, also rejects the State's submission that organizations depending on their members for more than half of their funds do not pose the same degree of danger as other religious organizations. In the course of doing so, the Court expressly disagrees with the notion that members in general can be relied upon to control their organizations. [2]

**\*263** I do not share the Court's view of our omniscience. The State has the same interest in requiring registration by organizations soliciting most of their funds from the public as it would have in requiring any charitable organization to register, including a religious organization, if it wants to solicit funds. And if the State determines that its interest in preventing fraud does not extend to those who do not raise a majority of their funds from the public, its interest in imposing the requirement on others is not thereby reduced in the least. Furthermore, as the State suggests, the legislature thought it made good sense, and the courts, including this one, should not so readily disagree.

Fourth, and finally, the Court agrees with the Court of Appeals and the District Court that the exemption must be extended to all religious organizations. The Court of Appeals noted that the exemption provision, so construed, could be said to prefer religious organizations over nonreligious organizations and hence amount to an establishment of religion. Nevertheless, the Court of Appeals did not further address the question, and the Court says nothing of it now. Arguably, however, there is a

more evident secular reason for exempting religious organizations who rely on their members to a great extent than there is to exempt all religious organizations, including those who raise all or nearly all of their funds from the public.

Without an adequate factual basis, the majority concludes that the provision in question deliberately prefers some religious denominations to others. Without an adequate factual basis, it rejects the justifications offered by the State. It reaches its conclusions by applying a legal standard different from that considered by either of the courts below.

I would reverse the judgment of the Court of Appeals.

**\*264** Justice REHNQUIST, with whom THE CHIEF JUSTICE, Justice WHITE, and Justice O'CONNOR join, dissenting.

From the earliest days of the Republic it has been recognized that "[t]his Court is without power to give advisory opinions. *Hayburn's Case*, 2 Dall. 409 [1 L.Ed. 436 (1792) ]." *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945). The logical corollary of this limitation has been the Court's "long ... considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision." *Ibid.* (citations omitted). Such fundamental principles notwithstanding, the Court today delivers what is at **\*\*1694** best an advisory constitutional pronouncement. The advisory

**[306]**

character of the pronouncement is all but conceded by the Court itself, when it acknowledges in the closing footnote of its opinion that appellees must still "prove that the Unification Church is a religious organization within the meaning of the Act" before they can avail themselves of the Court's extension of the exemption contained in the Minnesota statute. Because I find the Court's standing analysis wholly unconvincing, I respectfully dissent.

## I

Part II of the Court's opinion concludes that appellees have standing to challenge § 309.515, subd. 1(b), of the Minnesota Charitable Solicitation Act (Act), because they have "plainly met" the case-or-controversy requirements of Art. III. *Ante*, at 1680. This conclusion is wrong. Its error can best be demonstrated by first reviewing three factual aspects of the case which are either misstated or disregarded in the Court's opinion.

First, the Act applies to appellees not by virtue of the "fifty percent rule," but by virtue of § 309.52. That provision requires "charitable organizations" to register with the Securities and Real Estate Division of the Minnesota Department of Commerce. The Holy Spirit Association for the **\*265** Unification of World Christianity (Association) constitutes such a "charitable organization" because it "engages in or purports to engage in solicitation" for a "religious ... purpose." § 309.50, subds. 3 and 4 (Supp.1982). Only after an organization

is brought within the coverage of the Act by § 309.52 does the question of exemption arise. The exemption provided by the fifty percent rule of § 309.515, subd. 1(b), one of several exemptions within the Act, applies only to "religious organizations." Thus, unless the Association is a "religious organization" within the meaning of the Act, the fifty percent rule has absolutely nothing to do with the Association's duty to register and report as a "charitable organization" soliciting funds in Minnesota. This more-than-semantic distinction apparently is misunderstood by the Court, for it repeatedly asserts that the Association is required to register "under the Act *by virtue of* the fifty percent rule in § 309.515, subd. 1(b)." *Ante*, at 1681 (emphasis added).[1]

Second, the State's effort to enforce the Act against the Association was based upon the Association's status as a "charitable organization" within the meaning of § 309.52. The State initially sought registration from the Association by letter: "From the nature of your solicitation it appears that [the Association] must complete a Charitable Organization Registration Statement and submit it to the Minnesota Department of Commerce." Exhibit A to Affidavit of Susan **\*266** E. Fortney, Legal Assistant, Staff of Attorney General of Minnesota, Nov. 2, 1978 (Fortney Affidavit). When the Association failed to register within the allotted time, the State commenced "routine enforcement procedures," Fortney Affidavit, at 2, by filing a complaint in Minnesota state court. The complaint

