1
2
3
4
5
6
7
8        **UNITED STATES DISTRICT COURT**

9       **SOUTHERN DISTRICT OF CALIFORNIA**

10  CITIZENS FOR QUALITY
    EDUCATION SAN DIEGO, *et al*.,          Case No. 17-cv-1054-BAS-JMA
11
                          Plaintiffs,        **ORDER DENYING MOTION
12                                            FOR A PRELIMINARY
                                              INJUNCTION**
13       v.
                                             **[ECF No. 26]**
14  RICHARD BARRERA, in his official
    capacity as Board President, *et al*.,
15
                          Defendants.
16

17          This case stems from the San Diego Unified School District's (the "District")

18  decision in July 2016 to develop an Anti-Islamophobia Initiative (the "Initiative") to

19  address Islamophobia and anti-Muslim bullying and the District's decision in April

20  2017 to adopt implementing "Action Steps."

21          Plaintiffs are two organizations—Citizens for Quality Education San Diego

22  ("CQESD") and San Diego Asian Americans for Equality Foundation

23  ("SDAAEF")—and six parents of students in the District—Scott Hasson, Chaoyin

24  He, Xuexun Hu, Kevin and Melissa Steel, and Jose Velazquez (collectively,

25  "Plaintiffs"). Plaintiffs claim that the Initiative is a pretext to establish the District's

26  preference for Islam and Muslim students. They allege that the Initiative and its

27  implementing measures establish "a subtle, discriminatory scheme" based on religion

28  in violation of the First and Fourteenth Amendments of the Federal Constitution, the

religion clauses of the California Constitution, and various California state statutory provisions. (ECF No. 3 First Am. Compl. ("FAC").) Plaintiffs further allege that the District's relationship with non-party Council on American-Islamic Relations[1] ("CAIR") to address Islamophobia violates Plaintiffs' constitutional rights because Defendants "have entangled themselves with [a] religious organization." (FAC ¶ 2.) Given the parties' previous request to dismiss Plaintiffs' claim for nominal damages, the only relief Plaintiffs seek is injunctive and declaratory. (ECF Nos. 17, 19.)

Before the Court is Plaintiffs' motion for a preliminary injunction. (ECF No. 26.) Plaintiffs request this relief solely for the claims they assert pursuant to the No Preference and No Aid Clauses of the California Constitution and the First Amendment's Establishment Clause. (ECF No. 26-1 at 11–18.)[2] In connection with these claims, Plaintiffs request the Court enjoin Defendants from: (1) "[i]mplementing and executing the Initiative as detailed in the Policy's 'Action Steps' or any similar Policy," (2) "[p]ermitting [CAIR], its employees, agents, and representatives to advance their organizational objectives within the District," and (3) "[a]dopting and implementing the CAIR Committee's 'Islamophobia Toolkit' and all related online resources, recommended books, and instructional materials, together with all such materials currently in use in the District." (ECF No. 26-1 at 21–22.)

Defendants oppose Plaintiffs' motion. (ECF Nos. 32, 55.) Because the parties previously requested dismissal of the District as a defendant (ECF Nos. 17, 19), the

---

[1] CAIR is a Muslim civil liberties organization, which seeks to enhance understanding of Islam and empower Muslim Americans as part of its mission. (FAC ¶¶ 63, 65.) CAIR provides informational resources to teachers and students, which includes information about Islamic religious practices and religious accommodations for Muslim students. (LiMandri Decl. ¶¶ 13–14, Exs. 11–12.) In its amicus brief, CAIR states that "Islam is not a monolith" and "while CAIR and CAIR-CA endeavor to support all American Muslims, their positions do not necessarily reflect the entire breadth of the American Muslim experience." (ECF No. 36 at 1 n.1.)

[2] Plaintiffs do not move based on the other claims raised in the FAC, which include Plaintiffs' First Amendment Free Exercise Clause, Fourteenth Amendment Equal Protection Clause, and California state statutory claims. The Court will not analyze those claims in this Order.

remaining Defendants in this case are District Board members Richard Barrera, Kevin Beiser, John Lee Evans, Cynthia Marten, Michael McQuary, and Sharon Whitehurst-Payne (collectively, "Defendants" or the "Board"). Among other arguments they raise, Defendants contend that one of the District's post-FAC actions has mooted Plaintiffs' claims, which they argue in turn means that Plaintiffs cannot show a likelihood of success on the merits or irreparable harm. (ECF No. 32 at 8–13; ECF No. 55 at 1–8.) CAIR-California ("CAIR" for the purposes of this Order) has filed an *amicus curiae* brief opposing Plaintiffs' motion based on the merits of Plaintiffs' claims, to which Plaintiffs have responded. (ECF Nos. 36, 50.)

Having considered the FAC, the preliminary injunction record and the briefing, the Court denies Plaintiffs' motion for a preliminary injunction in its entirety because Plaintiffs have failed to show that this extraordinary relief is warranted.

## BACKGROUND[3]

***The "Initiative".*** On July 26, 2016, the Board approved a recommendation by two Board members to "take action to direct the superintendent to bring back to the board a plan to address Islamophobia and the reports of bullying of Muslim students . . . at a future date." (LiMandri Decl. ¶ 4 Ex. 2; FAC ¶ 30.) Plaintiffs refer to this Board action as the "Initiative." (ECF No. 26-1 at 2.)

The parties dispute the reasons for the Initiative's genesis. Defendants represent that they adopted the Initiative "[i]n the wake of the increased instances of

---

[3] The Court draws on the FAC's allegations and the parties' preliminary injunction submissions to outline the relevant background for this Order. In doing so, the Court overrules Defendants' multiple objections to Plaintiffs' preliminary injunction evidence. (ECF Nos. 32-1, 55-1.) Evidence proffered in connection with a preliminary injunction motion is not subject to the evidentiary strictures that would apply, for example, at the summary judgment or trial stages. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). District courts have discretion to consider otherwise inadmissible evidence when ruling on the merits of a preliminary injunction. *See Rosen Entm't Systems, LP v. Eiger Vision*, 343 F. Supp. 2d 908, 912 (C.D. Cal. 2004) (citing *Flynt Distrib. Co.*, 734 F.2d at 1394). The form of the evidence simply impacts the weight the evidence is accorded in assessing the merits of equitable relief. *Id.* Accordingly, the Court summarily overrules all Defendants' objections.

Islamophobia following Donald Trump's election campaign." (ECF No. 32 at 2.) Defendants cite an article, which explains that "[h]ate crimes against American Muslims have soared to their highest levels since the aftermath of the Sept. 11, 2001 attacks, according to data compiled by researchers" and identifies statements by candidate Trump about Muslims as one source. (*Id.* at 2 n.1); *see* Eric Lichtblau, *Hate Crimes Against American Muslims Most Since Post-9/11 Era*," N.Y. TIMES (Sept. 17, 2016), https://www.nytimes.com/2016/09/18/us/politics/hate-crimes-american-muslims rise.html. The FAC also alleges that the Board relied on a CAIR California state-wide survey, *Growing in Faith: California Muslim Youth Experiences with Bullying, Harassment & Religious Accommodation in Schools* [hereinafter "*CAIR Survey*"].[4] (FAC ¶¶ 36–39.) The survey details the experiences of surveyed California Muslim youth regarding religion-based bullying and harassment.[5]

In contrast, Plaintiffs believe that the Initiative's express focus on Islamophobia and anti-Muslim bullying masks the District's true goal to "singl[e] out a religious sect for favorable treatment" and "delegat[e] government power to a religious organization," *i.e.*, CAIR.[6] (ECF No. 26-1 at 1; FAC ¶¶ 1–3.) For example,

---

[4] Plaintiffs do not provide a copy of the survey and the web link they provide in the FAC does not link to any CAIR survey. The Court's own search for the survey Plaintiffs name, however, has returned the following source. *See Growing in Faith: California Muslim Youth Experiences with Bullying, Harassment & Religious Accommodation in Schools*, CAIR CALIFORNIA (2013), https://ca.cair.com/sfba/wp-content/uploads/sites/10/2018/04/GrowingInFaith.pdf?x93160.

[5] The FAC further alleges that "[a]s a moving force for the [] Initiative, Defendants relied, and continue to rely, upon oral testimony given at separate Board meetings by Muslim students who were purportedly bullied at schools." (FAC ¶ 33.) The FAC alleges that this Muslim student testimony was "prepared." (*Id.* ¶ 123.) Plaintiffs do not submit evidence of "prepared" Muslim student testimony with the preliminary injunction record. When asked about these allegations at oral argument, Plaintiffs' counsel suggested that there was no basis to treat such testimony as credible. The Court is at a loss to understand why.

[6] In its original form, the FAC contained multiple allegations attempting to link CAIR with "terrorist organizations." The Court struck these allegations as scandalous as well as irrelevant and immaterial to the claims in this case. (ECF No. 24.) Plaintiffs' preliminary injunction motion, however, comes close to invoking the spirit of these stricken allegations by asserting that "CAIR prioritizes public school districts as ground zero to advance its religious mission." (ECF 26-1 at 5.)

Plaintiffs point to the District's reported instances of bullying as insufficient to show "a Muslim bullying crisis even existed." (*Id*. at 3.) The District's 2016 "Protected Class Report" for July 2016 through December 2016 reported seven incidents of religion-based bullying, which Plaintiffs characterize as showing a "0.006% crisis" based on the District's approximate 125,300 K-12 student enrollment as of May 19, 2017. (LiMandri Decl. ¶ 7 Ex 5; FAC ¶¶ 27–28). Plaintiffs further note that the District reported to the California Department of Education in 2015 and 2016 "just two instances related to Muslim students." (ECF No. 26 at 3; LiMandri Decl. ¶¶ 5–6, Exs. 3–4.) Lastly, Plaintiffs point to a pre-existing California state law requirement that California public school districts adopt policies that prohibit religiously-based "discrimination, harassment, intimidation, and bullying" to assert that the District already had an anti-bullying program in place. (ECF No. 26-1 at 3 (citing 5 Cal. Code Reg. § 4261); FAC ¶ 22.)

***The "Action Steps".*** In an April 4, 2017 presentation to the Board, Stanley Anjan, the Executive Director of the District's Family and Community Engagement Department ("FACE") "propos[ed] action steps for an anti-Muslim bullying initiative." (ECF No. 32-2 Anjan Decl. ¶¶ 2–3; *see also* LiMandri Decl. ¶ 7 Ex. 5 at 51; FAC ¶ 5.) Anjan identified three sets of "Action Steps" for the District[7]:

---

[7] Following the three slides which identify the Action Steps, the presentation also included a slide titled "Student Empowerment." (LiMandri Decl. ¶ 7 Ex. 5 at 58.) The slide identified the following items: "[c]reate opportunities for students to come together and share out their successes and challenges in service of unity," "[i]dentify safe places and individuals for students to reach out to campus if they have a concern," and "[e]xplore clubs at the secondary level to promote the American Muslim Culture and the student experiences." (*Id*.)

| Action Steps |
|---|
| (LiMandri Decl. ¶ 7 Ex. 5 at 55–57; Anjan Decl. ¶ 3 Ex. A at 8–10; FAC ¶¶ 53–55.) |

| | |
|---|---|
| "Immediate Action Steps" | • "Distribute a letter to staff and parents addressing Islamophobia and direct support"<br><br>• "Review district calendars to ensure Muslim holidays are recognized"<br><br>• "Include a link of supports on the district's 'Report Bullying' page"<br><br>• "Provide resources and strategies to support students during the upcoming month of Ramadan"<br><br>• "Continue the collaboration with community partners and district departments" |
| "Action steps: Before the start of the 2017–18 school year" | • "Review and vet materials related to Muslim culture and history at the Instructional Media Center or in video libraries"<br><br>• "Provide resources and materials for teachers on the History/Social Services page"<br><br>• "Add information related to this topic in the Annual Employee Notifications (AP 6381)"<br><br>• "Explore and engage in formal partnerships with the Council on American-Islamic Relations (CAIR)" |
| "Steps Over Multiple Years" | • "Create a survey to measure knowledge and implementation of practice"<br><br>• "Identify areas of prevention, intervention, and restoration": "Restorative Practices" and "Trauma Informed Practices"<br><br>• "Provide a series of professional development opportunities for staff related to awareness and advocacy for Muslim culture"<br><br>• "Provide practical tools for educators regarding Islamic religious practices and accommodations in schools" |

Defendants acknowledge that "the Board approved the plan in the presentation, and FACE was responsible for implementing the action steps." (Anjan Decl. ¶ 3.) Plaintiffs refer to the Action Steps as "the Initiative's official policies and procedures[.]" (FAC ¶ 52; ECF No. 26-1 at 3 (labelling Action Steps as the "Policy".)

Plaintiffs speculate that the Action Steps are the "polished product of months of close collaboration between" the District and CAIR, but their speculation is not credibly supported. (ECF No. 26-1 at 3.) Plaintiffs' derive support for this speculation from notes of a September 26, 2016 CAIR meeting attended by some

District officials, including Defendant Superintendent Marten.  (*See* LiMandri Decl. ¶ 8 Ex. 6.)  The topics of the meeting included resources for teachers, professional development, curriculum, reporting bullying, and metrics to assess progress.  (*Id.*)  Beyond this document, the evidence otherwise shows that CAIR provided suggestions to the District and otherwise lacked information on aspects of the District's implementation plan.[8]  The District in fact notes that although CAIR "has been very generous in offering its time, advice and guidance to the district on ways to prevent bullying against Muslim students . . . [t]he District's anti-bullying program has been developed and implemented *by District staff*."  (LiMandri Decl. ¶ 25 Ex. 23 (emphasis added).)  Plaintiffs do not provide evidence controverting this.