[307]

alleges that "charitable organizations" are required by § 309.52 to register with the State, that the Association comes within the § 309.50, subd. 4, definition of "charitable organizations," and that "[t]he [Association] has failed to file a registration statement and financial information with the Minnesota Department of Commerce, **1695 resulting in a violation of Minn.Stat. § 309.52." Exhibit F to Fortney Affidavit, at 3.[2] This complaint, which never once mentions the fifty percent rule of § 309.515, subd. 1(b), nor characterizes the Association as a "religious organization," is still pending in Minnesota District Court, having been stayed by stipulation of the parties to this lawsuit. Because today's decision does nothing to impair the statutory basis of the complaint, or the State's reason for filing it, the State may proceed with its enforcement action before the ink on this Court's judgment is dry.[3]

*267 Third, appellees have never proved, and the lower courts have never found, that the Association is a "religious organization" for purposes of the fifty percent rule. The District Court expressly declined to make such a finding—"This court is not presently in a position to rule whether the [Association] is, in fact, a religious organization within the Act," App. to Juris. Statement A–47—and the Court of Appeals was content to decide the case despite the presence of this " 'unresolved factual dispute concerning the true character of [appellees'] organization,' " 637 F.2d 562, 565 (CA8 1981) (quoting *Village of Schaumburg v. Citizens for Better Environment*, 444 U.S.

620, 633, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980)). The absence of such a finding is significant, for it is by no means clear that the Association would constitute a "religious organization" for purposes of the § 309.515, subd. 1(b), exemption. The appellees' assertion in the District Court that their actions were religious was "directly contradict[ed]" by a "heavy testimonial barrage against the [Association's] claim that it is a religion." App. to Juris. Statement A–46.[4]

*268 **1696 II

The Court's opinion recognizes that the proper standing of appellees in this case is a constitutional prerequisite to the exercise of our Art. III power. See *ante*, at 1680. To invoke that power, appellees must satisfy Art. III's case-or-controversy requirement by showing that they have a personal stake in the outcome of the controversy, consisting of a distinct and palpable injury. *Ibid.* See also *Gladstone,* *269 *Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). I do not disagree with the Court's conclusion that the threatened application of the Act to appellees constitutes injury in fact.

But injury in fact is not the only requirement of Art. III. The appellees must also show that their injury "fairly can be traced to the challenged action of the defendant." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1925–

[308]

1926, 48 L.Ed.2d 450 (1976). The Court purports to find such causation by use of the following sophism: "there is a fairly traceable causal connection between the claimed injury and the challenged conduct—here, between the claimed disabling and the threatened application of § 309.515, subd. 1(b), and its fifty per cent rule." *Ante*, at 1681.

As was demonstrated above, the statute and the State require the Association to register because it is a "charitable organization" under § 309.52, not because of the fifty percent requirement contained in the exemption for religious organizations. Indeed, at this point in the litigation the fifty percent rule is entirely inapplicable to appellees because they have not shown that the Association is a "religious organization." Therefore, any injury to appellees resulting from the registration and reporting requirements is *caused* by § 309.52, not, as the Court concludes, by "the ... threatened application of § 309.515, subd. 1(b)'s fifty per cent rule." *Ante*, at 1682. Having failed to establish that the fifty percent rule is causally connected to their injury, appellees at this point lack standing to challenge it.

The error of the Court's analysis is even more clearly demonstrated by a closely related and equally essential requirement of Art. III. In addition to demonstrating an injury which is caused by the challenged provision, appellees must show "that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group,*

*supra,* 438 U.S., at 74, 98 S.Ct., at 2631. The importance **\*270** of redressability, an aspect of standing which has been recognized repeatedly by this Court,[5] is of constitutional dimension:

> **\*\*1697** "[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Org., supra,* at 38, 96 S.Ct., at 1924.

Appellees have failed to show that a favorable decision of this Court will redress the injuries of which they complain. By affirming the decision of the Court of Appeals, the Court today extends the exemption of § 309.515, subd. 1(b), to all "religious organizations" soliciting funds in Minnesota. See 637 F.2d, at 569–570. But because appellees have not shown that the Association is a "religious organization" under that provision, they have not shown that they will be entitled to this newly expanded exemption.[6] This uncertainty is expressly recognized by the Court:

> **\*271** "We agree with the Court of Appeals that appellees and others claiming the benefits of the religious-organization exemption should not automatically enjoy those benefits. Rather, in order to receive them, appellees

**[309]**

may be required by the State to prove that the Unification Church is a religious organization within the meaning of the Act." *Ante*, at 1689, n. 30 (citation omitted). [7]

If the appellees fail in this proof—a distinct possibility given the State's "heavy testimonial barrage against [the Association's] claim that it is a religion," App. to Juris. Statement A–46—this Court will have rendered a purely advisory opinion. In so doing, it will have struck down a state statute at the behest of a party without standing, contrary to the undeviating teaching of the cases previously cited. Those cases, I believe, require remand for a determination of whether the Association is a "religious organization" as that term is used in the Minnesota statute.