For example, in the week before the Action Steps were announced, Mohebi, CAIR-San Diego's Executive Director, emailed Linda Trousdale, a District employee, about the April 4, 2017 Board meeting.  (LiMandri Decl. ¶ 24 Ex. 22.)  Mohebi expressed his concern that "we have not discussed details of an MOU, partnership, or any understanding" and noted that he had shared comments on the proposed presentation.  (*Id.*)  Defendant Marten responded: "[w]hile the details for the implementation of these plans are currently being developed, one thing is clear: you, and your organization—CAIR are key partners in any of our next steps.  I look forward to continuing to partner with you in our next steps."  (*Id.*)

Shortly after announcing the Action Steps, District officials explored purchasing several CAIR-recommended third party books for the District's Intercultural Materials Center ("IMC").  (LiMandri Decl. ¶ 28 Ex. 26; Woehler Decl.

---

[8] Plaintiffs include a printout of a rush transcript from a July 28, 2016 KPBS News radio interview with Hanif Mohebi, Executive Director of CAIR's San Diego chapter, titled "San Diego Unified School Board Approves Creation of Anti-Islamophobia Plan."  (LiMandri Decl. ¶ 12 Ex. 10.)  In the transcript, Mohebi describes testimony provided by Muslim students to the Board, the experience of anti-Muslim bullying more generally, and reflects on measures that he would like to see as part of the District's plan.  (*Id.*)  The transcript does not reflect the level of collaboration Plaintiffs allege.

¶ 3.)  Pursuant to California Education Code § 60040[9] and District procedures, the District's Instructional Resources and Materials Department ("IRMD") vetted suggested books.  (Woehler Decl. ¶ 3 Exs. B, C.)  Valerie Shields, a CAIR member, sent Anjan a $1,236.54 Barnes & Noble price quote for the anticipated purchase of several books, the titles of which included "*Does My Head Look Big in This*?", "*I'm New Here*", and "*Lailah's Lunchbox: A Ramadan Story*."  (LiMandri Decl. ¶ 30 Ex. 28; Woehler Decl. ¶ 4.)  A District employee subsequently purchased the books using an IRMD procurement card with the costs covered by a budget code whose funds derive from payments by a third party recycling company for old books the District recycles.  (Woehler Decl. ¶¶ 3–4.)  Books were then distributed at "trainings with school librarians during the week of May 8, 2017," but without Anjan's authorization. (*Id.* ¶ 4; Anjan Decl. ¶ 4.)

*The Aftermath.*  The Action Steps and perceptions about the extent of CAIR's alleged involvement in developing them were viewed unfavorably by some.  During April 2017 Board meetings, several parents and local community members "presented their concerns" that the Action Steps showed "Defendants' favoritism and preference for a particular religious group" and that Defendants had a "sustained and detailed relationship with a controversial advocacy organization."  (FAC ¶ 58.)  In an April 27, 2017 letter, Plaintiffs' counsel told the Board "that the [] Initiative raises serious constitutional questions," "the policies, practices, and procedures associated with the [] Initiative were presently insufficient to prevent civil rights violations," and "recommended that Defendants rescind the prior vote that approved the [] Initiative." (*Id.* ¶¶ 59–60.)

These negative reactions affected the District.  On May 12, 2017, Anjan directed Steven Woehler, a District employee, to "retrieve all distributed [CAIR-

---

[9] Section 60040 provides that: "When adopting instructional materials for use in the schools, governing boards shall include only instructional materials which, in their determination, accurately portray the cultural and racial diversity of our society[.]"  Cal. Educ. Code § 60040(b).

recommended] books from school librarians." (Woehler Decl. ¶ 4; Anjan Decl. ¶ 4.) On May 17, 2017, Anjan "informed CAIR that SDUSD was putting a pause on any further actions pursuant to the April 4, 2017 Board meeting while SDUSD made the determination as to how best to move forward with the CAIR relationship." (Anjan Decl. ¶ 5.) Shortly thereafter, Plaintiffs filed the Complaint on May 22, 2017 and the FAC on June 28, 2017, seeking to enjoin Defendants from "enacting, implementing, and enforcing" the Initiative and "engaging in any partnership or associations whatsoever with" CAIR. (ECF Nos. 1, 3.)

***The Revised Policy.*** "In the wake of backlash from certain community members and this lawsuit" (ECF No. 32 at 3) and after the FAC was filed, Defendant Superintendent Marten moved the Board to adopt a new "plan" to "address[] tolerance" on July 25, 2017. (Anjan Decl. ¶ 6 Exs. E, F; ECF No. 32-6 Villegas Decl. ¶ 3; LiMandri Decl. ¶ 32 Ex. 30.) The Board meeting agenda identified this plan as "E. STUDENT INSTRUCTIONAL MATTERS. 2. Revised 7/25/17: Addressing Tolerance Through the Comprehensive School Counseling and Guidance Plan." (Anjan Decl. ¶ 6 Exs. E, F; LiMandri Decl. ¶ 32 Ex. 30.) Plaintiffs call this action the Revised Policy.[10]

The Revised Policy acknowledges that the purpose of the Board's April 4, 2017 "plan to address the bullying of Muslim students" was "to raise awareness of the issue of anti-Muslim bullying, ensure that District staff are aware of and sensitive to the issue, and to assure our Muslim community that their children will given [sic] the same protection from bullying as other students in the District." (LiMandri Decl. ¶ 32 Ex. 30.) Under the Revised Policy, however, "the Board affirms its commitment to ensure our schools are safe for all students and that the District will not tolerate the

---

[10] Plaintiffs' opening motion referred to the Board's July 25, 2017 action as a "sham" and, thus, referred only to a singular "Policy." (ECF No. 26-1 at 18 n.70.) In reply, Plaintiffs have differentiated the April 4, 2017 "Original Policy" from the July 25, 2017 "Revised Policy." (ECF No. 51 at viii.)

bullying of any students; and clarifies that our Muslim students will be treated equally with respect to bullying." (*Id*.)  In this manner, the Revised Policy articulates guiding principles for how the District will address Islamophobia and anti-Muslim bullying, which are absent from the Action Steps.  The Revised Policy continues:

- A calendar of observances to be created shall include holidays of all faiths for the purpose of enhancing mutual understanding and respect among the various religious, ethnic and cultural groups, and to assist staff to be sensitive to such holidays in the scheduling of events.

- Staff have not been assigned specifically to address the bullying of students of any single religion; rather, the District's anti-bullying program is developed to comprehensively address the issue of bullying of all students through the No Place for Hate program.

- The District's instructional materials are and will continue to be consistent with state standards which address all major world religions in the context of world history and culture.

- While students are entitled under federal law to form student clubs focused on religion; however, District policy (consistent with federal law) prohibits staff from promoting any such club and that remains unchanged.

(*Id*. (bulleting added).)  Several of these items are consistent with the Action Steps and the Revised Policy is largely silent on the Board's approach to several Action Steps.  But, in a stark departure from a prior Action Step, the Revised Policy commands that "staff is redirected from forming a formal partnership with CAIR to forming an intercultural committee which shall include representatives of all faiths and cultures and which shall provide input to District staff on issues of cultural sensitivities and the individual needs of various subgroups within our diverse community." (*Id*.)

Plaintiffs believe the Revised Policy's statement regarding the District's potential formal partnership with CAIR was a farce because of a communication prior to the Board's announcement.  Two hours before the Board publicly announced the

Revised Policy, CAIR member Linda Williams sent District employees a "1st DRAFT" for "[c]reating a Toolkit of online resources for Addressing Islamophobia." (LiMandri Decl. ¶ 33 Ex. 31.) Noting that the CAIR Committee which compiled the resources "is comprised of a large number of interfaith, intercultural community volunteers," Williams characterized the resources as "only the very beginnings of what could grow into a robust 'Toolkit' for Teachers, Counselors, and Administrators." (*Id.*) The resources included: CAIR's 2013 and 2015 reports on anti-Muslim bullying, suggested book lists for addressing Islamophobia, "compassionate comprehension" exercises for students, information on restorative justice and conflict resolution techniques, and information for teachers about childhood trauma. (*Id.*)

Contrary to Plaintiffs' view, the Revised Policy clearly alters CAIR's relationship with the District, including by CAIR's own account. On July 28, 2017, Williams contacted the Board. She acknowledged "the challenges and stress created by the backlash to the Board 4-4-17 vote to address Islamophobia and the bullying of Muslim students—and especially the ensuring threats and lawsuit." (LiMandri Decl. ¶ 35 Ex. 33.) Yet, she noted that, "[w]e are still quite incredulous that no one connected with CAIR or our Committee . . . to give us a respectful, timely notice that Board action item E.2 included specific reference to the District's relationship with CAIR, changing that relationship in dramatic though unspecified ways." (*Id.*) Williams expressed that "the following list of Action Steps are still in effect. Our Committee has worked diligently to assist the District in Implementation; however, instead of being supported and . . . appreciated, our efforts have actually been undone/reversed by District Staff[.] Please let us know what the next steps are—and when they will be taken—to follow through with what the Board voted unanimously to do on 4-4-17." (*Id.*) Williams further noted that CAIR was requesting a restorative justice circle with the District. (*Id.*)

***Post-Revised Policy.*** In the wake of the Revised Policy, the CAIR-

recommended, District-vetted books "were subsequently incorporated into a Multicultural Text Set that covered a variety of culture and identity groups to support SDUSD's goal of providing a supportive environment for all students that values diversity." (Woehler Decl. ¶ 5; Anjan Decl. ¶ 4.) The books appear to have been re-distributed to District libraries by November 2017. (LiMandri Supp. Decl. ¶ 3 Ex. 53.) Accordingly, Plaintiffs contend that "school library shelves are stocked with CAIR books." (ECF No. 26-1 at 8.)

On November 1, 2017, the District entered into a formal partnership with the Anti-Defamation League ("ADL")[11] to implement the No Place for Hate program. (Villegas Decl. ¶ 3 Ex. J.) The program "is a strong anti-bullying effort that highlights and fosters positive school environments, climates, and cultures for all students" and "does not emphasize any one religion[.]" (*Id*. ¶ 3.) The District has not entered into a formal partnership with and "has not implemented any program, curriculum, or materials created by CAIR[.]" (ECF No. 32 at 7; Anjan Decl. ¶ 12; Santos Decl. ¶ 7; Villegas Decl. ¶ 5.)

The District also established the Intercultural Relations Community Council ("IRCC"), which is overseen by the Youth and Family Advocacy Department and District staff. (ECF No. 32-4 Santos Decl. ¶¶ 2–3, 8; Anjan Decl. ¶ 7.) The IRCC first met on January 22, 2018, to "hav[e] an open dialogue with community members and local organizations regarding safe and inclusive school environments for all students." (Santos Decl. ¶ 3; Anjan Decl. ¶ 7 Ex. H.) Organizations present included the San Diego LGBT Community Center, San Diego Youth Services, the Southern California American Indian Resource Center, and Social Advocates for Youth San Diego. (Anjan Decl. ¶ 7.) Attendees expressed excitement about using the IRCC to focus on diversity and social justice. (LiMandri Supp. Decl. ¶ 18 Ex. 68.) Additional meetings were held on March 29 and May 21, 2018. (Santos Decl. ¶ 3 Ex. I.)

---

[11] According to Plaintiffs, the ADL "is a national, nonprofit organization that works to stop anti-Semitism, discrimination, and bigotry[.]" (FAC ¶ 45.)

*Interactions between the District and CAIR.*  The District and CAIR have interacted since the Board adopted the Revised Policy.  First, as a follow-up to the previously suggested "toolkit" resources, Williams provided an updated list of resources on August 9, 2017 "to be reviewed/vetted by SDUSD Curriculum Department," noting that "[w]e are glad to support the District's efforts in this way[.]" (LiMandri Decl. ¶ 36 Ex. 34.)  Another CAIR member, Lallia Allali, suggested additional books on addressing Islamophobia—several of which were the books the District purchased in May 2017.  (*Id.*; *see also* LiMandri Decl. ¶ 38 Ex. 36)[12] Williams followed up with District staff about the suggested resources on September 28, 2017.  (LiMandri Supp. Decl. ¶ 7 Ex. 57.)  Plaintiffs label all the materials Allali and Williams suggested as "the District's New 'Islamophobia Toolkit,'" and contend that the "Toolkit" is being circulated in the District.  (ECF No. 26-1 at 8–9.)  Plaintiffs do not provide evidence showing that the District has adopted this "Toolkit."