## III

There can be no doubt about the impropriety of the Court's action this day. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor* **\*272** *Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). Nowhere does this doctrine have more force than in cases such as **\*\*1698** this one, where the defect is a possible lack of Art. III jurisdiction due to want of standing on the part of the party which seeks the adjudication.

"Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of [legislative Acts] unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it." *Blair v. United States*, 250 U.S. 273, 279, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919), quoted in *Ashwander v. TVA*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

The existence of injury in fact does not alone suffice to establish such an interest. "The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement. A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S., at 39, 96 S.Ct., at 1925.

## IV

In sum, the Court errs when it finds that appellees have standing to challenge the constitutionality of § 309.515, subd. 1(b). Although injured to be sure, appellees have not demonstrated that their injury was caused by the fifty percent rule or will be redressed by its invalidation. This is not to say that appellees can never prove causation or redressability, only that they have not done so at this point. The case

[310]

should be remanded to permit such proof. Until such time as the requirements of Art. III clearly have been satisfied, this Court should refrain from rendering significant constitutional decisions.

**All Citations**

456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    The Clause provides that "Congress shall make no law respecting an establishment of religion...." It is applied to the States by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

2    Section 309.51, subd. 1(a) (1969), repealed in 1973, provided in pertinent part:

> "[S]ections 309.50 to 309.61 shall not apply to any group or association serving a bona fide religious purpose when the solicitation is connected with such a religious purpose, nor shall such sections apply when the solicitation for such a purpose is conducted for the benefit of such a group or association...."

Between 1973 and 1978, § 309.515, subd. 1, provided in pertinent part:

"[S]ections 309.52 and 309.53 shall not apply to ....

_____

"(b) Any group or association serving a bona fide religious purpose when the solicitation is connected with such a religious purpose, nor shall such sections apply when the solicitation for such a purpose is conducted for the benefit of such a group or association by any other person with the consent of such group or association...."

3    The amended exemption provision read in relevant part:

"309.515 Exemptions

"Subdivision 1. ... [S]ections 309.52 and 309.53 shall not apply to ...:

_____

"(b) A religious society or organization which received more than half of the contributions it received in the accounting year last ended (1) from persons who are members of the organization; or (2) from a parent organization or affiliated organization; or (3) from a combination of the sources listed in clauses (1) and (2). A religious society or organization which solicits from its religious affiliates who are qualified under this subdivision and who are represented in a body or convention is exempt from the requirements of sections 309.52 and 309.53. The term 'member' shall not include those persons who are granted a membership upon making a contribution as a result of a solicitation."

4    This notice "discussed the application of the amendments expanding the scope of the charities law to religious organizations, explained the registration procedure, enclosed the proper forms, and sought [appellees'] compliance with the law." Affidavit of Susan E. Fortney, Legal Assistant, Staff of Attorney General of Minnesota, Nov. 2, 1978. The notice also threatened legal action against the Church if it failed to comply. The notice read in pertinent part as follows:

"During the recent Minnesota legislative session, a bill was passed which changes the registration and reporting requirements for charitable organizations which solicit funds in Minnesota. One significant change was in the religious exemption which previously exempted from registering and reporting any organization serving a bona fide religious purpose.

"Minn.Stat. § 309.515 as found in chapter 601 of the 1978 Session Laws provides that the religious exemption now applies to religious groups or societies which receive more than half of its contributions in the accounting year last ended from persons who are members of the organization or from a parent organization or affiliated organization. In other terms, a religious organization which solicits more than half its funds from non-members must register and report according to the provisions of the Minnesota Charitable Solicitation Law.

"From the nature of your solicitation it appears that Holy Spirit Association for the Unification of World Christianity must complete a Charitable Organization Registration Statement and submit it to the Minnesota Department of Commerce. The Charitable Organization Registration Statement must be accompanied with a financial statement for the fiscal year last ended.

**[311]**

"I am enclosing the proper forms and an information sheet for your use. Please be advised that the proper forms must be on file with the Department of Commerce by September 30, 1978, or we will consider taking legal action to ensure your compliance." Affidavit of Susan E. Fortney, *supra*, Exhibit A.

5   Appellees' complaint stated in pertinent part that the "application of the statutes to itinerant missionaries whose Churches are not established in Minnesota, but not to Churches with substantial local membership, constitutes an unequal application of the law." App. A–5. The focus of this allegation was plainly the fifty per cent rule of § 309.515, subd. 1(b).

6   Appellants responded to appellees' motion for a preliminary injunction with a motion to dismiss. App. to Juris. Statement A–38. They disputed appellees' claims on the merits, and also challenged appellees' standing to raise their Establishment Clause claims, arguing that the Unification Church was not a religion within the meaning of that Clause. *Id.*, at A–44—A–45. The Magistrate made findings of fact that the Unification Church was a California nonprofit religious corporation, and that it had been granted tax exempt religious organization status by the United States Internal Revenue Service and the State of Minnesota. *Id.*, at A–37. These findings were later incorporated into the Magistrate's report and recommendation on the motion for summary judgment. *Id.*, at A–21. He declined, however, to rule on the issue of the religious status of the Church. *Id.*, at A–47.