Second, the District and CAIR sought to repair their relationship given the damage it sustained from the backlash to the Initiative and the Action Steps.  The District met with representatives of CAIR, Alliance San Diego ("ASD") and the American Civil Liberties Union at ASD's suggestion on August 31, 2017.  (ECF No. 32-5 Sharp Decl. ¶ 4.)  The District and CAIR subsequently held a restorative circle on November 9, 2017 at a Buddhist temple which was facilitated by third parties. (Anjan Decl. ¶ 8 Ex. K; Sharp Decl. ¶ 5; LiMandri Supp. Decl. ¶ 2 Ex. 52.)  A follow-up email regarding the circle noted that "CAIR will be an active member of the Intercultural Community Council."  (LiMandri Supp. Decl. ¶ 3 Ex. 53.)  Defendant Marten specifically "requested that CAIR stay engaged as an important partner with SDUSD in addressing Islamophobia" and "welcome[d] the CAIR Committee's input to the ADL curriculum used in the District—specifically in regards to teaching about

---

[12] Plaintiffs also highlight that an August 23, 2017 version of CAIR's resource list included the phrase "CAIR flyers for students, when ready!"  (ECF No. 26-1 at 8; LiMandri Decl. ¶ 37 Ex. 35.)  The record does not show the provision of CAIR flyers to the District.

addressing Islamophobia." (*Id.*)

A follow-up meeting occurred on December 11, 2017. (Anjan Decl. ¶ 9; Santos Decl. ¶ 4; LiMandri Supp. Decl. ¶ 16 Ex. 66.)  Agenda items developed by CAIR included "Action Items from 4-4-17 which were NOT rescinded on 7-25-17," "supplementing ADL's efforts in the District with APPROPRIATE approaches/materials to address Islamophobia" and "sending the online teacher support materials." (LiMandri Supp. Dec. ¶¶ 5–6 Exs. 55–56 (capitalization in original).)  At the meeting, District staff introduced CAIR to the District employee in charge of the IRCC. (Anjan Decl. ¶ 10; Santos Decl. ¶ 4.)  Additional meetings between the District and CAIR occurred on January 11, 2018 and February 8, 2018 to plan for upcoming IRCC meetings. (Anjan Decl. ¶ 9; Santos Decl. ¶ 5; LiMandri Supp. Decl. ¶ 17 Ex. 67 .)  CAIR has continued to send the District suggested resources. (LiMandri Supp. Decl. ¶ 10 Ex. 60.)

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  "Under *Winter,* plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).  A preliminary injunction may also be proper "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## DISCUSSION

### I.    The Court's Jurisdiction to Issue a Preliminary Injunction

The Court must first consider the jurisdictional issues of standing and

mootness. Plaintiffs argue that they have shown Article III standing to seek the requested injunctive relief because Defendants failed to oppose Plaintiffs' assertions of standing in Plaintiffs' opening brief. (ECF No. 51 at 3.) This argument is inherently flawed because a litigant cannot waive Article III's requirements. *Ass'n of Christian Sch. Int'l v. Stearns*, 678 F. Supp. 2d 980, 984 (C.D. Cal. 2008) (citing *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996)). Even if a defendant fails to challenge Article III standing, a federal court has an independent duty to assure itself that a plaintiff has properly invoked its jurisdiction. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). And it is *Plaintiffs*' burden to show—rather than Defendants' burden to disprove—the existence of jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."). Thus, the Court assesses whether the Plaintiffs have shown standing and then considers mootness.

### A. Standing

Article III limits federal courts to deciding "cases" and "controversies." U.S. Const. art. III, § 2; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc*., 454 U.S. 464, 471 (1982). Because of this limitation, a plaintiff who invokes federal jurisdiction must show "the irreducible constitutional minimum": (1) an injury in fact via an invasion of a legally protected interest that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical, (2) fairly traceable to the defendant's conduct, and (3) redressable by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff "'must demonstrate standing for each claim he seeks to press' and 'for each form of

relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). A plaintiff's standing to sue is determined based on the facts that exist at the time of the complaint. *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001); *In re 1250 Oceanside Partners*, 260 F. Supp. 3d 1300, 1313 (D. Haw. 2017) (same). And "each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "[A]t the preliminary injunction stage, a plaintiff must make a 'clear showing' of [the standing elements]." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). "Because '[c]onstitutional challenges based on the First Amendment present unique standing considerations,' plaintiffs may establish an injury in fact without first suffering a direct injury from the challenged restriction." *Id*. (citation omitted).

### 1. Organizational Plaintiffs

The Organizational Plaintiffs have not shown Article III standing whether premised on (1) organizational harms or (2) in a representational capacity on behalf of their members. First, although "[a]n organization has 'direct standing to sue [when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission,'" *Valle Del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013), neither organization *alleges* a diversion of resources. (FAC ¶¶ 8–9, 154, 169, 177, 186, 193.) Although they submit declarations invoking such harms (ECF No. 26-3 Ex. 43 (CQESD Decl.); *id*. Ex. 44 (SDAAEF Decl.)), a plaintiff may not "effectively amend its complaint by raising" new allegations of standing not contained in the complaint. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088–89 (9th Cir. 2010) (rejecting as "ineffectual" declarations averring standing on grounds absent from the complaint).

Second, representational standing is also absent. "[A]n organization suing as a representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United*

*Food & Commercial Workers Union Local 751*, 517 U.S. at 555. But neither organization "*identif[ies]* a single member with standing to sue in his or her own right" in the FAC, let alone in their preliminary injunction declarations. *Advocates for Individuals with Disabilities Found., Inc. v. Circle K Props., Inc*., No. CV-16-02358-PHX-SPL, 2017 WL 2637886, at *4 (D. Ariz. Mar. 20, 2017) (emphasis added); (*see generally* CQESD Decl.; SDAAEF Decl.). The Individual Plaintiffs are not alleged to be members of the Organizational Plaintiffs. And to the extent the Organizational Plaintiffs seek to base representational standing on an unidentified member's taxpayer status, the Court's taxpayer standing analysis with respect to the Individual Plaintiffs forecloses this basis.

### 2. Individual Plaintiffs

The Individual Plaintiffs are District parents and schoolchildren and they are not Muslim. (FAC ¶¶ 10–14, 119–20); Hasson Decl. ¶ 4; He Decl. ¶ 4; Hu Decl. ¶ 4; Steel Decl. ¶ 4; Velazquez Decl. ¶ 4.) They aver that they possess Article III standing as (1) District taxpayers and (2) as schoolchildren and parents who are "spiritually affront[ed]" by the District's challenged conduct. (ECF No. 26-1 at 19.) The Court concludes that the Individual Plaintiffs lack taxpayer standing, but at least one Individual Plaintiff possesses standing based on the alleged spiritual harms and direct contact with challenged conduct.

### a. Taxpayer Standing

"'[T]axpayer standing,' by its nature, requires an injury *resulting from a government's expenditure of tax revenues*." *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 793 (9th Cir. 1999) (citing *Clay v. Fort Wayne Cmty. Schs*., 76 F.3d 873, 879 (7th Cir. 1996)) (emphasis added). A municipal or state taxpayer may have standing to pursue a "good-faith pocketbook" challenge to government conduct by showing that the challenged "activity is supported by an separate tax or paid from any particular appropriation or that it adds any sum whatever to the cost of conducting the school." *Doremus v. Bd. of Educ*., 342 U.S. 429, 434 (1952); *Plans, Inc. v.*

*Sacramento City Unified Sch. Dist.*, 319 F.3d 504, 506 (9th Cir. 2003) ("A good-faith pocketbook challenge identifies a measurable sum of public funds being used to further a challenged activity."). Allegations of specific amounts of money that the government spent solely on the challenged conduct are adequate. *See Plans, Inc.*, 319 F.3d at 508 (taxpayer standing when plaintiff identified public monies used to operate schools whose curriculum plaintiff challenged as "inherently religious" in violation of the Federal and California Constitutions); *Cammack v. Waihee*, 932 F.2d 765, 769 (9th Cir. 1991) (state and municipal taxpayer standing to challenge a state's declaration of Good Friday as a holiday because "state and municipal tax revenues fund the paid holiday for government employees").

The Individual Plaintiffs' allegations lack the particularity required for taxpayer standing. A plaintiff lacks taxpayer standing when he or she fails to allege a specific tax dollar appropriation or disbursement "spent solely" on the challenged conduct. *See Madison Sch. Dist. No. 321*, 177 F.3d at 794 (no taxpayer standing to challenge graduation prayer because plaintiff "identifies no tax dollars the defendants spent solely on the graduation prayer," but rather only "ordinary costs of graduation that the school would pay whether or not the ceremony included a prayer"); *Reimers v. Oregon*, 863 F.2d 630 (9th Cir. 1989) (no taxpayer standing because taxpayer "does not challenge the disbursement of state funds on the chaplain program . . . .[i]nstead, he complains about the requirement that a specific religion . . . be represented on the chaplain staff"). The FAC generally alleges that "Plaintiffs object to the use of taxpayer funds to enact, implement, and enforce the [] Initiative" and "to collaborate and engage in formal partnerships with CAIR-SD[.]" (FAC ¶¶ 125–26.) The Individual Plaintiffs further speculate about the use of generalized "taxpayer dollars." (Hasson Decl. ¶ 13; He Decl. ¶ 27; Hu Decl. ¶ 13; Steel Decl. ¶ 13; Velazquez Decl. ¶ 13.) Without more, these allegations and averments which assume that taxpayer funds must have been spent on the challenged conduct are insufficient. The Court will not endorse this unbounded view of taxpayer standing, which would vitiate

Article III's standing limitation based on a plaintiff's mere assertion that he or she is a taxpayer. The Individual Plaintiffs lack taxpayer standing because they did not allege a pocketbook injury.

### b. Alleged Spiritual Harm

"The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context . . . . because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature." *Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1250 (9th Cir. 2007) (citing *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1085 (4th Cir. 1997)). "In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show . . . that he is 'directly affected by the laws and practices against which [his] complaints are directed.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 n.9 (1963)). "[S]piritual harm resulting from unwelcome direct contact with an allegedly offensive religious (or anti-religious)" activity will support Article III standing. *Vasquez*, 487 F.3d at 1253.

The Supreme Court has recognized that "school children and their parents, who are directly affected by the laws and practices against which their complaints are directed" may have standing based on "a spiritual stake in First Amendment values." *Sch. Dist. of Abington Twp.*, 374 U.S. at 224 n.9; *Vasquez*, 487 F.3d at 1251. In these circumstances, standing does not exist simply "because [a] complaint rest[s] on the Establishment Clause . . . but because impressionable schoolchildren [a]re subjected to unwelcome religious exercises or [ar]e forced to assume special burdens to avoid them." *Valley Forge Christian College*, 454 U.S. at 486 n.22; *see also ACLU v. Rabun Cty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1108 (11th Cir. 1983) (plaintiffs had standing to challenge the location of a cross existed pursuant to *Valley Forge* because the plaintiffs "are presently forced to locate other camping areas or to have the right to use Black Rock Mountain State Park conditioned upon the acceptance of unwanted religious symbolism[.]").

1    Although spiritual injury may suffice for Article III standing when the injury

2    is allegedly caused by direct contact with the challenged activity, certain harms are

3    insufficient notwithstanding a plaintiff's invocation of the Establishment Clause.

4    Mere "psychological consequence[s] produced by observation of conduct with which

5    one disagrees" are insufficient to support standing even if "phrased in constitutional

6    terms." *Valley Forge*, 454 U.S. at 473; *see also id*. at 487 ("Their claim that the

7    Government has violated the Establishment Clause does not provide a special license

8    to roam the country in search of governmental wrongdoing and to reveal their

9    discoveries in federal court.  The federal courts were simply not constituted as

10   ombudsmen of the general welfare.").  Allegations of injury that are "no more than

11   an 'abstract objection'" are an insufficient basis for standing. *Caldwell v. Caldwell*,

12   545 F.3d 1126, 1133 (9th Cir. 2008).  "[A]n 'abstract stigmatic injury' resulting from

13   . . . outsider status" allegedly caused by government conduct with which a plaintiff

14   has not direct contact is also insufficient. *See Newdow v. Lefevre*, 598 F.3d 638, 643

15   (9th Cir. 2010).

16   Many of the Individual Plaintiffs' allegations and averments of spiritual injury

17   are insufficient to cross the elusive line which separates abstract stigmatic injuries

18   from the circumstances which make a spiritual injury sufficiently concrete to invoke

19   federal jurisdiction.  For example, although the Plaintiffs allege that they "perceive

20   the [] Initiative as the [] District's endorsement of Islam and a rejection of other

21   religions" and that that Defendants' conduct "send[s] a clear message to Student

22   Plaintiffs that they are outsiders, not full members of the school community, while

23   sending an accompanying message that Muslim students are insiders, full members

24   of the school community," (FAC ¶¶ 120, 133, 137, 142), entirely absent from the FAC

25   are allegations of Plaintiffs' direct contact with any aspect of the Initiative or the

26   measures which implement it.  The Individual Plaintiffs' declarations similarly claim

27   injury based on the Board's mere adoption of the Action Steps and being "directly

28   offended" by the District's interactions with CAIR.  (Hasson Decl. ¶¶ 7, 10; He Decl.

¶¶ 7–18; Hu Decl. ¶¶ 7, 10; Steel Decl. ¶¶ 7, 10; Velazquez Decl. ¶¶ 7, 10.)  These allegations and averments appear insufficient to confer standing on the Individual Plaintiffs.