7   Appellants asserted that the central issue in the case was "whether [appellees'] fund raising practices constitute expression of religious beliefs within the protection of the First Amendment." Defendants' Objections to Report and Recommendations of Magistrate Robert Renner in No. Civ. 4–78–453 (DC Minn.), p. 2. Appellants argued that appellees' fundraising activities were not a form of religious expression; they provided evidentiary support for this argument in the form of numerous affidavits of persons claiming to be former members of the Unification Church, who asserted that they had been encouraged to engage in fundraising practices that were both fraudulent and unrelated to any religious purpose.

8   That second test requires that the "principal or primary effect" of the challenged statute "be one that neither advances nor inhibits religion." 403 U.S., at 612, 91 S.Ct., at 2111. The Magistrate found that § 309.515, subd. 1(b)'s fifty per cent rule violated that requirement "in that it inhibit[ed] religious organizations which receive[d] more than half of their contributions from non-members, and thereby enhance[d] religious organizations which receive[d] less than half from non-members." App. to Juris. Statement A–24.

9   The District Court's judgment provided:

"1. The Minnesota Charitable Solicitation Act, Minn.Stat. § 309.50 *et seq.*, is unconstitutional as applied to religious organizations and members thereof;

"2. The Act is constitutional as applied to non-religious organizations and members thereof;

"3. Sections 309.534, subd. 1(a), and 309.581 of the Act is [*sic*] unconstitutional as applied to persons claiming to be religious organizations or members thereof;

"4. The constitutionality of the application of section 309.532 [relating to denial, suspension, and revocation of licenses issued under the Act] to [appellees] and others whose claims to a religious exemption are challenged by the State is a nonjusticiable issue;

"5. [Appellant Larson] is permanently enjoined from enforcing the Act as to any and all religious organizations;

"6. [Appellant Larson] is permanently enjoined from utilizing sections 309.534, subd. 1(a), and 309.581 to enforce the Act as against [appellees] and other persons claiming to be religious organizations or members thereof." *Id.*, at A–18—A–19.

10   The Court of Appeals supported this conclusion on grounds broader than those of the District Court. Whereas the District Court had found § 309.515, subd. 1(b)'s fifty per cent rule to violate only the second of the *Lemon* tests, the Court of Appeals found the rule to violate the first of those tests as well. 637 F.2d, at 567–568. The first *Lemon* test provides that "the statute must have a secular legislative purpose." 403 U.S., at 612, 91 S.Ct., at 2111.

11   The Court of Appeals summarized its holdings as follows:

"[W]e agree with the district court's holding that [appellees] have standing to challenge the classification made in the exemption section of the Act, as it pertains to religious organizations; we agree with the court's invalidation of the classification made in that section; we agree that the exemption section should apply to all religious organizations, subject to possible legislative revision; we disagree with the conclusion that no part of the Act may be applied to religious organizations, but leave open questions of construction and validity for further development, including the application of the Act to charitable organizations; and we disagree with the conclusion that [appellees] and others claiming the religious exemption should automatically enjoy such exemption, but leave open the question of [appellees'] status for further development." 637 F.2d, at 571.

12   Justice REHNQUIST's dissent suggests, *post*, at 1694, and n. 2, that our interpretation of the State's grounds for application of the Act to appellees is erroneous. But the letter quoted in n. 4, *supra*, speaks for itself, and we reject

[312]

the novel suggestion that the contents of such a notification of official enforcement action may be ignored by this Court depending upon the state official who signs the notice.

13    The Department's attempt to apply the Act to appellees by means of § 309.515, subd. 1(b), was consistent with the expectation, evident in the legislative history of § 309.515, subd. 1(b), that that provision's fifty per cent rule would be applied to the Unification Church in order to deny it continued exemption from the requirements of the Act. See *infra*, at 1688.

Justice REHNQUIST's dissent suggests, *post*, at 1693, that "the Act applies to appellees not by virtue of the 'fifty-per cent rule,' but by virtue of § 309.52." This suggestion misses the point. Section 309.52 announces the Act's general registration requirement for charitable organizations. In 1978, the State sought to compel the Church to register and report under the Act, relying upon § 309.515, subd. 1(b). The State might have chosen to rely upon some other provision, *e.g.*, § 309.515, subd. 1(a)(1), which exempts charitable organizations receiving less than $10,000 annually from the public. Instead the State chose to rely upon § 309.515, subd. 1(b). Thus if the Act applies to appellees, it of course does so by the combined effect of § 309.52 and § 309.515, subd. 1(b). In this attenuated sense the Act does apply to appellees "by virtue of § 309.52." But nevertheless the State sought to impose the requirements of the Act upon appellees by only one means out of the several available to it, and that means was § 309.515, subd. 1(b).