Nevertheless, one Individual Plaintiff avers that "[i]n November 2017, my son and I had direct contact with CAIR's book, as they are available for checkout at his school library."  (He Decl. ¶ 26.)  The Individual Plaintiffs otherwise aver that they are "spiritually affronted" by Defendants' conduct, which they declare has chilled their participation in District activities; additionally, one Plaintiff alleges that Defendants' conduct will cause the Plaintiff to remove the Plaintiff's child from the District.  (Hasson Decl. ¶¶ 8–9, 11; He Decl. ¶¶ 7–18; Hu Decl. ¶¶ 8–9, 11; Steel Decl. ¶¶ 8–9, 11; Velazquez Decl. ¶¶ 8–9, 11.)  These averments are consistent with the Individual Plaintiffs' allegation that they do not wish for their children to receive an education from a school district that, in their view, "endorse[s ] Islam" and "reject[s] other religions[.]"  (FAC ¶ 120.)

The Court finds that at least one of the Individual Plaintiffs has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Larson v. Valente*, 456 U.S. 228, 238 (1982) (citation and quotations omitted); *see also Pickup v. Brown*, 740 F.3d 1208, 1224 n.2 (9th Cir. 2013) ("[T]he presence in a suit of even one party with standing suffices to make a claim justiciable."); *Akina v. Hawaii*, 141 F. Supp. 3d 1106, 1125 (D. Haw. 2015).  The Court has jurisdiction to entertain the request for preliminary injunctive relief.[13]

---

[13] It could be argued that the Individual Plaintiffs' alleged spiritual harms implicate merits issues—specifically, whether Defendants have established a preference for Muslim students to the exclusion of non-Muslim students and become excessively entangled with religion through the District's relationship with CAIR.  But "standing does not depend on the merits of the plaintiff's contention that particular conduct is illegal." *Davis v. Guam*, 785 F.3d 1311, 1316 (9th Cir. 2015).  Thus, the Court's conclusion that at least one Individual Plaintiff possesses Article III standing based on the alleged spiritual harms does not mean that Plaintiffs are likely to succeed on the merits of

### B.    Mootness

Mootness is "the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks and citation omitted). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SIEU, Local 1000*, 567 U.S. 298, 307 (2012); *Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010) (internal quotations and citation omitted). A federal court must dismiss a case for lack of jurisdiction if it becomes moot. *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086–87 (9th Cir. 2011). But "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307–08 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)). When assessing mootness, a court should not conflate whether a plaintiff retains an interest in a case with the distinct issue of whether the plaintiff's claims are meritorious. *See Al Otro Lado, Inc. v. Nielsen*,—F. Supp. 3d—, 2018 WL 3969700, at *7 (S.D. Cal. Aug. 20, 2018) (Bashant, J.).

Defendants' mootness challenge stems from a post-FAC Board action. Defendants argue that the "Board's action to ensure religious neutrality" in the Revised Policy "to prevent[] bullying" moots Plaintiffs' case. (ECF No. 32 at 1.) Plaintiffs dispute mootness on the ground that "the District is still working with CAIR to 'address Islamophobia'" and "to develop resources for 'addressing Islamophobia.'" (ECF No. 51 at 1, 3.) The Court concludes that the Revised Policy does not moot this case based on voluntary cessation. Nevertheless, the Revised Policy's rescission of

_____

their claims.

the CAIR-related Action Step moots Plaintiffs' requested injunctive relief to enjoin Defendants from entering into a formal partnership with CAIR.

### 1. The District's Voluntary Cessation Does Not Moot this Case

Both sides recognize the voluntary cessation doctrine as the relevant framework for assessing Defendants' mootness challenge. (ECF No 26-1 at 18 n.70; ECF No. 32 at 8; ECF No. 51 at 3.). Defendants argue that Plaintiffs' claims in the FAC encompass the Initiative and the Action Steps, but "th[e] plan [*i.e.*, the Initiative], and the action steps to implement [it], were clearly reversed at a Board meeting on July 25, 2017." (ECF No. 32 at 9.) Thus, according to Defendants, there is no relief left for the Court to provide.

"A party 'cannot automatically moot a case simply by ending its unlawful conduct once sued,' else it 'could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends.'" *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 n.* (2018) (quoting *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013)). For this reason, "voluntary cessation . . . does not ordinarily render a case moot[.]" *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (citation and quotations omitted). In certain circumstances, however, "voluntary cessation can yield mootness if a 'stringent' standard is met" by the defendant. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 189 (2000). Under this standard, voluntary cessation moots a case only if "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992). The party asserting mootness based on voluntary cessation has a "heavy burden." *Friends of the Earth*, 528 U.S. at 189; *Rosebrock*, 745 F.3d at 971.

Defendants' mootness argument relies on the *Rosebrock* factors applicable to a government defendant's voluntary cessation "not reflected in statutory changes or . . . . changes to ordinances or regulations." *Rosebrock*, 745 F.3d at 972. Pursuant to

the *Rosebrock* factors, "mootness is more likely if":

> (1) the policy change is evidenced by language that is broad in scope and unequivocal in tone; (2) the policy change fully addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case; (3) th[e] case [in question] was the catalyst for the agency's adoption of the new policy (4) the policy has been in place for a long time when we consider mootness; and (5) since [the policy's] implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff[.]

*Id.* (internal citations omitted). In assessing these factors, courts may "presume that a government entity is acting in good faith when it changes its policy[.]" *Id.* at 971. Defendants easily satisfy the third *Rosebrock* factor. The Revised Policy was adopted some two months after the original Complaint was filed, clearly in response to this lawsuit and the backlash to the Initiative and the Action Steps. (*Compare* ECF No. 1 *with* LiMandri Decl. ¶ 32 Ex. 30; Anjan Decl. ¶ 6 Exs. E, F.)

However, even affording Defendants a presumption of good faith, Defendants, have not otherwise met their heavy burden to show mootness through voluntary cessation. The *Rosebrock* factors are largely variations of a court's basic mootness inquiry into whether "the *allegedly wrongful behavior* could not reasonably be expected to recur[.]" *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (emphasis added). "[I]n cases of voluntary cessation, the defendant bears a 'formidable burden'" in making this showing. *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1140 (D. Haw. 2006). As is relevant here, "the form the governmental action takes is critical and, sometimes, dispositive" to the voluntary cessation inquiry. *Yonas Fikre v. FBI*, —F.3d—, 2018 WL 4495552, at *3 (9th Cir. Sept. 20, 2018). The Revised Policy cannot show mootness by voluntary cessation because it leaves intact the "wrongful behavior" Plaintiffs allege and seek to enjoin.

For one, the Initiative—the directive to "adopt a plan to address Islamophobia and anti-Muslim bullying"—and its underlying purpose remain intact. Although Defendants contend that the Revised Policy "rescinded" both the July 26, 2016

Initiative and the April 4, 2017 Action Steps (ECF No. 32 at 9), the Revised Policy refers solely to the Action Steps. (LiMandri Decl. ¶ 32 Ex. 30; Anjan Decl. ¶ 6 Ex. E.) By its own terms then, the Revised Policy cannot moot Plaintiffs' challenge to the Initiative. The preliminary injunction record shows that addressing Islamophobia and anti-Muslim bullying remains an objective of the District. (LiMandri Decl. ¶ 36 Ex. 34; LiMandri Supp. Decl. ¶¶ 3–6 Exs. 53–56.) The District maintains a webpage on "Addressing Bullying of Muslim students." (ECF No. 51 at 9; LiMandri Decl. ¶ 25 Ex. 23.)[14] The page expressly notes that "[t]he District recently announced an intent to take action specifically to address the bullying of Muslim students" and "the proposed action will be a part of the district's efforts to protect all students from bullying, intimidation, and discrimination." *Addressing the Bullying of Muslim Students*, San Diego Unified School District, https://www.sandiegounified.org/addressing-bullying-muslim-students (last accessed September 19, 2018); (LiMandri Decl. ¶ 25 Ex. 23).[15]

Second, although the Revised Policy clearly clarifies the District's intention not to single out a particular religion, government "action that is not governed by clear or codified procedures cannot moot a claim[.]" *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015). In this case, the Revised Policy is silent on and therefore

---

[14] In surreply, Defendants argue that "this webpage is clearly an error, and was implemented before the Board's clear action on July 25, 2017 rescinding the Initiative." (ECF No. 55 at 4 n.3.) Without more, the Court cannot accept this statement in a legal memorandum as fact. *See Spradlin v. Lear Siegler Mgmt. Servs. C*o., 926 F.2d 865, 869 (9th Cir. 1991) ("Argument by counsel serves only to elucidate the legal principles and their application to the facts at hand; it cannot create the factual predicate."). Moreover, it strains the Court to understand how this webpage could be in "error" when it has remained on the District's website until the date of this Order, several months after Plaintiffs submitted a printout of the webpage in February 2017 as evidence that the District remains committed to the Initiative.

[15] The webpage is otherwise a compilation of "frequently asked questions" from concerned parents and others regarding the Initiative and the District's efforts to address Islamophobia and anti-Muslim bullying, for which the District provides answers. (LiMandri Decl. ¶ 25 Ex. 23.) Some of the questions on the webpage include: "why are Muslim students getting special treatment?", "what do you do to protect non-Muslim students and groups from bullying?", "are you implementing Sharia law?", and "are you endorsing Islam?" (*Id.*)

cannot rescind many Action Steps identified in the April 4, 2017 presentation to the Board. (*Compare* LiMandri Decl. ¶ 7 Ex. 5 at 55–57 *with* LiMandri Decl. ¶ 32 Ex. 30.) Other items covered in the Revised Policy are consistent with several Action Steps. Although the Court can appreciate Defendants' argument that the Revised Policy shows the District's religion-neutrality (ECF No. 55 at 1–8), the Court is reticent to conflate the merits arguments with mootness.

Finally, although the Revised Policy "redirected [staff] from forming a formal partnership with CAIR," it does not sever the District's ties with CAIR, nor prevent CAIR from addressing Islamophobia in the District—relief Plaintiffs seek. The District has received CAIR's suggestions for resources. (LiMandri Decl. ¶¶ 36, 38 Exs. 34, 36; LiMandri Supp. Decl. ¶¶ 7, 10 Exs. 57, 60.) The District has otherwise solicited information from and discussed with CAIR how to address Islamophobia. (LiMandri Supp. Dec. ¶¶ 5–6 Exs. 55–56.) And CAIR participates in the IRCC, which Defendants have expressly told CAIR may be used to recommend additional resources and curriculum on addressing Islamophobia. (Anjan Decl. ¶¶ 9–10; Santos Decl. ¶¶ 4–5; LiMandri Supp. Decl. ¶ 17 Ex. 67.) In sum, the Revised Policy is not a wholesale and clear revocation of the District's Initiative to address Islamophobia and anti-Muslim bullying, the Action Steps implementing it, or reliance on CAIR to support the District's measures. There is a continuing stake in these proceedings sufficient to support the Court's jurisdiction.

### 2. The Revised Policy's Impact on the Requested Relief

Although Defendants have not met their heavy burden to show that this entire case is moot based on voluntary cessation, the Revised Policy nevertheless impacts the relief Plaintiffs seek. First, it is clear to the Court that part of the Revised Policy substantially undermines the need for, if not moots, Plaintiffs' request for injunctive relief to enjoin Defendants from creating a formal partnership with CAIR. Based on its plain terms, the Revised Policy eliminates the prior Action Step regarding the creation of a formal partnership between CAIR and the District to implement the

Initiative. (*Contrast* LiMandri Decl. ¶ 7 Ex. 5 at 55–57 *with* LiMandri Decl. ¶ 32 Ex. 30.) The record shows that Defendants have not created a formal partnership with CAIR to achieve the Initiative's objectives, but have instead entered into a formal partnership with a different organization. CAIR recognizes that the District's action forecloses a formal relationship with CAIR. (ECF No. 36.) And Plaintiffs do not provide evidence showing any credible possibility that the District will enter into a formal partnership with CAIR to address Islamophobia and anti-Muslim bullying.

Second, although the Revised Policy does not otherwise moot Plaintiffs' requests for preliminary injunctive relief, the Revised Policy may impact the Court's preliminary injunction analysis. Although a defendant's post-complaint conduct may not moot a case such that a court lacks jurisdiction, changes in a defendant's conduct "may . . . render[] certain aspects of Plaintiffs' originally-alleged harm no longer imminent[.]" *McFalls v. Purdue*, No. 3:16-cv-2116-SI, 2018 WL 785866, at *10 (D. Or. Feb. 8, 2018). Changes in a defendant's conduct are therefore relevant to a court's consideration of whether the plaintiff has carried his or her burden to demonstrate a likelihood of irreparable harm. *See Lofton v. Verizon Wireless (VAW) LLC*, 586 Fed. App'x 420, 421 (9th Cir. 2014) (citing *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 953–54 (9th Cir. 1981)). Plaintiffs implicitly recognize the relevance of the Revised Policy to the merits of their requested preliminary injunctive relief by arguing that "the Revised Policy not only fails to moot this case, it is unconstitutional." (ECF No. 51 at 4.) Defendants also argue about the impact of the Revised Policy on Plaintiffs' request. (ECF No. 55 at 1–8.) Accordingly, the Court finds it appropriate to consider the Revised Policy in assessing whether Plaintiffs have met their burden to show that they are entitled to preliminary injunctive relief.