14    See *supra*, at 1687–1688; n. 29, *infra*.

15    In reaching the conclusion that appellees' claims would not be redressed by an affirmance of the decision below, Justice REHNQUIST's dissent reveals a draconic interpretation of the redressability requirement that is justified by neither precedent nor principle. The dissent appears to assume that in order to establish redressability, appellees must show that they are *certain*, ultimately, to receive a religious-organization exemption from the registration and reporting requirements of the Act—in other words, that there is no other means by which the State can compel appellees to register and report under the Act. We decline to impose that burden upon litigants. As this Court has recognized, "the relevant inquiry is whether ... the plaintiff has shown *an* injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (emphasis added); accord, *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 262, 97 S.Ct. 555, 561–562, 50 L.Ed.2d 450 (1977). In other words, a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury. Cf. *University of California Regents v. Bakke*, 438 U.S. 265, 280–281, n. 14, 98 S.Ct. 2733, 2742–2743, n. 14, 57 L.Ed.2d 750 (1978) (opinion of POWELL, J.)

16    Appellants contended below that appellees were not entitled to raise their Establishment Clause claims until they had demonstrated that their activities were within the protection of that Clause. The courts below applied the overbreadth doctrine to reject this contention, and appellants argue that those courts erred in doing so. We have no need to address these matters. Appellees have made a sufficiently strong demonstration that the Church is a religion to overcome any prudential standing obstacles to consideration of their Establishment Clause claim.

17    See S. Cobb, The Rise of Religious Liberty in America: A History 67–453 (1970); L. Pfeffer, Church, State, and Freedom 71–90 (rev. ed. 1967).

18    B. Bailyn, The Ideological Origins of the American Revolution 265 (1967).

19    For example, according to John Adams, colonial Massachusetts possessed "the most mild and equitable establishment of religion that was known in the world, if indeed [it] could be called an establishment." Quoted in B. Bailyn, at 248. But Baptists in Massachusetts chafed under any form of establishment, and Revolutionary pamphleteer John Allen expressed their views to the members of the General Court of Massachusetts in his declamation, The American Alarm, or the Bostonian Plea, for the Rights and Liberties of the People:

"You tell your [colonial] governor that the Parliament of England have no right to tax the Americans ... because they are not the representatives of America; and will you dare to tax the Baptists for a religion they deny? Are you gentlemen their representatives before GOD, to answer for their souls and consciences any more than the representatives of England are the representatives of America? ... [I]f it be just in the General Court to take away my sacred and spiritual rights and liberties of conscience and my property with it, then it is surely right and just in the British Parliament to take away by power and force my civil rights and property without my consent; this reasoning, gentlemen, I think is plain." Quoted *id.*, at 267–268.

20    See Pfeffer, *supra*, at 104–119.

21    *Id.*, at 125–127.

22    The Federalist No. 51, p. 326 (H. Lodge ed. 1908).

[313]

23   Appellants urge that § 309.515, subd. 1(b), does not grant such preferences, but is merely "a law based upon secular criteria which may not identically affect all religious organizations." Brief for Appellants 20. They accordingly cite *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and cases following *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), for the proposition that a statute's "disparate impact among religious organizations is constitutionally permissible when such distinctions result from application of secular criteria." Brief for Appellants 26. We reject the argument. Section 309.515, subd. 1(b), is not simply a facially neutral statute, the provisions of which happen to have a "disparate impact" upon different religious organizations. On the contrary, § 309.515, subd. 1(b), makes explicit and deliberate distinctions between different religious organizations. We agree with the Court of Appeals' observation that the provision effectively distinguishes between "well-established churches" that have "achieved strong but not total financial support from their members," on the one hand, and "churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members," on the other hand. 637 F.2d, at 566. This fundamental difference between § 309.515, subd. 1(b), and the statutes involved in the "disparate impact" cases cited by appellants renders those cases wholly inapplicable here.

Appellants also argue that reversal of the Court of Appeals is required by *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). In that case we rejected an Establishment Clause attack upon § 6(j) of the Military Selective Service Act of 1967, 50 U.S.C.App. § 456(j) (1964 ed., Supp.V), which afforded "conscientious objector" status to any person who, "by reason of religious training and belief," was "conscientiously opposed to participation in war in any form." 401 U.S., at 441, 91 S.Ct., at 832. *Gillette* is readily distinguishable from the present case. Section 6(j) "focused on individual conscientious belief, not on sectarian affiliation." *Id.*, at 454, 91 S.Ct., at 838. Under § 6(j), conscientious objector status was available on an equal basis to both the Quaker and the Roman Catholic, despite the distinction drawn by the latter's church between "just" and "unjust" wars, see St. Thomas Aquinas, Summa Theologica, Second Part, Part II, Question 40, Arts. 1, 4; St. Augustine, City of God, Book XIX, Ch. 7. As we noted in *Gillette*, the "critical weakness of petitioners' establishment claim" arose "from the fact that § 6(j), on its face, simply [did] not discriminate on the basis of religious affiliation." 401 U.S., at 450, 91 S.Ct., at 836. In contrast, the statute challenged in the case before us focuses precisely and solely upon religious organizations.