## II.    Plaintiffs Have Not Shown They Are Entitled to a Preliminary Injunction

### A.    Likelihood of Success on the Merits

Plaintiffs contend that they have shown a likelihood of success on the merits of their constitutional claims because Defendants did not directly address Plaintiffs'

briefing on this issue. (ECF No. 51 at 3.) The Court unequivocally rejects this contention. Despite the vacuum in Defendants' opposition on merits element, CAIR's amicus directly addresses it. (ECF No. 36 at 14–25.)[16]

More importantly, as the movants, it is Plaintiffs' burden to show they are entitled to a preliminary injunction.[17] *See Winter*, 555 U.S. at 22 ("injunctive relief . . . may only be awarded upon a *clear showing* that *the plaintiff* is entitled to such relief" (emphasis added)); *see also Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015) (movant "bears the heavy burden of making a 'clear showing' that it [i]s entitled to a preliminary injunction"); *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (preliminary injunction "should not be granted unless *the movant*, by a clear showing, carries the burden of persuasion" (emphasis added) (original emphasis omitted)). Treating as a foregone conclusion that Plaintiffs have shown a likelihood of success is inconsistent with their burden. It is furthermore inappropriate in this case because Plaintiffs rely on the asserted merits of their First Amendment claim as the panacea for the remaining preliminary injunction elements. (ECF No. 26-1 at 20 (irreparable harm), *id.* at 21 (balance of the hardships and public interest); ECF No. 51 at 11.) The Court thus turns to Plaintiffs' merits showing and concludes that they have not shown a likelihood of success on the merits of the claims on which they premise their need for preliminary injunctive relief. Since the requested relief is not warranted, the Court will not consider the parties' arguments

---

[16] Plaintiffs suggest that the District and CAIR conspired to oppose Plaintiffs' motion. (ECF No. 51 at 3 n.9.) Plaintiffs' speculation is contradicted by the record. Defendants sought to file a response to CAIR's brief to expressly argue that the Court should not consider CAIR's constitutionality arguments based on Defendants' view that the Revised Policy moots the case. (ECF No. 43.) Defendants did not argue constitutionality or refer to CAIR's amicus at the Court's July 17, 2018 oral argument on Plaintiffs' motion. (ECF No. 60.)

[17] In assessing whether Plaintiffs have satisfied their preliminary injunction burden, the Court will not "'search for truffles' in the evidentiary record" Plaintiffs have submitted "to discover the facts supporting Plaintiff[s'] claims." *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1249 n.4 (S.D. Cal. 2018).

regarding the scope of such relief.  (ECF No. 32 at 16–20; ECF No. 51 at 17–20.)

### 1.    Constitutional Avoidance Doctrine

Invoking the constitutional avoidance doctrine, Plaintiffs argue that the Court should consider their No Aid and No Preference Clause California Constitutional claims before addressing their likelihood of success on their Establishment Clause claim.  (ECF No. 26-1 at 10.)  The Court agrees in part.

Pursuant to the avoidance doctrine, a court avoids federal constitutional determinations if a state law decisional ground is available, even one of state constitutional law.  *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) ("[F]ederal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available").  Federal courts have invoked the constitutional avoidance doctrine to address No Aid Clause claims prior to consideration of First Amendment claims.  *See Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1078 (9th Cir. 2012) (addressing plaintiffs' California Constitution claims under the No Aid Clause).  Thus, the Court will consider Plaintiffs' likelihood of success on their No Aid Clause claim before addressing their Establishment Clause claim.

However, Plaintiffs' No Preference Clause claim need not be separately analyzed before assessing their First Amendment claim.  It is true that there is no "counterpart" to the No Preference Clause's "language" in the Federal Constitution.  *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1395 (9th Cir. 1994).  The No Preference Clause guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference," Cal. Const., art. I § 4, language that is absent from the Federal Constitution.[18]  Yet, the California Supreme Court has made clear that when

---

[18] The No Preference Clause is part of the same provision of the California Constitution whose concluding clause establishes California's version of the Establishment Clause in the Federal Constitution.  *See* Cal. Const., art. I § 4 (also providing that "[t]he Legislature shall make no law respecting an establishment of religion").

government activity passes muster under the Establishment Clause, "it follows that the [activity] is neither a governmental preference for or discrimination against religion" and, thus, satisfies the No Preference Clause. *E. Bay Asian Local Dev. Corp. v. California*, 13 P.3d 1122, 1139 (Cal. 2000); *see also Vernon*, 27 F.3d at 1396 ("[C]alifornia courts have recognized that an analysis of establishment claims under the California Constitution frequently produces the same results as one under the federal constitution."). Specifically, a governmental action that satisfies the test of *Lemon v. Kurtzman*, 403 U.S. 60 (1971), for permissibility under the federal Establishment Clause necessarily passes muster under the California No Preference Clause." *Barnes-Wallace*, 704 F.3d at 1082 (citing *E. Bay Asian Local Dev. Corp.*, 13 P.3d at 1139).

The coextensive means for resolving No Preference and Establishment Clause claims means that the Court need not separately analyze Plaintiffs' No Preference claim. *See Vernon*, 27 F.3d at 1392 ("Where the state constitutional provisions are coextensive with related federal constitutional provisions, [courts] may decide the federal constitutional claims because that analysis will also decide the state constitutional claims."). Application of the *Lemon* test will determine Plaintiffs' likelihood of success on both claims. *See Barnes-Wallace*, 704 F.3d at 1082–84; *Davies v. L.A. Cty. Bd. of Supervisors*, 177 F. Supp. 3d 1194, 1215 (C.D. Cal. 2016); *Am. Humanist Ass'n v. City of Lake Elsinore*, No. 5:13-cv–00989-SVW-OPx, 2014 WL 791800, at *6 (C.D. Cal. Feb. 25, 2014).

### 2. The No Aid Clause Claim

The California Constitution's No Aid Clause prohibits the government from "mak[ing] an appropriation, or pay[ing] from any public fund whatever, or grant[ing] anything to or in aid of any religious sect, church, creed, or sectarian purpose [.]" Cal. Const. art. XVI § 5. "[T]he provision was intended to insure the separation of church and state and to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or

sectarian purposes." *California Educ. Facilities Auth. v. Priest*, 526 P.2d 513, 520 (Cal. 1974). Because of its broad scope, the government may violate the No Aid Clause even without providing a financial benefit or tangible aid by, for example, lending its prestige and power" to a "sectarian purpose." *Paulson v. City of San Diego*, 294 F.3d 1124, 113 (9th Cir. 2002) (en banc) (quoting *Feminist Women' Health Ctr., Inc. v. Philibosian*, 203 Cal. Rptr. 918, 920–22, 927 (Cal. Ct. App. 1984)). But the No Aid Clause "has never been interpreted . . . to require governmental hostility to religion, nor to prohibit a religious institution from receiving an indirect, remote, and incidental benefit" when there exists "a secular primary purpose." *Priest*, 526 P.2d at 521.

Distilling a test from California state court cases, the Ninth Circuit has stated that the No Aid Clause "prohibits the government from (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government's secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental." *Paulson*, 294 F.3d at 1131. "A sectarian benefit that is ancillary to a primary secular purpose may qualify as 'incidental' if the benefit is available on an equal basis to those with sectarian and those with secular objectives." *Id.* But "official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes" will not pass muster. *Id.* at 1129.

Although Plaintiffs' preliminary injunction analysis regarding their No Aid Clause is thin, Plaintiffs apparently believe that Defendants are violating the Clause by providing financial and, more broadly, non-financial, intangible "aid" to religion. (ECF No. 26-1 at 12–13.) The Court concludes that Plaintiffs have not shown that they are likely to succeed on the merits of their No Aid Clause claim.

***Financial "Aid".*** Alleged No Aid Clause violations typically involve the direct grant of financial aid to a religious organization. *See, e.g., Barnes-Wallace*, 704 F.3d at 1078 (property leasing); *Cal. Statewide Communities Dev. Auth. v. All Persons Interested in the Matter of the Validity of a Purchase Agreement*, 152 P.3d

1070 (Cal. 2007) (bond financing agreements); *Priest*, 526 P.2d at 513 (issuance of bonds); *Frohliger v. Richardson*, 218 P. 497 (Cal. Ct. App. 1923) (funding for restoration of San Diego Catholic mission).

Plaintiffs argue that Defendants are financially aiding a religion by means of a "government policy" that uses "taxpayer money under the direction of a sectarian organization." (ECF No. 26-1 at 12.) Tellingly, Plaintiffs do not argue that the District is *directly* providing taxpayer money to any sectarian organization, nor does the record contain any evidence that would support such an argument. Even assuming that a government policy may violate the No Aid Clause if taxpayer money is used "under the direction of a sectarian organization," (*id.*), Plaintiffs have not provided evidence that CAIR directs or has directed the District's use of taxpayer money pursuant to the Initiative.

The only concrete financial expenditure Plaintiffs identify in their motion is the District's purchase of several books that CAIR recommended as part of the District's measures to address Islamophobia and anti-Muslim bullying. (*Id.* at 6–7, 12.)[19] Setting aside that the FAC does not allege this expenditure, the record shows that District staff separately vetted the books pursuant to a vetting process mandated by California law and District procedures. (Woehler Decl. ¶ 3 Exs. B, C.) The books were purchased solely by a District employee from a third party commercial retailer. (LiMandri Decl. ¶ 30 Ex. 28; Woehler Decl. ¶ 4.) And the record shows that only District has made decisions regarding how the books are distributed in District schools, where they are available to teachers and students on an equal basis. (Woehler Decl. ¶ 4; Anjan Decl. ¶ 4; LiMandri Supp. Decl. ¶ 3 Ex. 53.) The Court finds that any "benefit" to religion based on the purchase of the CAIR-recommended books is

_____

[19] Plaintiffs underscore that the District purchased these books despite "the $124 million budget deficit and corresponding spending freeze." (ECF No. 26-1 at 12.) It is unclear to the Court what legal significance this has to a No Aid Clause claim and Plaintiffs provide no authority addressing it. Moreover, the preliminary injunction record shows that the books were funded in a manner that did not require a new expenditure of funds by the District. (Woehler Decl. ¶¶ 3–4.)

properly characterized as "incidental" and consistent with the No Aid Clause.

***Non-Financial, Intangible "Aid".*** Plaintiffs further argue that the Initiative violates the No Aid Clause because "Defendants have placed their power, prestige, and purse behind a single religion: Islam." (ECF No. 26-1 at 13; *see also* FAC ¶¶ 191–92.) Recognizing that the No Aid Clause does not prohibit "incidental benefits" to a sectarian purpose, Plaintiffs argue that the Initiative violates the No Aid Clause on this more far-reaching basis because: "[t]here are no programs promoting 'Jewish culture.' There are no lectures from priests on how to accommodate Catholic students during Lent. And there are no partnerships with Evangelical Christian activists." (*Id.*) Plaintiffs fail to support this assertion of a No Aid Clause violation with any concrete evidence or analysis tethered to the actual substance of the Initiative, its implementing measures, or even the District's treatment of other religions in general.[20] This failure is a sufficient basis to conclude that Plaintiffs have not met their preliminary injunction burden to state a No Aid Clause claim on this basis.

However, the Court finds that the record does not support Plaintiffs' assertions. For one, there is no evidence to support Plaintiffs' suggestion that the District has failed to provide instructional materials for other religions and religious groups. In fact, the District indicates that its instructional materials "address all major world religions[.]" (LiMandri Decl. ¶ 32 Ex. 30; *see also* Woehler Decl. ¶ 5; Anjan Decl. ¶ 4.) Plaintiffs have not controverted this evidence. Second, the record contradicts Plaintiffs' suggestion that the District has a "partnership" with CAIR in connection with the Initiative. The District expressly rejected a formal partnership with CAIR. (*Contrast* LiMandri Decl. ¶ 7 Ex. 5 at 55–57 *with* LiMandri Decl. ¶ 32 Ex. 30.) CAIR acknowledges in its amicus that there is no partnership between it and the District.

---

[20] The Court observes that Plaintiffs' failure to provide concrete analysis through application of the law to the facts of this case pervades the preliminary injunction motion. (ECF No. 26-1.) It is not the Court's duty to make legal arguments for Plaintiffs that they do not raise and the Court will not do so. *See, e.g., Blankenship v. Cox*, No. 3:05-CV-00357-RAM, 2007 WL 844891, at *12 (D. Nev. Mar. 19, 2007) ("[I]t is not the court's duty to do [a litigant's] legal research.").

(ECF No. 36 at 14.)  Third, and relatedly, the record shows that the District has in fact entered into a formal partnership with the ADL.  (Villegas Decl. ¶ 3 Ex. J.)  Plaintiffs recognize that the ADL "is a national, nonprofit organization that works to stop anti-Semitism, discrimination, and bigotry[.]"  (FAC ¶ 45.)  It is simply not accurate for Plaintiffs to suggest that the District excludes organizations with focuses on other religions or religious groups from the District.  Fourth, there is no evidence to support Plaintiffs' belief that the District "lavishes" Muslim students with "benefits" not received by students of other religions.  The text of many of the Action Steps are framed to *update* District resources and recognition of Islam and Muslim culture. This framing strongly suggests that the District sought to make its offerings on par with what it already provides students of other religions.