24   In support of their assumption of such supervision, appellants cite Minn.Stat. § 317.28(2) (1969), which allows any member of a domestic nonprofit corporation to "inspect all books and records for any proper purpose at any reasonable time." But this provision applies only to domestic nonprofit corporations; appellants have made no showing that religious organizations incorporated in other States operate under an analogous constraint. Further, in Minnesota even domestic religious organizations need not be organized as nonprofit corporations—they may also choose to organize under Minn.Stat., ch. 315, governing "Religious Associations," which has no provision analogous to § 317.28(2). Moreover, even as to the religious organizations to which it applies, § 317.28(2) obviously does not ensure that any member of a religious organization will actually take advantage of the supervision permitted by that provision. And finally, since § 317.28(2) applies irrespective of the percentage of membership contributions, it cannot provide any justification at all for the fifty per cent rule in § 309.515, subd. 1(b). In sum, appellants' assumption of membership supervision is purely conjectural.

25   An early draft of that provision allowed an exemption from the Act only for a religious organization that solicited "substantially more than half of the contributions it received ... from persons *who have a right to vote as a member* of the organization." Minn. H. 1246, 1977–1978 Sess., § 4 (read Apr. 6, 1977). The italicized language was later amended to read, "who are members." Attachment to Minutes of Meeting of Commerce and Economic Development Committee, Jan. 24, 1978. Since § 309.515, subd. 1(b), as enacted deliberately omits membership voting rights as a requirement for a religious organization's exemption, it clearly permits religious organizations that are not subject to control by their membership to be exempted from the Act. Of course, even if § 309.515, subd. 1(b), exempted only those religious organizations with membership voting rights, the provision obviously would not ensure that the membership actually exercised its voting rights so as to control the organization in any effective manner.

26   This thesis is evident in the Act's treatment of nonreligious organizations that might solicit within the State: With exceptions not relevant here, such organizations are exempted from the registration and reporting requirements of the Act only if their solicitations of the public are *de minimis*, §§ 309.515, subds. 1(a)(1), (f), or if they are subject to independent state regulation, § 309.515, subd. 1(c).

27   We do not suggest, however, that an exemption provision based upon the absolute amount of nonmember contributions would necessarily satisfy the standard set by the Establishment Clause for laws granting denominational preferences.

28   *Allen* involved a state law requiring local public school authorities to lend textbooks free of charge to all students in grades seven through twelve, including those in parochial schools. 392 U.S., at 238, 88 S.Ct., at 1924. *Walz* examined a state law granting property tax exemptions to religious organizations for religious properties used solely for religious worship. 397

[314]

Larson v. Valente, 456 U.S. 228 (1982)
102 S.Ct. 1673, 72 L.Ed.2d 33

U.S., at 666, 90 S.Ct., at 1410. And in *Lemon* itself, the challenged state laws provided aid to church-related elementary and secondary schools. 403 U.S., at 606, 91 S.Ct., at 2108.

29 The registration statement required by § 309.52 calls for the provision of a substantial amount of information, much of which penetrates deeply into the internal affairs of the registering organization. The organization must disclose the "[g]eneral purposes for which contributions ... will be used," the "[b]oard, group or individual having final discretion as to the distribution and use of contributions received," and "[s]uch other information as the department may ... require"—and these are only three of sixteen enumerated items of information required by the registration statement. The annual report required by § 309.53 is even more burdensome and intrusive. It must disclose "[t]otal receipts and total income from all sources," the cost of "management," "fund raising," and "public education," and a list of "[f]unds or properties transferred out of state, with explanation as to recipient and purpose," to name only a few. Further, a religious organization that must register under the Act may have its registration withdrawn at any time if the Department or the Attorney General concludes that the religious organization is spending "an unreasonable amount" for management, general, and fund-raising costs. § 309.555.

30 In so holding, we by no means suggest that the State of Minnesota must in all events allow appellees to remain exempt from the provisions of the Charitable Solicitation Act. We agree with the Court of Appeals that appellees and others claiming the benefits of the religious-organization exemption should not automatically enjoy those benefits. 637 F.2d, at 571. Rather, in order to receive them, appellees may be required by the State to prove that the Unification Church is a religious organization within the meaning of the Act. Nothing in our opinion suggests that appellants could not attempt to compel the Unification Church to register under the Act as a charitable organization not entitled to the religious-organization exemption, and put the Church to the proof of its bona fides as a religious organization. Further, nothing in our opinion disables the State from denying exemption from the Act, or from refusing registration and licensing under the Act, to persons or organizations proved to have engaged in frauds upon the public. See § 309.515, subd. 3. We simply hold that because the fifty per cent rule of § 309.515, subd. 1(b), violates the Establishment Clause, appellees cannot be compelled to register and report under the Act on the strength of that provision.