More fundamentally, Plaintiffs' zero-sum view of who "benefits" from the District's efforts to address Islamophobia and anti-Muslim bullying is not persuasive. The Initiative aims to address the behavior and conduct of "Islamophobia" and "anti-Muslim bullying."  (LiMandri Decl. ¶ 4 Ex. 2; FAC ¶ 30.)  There is nothing inherent in addressing such behavior and conduct that limits any benefit to solely those who are Muslim.  The evil that measures like the Initiative seek to address can harm more than those who are directly targeted.

In this case, the District has sought to address Islamophobia and anti-Muslim by updating certain instructional materials and resources regarding Islam and Muslim culture for all staff and students.  As CAIR persuasively asserts, any benefit from these measures "accrues to all of the students at the School District by learning about the world," including "about the culture of a growing" segment of the Nation.  (ECF No. 36 at 24.)  Even if the District's measures could be construed to provide a "benefit" to Muslim students, the Revised Policy largely blunts Plaintiffs' claims about an unequal benefit or "special treatment" for Muslim students.  The Revised Policy expressly states that: "the District's anti-bullying program is developed to comprehensively address the issue of bullying of all students through the No Place

17cv1054

for Hate program" and "[t]he District's instructional materials are and will continue to be consistent with state standards which address all major world religions in the context of world history and culture  (LiMandri Decl. ¶ 32 Ex. 30.)  Any alleged "benefit" that the Initiative is alleged to have provided Muslim students in the District is presently available on an equal basis.  Accordingly, the Court concludes that Plaintiffs haven not shown a likelihood of success on the merits of their No Aid Clause claim, nor have they have shown a need for preliminary injunctive relief on this basis.

### 3.  Establishment Clause and No Preference Clause Claims

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion[.]"  U.S. const., amend. I.  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  *Larson*, 456 U.S. at 244.  This means that "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs."  *Cty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 590 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014); *see also Gillette v. United States*, 401 U.S. 437, 450 (1971) (the government may not "abandon[] secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor adherents of any sect or religious organization").

In the context of elementary and secondary schools, the values secured by the Establishment Clause are especially important.  "The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools."  *Edwards*, 482 U.S. at 583–84.  Courts "recognize that minors' beliefs and actions are often more vulnerable to outside influence."  *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132,

1144 (9th Cir. 2018) (citing *Lee v. Weisman*, 505 U.S. 577, 593–94 (1991)). "Because children's 'experience is limited,' their 'beliefs consequently are the function of environment as much as of free and voluntary choice.'" *Id.* at 1145–46 (quoting *Sch. Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985), *overruled on other grounds by Agostini v. Felton*, 521 U.S. 203 (1997)). Thus, courts have found Establishment Clause violations when, for example, public schools (1) invite clergy to pray at formal graduation ceremonies, (2) perform daily readings of the Bible or recitations of the Lord's Prayer, (3) post the Ten Commandments in every classroom, or (4) begin school assemblies with prayers. *Lee*, 505 U.S. at 577 (clergy prayer); *Sch. Dist. of Abington Twp.*, 374 U.S. at 203 (Bible readings and Lord's Prayer); *Stone v. Graham*, 449 U.S. 39 (1981) (Ten Commandments); *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759 (9th Cir. 1991) (school assembly prayer).

But "[t]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious." *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring). In the context of public schools, which prepare students to live in a pluralistic society, "the Establishment Clause does not prohibit schools from teaching about religion." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 76 (2d Cir. 2001) (citing *Stone*, 449 U.S. at 42). And the Establishment Clause does "not mean that the Constitution prohibits public schools from making any mention of religion when teaching a secular lesson about pluralism and tolerance." *Skoros v. City of New York*, 437 F.3d 1, 31 (2d Cir. 2006).

With these Establishment Clause principles in mind, the Court turns to Plaintiffs' arguments. Plaintiffs argue that they are likely to succeed on the merits of their Establishment Clause and No Preference Clause claims based on two grounds: (1) the Initiative establishes a religious preference in favor of Islam and (2) the Initiative fails the *Lemon* test. The Court concludes that Plaintiffs have not shown that they are likely to succeed on their Establishment Clause claim on either basis.

### a. Religious Preference Argument

"[W[hen it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon*[]." *Hernandez v. Comm'r*, 490 U.S. 680, 695 (1989) (citing *Larson*, 456 U.S. at 228, *Lemon*, 403 U.S. at 602); *see also Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) ("*Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny, and that laws 'affording a uniform benefit to *all* religions' should be analyzed under *Lemon*." (emphasis in original)). If a government policy grants a denominational preference, the "rule must be invalidated unless it is justified by a compelling governmental interest and unless it is closely fitted to further that interest[.]" *Larson*, 456 U.S. at 247.

Determining whether Plaintiffs are likely to prove an Establishment Clause violation on the ground that the Initiative is a religious preference may "require[] an equal protection mode of analysis." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 540 (1993) (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970)). "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 540; *see also Trump*, 138 S. Ct. at 2434 (Sotomayor, J., dissenting). A government action that "targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Church of Lukumi Babalu Aye, Inc.*, 508 U. S. at 546.

### i. The Initiative Does Not Distinguish Among Religions

Plaintiffs aver that the Initiative violates the Establishment Clause because it

"facially classifies" on the basis of religion to grant a religious preference "under the guise of th[e] anti-bullying program," lacks a compelling government interest, and the Initiative's implementing policies are not narrowly tailored.[21] (ECF No. 26-1 at 13–16.) Focusing on the Initiative[22], Plaintiffs have not shown that it distinguishes among religions to establish a preference for Islam and Muslim students.

The gravamen of Plaintiffs' preference argument is that the Initiative is analogous to the statute invalidated in *Larson v. Valente*, 456 U.S. 228 (1982). *Larson* concerned a Minnesota statute, § 309.515 subd. 1(b), which "impos[ed] certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers[.]" *Id*. at 230. Section 309.515 had at one point exempted all religious organizations from Minnesota's registration requirements, but the Minnesota Legislature subsequently added the fifty per cent rule. *Id*. at 231–32. Recognizing that "no State can 'pass laws which aid one religion' over another," the Supreme Court held that the fifty per cent rule "clearly grants a denominational preference" because it "makes explicit and deliberate distinctions between different religious organizations." *Id*. at 246–47 & n.23.

Despite Plaintiffs' belief that this case is indistinguishable from *Larson*, neither in the FAC, nor in the preliminary injunction motion do Plaintiffs attempt to

---

[21] As a pleading matter, Plaintiffs expressly allege that the Initiative lacks a compelling government interest and it is not narrowly tailored as part of their Free Exercise Clause and Fourteenth Amendment claims—not their Establishment Clause claim. (*Compare* FAC ¶¶ 159–161 (Free Exercise claim allegations) *and id*. ¶¶ 166–68 (Fourteenth Amendment claim allegations) *with id*. ¶¶ 146–155 (Establishment Clause claim).) Notwithstanding the absence of these allegations from Plaintiffs' Establishment Clause claim, the Court will consider Plaintiffs' argument.

[22] Plaintiffs' argument that Defendants have "facially classifie[d] among religions" has shifted throughout the course of the preliminary injunction briefing. Plaintiffs initially asserted that "the Policy [*i.e.*, the *Action Steps*] "facially classifies among religions," thus subjecting the Action Steps to strict scrutiny they could not survive. (ECF No. 26-1 at 13–15.) Faced with Defendants' mootness challenge based on the Revised Policy, Plaintiffs now argue that "[e]ven though the Revised Policy may be facially neutral, Defendants cannot hide behind it" because "it was dictated entirely by *the Initiative* . . . enacted to discriminate in favor of Muslim students." (ECF No 51 at 5 (emphasis added).) Taking Plaintiffs' distinctions at face value, the Court focuses on the Initiative.

undertake a meaningful textual analysis of the Initiative to show or explain how this is so.  (*See generally* FAC; ECF No. 26-1 at 13–14.)  It bears setting forth the text of the Initiative: to "take action to direct the superintendent to bring back to the board a plan to address Islamophobia and the reports of bullying of Muslim students." (LiMandri Decl. ¶ 4 Ex. 2; FAC ¶ 30.)  The Court need not look beyond the FAC to ascertain the meaning of the operative terms.  Plaintiffs define "Islamophobia" as "the 'fear, hatred, or mistrust of Muslims or of Islam.'"  (FAC ¶ 31 (citing American Heritage Dictionary (5th ed. 2017).)  Although the term "bullying" may be susceptible to different definitions, Plaintiffs appear to endorse the United States Department of Health and Human Services' definition: "aggressive behavior that is intentional and that involves an imbalance of power or strength."  (*Id.* ¶¶ 24, 42.)  Based on Plaintiffs' own definitions, the Initiative's focus is not religion, but on conduct and behavior.  Plaintiffs have not argued, nor shown that this conduct or behavior is attributable to a particular religion or faith such that the Initiative's focus on these terms "makes explicit and deliberate distinctions between different religious organizations." *Larson*, 456 U.S. at 246–47 & n.23.  Nor does the Court believe that Plaintiffs would reasonably contend that such behavior or conduct is the province of a particular religion or sect.

As far as the Court can discern, the Initiative's plain text "does not differentiate among sects."  *Hernandez*, 490 U.S. at 695.  Because the Initiative does not draw distinctions on the basis of religion, it would be proper for the Court to proceed to the *Lemon* test.  *Id.* (indicating that if a law does not facially discriminate on the basis of religion, "then the Court applies the three-pronged test announced in *Lemon*[]").

### ii. Plaintiffs' Strict Scrutiny Arguments Are Unavailing

Even if the Initiative triggers the strict scrutiny under which Plaintiffs contend the Initiative "withers" (ECF No. 26-1 at 13), Plaintiffs have not made a clear showing that the Initiative lacks a compelling interest or that the District's measures have not been narrowly tailored.

***Compelling Interest.*** Plaintiffs initially argue that the Initiative lacks a compelling interest characterizing the relevant interest as the District's "amorphous" intention to "eliminat[e] fear faced by children." (ECF No. 26-1 at 14.) Perhaps realizing that this characterization of the relevant interest is not a fair one and in response to CAIR's amicus which highlights the particular dangers bullying may pose for the educational environment (ECF No. 36 at 6–7, 8–9), Plaintiffs concede that "protecting students from bullying [is] a valid concern[.]"[23] (ECF No. 50 at 4.) The Court accepts that addressing bullying of students, including bullying directed at students of a particular background, is a "valid" government interest.[24]

Plaintiffs nevertheless argue that Defendants lacked the requisite basis to make this interest "compelling" in the context of Islamophobia and anti-Muslim bullying. According to Plaintiffs, Defendants have not shown that there is an "actual problem in need of solving." (ECF No. 26-1 at 15.) Specifically, Plaintiffs contend that "there is not a scintilla of credible evidence that 'Islamophobia' . . . runs rampant in District schools," but rather, in Plaintiffs' view, "Defendants have relied solely on specious student surveys and testimonials that CAIR had provided as part of its lobbying for the Initiative." (*Id*.; *see also* ECF No. 50 at 4.) Plaintiffs do not provide evidence or persuasive arguments to support their contentions.

---

[23] As Plaintiffs recognize, California law requires school districts to adopt policies that prohibit religion-based "discrimination, harassment, intimidation and bullying." (ECF No. 26-1 at 2–3 (citing 5 Cal. Code Reg. § 4621).) California law expressly addresses bullying of students as relevant to education. *See* Cal. Educ. Code § 201 (recognizing "an urgent need to prevent and respond to acts of hate violence and bias-related incidents that are occurring at an increasing rate in California's public schools"); Cal. Educ. Code § 234(b) ("It is the policy of the State of California to ensure that all local educational agencies continue to work to reduce discrimination, harassment, violence, intimidation, and bullying. It is further the policy of the state to improve pupil safety at schools and the connections between pupils and supportive adults, schools, and communities.").

[24] Plaintiffs acknowledge that the government has a valid interest in addressing bullying that targets individuals of a particular religion or race. In the FAC, Plaintiffs fault Defendants for their alleged failure to develop initiatives on "anti-Semitism bullying" or "religion-based, Asian American bullying[.]" (FAC ¶¶ 45–49.) Thus, by Plaintiffs' own account, District policies can account for bullying directed at students of a particular background.

Although Plaintiffs allege that the District relied on "prepared student testimony" of Muslim students when it decided to address Islamophobia and anti-Muslim bullying (FAC ¶ 123), evidence substantiating the suggestion of fabricated testimony is entirely absent from the preliminary injunction record. Plaintiffs have not otherwise articulated in their briefing or at oral argument on what concrete basis they believe the reports and testimony by Muslim students on which the District allegedly relied to adopt the Initiative are not credible.