1 The Church has been incorporated in California as a religious corporation and has been treated as a religious organization for tax purposes by the Federal Government and by the State of Minnesota. App. to Juris. Statement A–37. The Church was treated as a religious organization by the State prior to the enactment of the 50-percent rule in 1978. According to the Magistrate, the appellees "have submitted substantial, although not uncontroverted, evidence of the religious nature of the Unification Church and of their solicitations." *Id.*, at A–29; see *id.*, at A–47.

2 See *Washington Ethical Society v. District of Columbia*, 101 U.S.App.D.C. 371, 373, 249 F.2d 127, 129 (1957) (Burger, J.) ("To construe exemptions so strictly that unorthodox or minority forms of worship would be denied the exemption benefits granted to those conforming to the majority beliefs might well raise constitutional issues").

3 See generally *Rescue Army v. Municipal Court*, 331 U.S. 549, 568–574, 67 S.Ct. 1409, 1419–1422, 91 L.Ed. 1666; *Ashwander v. TVA*, 297 U.S. 288, 346–348, 56 S.Ct. 466, 482–483, 80 L.Ed. 688 (BRANDEIS, J., concurring). I have no reservations about the wisdom or importance of this policy. See, *e.g.*, *California ex rel. Cooper v. Mitchell Brothers' Santa Ana Theater*, 454 U.S. 90, 94, 102 S.Ct. 172, 174, 70 L.Ed.2d 262 (STEVENS, J., dissenting); *Minnick v. California Dept. of Corrections*, 452 U.S. 105, 102 S.Ct. 2211, 68 L.Ed.2d 706; *University of California Regents v. Bakke*, 438 U.S. 265, 411–412, 98 S.Ct. 2733, 2809–2810, 57 L.Ed.2d 750 (opinion of STEVENS, J.).

4 Even if we were to conclude that the constitutional standards for resolving the statutory issue were perfectly clear, there is nevertheless an important interest in avoiding litigation of issues relating to church doctrine. See *United States v. Lee*, 455 U.S. 252, 263, n. 2, 102 S.Ct. 1051, 1058, n. 2, 71 L.Ed.2d 127 (STEVENS, J., concurring in judgment). Cf. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533.

5 Even if the District Court should find that the Church is not a religious organization, I believe that it is fair to assume that the Church would challenge that conclusion in this Court. I recognize that it is also possible that ultimately we may be required to confront both constitutional problems, but that possibility is present whether we dismiss the appeal pending resolution of the Church's status or we decide now the validity of the 50-percent rule.

1 The Magistrate also recommended, and the District Court agreed, that all of the registration provisions applicable to religious organizations be enjoined as prior restraints offensive to the First Amendment. App. to Juris. Statement A–33. The Court of Appeals did not agree in this respect.

2 This observation would appear to call into question the exemption of charitable organizations raising all of their funds from their members: since members cannot be relied upon to control their organization's fundraising activities so as to prevent fraud, why should those organizations be entitled to an exemption when others are not?

[315]

1    The examples of this error by the Court are numerous. The Court speaks of the Act "as applied to [appellees] *through* § 309.515, subd. 1(b)' s fifty per cent rule," *ante*, at 1677 (emphasis added), "the application of the Act to the Church *through* § 309.515, subd. 1(b)'s fifty per cent rule," *ante*, at 1678 (emphasis added), the State's attempt to enforce the Act against the appellees "in express and exclusive reliance upon the newly enacted fifty per cent rule of § 309.515, subd. 1(b)," *ante*, at 1680, and the State's "attemp[t] to use § 309.515, subd. 1(b)'s fifty per cent rule in order to compel the Unification Church to register and report under the Act," *ante*, at 1681. In addition, the Court holds that because the fifty percent rule is unconstitutional, the "appellees cannot be compelled to register and report under the Act *on the strength of that provision*," *ante*, at 1689 (emphasis added).

2    The Court errs when it concludes that the basis for the State's enforcement action was the fifty percent rule of § 309.515, subd. 1(b). See *ante*, at 1677, 1681. The Court bases this conclusion on a letter to the Association from Legal Assistant Fortney which referred to the fifty percent rule while informing the Association of its obligation to register under the Act. See *ante*, at 1677, n. 4. The Court apparently concludes from this letter that it was the fifty percent rule which motivated the State to seek registration from the Association. Certainly the imprecise implications of a letter from a Legal Assistant in the Attorney General's Office do not establish the motive behind the State's enforcement action. More importantly, the reason for the State's action was expressly alleged in the enforcement complaint: the Association is a charitable organization soliciting funds in Minnesota. See Exhibit F to Fortney Affidavit. Even if the State had been motivated by the narrowing of the religious organization exemption, however, that would not alter the legal basis for enforcement of the statute against appellees or the analysis of appellees' standing before this Court.