Plaintiffs' challenge to the District's alleged reliance on the CAIR Survey as methodologically flawed is also unpersuasive. (ECF No. 26-1 at 15 n.15.) Based on Plaintiffs' allegations, the Court understands the survey's alleged flaws to be that: (1) the survey used a definition of bullying that they believe is "dissimilar" from the definitions used by HHS or identified in the California Education Code and (2) CAIR "did not distribute a comparative survey to non-Muslim students to validate its findings."[25] (FAC ¶¶ 40, 42–43.) Plaintiffs' motion, however, curiously omits evidence based on which the Court can assess Plaintiffs' assertions. Plaintiffs fail to provide a copy of the CAIR survey and they do not introduce any evidence showing its alleged methodological flaws. Contrary to Plaintiffs' assertions about the CAIR

---

[25] Plaintiffs' allegation that the CAIR survey is not "validated" is inconsistent with Plaintiffs' reliance on two student surveys and reports in the FAC to allege that the District has failed to protect students of other backgrounds. (FAC ¶¶ 45 (the "*ADL Audit*"), 48 (the "*AAPI Task Force Report*").) *See* Anti-Defamation League, *ADL Audit: U.S. Anti-Semitic Incidents Surged in 2016–17* (2017), https://www.adl.org/sites/default/files/documents/Anti-Semitic%20Audit%20Print_vf2.pdf [herein "*ADL Audit*"]; *see* Asian American and Pacific Islander (AAPI) Bullying Prevention Task Force, *Task Force Report* (2014–2016), https://sites.ed.gov/aapi/files/2015/02/AAPI-Bullying-Prevention-Task-Force-Report-2014-2016.pdf [herein "*AAPI Task Force Report*"] Taking without endorsing Plaintiffs' view of the appropriate measure of validation, neither the *AAPI Task Force Report*, nor the *ADL Audit* were "validated" against non-Asians or non-Jewish individuals. The *ADL Audit* is a compilation of nation-wide reports of anti-Semitic incidents from various sources, including "victims, law enforcement and community leaders and evaluated by ADL's professional staff[.]" *ADL Audit*, at 2. More troubling for Plaintiffs' argument, the *AAPI Task Force Report* on which Plaintiffs rely expressly states: "[t]he survey and the listening sessions *did not generate statistically reliable results*, and the reader should not use this information to draw definitive conclusions about bullying of AAPI students as a whole." *AAPI Task Force Report*, at 4 (emphasis added).

survey's flaws then, this is not a case in which "significant, admitted flaws in methodology" undermine the existence of a compelling interest. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009), *aff'd sub nom. Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011). More broadly, Plaintiffs provide no authorities showing that the District would need a validated study of identity-based bullying, or even bullying more generally, in order for District administrators and staff to develop policies to address student reports of such behavior.

Finally, Plaintiffs provide no persuasive explanation for the basic premise underlying their argument that the District lacks a compelling interest: that the District may not take into account Islamophobia and anti-Muslim bullying that occurs outside the District. In opposing Plaintiffs' preliminary injunction motion, the District makes clear that it adopted the Initiative "[i]n the wake of the increased instances of Islamophobia following Donald Trump's election campaign." (ECF No. 32 at 2.) The Court observes that CAIR has offered more detailed insight into this point. (ECF No. 36 at 5–6.) Plaintiffs do not seriously contend that nationwide information about identity-based bullying and harassment is not a relevant consideration. Plaintiffs rely on nationwide surveys of anti-Semitism and bullying of Asian-American students, including religion-based bullying of Asian-American students. (FAC ¶¶ 45–46, 48); *see also ADL Audit*; *AAPI Task Force Report*. The Court is left to wonder what makes Islamophobia and anti-Muslim bullying different. When the Court pressed Plaintiffs at oral argument about why the District cannot take into account national events or reports about Islamophobia and anti-Muslim bullying, Plaintiffs' counsel speculated that such new was "fake news."[26] This speculation by Plaintiffs' counsel is

---

[26] The Supreme Court has alluded to references to Muslims and Islam during the 2016 election campaign. *See Trump*, 138 S. Ct. at 2417 (Roberts, C.J., maj. op.) ("For example, while a candidate on the campaign trail, the President published a 'Statement on Preventing Muslim Immigration' that called for a 'total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on.'"); *id*. ("Then-candidate Trump also stated that 'Islam hates us' and asserted that the United States was 'having problems with Muslims coming into the country.'"). Justice Sotomayor has discussed the campaign in greater

insufficient.

***Narrowly Tailored***.  The Initiative is not self-executing—it requires a plan to address Islamophobia and anti-Muslim bullying.  (LiMandri Decl. ¶ 4 Ex. 2; FAC ¶ 30.)  The Action Steps reflect the District's initial plan to do so and the Revised Policy provides an additional gloss on how the District seeks to address Islamophobia and anti-Muslim bullying.

The Court turns first to a narrow tailoring argument Plaintiffs raise that applies equally to the Action Steps and the Revised Policy.  According to Plaintiffs, "narrow tailoring requires the District to show that the Initiative 'will in fact alleviate' the alleged Islamophobia in a 'direct and material way.'"  (ECF No. 26-1 at 16 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994).)  Plaintiffs argue that the District's plan to address Islamophobia and anti-Muslim bullying fails this requirement because "the District already has an anti-bullying department" and "already has state-mandated policies in place to address student bullying and discrimination."  (*Id*.)  The argument is unpersuasive.  Plaintiffs have submitted a copy of the District's "Administrative Procedure" for addressing "Bullying and Intimidation," which became effective in November 2011 and which the District revised in August 2015.  (LiMandri Decl. ¶ 40 Ex. 38.)  The procedure is silent on religion-based bullying, let alone any type of identity-based bullying.  (*Id*.)  As even Plaintiffs recognize, religion-based bullying is reported to have occurred in the District.  (FAC ¶ 26; ECF No. 26-1 at 3; LiMandri Decl. ¶ 5 Ex. 3, *id.* ¶ 6, Ex. 4.)  It is thus unclear to the Court on what basis Plaintiffs' believe the District's pre-existing bullying procedure limits the measures the District may take to address religion-based bullying.

Second, Plaintiffs argue that the Action Steps are not narrowly tailored because the District failed to consider "constitutionally-mandated" religion-neutral

---

detail.  *See id*. at 2435–49 (Sotomayor, J., dissenting).

alternatives. (ECF No. 26-1 at 16); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007). The Court is at a loss to understand how the District could meaningfully address Islamophobia and anti-Muslim bullying through measures that do not account for the fact that, by Plaintiffs' own definitions, "Islamophobia" and "anti-Muslim bullying" target an individual precisely because he or she is Muslim (or perceived to be). Even taking Plaintiffs' argument on its own terms, however, Plaintiffs do not provide evidence showing that the District failed to consider religion-neutral alternatives or that the Initiative was built "from the ground up with CAIR." (ECF No. 26-1 at 16.)

Turning to the Action Steps, many of them do not in fact use the terms "Islam" or "Muslim," or even refer to any associated religious beliefs or practices. (LiMandri Decl. ¶ 7 Ex. 5 at 55–57; Anjan Decl. ¶ 3 Ex. A at 8–10; FAC ¶¶ 53–55.) There are of course several Action Steps which do refer to Islam and Muslims—steps which the Plaintiffs emphasize to raise the specter of the Initiative's unconstitutionality. (FAC ¶¶ 53–55; LiMandri Decl. ¶ 7 Ex. 5 at 55–57 (highlighting certain Action Steps).) These Action Steps direct the District "to review District calendars to ensure Muslim holidays are recognized," "provide a series of professional development opportunities for staff related to awareness and advocacy for Muslim culture," "provide practical tools for educators regarding Islamic religious practices and accommodations in schools," "provide resources and strategies to support students during the upcoming month of Ramadan," and "review and vet materials related to Muslim culture and history at the Instructional Media Center[.]" (*Id.*)

To the extent Plaintiffs believe that the District's mere references to "Islam" or "Muslims" are an unconstitutional endorsement of a religion, they impute to the Establishment Clause a breadth that is not tenable in a pluralistic society. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 10 (1989) ("Nor have we required that legislative categories make no explicit reference to religion. . . .Government need not resign itself to ineffectual diffidence because of exaggerated fears of contagion of or by

religion[.]"); *see also Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring) ("The endorsement test does not preclude government from acknowledging religion or from taking religion into account in making law and policy.").  Importantly, there is no evidence that the District does not recognize other religious holidays and there is no evidence that the District is not receptive to or lacks instructional materials about other religions and cultural groups.  Without such evidence, the Court cannot conclude that the District's use of the terms "Muslim" and "Islam" is for a purpose other than recognizing that it serves a student population which also includes Muslim students.

More fundamentally, several of the Action Steps which use the terms "Muslim" and "Islam" are entirely consistent with religious accommodations to which, like students of any religious faith, Muslim students are entitled as a matter of government neutrality "in the face of religious differences."[27]  *See Church of God (Worldwide, Texas Region) v. Amarillo Independent Sch. Dist.*, 511 F. Supp. 613, 618 (N.D. Tex. 1981), *aff'd by*, 670 F.2d 46 (5th Cir. 1982).  The District's decision to "ensure" that Muslim holidays were included on the District-wide calendar clearly reflects that such holidays were inadequately recognized beforehand.  There is nothing nefarious about the District taking action to ensure the adequacy of its recognition of such holidays.  And certain Action Steps which aim to increase awareness of "Muslim culture" are consistent with "the entirely nonreligious (*i.e.*, secular) and commendable purpose of exposing students to different cultural attitudes and outlooks."  *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1539 (9th Cir. 1985) (Canby, J., concurring); *see also*

_____

[27] Plaintiffs argue that CAIR "disseminate[s] propaganda to teachers and students, including brochures about Islamic religious practices and Muslim student accommodations."  (ECF No. 26-1 at 5.)  Despite pejoratively referring to the informational materials as "propaganda," the materials Plaintiffs submit are specifically concerned with the rights of students to religious accommodations and providing teachers and administrators with information relevant to provision of such accommodations.  (LiMandri Decl. ¶¶ 13–14 Exs. 11–12.)  It is unclear to the Court how the provision of information on religious accommodations violates the Establishment Clause or how the District could permissibly adopt a policy which limits which students receive such information without in turn classifying students on the basis of their (perceived) religion.

*Lee*, 505 U.S. at 638 (1992) (Scalia, J., dissenting) ("[M]aintaining respect for the religious observances of others is a fundamental civil virtue that government (including the public schools) can and should cultivate[.]")

Even if certain Action Steps could be construed as not being "religion-neutral," the District's Revised Policy precisely aims for the religion-neutrality Plaintiffs believe is constitutionally required for the Initiative's implementing measures to be narrowly tailored. (Anjan Decl. ¶ 6 Exs. E, F; LiMandri Decl. ¶ 32 Ex. 30.) The Revised Policy expressly directs the creation of "[a] calendar of observances" which "shall include holidays of all faiths for the purpose of enhancing mutual understanding and respect among the various religious, ethnic and cultural groups, and to assist staff to be sensitive to such holidays in the scheduling of events." (LiMandri Decl. ¶ 32 Ex. 30.) And the Revised Policy affirms that "[t]he District's instructional materials are and will continue to be consistent with state standards which address all major world religions in the context of world history and culture." (*Id.*) This affirmation is otherwise supported by the record, which shows that the District's materials on Islam and Muslim culture are part of an intercultural set of materials. (Woehler Decl. ¶ 5; Anjan Decl. ¶ 4.) Plaintiffs' narrow tailoring arguments are not persuasive.

### b. The *Lemon* Test

The *Lemon* test primarily governs judicial evaluation of whether a particular government activity violates the Establishment Clause. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971); *Freedom From Religion Found., Inc.*, 896 F.3d at 1149 ("The *Lemon* test remains the dominant mode of Establishment Clause analysis."). In order to pass constitutional muster under the *Lemon* test, the challenged action must satisfy each of three elements: it must (1) have a secular purpose, (2) have a primary effect which neither advances nor inhibits religion, and (3) not foster excessive state entanglement with religion. *Lemon*, 403 U.S. at 612–13; *see also Edwards v. Aguillard*, 482 U.S. 578, 583 (1987) ("State action violates the Establishment Clause

1  if it fails to satisfy any of these prongs."); *Newdow v. Rio Linda Union Sch. Dist.*, 597

2  F.3d 1007, 1076–77 (9th Cir. 2010).

3     Plaintiffs allege that Defendants have violated the Establishment Clause

4  because their "policies, practices, and procedures convey an impermissible,

5  government-sponsored approval of, and preference for, Islam" and the policies

6  "send[] a clear message to Plaintiffs that they are outsiders, not full members of the

7  school and political communities because they are not Muslim[.]" (FAC ¶¶ 149, 152–

8  53.) Plaintiffs further allege that both the Initiative and Defendants' collaboration

9  with CAIR lack a valid secular purpose, have the primary effect of advancing and

10  endorsing a religion and religious practices, and create excessive entanglement with

11  religion. (*Id.* ¶¶ 150–51.) In a similar vein, Plaintiffs allege that Defendants have

12  violated the California Constitution's No Preference Clause because they have

13  "granted preferential treatment to Muslim students because of their religion" and

14  Defendants' relationship with CAIR "conveys a preference for a particular sectarian

15  group[.]" (*Id.* ¶¶ 174–75.) The Court finds that Plaintiffs have not made a clear

16  showing that they are likely to succeed on the merits of these claims based on the

17  *Lemon* test.