3    It is not surprising that the Court's opinion never once mentions this enforcement complaint. That the complaint is pending in the Minnesota District Court, and that it relies entirely upon the Association's status as a "charitable organization" within the meaning of § 309.52, altogether refute the Court's assertion that the fifty percent "rule was the sole basis for the State's attempt to compel registration," and the consequent conclusion that invalidation of the rule will mean that "the Church cannot be required to register and report under the Act." *Ante*, at 1682. As has already been demonstrated, invalidation of the fifty percent rule will have absolutely no effect on the Association's obligation to register and report as a *charitable organization* under the Act. See *supra*, at 1694. Indeed, the Court's decision today will not even require the State to amend its complaint before proceeding with its enforcement action.

4    Apparently forgetting that our role does not include finding facts, the Court finds itself "compel[led]" to conclude that "the Church is indeed a religious organization within the meaning of the Act." *Ante*, at 1681. The Court's compulsion to disregard its purely appellate function is caused not by evidence adduced in the District Court, but by the faulty premise which underlies the Court's entire standing analysis: that "appellants chose to apply § 309.515, subd. 1(b), and its fifty per cent rule as the sole statutory authority requiring the Church to register under the Act." *Ibid.* The utter error of that premise has already been demonstrated. See *supra*, at 1693–1694. But even if one accepts the premise that the State acted because it considered the Association to be a "religious organization" for purposes of the fifty percent rule, that premise cannot properly lead to the conclusion that the Association is *in fact* such an organization. Factual determinations of that sort are to be made by state courts construing the Minnesota statute, not by attorneys in the Minnesota Attorney General's office. And if the Court is saying that the Attorney General has "admitted" by its enforcement action that the Association is a "religious organization" within the meaning of the Act, it has ventured into a realm of state evidentiary law in which it has no competence and no business. It is worth noting that even the Court of Appeals did not take such liberties with the record. It held that the " 'bare assertion ... without the production of any evidence ... is simply not sufficient to sustain [an] assertion that [the Unification Church] is a religious organization.' " 637 F.2d 562, 570 (CA8 1981) (quoting *United States v. Berg*, 636 F.2d 203, 205 (CA8 1980)).

> Even more questionable than this finding of fact is the judicial wizardry by which the Court shifts the state-created burden of proof. The Court concludes, without citation to supporting authority, that "a declaration that § 309.515, subd. 1(b)'s fifty per cent rule is unconstitutional would put the *State* to the task of demonstrating that the Unification Church is *not* a religious organization within the meaning of the Act." *Ante*, at 1682 (emphasis added). This conclusion directly conflicts with the Minnesota statute, which requires registration and reporting under the Act if the State demonstrates that an organization is "charitable" within the meaning of § 309.52. See *supra*, at 1694. It then becomes incumbent on the organization to show that it qualifies for one of the Act's several exemptions—in this case to show that it is a "religious organization" within the meaning of § 309.515, subd. 1(b). The Court cannot change this state regulatory scheme by judicial fiat, and does so only in a transparent attempt to manufacture redressability where none exists. See *infra*, at 1696–1697.

5    See *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1981); *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 161, 102 S.Ct.

[316]

Larson v. Valente, 456 U.S. 228 (1982)
102 S.Ct. 1673, 72 L.Ed.2d 33

205, 212, 70 L.Ed.2d 309 (1981); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S., at 74, 75, n. 20, 98 S.Ct., at 2631, n. 20; *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 262, 97 S.Ct. 555, 561–562, 50 L.Ed.2d 450 (1977); *Warth v. Seldin*, 422 U.S. 490, 504, 507–508, 95 S.Ct. 2197, 2209–2210, 45 L.Ed.2d 343 (1975); *Linda R. S. v. Richard D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973).

6   The Court attempts to finesse this fact by stating: "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Ante,* at 1682, n. 15 (emphasis in original). True though this statement may be, appellees have failed to demonstrate that a favorable decision in this Court will relieve *any* injury. The Court's decision does not alter the statutory requirement that the Association register under the Act, and expands an exemption from which appellees can benefit *only* when they prove that the Association is a "religious organization" within the meaning of the Act.

7   At another point in its opinion, the Court acknowledges:

"Of course, the Church cannot be assured of a continued religious-organization exemption even in the absence of the fifty per cent rule. ... But that fact by no means detracts from the palpability of [appellees' injury]." *Ante,* at 1681–1682 (citation omitted).

I agree that the uncertainty as to whether this decision will benefit appellees does not detract from the "palpability" of their injury. As shown in the text, however, it detracts totally from their ability to demonstrate the essential Art. III requirements of causation and redressability.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

[317]