18     ***Purpose.*** "Under the first prong of *Lemon*, we consider whether the challenged

19  government act is grounded in a secular purpose." *Vasquez*, 487 F.3d at 1255 (citing

20  *Lemon*, 403 U.S. at 612). To determine "purpose" under the *Lemon* test, the "starting

21  point" is the government policy's "language itself." *Newdow*, 597 F.3d at 1024;

22  *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624

23  F.3d 1043, 1056 (9th Cir. 2010) ("[A] court must, in deciding whether a government

24  action violates the Establishment Clause, read the words of the government

25  enactment."). Evaluation of the government's purpose is not limited to the text of a

26  government policy. "Context is critical when evaluating the government's conduct."

27  *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 958–59, 971–75 (9th Cir. 2011).

28  And so, "[i]n evaluating purpose, we regularly take into account the statements of

government officials involved in a policy's enactment." *Freedom From Religion Found., Inc.*, 896 F.3d at 1149.  Generally, in assessing the purpose, courts "must defer to the government's articulation of a secular purpose" so long as the articulation is sincere. *Newdow*, 597 F.3d 1019.

Plaintiffs argue that "the Initiative's purpose is sectarian" because its "plain language makes it obvious that Defendants have implemented the Initiative for the unlawful purpose of favoring a particular religious sect."  (ECF No. 26-1 at 17.) Plaintiffs do not actually point to any language in the Initiative that establishes a religious purpose.  The Court has already identified the Initiative's textual focus on "Islamophobia" and the "bullying of Muslim students" and discussed why these terms are not religious. (LiMandri Decl. ¶ 7 Ex. 5 at 55–57; Anjan Decl. ¶ 3 Ex. A at 8–10; FAC ¶¶ 53–55.)  The District has also acknowledged that it adopted the Initiative to address Islamophobia and anti-Muslim bullying in the wake of the 2016 presidential election.  This purpose is corroborated by other evidence Plaintiffs have submitted. (LiMandri Decl. ¶ 16 Ex. 14 ("In the heat of the 2016 campaign season, San Diego Unified board members voted to put together a plan to stop Islamophobia in schools.").)  The Court credits the District's statement as sincere and plausible given the Initiative's express text and presentation regarding the Action Steps, which expressly frames the Action Steps in relation to Islamophobia and anti-Muslim bullying.  *See Newdow*, 597 U.S. at 1035 (noting that courts should be "reluctant to attributable unconstitutional motives" when there is "a plausible secular purpose" (citing *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983)).

Defendants' approval of the Revised Policy should clear any remaining doubt about the District's secular purpose.  "It is well-established that governmental actions primarily aimed at avoiding violations of the Establishment Clause have a legitimate secular purpose." *Vasquez*, 487 F.3d at 1256; *Vernon*, 27 F.3d at 1397.  Although Plaintiffs seek to discount the Revised Policy as a "religious gerrymander" built around CAIR (ECF No. 51 at 8, 16), Plaintiffs' argument is unsupported by the

preliminary injunction record. The District has offered credible evidence that its post-Revised Policy interactions with CAIR sought to address the damage caused by the backlash to the Initiative and this lawsuit. (Anjan Decl. ¶ 8 Ex. K; Sharp Decl. ¶¶ 4–5; Anjan Decl. ¶ 9; Santos Decl. ¶ 4.) CAIR's involvement through the IRCC is otherwise consistent with the District's secular purpose in adopting the Revised Policy.

*Primary Effect.* "The second prong of *Lemon* bars governmental action that has the 'principal or primary effect' of advancing or disapproving of religion." *Vasquez*, 487 F.3d at 1256 (quoting *Lemon*, 403 U.S. at 612). Governmental action has the primary effect of advancing or disapproving of a religion if it is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir. 1994).

The sole argument Plaintiffs advance for why the Initiative's primary effect advances religion is that "the Initiative sends a message to Plaintiffs—as nonadherents of Islam—that they are outsiders, not full members of the school community." (ECF No. 26-1 at 17; *see also* Hasson Decl. ¶¶ 7–12; He Decl. ¶¶ 7–8, 12–19, 23, 26, 28; Hu Decl. ¶¶ 7–12; Steel Decl. ¶¶ 7–12; Velazquez Decl. ¶¶ 7–12; *see also* FAC ¶ 120 ("Plaintiffs perceive the [] Initiative as the [] District's endorsement of Islam and a rejection of other religions[.]").)[28] Plaintiffs' argument

---

[28] The majority of the declarations submitted on the Individual Plaintiffs' behalf are virtually undifferentiated, save for the Plaintiffs' names, and repeat the same thirteen paragraphs in boilerplate fashion. (*See, e.g.*, Hasson Decl. ¶¶ 1–13; Hu Decl. ¶¶ 1–13; Steel Decl. ¶¶ 1–13; Velazquez Decl. ¶¶ 1–13.) The boilerplate nature of the declarations undermines their credibility. *See Orantes-Hernandez v. Gonzales*, 504 F. Supp. 2d 825, 848–49 (C.D. Cal. 2007) (finding a set of declarations not to be "entirely credible" because "[m]ost of these declarations are written in nearly identical boilerplate language."). Plaintiff He's declaration is far more detailed, but its credibility is undermined by the fact that it is undated (*i.e.*, "[e]xecuted in San Diego, California on January XX, 2018") and incomplete: "[i]n DATE, I emigrated from WHERE. I have lived in the United States for NUMBER years." (He Decl. ¶ 2.) Even so, the Court has otherwise considered

is thus admittedly about Plaintiffs' subjective views about the Initiative.

Courts, however, do not employ a subjective test for assessing the primary effect of a challenged government activity. In the context of government activity affecting curriculum, the express rejection of a subjective test has particular force. "If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself." *Brown*, 27 F.3d at 1378–79. The Court sees no reason to distinguish this rationale in the school classroom curriculum context from trainings and resources provided to teachers, both of which are elements of the Initiative and its implementing measures. Because a subjective test does not govern, primary effect is assessed "from the point of view of a *reasonable* observer who is 'informed . . . [and] familiar with the history of the government practice at issue.'" *Vasquez*, 487 F.3d at 1256 (quoting *Brown*, 27 F.3d at 1378) (emphasis added). Plaintiffs do not argue nor present evidence regarding how an objective or reasonable observer would perceive the Initiative as an endorsement of Islam and Muslims and rejection of other religions.

Finally, to the extent Plaintiffs believe that the Initiative's focus on Islamophobia and anti-Muslim bullying primarily advances religion because it coincides with a focus of CAIR or because the District has adopted educational and awareness measures that account for religion, the Court rejects this argument. In addition to the reasons the Court has set forth in analyzing Plaintiffs' narrow tailoring argument, there is "no reason to conclude" that the Initiative "serves an impermissible religious purpose simply because" its focus "coincide[s] with the beliefs of certain religious organizations." *See Bowen v. Kendrick*, 487 U.S. 589, 605 (1988). Plaintiffs have not made a showing on the primary effect prong.

the declaration's averments.

17cv1054

*Entanglement*.  When assessing the third *Lemon* prong of excessive entanglement, courts examine "the character and purposes of the benefited institutions, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Agostini v. Felton*, 521 U.S. 203, 206 (1997) (internal quotation marks omitted).  "Cases in which the Supreme Court has found excessive . . . entanglement often involve state aid to organizations or groups affiliated with religious sects, such as parochial schools." *Cammack*, 932 F.2d at 781 (citations omitted).

The central feature of Plaintiffs' argument that the Initiative fosters excessive entanglement with religion is CAIR.  Plaintiffs argue that Defendants have "delegate[d] government power to a religious organization," *i.e.*, CAIR, and relatedly, Defendants "give sectarian activists exclusive access into classrooms to proselytize to schoolchildren[.]"  (ECF No. 26-1 at 18.)  Based on the assertion that "[l]ittle analysis is needed" (*id.*), Plaintiffs fail to identify any evidence in the record substantiating these claims of excessive entanglement.

Viewing the preliminary injunction record as a whole, the Court concludes that Plaintiffs have failed to show excessive entanglement with religion on the basis of the District's relationship with CAIR.  As the Court has noted, Defendants have eliminated the possibility of a formal partnership between the District and CAIR to address Islamophobia and anti-Muslim bullying.  (LiMandri Decl. ¶ 32 Ex. 30.) CAIR's role is largely limited to the IRCC on terms that apply equally to any other community organization.  (ECF No. 32 at 7; Anjan Decl. ¶ 12; Santos Decl. ¶ 7; Villegas Decl. ¶ 5.)  Moreover, to the extent CAIR has provided and suggests resources for the District on Islamophobia and anti-Muslim bullying, these resources are subject to review by the District and/or the ADL.  (LiMandri Supp. Dec. ¶¶ 5–6 Exs. 55–56.)  Plaintiffs have simply not substantiated their belief that CAIR has unfettered and preferential access to the District's classrooms and students.  Accordingly, the Court concludes that Plaintiffs are not likely to succeed on the merits

17cv1054

of their Establishment Clause claim.

**B.    Irreparable Harm**

By assuming that they are likely to succeed on the merits of their First Amendment claims, Plaintiffs assert that they have shown the irreparable harm necessary for the issuance of injunctive relief.  (ECF No. 26-1 at 20; ECF No. 51 at 11.)  Plaintiffs' argument assumes too much.  "Irreparable harm is presumed if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights always constitutes irreparable harm." *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1281 (N.D. Cal. 2014) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011)).  And it is true that "[t]he loss of First Amendment freedoms, for even minimal periods of time, . . . constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012); *see also Doe v. Harris,* 772 F.3d 563, 583 (9th Cir. 2014) ("[A] colorable First Amendment claim is irreparable injury sufficient to merit the grant of [preliminary injunctive] relief.").  But to premise irreparable harm on this basis, Plaintiffs would need to show that they have lost or are likely to lose rights secured by the Establishment Clause.  Plaintiffs have not made this showing.  Thus, Plaintiffs fail to show irreparable harm on the only basis they advance.[29]

**C.    Balance of Hardships and Public Interest**

"To qualify for injunctive relief, the plaintiffs must establish that 'the balance of the equities tips in [their] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  A court has the "duty . . . to balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

---

[29] Plaintiffs contend more broadly, that "no further showing of irreparable harm is necessary when an *alleged* deprivation of a constitutional right is involved."  (ECF No. 51 at 11 (emphasis added).)  This contention is misguided.  Mere allegations are insufficient for a plaintiff to meet his or her burden at the preliminary injunction stage.  Holding otherwise would divest preliminary injunctive relief of its "extraordinary" nature based on a plaintiff's pleading decisions.

Plaintiffs argue that the equities warrant preliminary injunctive relief because they have raised serious First Amendment claims. (ECF No 26-1 at 21; ECF No. 51 at 14–15.) A "colorable First Amendment claim" may "raise the specter of irreparable injury, but simply raising a serious claim is not enough to tip the hardship scales." *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007). But the Plaintiffs have not raised a serious or colorable First Amendment claim. Therefore, they have not shown that the equities tip in their favor on this basis.

Plaintiffs further contend that the public interest warrants preliminary injunctive relief because "the substantial controversy surrounding CAIR's presence in a public school district illustrates the extraordinary public interest . . . to keep a divisive force like CAIR out of public schools." (ECF No. 51 at 16; *see also* FAC ¶ 1.) That Plaintiffs view CAIR as divisive is not a sufficient basis for this Court to enjoin the Defendants from interacting with CAIR. "Although political divisiveness has been considered in establishment clause cases, it has never been relied upon as an independent ground for holding a government practice unconstitutional." *Cammack*, 932 F.2d at 781 (internal citations and quotations omitted). "Because [Plaintiffs] lack any other basis for their Establishment Clause claim, any purported political divisiveness caused by" CAIR's involvement with the District to address Islamophobia and anti-Muslim bullying is an insufficient basis to issue the preliminary injunctive relief Plaintiffs seek. *See Brown*, 27 F.3d at 1383.

On the other hand, the equities and the public interest weigh against the issuance of the preliminary injunction Plaintiffs request. In this case, Plaintiffs take issue with the District's decision to address Islamophobia and anti-Muslim bullying and the District's implementation measures. "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and constraint." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Although courts must not "fail[] to apply the First Amendment's mandate in our educational systems where essential to safeguard the fundamental values" it protects, "[c]ourts do not and cannot

intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Id*. Although Plaintiffs have invoked the First Amendment and the No Aid Clause to challenge Defendants' conduct, they have not shown a likelihood of success on these claims. Plaintiffs' request for injunctive relief otherwise seeks judicial intervention in "matters which the courts ought to entrust very largely to the experienced officials who superintend our Nation's public schools." *Sch. Dist. of Abington Twp.*, 374 U.S. at 300; *Cal. Parents for the Equalization of Educ. Materials v. Noonan*, 600 F. Supp. 2d 1088, 1116 (E.D. Cal. 2009). In the absence of a clear showing that the Initiative and its implementation directly and sharply implicate basic constitutional values, the Court cannot grant the extraordinary remedy Plaintiffs request.

## CONCLUSION & ORDER

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for a preliminary injunction in its entirety. (ECF No. 26.)

**IT IS SO ORDERED.**

**DATED: September 25, 2018**

**Hon. Cynthia Bashant**
**United States District Judge**